**No. 2015-1946**

IN THE

# UNITED STATES COURT OF APPEALS
### FOR THE FEDERAL CIRCUIT

WI-FI ONE, LLC,

*Appellant,*

v.

BROADCOM CORPORATION,

*Appellee.*

*Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Case No. IPR2013-00636*

## NON-CONFIDENTIAL JOINT APPENDIX

G. Donald Puckett
NELSON BUMGARDNER PC
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
(817) 377-9111

Douglas A. Cawley
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
(214) 978-4972

Peter J. Ayers
LEE & HAYES PLLC
11501 Alterra Parkway, Suite 450
Austin, TX 78758
(512) 605-0252

*Attorneys for Appellant
Wi-Fi One, LLC*

Dominic E. Massa
Katie M. Saxton
Kevin A. Goldman
Zachary P. Piccolomini
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

*Attorneys for Appellee
Broadcom Corporation*

## Table of Contents

| Document Title | Page Range |
|---|---|
| Final Written Decision (Paper No. 60) | A1–A37 |
| United States Patent No. 6,424,625 | A38–A57 |
| [SEALED] Motion for Additional Discovery (Paper No. 11) *Pages A0064 and A0068 contain confidential material.* | A62–A72 |
| [PUBLIC] Motion for Additional Discovery (Paper No. 13) | A73–A83 |
| [REDACTED] Petitioner's Opposition to Motion for Additional Discovery (Paper No. 16) | A84–A93 |
| [SEALED] Petitioner's Opposition to Motion for Additional Discovery (Paper No. 17) *Pages A0098 and A0099 contain confidential material.* | A94–A103 |
| Decision on Motion for Discovery (Paper No. 20) | A104–A120 |
| Patent Owner's Request for Rehearing (Paper No. 23) | A121–A129 |
| Decision on Request for Rehearing (Paper No. 24) | A130–A135 |
| Decision on Institution of Inter Partes Review (Paper No. 25) | A136–A157 |
| Excerpts from [SEALED] Patent Owner Response (Paper No. 34) *Pages A0169 and A0170 contain confidential material.* | A165–A178, A204–A206 |
| Excerpts from [REDACTED] Patent Owner Response (Paper No. 35) | A221, A228–A242, A266–A271 |
| Excerpts from Petitioner's Reply to Patent Owner Response (Paper No. 45) | A284, A287–A290 A297–A299 |
| Patent Owner's Request for Rehearing of Final Written Decision (Paper No. 64) | A306–A323 |
| Decision on Request for Rehearing (Paper No. 65) | A324–A333 |
| Notice of Appeal (Paper No. 66) | A334–A340 |
| Certified List, Case No. IPR2013-00636 | A350–A354 |
| Excerpts from Petition for Inter Partes Review of U.S. Patent 6,424,625 (Paper No. 3) | A358, A361–A362 |

| Document Title | Page Range |
|---|---|
| Excerpt from Patent Owner's Motion to Amend (Paper No. 36) | A426–A427 |
| Excerpts from Record of Oral Hearing (Paper No. 59) | A556 |
| Excerpts from Ex. 1003 – Diplomarbeit Hettich | A609 |
| Excerpts from Ex. 1006 – Bims Declaration | A738–A741, A763–A765 |
| Excerpts from Ex. 1007 – Certified Translation of Hettich Thesis | A795–A796, A802, A826–A827 A831–A832 |
| Excerpts from Ex. 1013 – 625 Patent Prosecution History Oct 31 2001 | A1190–A1191, A1194 |
| Ex. 1017 - Declaration of David Djavaherian<br>*Pages A1447 and A1448 contain confidential material.* | A1446–A1448 |
| Excerpts from Ex. 1022 - Bims Reply Declaration | A1665–A1667 |
| Ex. 2001 - PO's Request for Production | A1671–A1678 |
| Excerpts from Ex. 2005 - Form 10-Q SEC Filing | A1879 |
| Ex. 2007 - Email Stream 06-04-2010 | A1913–A1915 |
| Ex. 2009 - EC Complaint<br>*Pages A1923 to A1959 contain confidential material.* | A1923–A1959 |
| Ex. 2016 – D-Link Order | A2089–A2092 |
| Excerpts from Ex. 2018 - Final Judgment Pursuant to FRCP 54(b) | A2102 |
| Excerpts from Ex. 2020 - Declaration of Robert Akl, D.Sc. in Support of Patent Owner's Response | A2106, A2136–A2137 A2139–A2142 |
| Excerpts from Petitioner's Oral Argument Demonstratives (Paper No. 54) | A2838 |

**Confidential Material Omitted**

The material omitted on pages A88, A98 and A1447-48 describes the commercial relationship between Broadcom and the Texas Defendants. The material omitted on pages A64, A68, A75, A79, A89, A99, A169-170, A232-33 and A1924-59 describes a nonpublic regulatory action.

ii

Trials@uspto.gov
571-272-7822

Paper 60
Entered: March 6, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

—————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

—————

BROADCOM CORPORATION,
Petitioner,

v.

WI-FI ONE, LLC,
Patent Owner.

—————

Case IPR2013-00636
Patent 6,424,625 B1

—————

Before KARL D. EASTHOM, KALYAN K. DESHPANDE, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges*.

CLEMENTS, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

**A0001**

IPR2013-00636
Patent 6,424,625 B1

## I.    INTRODUCTION

Broadcom Corporation ("Petitioner") filed a Petition requesting *inter partes* review of claim 1 of U.S. Patent No. 6,424,625 (Ex. 1001, "the '625 patent"). Paper 3 ("Pet."). Telefonaktiebolaget L. M. Ericsson[1] ("Patent Owner") filed an election to waive its Preliminary Response. Paper 19. On March 10, 2014, we instituted an *inter partes* review of claim 1on certain grounds of unpatentability alleged in the Petition. Paper 25 ("Dec. to Inst.").

After institution of trial, Patent Owner filed a Patent Owner Response (Paper 34, "PO Resp.") and a Motion to Amend (Paper 36, "Mot. to Amend"). Petitioner filed a Reply (Paper 45, "Pet. Reply") and an Opposition to Patent Owner's Motion to Amend (Paper 44, "Opp. to Mot. to Amend"). Patent Owner filed a Reply to Petitioner's Opposition to its Motion to Amend. Paper 47 ("PO Reply"). Oral hearing was held on December 8, 2014.[2]

The Board has jurisdiction under 35 U.S.C. § 6(c). This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Petitioner has shown, by a preponderance of the evidence, that claim 1 of the '625 patent is unpatentable. Petitoner's Motion to Amend is *denied*.

---

[1] On July 11, 2014, Patent Owner filed an Updated Mandatory Notice indicating that the '215 patent had been assigned to Wi-Fi One, LLC, and that Wi-Fi One, LLC and PanOptis Patent Management, LLC were now the real parties-in-interest. Paper 38.

[2] A transcript of the oral hearing is included in the record as Paper 59.

2

**A0002**

IPR2013-00636
Patent 6,424,625 B1

## A. Related Proceedings

Petitioner and Patent Owner indicate that the '625 patent is involved in a case captioned *Ericsson Inc. v. D-LINK Corp.*, Civil Action No. 6:10-cv-473 (E.D. Tex.) ("D-Link Lawsuit"). Pet. 1–2; Paper 6, 1. Patent Owner also identifies an appeal at the Federal Circuit captioned *Ericsson Inc. v. D-LINK Corp.*, Case Nos. 2013-1625, -1631, -1632, and -1633. Paper 6, 1. Petitioner also filed two petitions for *inter partes* review of related patents: IPR2013-00601 (U.S. Patent No. 6,772,215) and IPR2013-00602 (U.S. Patent No. 6,466,568). Pet. 2.

## B. The '625 patent

The '625 patent relates generally to Automatic Repeat Request (ARQ) techniques for transferring data in fixed/wireless data networks. Ex. 1001, 1:7–9. ARQ techniques commonly are used in data networks to ensure reliable data transfer and to protect data sequence integrity. *Id.* at 1:13–15. The integrity of data sequences normally is protected by sequentially numbering packets and applying certain transmission rules. *Id.* at 1:20–22. By doing so, the receiver receiving the packets can detect lost packets and thereby request that the transmitter retransmit the affected data packets. *Id.* at 1:15–20. According to the '625 patent, there were three main ARQ schemes: Stop-and-Wait; Go-Back-N; and Selective Reject. *Id.* at 1:23–25. All three provide a mechanism for transferring packets to a receiver in a data network in an appropriate order. *Id.* at 1:25–27.

Normally, it is desirable to transfer all packets without data loss. *Id.* at 3:46–47. Sometimes, however, sending significantly

3

**A0003**

IPR2013-00636
Patent 6,424,625 B1

delayed packets provides no benefit—e.g., where the delay causes the information in the packets to become outdated and therefore useless to the receiver. *Id.* at 3:47–51. Examples of delay-sensitive applications are, e.g., telephony, video conferencing, and delay-sensitive control systems. *Id.* at 3:51–53. According to the '625 patent, prior art ARQ methods did not recognize and allow for situations where data packets have a limited lifetime, and therefore, fail to minimize bandwidth usage by not sending (or resending) significantly delayed or outdated data packets. *Id.* at 4:9–13.

To address these issues, the '625 patent discloses an ARQ technique that minimizes bandwidth usage by accounting for data packets that have an arbitrary but limited lifetime. *Id.* at 4:16–19. Exemplary embodiments of the invention include enhanced "Go-Back-N" and "Selective Reject" techniques that discard outdated data packets. *Id.* at 4:21–25. In an exemplary embodiment of the invention, the progress of a bottom part of a sender window of the transmitter is reported to the receiver in order to allow the receiver to properly skip packets which do not exist anymore because they have been discarded. *Id.* at 5:15–21. Thus, the receiver can be commanded to skip or overlook the packets that have been discarded or, in other words, to release any expectation of receiving the packets that have been discarded. *Id.* at 5:22–27. In the case where the transmitter discards a packet, it orders the receiver to accept the next packet by setting a Receiver Packet Enforcement Bit ("RPEB") in the ARQ header of the next packet and sending the packet to the receiver. *Id.* at

4

**A0004**

IPR2013-00636
Patent 6,424,625 B1

5:28–32.  When the receiver receives the packet, the RPEB will cause the receiver to accept the packet.  *Id.* at 5:32–33.

Figure 8 is reproduced below.



FIG. 8

Figure 8 shows ARQ packet 810 with ARQ header 812 and data portion 818.  *Id.* at 5:33–35.  Header 812 includes RPEB 814 and k-bit sequence number N(S) 816.  *Id.* at 5:35–37.  RPEB 814 may be used in a variety of situations.  *Id.* at 5:41–43.  For example, if a NACK is sent by a receiver, received by the transmitter, and is valid for one discarded data packet, then the next data packet to be retransmitted can have RPEB set to TRUE.  *Id.* at 5:43–48.  In another example, if a retransmission timer expires and one or more data packets have been discarded, the next incoming data packet to be transmitted (or the first data packet to be retransmitted) can have RPEB set to TRUE.  *Id.* at 5:49–53.  If RPEB is TRUE and the difference between the sequence number and the Expected Sequence Number (ESN) of the next packet to be received is less than the window size (i.e., half the maximum sequence number), the packet will be accepted and forwarded to a higher layer (as long as the data in the packet is also correct).  *Id.* at 5:62–63, 6:32–36.  In this way, the various embodiments of the invention increase throughput of a communications system using ARQ packets by discarding outdated packets.  *Id.* at 9:60–62.

5

IPR2013-00636
Patent 6,424,625 B1

### C. Illustrative Claim

Claim 1, the sole challenged claim, is reproduced below:

1.      A method for discarding packets in a data network employing a packet transfer protocol including an automatic repeat request scheme, comprising the steps of:

a transmitter in the data network commanding a receiver in the data network to a) receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet and b) release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet; and

the transmitter discarding all packets for which acknowledgment has not been received, and which have sequence numbers prior to the at least one packet.

### D. Prior Art Supporting the Instituted Grounds

The following prior art was asserted in the instituted grounds:

| | | | |
|---|---|---|---|
| Garrabrant | US 5,610,595 | Mar. 11, 1997 | Ex. 1002 |
| Andreas Hettich, "Development and performance evaluation of a Selective Repeat-Automatic Repeat Request (SR-ARQ) protocol for transparent, mobile ATM access" (April 17, 1996) (diploma paper, Aachen Tech. University)("Hettich") | | | Ex. 1003 |
| Walke | DE 19543280 | May 22, 1997 | Ex. 1004 |
| Hettich (English language translation)[3] | | | Ex. 1007 |
| Walke | DE 19543280 (English translation)[4] | May 22, 1997 | Ex. 1008 |

---

[3] All references in this decision to "Hettich" are to the English translation (Ex. 1007) of the German thesis.
[4] All references in this decision to "Walke" are to the English translation (Ex. 1008) of the German patent publication.

6

**A0006**

IPR2013-00636
Patent 6,424,625 B1

### E. The Instituted Grounds of Unpatentability

The following table summarizes the challenges to patentability on which we instituted *inter partes* review:

| Reference | Basis |
|-----------|-------|
| Garrabrant | § 102 |
| Hettich | § 102 |
| Walke | § 103 |

## II.    ANALYSIS

### A.  35 U.S.C. § 315(b)

Patent Owner argues that "Petitioner is subject to the 35 U.S.C. § 315(b) bar as a privy to the D-Link Defendants, and because the D-Link Defendants are real parties-in-interest to this action, despite Petitioner's failure to designate them as such under 35 U.S.C. § 312(a)(2)." PO Resp. 8–9. According to Patent Owner, Petitioner is in privity with defendants named in the D-Link Lawsuit (*Ericsson Inc. v. D-Link Corp.*, 6:10-cv-473) because, *inter alia*, "[Petitioner] has an indemnity relationship with Dell and Toshiba." *Id.* at 9–12. Patent Owner also argues that the defendants named in the D-Link Lawsuit (the "D-Link Defendants") are real parties-in-interest to this proceeding because Petitioner has a "substantive legal relationship with at least Dell and Toshiba," Petitioner used the same prior art references as the D-Link Defendants, and the Petition was filed after the D-Link Defendants abandoned their invalidity case regarding the '625 patent in the D-Link Lawsuit. *Id.* at 12–15.

7

**A0007**

IPR2013-00636
Patent 6,424,625 B1

Petitioner counters that "[Patent] Owner has raised this identical argument twice, and failed each time," and that "[t]his third attempt relies on exactly the same arguments [Patent] Owner made to this Board and the Federal Circuit and should be rejected for the same reasons." Pet. Reply 1. Petitioner continues that, "[Patent] Owner offers no new reason whatsoever for this Board to reverse its prior decision that [Patent] Owner's proferred 'evidence' and legal authorities fail to amount to anything more than 'speculation' or 'a mere possibility' that [Petitioner] is in privity with the D-Link Defendants or that the D-Link Defendants are real parties-in-interest." *Id.* We find Petitioner's arguments persuasive.

Patent Owner's arguments and evidence are not different substantively from the arguments and evidence presented in its Motion for Additional Discovery (Paper 11). The arguments and evidence are unpersuasive for same reasons explained in our Decision on Patent Owner's Motion for Additional Discovery (Paper 20), which we adopt and incorporate by reference.

### B. Claim Construction

In an *inter partes* review, claim terms in an unexpired patent are interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b); *see also In re Cuozzo Speed Technologies, LLC*, No. 2014-1301, 2015 WL 448667, at *5–*8 (Fed. Cir. Feb. 4, 2015) ("Congress implicitly adopted the broadest reasonable interpretation standard in enacting the AIA," and "the standard was properly adopted by PTO regulation."). Under the broadest reasonable

8

**A0008**

IPR2013-00636
Patent 6,424,625 B1

interpretation standard, claim terms are given their ordinary and customary meaning as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). An inventor may rebut that presumption by providing a definition of the term in the specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). In the absence of such a definition, limitations are not to be read from the specification into the claims. *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

### 1. Preamble

Petitioner proposes that the preamble of claim 1 should not be construed to limit claim 1. Pet. 17–18. Specifically, Petitioner argues that the terms used in the preamble are not later referred to or necessary to understand the body of claim 1, and that the preamble merely states the purpose or intended use of the invention. *Id.* at 17. Petitioner further argues that, during prosecution of the '625 patent, the Patent Owner did not rely on the preamble to distinguish the prior art. *Id.* at 18.

"In general, a preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)).

9

**A0009**

IPR2013-00636
Patent 6,424,625 B1

On this record, because claim 1 defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention, we agree that the preamble does not limit claim 1.

### 2. "commanding"

Petitioner argues that "commanding" should be construed to mean "an instruction represented in a control field to cause an addressed device to execute a specific control function." Pet. 18–19 (emphasis and internal quotation marks omitted). Petitioner's proposed construction is similar to the definition of "command" from the *IEEE Dictionary*. Pet. 19 n.3 (citing Ex. 1011, 214–215). Petitioner argues that this construction is consistent with the claims and specification of the '625 patent, which describes the commanding step being carried out by an enforcement bit ("RBEP bit"). *Id.* (citing Ex. 1001, Abstract, claim 3). Petitioner argues that the definition proposed by Patent Owner in the Texas Litigation was overly broad because one of ordinary skill would not understand a packet to be a command to receive simply because the receiver receives it. Pet. 19–20 (citing Ex. 1006 ¶ 38).

The '625 patent states that, "the receiver can be *commanded* to skip or overlook the packets which have been discarded, or in other words, to release any expectation of receiving the packets which have been discarded." Ex. 1001, 5:22–25 (emphasis added). The '625 patent further explains that, "[i]n the case where the transmitter discards a packet, it orders the receiver to accept the next packet, by setting a certain Receiver Packet Enforcement Bit (RPEB) in the ARQ

10

**A0010**

IPR2013-00636
Patent 6,424,625 B1

header of the next packet and sending the packet to the receiver." *Id.* at 5:28–32. The result is that, "[w]hen the receiver receives the packet, the RPEB bit will cause the receiver to accept the packet." *Id.* at 5:32–33. Thus, not every received packet "commands" the receiver to perform the rest of the claimed limitation; only a packet whose RPEB bit is set "commands" the receiver to do so. Moreover, Petitioner's proposed construction is consistent with how a person of ordinary skill in the art would have understood the term at the time that the '625 patent was filed. *See* Ex. 1011, 214–215. Accordingly, in the Decision to Institute, we construed "commanding" to mean "an instruction represented in a control field to cause an addressed device to execute a specific control function." Dec. to Inst. 8–9.

Patent Owner argues that this construction "does not represent the broadest reasonable construction" (PO Resp. 19) because it "improperly imports limitations from the specification" by reciting "represented in a control field" (*Id.* at 20). According to Patent Owner, the broadest reasonable interpretation of "commanding" is "exercising a dominating influence." *Id.* at 19–20.

Patent Owner's proposed construction relies heavily on extrinsic evidence in the form of a definition from http://www.merriam-webster.com. Patent Owner does not even attempt to establish that this definition is contemporaneous with the effective filing date of the '625 patent. Nevertheless, to the extent that "an instruction represented in a control field" incorporates a limitation from the Specification, we modify our construction to clarify that the command need not be in any particular format, such as the RPEB bit

11

**A0011**

IPR2013-00636
Patent 6,424,625 B1

of the preferred embodiment; it need only cause an addressed device to execute a specific control function. Accordingly, we construe "commanding" to mean "causing an addressed device to execute a specific control function."

### C. Claim 1 – Anticipation by Garrabrant

Petitioner argues that claim 1 is unpatentable under 35 U.S.C. § 102(b) as anticipated by Garrabrant. Pet. 28–37. In support of this ground of unpatentability, Petitioner provides detailed explanations as to how each claim limitation is disclosed by Garrabrant, and relies upon the Declaration of Dr. Harry Bims (Ex. 1006). *Id.* (citing Ex. 1006 ¶¶ 47–70).

Patent Owner argues that claim 1 is not anticipated by Garrabrant because Garrabrant does not disclose (1) "commanding a receiver to . . . receive," as recited in claim 1; (2) "commanding a receiver to . . . release," as recited in claim 1; and (3) "discarding all packets for which acknowledgment has not been received, and which have sequence numbers prior to the at least one packet," as recited in claim 1. PO Resp. 20–37.

Upon consideration of the parties' contentions and supporting evidence, we determine that Petitioner has not demonstrated, by a preponderance of the evidence, that claim 1 is anticipated by Garrabrant.

#### *Garrabrant (Exhibit 1002)*

Garrabrant describes a method and apparatus for transmitting data in a packet radio communication system having data sources, destinations, and intermediate repeaters. Ex. 1002, Abstract.

12

**A0012**

IPR2013-00636
Patent 6,424,625 B1

According to a packet protocol, a sequence index is used to prevent
duplicate packets from being received by requiring that the sequence
number fall within a sequence number window at each device. *Id.*
The sequence number window is incremented each time a packet is
received. *Id.* The sequence number also is used to cause the
retransmission of packets that are lost, at which time the sequence
number window in the devices that are affected are reset to allow
transmission of the lost packet. *Id.*

Figure 7A is reproduced below.



*Fig. 7A*

Figure 7A illustrates a window used with the packet radio
communication system of the '625 patent according to the protocol of
the '625 patent before the transmission of a message. *Id.* at 9:9–13.
The window has circle 140 with sequence numbers on the
circumference of the circle representing the possible values that can
be contained in a set of possible sequence numbers. *Id.* at 9:13–16.
Some predetermined fraction of the set of possible sequence numbers
constitutes the set of sequence numbers in "valid" window 142, and

13

A0013

IPR2013-00636
Patent 6,424,625 B1

the set of remaining possible sequence numbers constitutes the set of sequence numbers in "rejection" window 144. *Id.* at 9:20–24.

When the message source does not receive a response ("UA") acknowledging receipt of the transmitted message, the message is retransmitted for a certain predetermined number of times. *Id.* at 10:4–8. A source unit and a destination unit will allow as many messages as there are in "valid" window 142 to become lost while still maintaining synchronization. *Id.* at 10:15–17.

Figures 8A and 8B, reproduced below, show what happens if five packets are lost. *Id.* at 10:17–18.



Fig. 8A                    Fig. 8B

Figure 8A illustrates rejection window 160 in circle set of acceptable sequence numbers 162 at a destination unit of the packet radio communication system *before* the rejection window is updated in response to the receipt of a "lost" message. *Id.* at 10:18–24. Figure 8B illustrates rejection window 170 in circle set of acceptable sequence numbers 172 at the destination unit *after* the rejection window is updated in response to the receipt of a "lost" message. *Id.* at 10:24–28. In Figure 8A, it is assumed that out of 8 packets sent,

14

**A0014**

IPR2013-00636
Patent 6,424,625 B1

packets 0 and 1 were successfully received to define "valid" window 164 and packets 2 through 6 were lost. *Id.* at 10:28–30. As a result, "valid" window 164 did not advance further. *Id.* at 10:30–32. Each time a packet was transmitted, the sender unit incremented its sequence count. *Id.* at 10:32–34. However, because these packets were lost, the destination unit did not receive them and "valid" window 164 is still set between 2 and 17. *Id.* at 10:34–37. When packet 7 eventually arrives at the destination unit, it falls within "valid" window 164 and is accepted by the destination unit. *Id.* at 10:37–39. The destination unit then sets its internal sequence count to 8 as shown in Figure 8B and slides its "valid" window 164 to the position of "valid" window 174, shown in Figure 8B, to allow packets 8 through 23. *Id.* at 10:39–42.

> *Analysis*
>
> Independent claim 1 recites
>
> > a transmitter in the data network commanding a receiver in the data network to a) receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet and b) release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet.

Petitioner relies upon Garrabrant's disclosure of sending a "lost" message that instructs the receiver to move its window forward upon receipt of the next received packet. Pet. 31 (citing Ex. 1002, Figs. 8A, 8B, 10:14–42). In the example illustrated in Figures 8A and 8B, the "lost" message instructs the receiver to receive a packet (packet 7) having a sequence number that is not consecutive with a sequence number of a previously received packet (packets 0 and 1), and release

15

**A0015**

IPR2013-00636
Patent 6,424,625 B1

any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet (i.e., moving "valid" window forward to allow packets 8 through 23, thereby giving up on packets 2 through 5). *Id.*

> Patent Owner argues as follows:

> A "lost" message is not a unique command (or even a command for that matter); a "lost" message that is received by a receiver is no different from, nor treated differently from any other message (or packet) received by the receiver—that is why Garrabrant puts that term in quotes. (*See id.* at 10:18-28 ("a 'lost' message").) Upon receipt of a message, the Garrabrant receiver adjusts its valid window (and concomitantly the rejection window) based upon the sequence number of every received message—whether that received message is a "lost" message or one received in sequence.

PO Resp. 26. According to Patent Owner, "[a]n analysis of Figs. 8A and 8B shows that the 'lost' message disclosed in Garrabrant does not command the receiver to accept anything, let alone a packet." *Id.* at 28. Although Garrabrant describes Figure 8B as representing the rejection window after it is updated in response to receipt of "a 'lost' message" (Ex. 1002, 10:24–28), Patent Owner argues that the "lost" message referred to is actually packet 7. PO Resp. 29 (citing 1002, 10:37–42). Patent Owner also argues that if the "lost" message were a command, it would be listed in Garrabrant's two tables of commands, which it is not. *Id.* at 24–25.

Petitioner counters that Garrabrant's description of "a 'lost' message" refers to "a control message *named* 'lost.'" Pet. Reply 7. Petitioner emphasizes Garrabrant's disclosure that "the rejection window [is] updated in response to the receipt of a 'lost' message."

16

**A0016**

IPR2013-00636
Patent 6,424,625 B1

*Id.* With respect to the tables of commands, Petitioner argues that "Garrabrant never states that the messages in the tables are the 'only' commands allowed" and that "Garrabrant never excludes other commands from being present." *Id.* at 8. Petitioner concludes that "[Patent] Owner's argument does not preclude either of these types of command messages from transmitting the 'lost' message." *Id.* at 9.

In light of the arguments and evidence, we are not persuaded that Petitioner has demonstrated, by a preponderance of the evidence, that Garrabrant discloses a control message named "lost." Garrabrant describes the rejection window in Figure 8B as having been "updated in response to the receipt of a 'lost' message." Ex. 1002, 10:24–28. Later in the same paragraph, however, Garrabrant states explicitly that valid window 174 is updated "[w]hen packet 7 eventually arrives . . . and is accepted by the destination unit." *Id.* at 10:37–42. Together, the two sentences imply that packet 7 is the "lost" message referred to at column 10, line 28. Garrabrant, however, describes only packets 2 through 6—not packet 7—as lost (*Id.* at 10:30), which implies that packet 7 is not a "lost" message. We note, however, that Garrabrant describes packets 2 through 6 as lost (without quotes). *Id.* at (10:28–30 ("In FIG. 8A it is assumed that out of 8 packets sent, packets 0 and 1 were successfully received to define the "valid" window 164 and packets 2 through 6 were lost."). We, therefore, interpret Garrabrant's use of lost (without quotes) to mean truly lost (i.e., never received by the receiver), and its use of "lost" (with quotes) to mean transmitted but not yet received, as packet 7 is at the time depicted in Figure 8A. As a result, we agree with Patent Owner that Garrabrant discloses

17

**A0017**

IPR2013-00636
Patent 6,424,625 B1

updating the window in response to packet 7, and does not disclose a separate control message named "lost." Because we are not persuaded that Garrabrant discloses a control message named "lost," we are not persuaded that Garrabrant discloses "causing an addressed device to execute a specific control function," as required by our construction of "commanding."

Our determination is supported by the fact that Petitioner's contention that a separate "lost" message is received before packet 7 is inconsistent with the disclosure in Garrabrant. If we were to accept Petitioner's contention that the described "lost" message is a separate control message that updates the valid window as shown in Figure 8B, then valid window 174 shown in Figure 8B would be set to allow only packets 8 through 23 before packet 7 arrived and, therefore, packet 7 would not be "accepted by the destination unit" when it "eventually arrives," as Garrabrant states. Ex. 1002, Fig. 8B, 10:39–42. Casting further doubt upon Petitioner's contention that the described "lost" message is a control message is the omission of any such message from the tables of commands disclosed in Garrabrant. *Id.* at 6:5–45.

*Conclusion*

We are not persuaded that Petitioner has demonstrated, by a preponderance of the evidence, that claim 1 is unpatentable as anticipated by Garrabrant.

*D. Claim 1 – Anticipation by Hettich*

Petitioner argues that claim 1 is unpatentable under 35 U.S.C. § 102(b) as anticipated by Hettich. Pet. 37–41. In support of this ground of unpatentability, Petitioner provides detailed explanations as

18

**A0018**

IPR2013-00636
Patent 6,424,625 B1

to how each claim limitation is disclosed by Hettich, and relies upon the Declaration of Dr. Bims (Ex. 1006). *Id.* (citing Ex. 1006 ¶¶ 79–90).

Patent Owner argues that claim 1 is not anticipated by Hettich because Hettich does not disclose (1) "commanding a receiver to . . . receive," as recited in claim 1; (2) "commanding a receiver to . . . release," as recited in claim 1; and (3) "discarding all packets for which acknowledgment has not been received, and which have sequence numbers prior to the at least one packet," as recited in claim 1. PO Resp. 37–46.

Upon consideration of the parties' contentions and supporting evidence, we determine that Petitioner has demonstrated, by a preponderance of the evidence, that claim 1 is anticipated by Hettich.

*Hettich (Exhibit 1007)*

Hettich describes a new link access protocol based on known ARQ protocols and adjusted for the special requirements of the Mobile Broadband System ("MBS") project. Ex. 1007, 4–5. Specifically, Hettich discloses an Adaptive Selective Repeat ("ASR") ARQ protocol that is a modified Selective Reject ("SR") ARQ and uses a Selective Reject (SREJ) PDU to request an individual frame again. *Id.* at 29–30. Hettich further discloses a Delay PDU that "is used to inform receivers that cells have been discarded." *Id.* at 34. The Delay PDU "is sent in the opposite direction instead of an acknowledgement"—i.e., from transmitter to receiver—and has RN (the lowest frame number that has not been received correctly yet) set equal to SN, where SN is the highest number of all of the discarded

19

**A0019**

IPR2013-00636
Patent 6,424,625 B1

cells. *Id.* at 28, 34. If the receiver receives a Delay PDU, it stops waiting for cells with sequence numbers less than or equal to RN. *Id.* at 35. The receiver then shifts its window and issues a corresponding acknowledgement. *Id.*

*Analysis*

Independent claim 1 recites

a transmitter in the data network commanding a receiver in the data network to a) receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet and b) release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet.

Petitioner relies upon Hettich's disclosure of a Delay PDU that commands a receiver to shift its window, thereby releasing any expectation of receiving packets having sequence numbers less than or equal to SN and allowing the receiver to receive packets with sequence numbers greater than SN. Pet. 34–35.

Claim 1 also recites "the transmitter discarding all packets for which acknowledgment has not been received, and which have sequence numbers prior to the at least one packet." Petitioner relies upon Hettich's disclosure that the transmitter sets RN=SN in the Delay PDU, where "*SN* is the highest number of all the discarded cells," and "there cannot be valid (not discarded) cells with lower sequence numbers." *Id.* at 34. Thus, the transmitter discards all packets with sequence numbers below SN.

We are persuaded that the evidence cited by Petitioner supports Petitioner's contentions. Patent Owner presents several arguments as to why Hettich does not teach all of the limitations of the claims. PO

20

**A0020**

IPR2013-00636
Patent 6,424,625 B1

Resp. 37–46.  Petitioner responds to these arguments.  Pet. Reply 11–13.  We address each argument in turn below.

*"commanding a receiver to receive"*

Patent Owner argues that, "the Delay PDU causes Hettich's receiver to 'stop[] waiting for cells,'" but "does not 'command' or 'order' the receiver to accept any packet, as required by the claim language."  PO Resp. 39.  According to Patent Owner, "[t]hat the receiver moves its window forward to allow it 'to receive a packet after SN' shows that the receiver, not the transmitter controls packet reception."

Petitioner counters that "claim 1 does not require identifying a specific sequence number.  Nor does it require that the next received packet have that specific sequence number.  Claim 1 only requires that there be a command to receive 'at least one packet,' which in Hettich are sequence numbers to N+1, N+2, N+3, etc."  Pet. Reply 11.

We find Petitioner's arguments persuasive.  Receipt of a Delay PDU causes Hettich's receiver to "shift[] the window."  Ex. 1007, 35.  As a result of that shift, Hettich's receiver will accept a packet, such as N+2 or N+3, that has "a sequence number that is not consecutive with a sequence number of a previously received packet," as required by claim 1.  Pet. Reply 11; Ex. 1007, 35–36.  Patent Owner's argument that the receiver controls packet reception because it moves its window forward is not persuasive because it does so in response to Hettich's Delay PDU sent by the transmitter.

21

**A0021**

IPR2013-00636
Patent 6,424,625 B1

*"commanding a receiver to release"*

Patent Owner argues that "a Delay PDU does not command a receiver to release expectations of receiving outstanding packets having a sequence number *prior to* a received out of sequence packet" because it "merely release[s] expectation of receiving outstanding packets having sequence numbers equal to or less than the sequence number of the Delay PDU, not packets having sequence numbers prior to the out of sequence packet." PO Resp. 40. Patent Owner argues that, in Hettich, it is possible for the next packet received by the receiver to have a non-sequential SN. *Id.* at 40–41. Patent Owner then acknowledges that the next packet received by the receiver could be sequential, but argues that a person of ordinary skill in the art would not expect it to be. *Id.* at 41–42.

Petitioner counters that Hettich's "transmitter would be able to send the DELAY N command and then send packet N+1 next, and this would be readily understood." Pet. Reply 12. Petitioner also argues that, "[a]t a minimum, Hettich implicitly discloses (and certainly does not exclude) sending N+1 as the next packet." *Id.* Finally, Petitioner argues that "claim 1 does not require the next packet actually sent to have any particular sequence number, only that the receiver be ready to receive 'at least one packet' not consecutive with a previously received packet (such as N+1) and release expectations of receiving prior packets (such as N, N-1, etc.)." *Id.*

Although this limitation is amenable to two interpretations, we find Petitioner's arguments persuasive under both. To the extent that this limitation is construed to require releasing expectation of *all*

22

**A0022**

IPR2013-00636
Patent 6,424,625 B1

packets having a sequence number prior to the received out of sequent packet, Hettich teaches that the Delay PDU—*i.e.,* the out of sequence packet—commands the receiver to release expectation of receiving packets having a sequence number lower than SN by instructing the receiver that cells with sequence numbers less than SN have been discarded. Ex. 1007, 34. Patent Owner concedes that the Delay PDU "release[s] expectation of receiving outstanding packets having sequence numbers *equal to or less than* the sequence number of the Delay PDU." PO Resp. 40 (emphasis added). Thus, when SN is equal to the sequence number of the Delay PDU, the receiver "release[s] any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet [i.e., the Delay PDU]," as recited in claim 1. Ex. 1007, 34–36. To the extent that this limitation is construed to require releasing expectation of receiving *at least some* outstanding packets, Hettich's Delay PDU does so when SN is less than the sequence number of the Delay PDU. *Id.*

   With respect to whether the next packet would be sequential, claim 1 does not require that the next received packet have a particular sequence number. It requires only that that packet's sequence number "is not consecutive with a sequence number of a previously received packet." As a result, Patent Owner's arguments are not persuasive because they are not commensurate with the limitations of the claim.

   *Discarding unacknowledged packets*

   Patent Owner argues that, "Hettich is silent as to whether acknowledgment has been received for any of the non-discarded cells having sequence numbers between the Delay PDU and the next

23

**A0023**

IPR2013-00636
Patent 6,424,625 B1

received out of order packet." PO Resp. 43.  According to Patent

Owner, "the transmitter in Hettich may contain one or more non-

discarded cells for which acknowledgement has not been received,

and which have sequence numbers prior to the first cell that the

receiver received after reception of the Delay PDU." *Id.*

Petitioner counters that "[w]hile possible, it is understood that

the transmitter could send DELAY N and then send packet N+1."

Pet. Reply 13.  According to Petitioner, "as long as the transmitter

discards packets meeting the conditions of claim 1, claim 1 is met

whether or not the transmitter discards other packets." *Id.*

We find Petitioner's arguments to be persuasive.  Hettich

discloses that the "[t]he Delay PDU is used to inform receivers that

cells have been discarded." Ex. 1007, 34.  "SN is the highest number

of all of the discarded cells." *Id.*  Thus, Hettich discloses that the

transmitter discards all packets having sequence numbers less than or

equal to SN.  Patent Owner concedes that SN may be the sequence

number of the Delay PDU itself.  PO Resp. 40 (the Delay PDU

"release[s] expectation of receiving outstanding packets having

sequence numbers *equal to or less than* the sequence number of the

Delay PDU." (emphasis added)).  Thus, Hettich discloses "discarding

all packets . . . which have sequence numbers prior to the at least one

packet [i.e., the Delay PDU]" because the transmitter discards *all*

packets that have a sequence number prior to the Delay PDU.  It

discards all packets that have a sequence number prior to the Delay

PDU, including, *inter alia,* those "for which acknowledgement has not

24

**A0024**

IPR2013-00636
Patent 6,424,625 B1

been received," as required by claim 1.  Thus, we are persuaded that Hettich discloses the limitation.

*Conclusion*

We determine that Petitioner has established, by a preponderance of evidence, that Hettich anticipates claim 1.

### E.  Claim 1 – Obviousness over Walke

Petitioner argues that claim 1 is unpatentable under 35 U.S.C. § 103(a) as obvious over Adams.  Pet. 41–47.  In support of this ground of unpatentability, Petitioner provides detailed explanations as to how each claim limitation is taught or suggested by Walke, and relies upon the Declaration of Dr. Bims.  *Id.* (citing Ex. 1006 ¶¶ 91–99).

Patent Owner argues that claim 1 is not obvious over Walke because Walke does not disclose (1) "commanding a receiver to . . . receive," as recited in claim 1; (2) "commanding a receiver to . . . release," as recited in claim 1; and (3) "discarding all packets for which acknowledgment has not been received, and which have sequence numbers prior to the at least one packet," as recited in claim 1.  PO Resp. 46–54.

Upon consideration of the parties' contentions and supporting evidence, we determine that Petitioner has not demonstrated, by a preponderance of the evidence, that claim 1 is obvious over Walke.

*Walke (Exhibit 1008)*

Walke describes a mobile communication system in which Asynchronous Transfer Mode ("ATM") network cells can be transmitted via a radio interface with a quality of service comparable

25

**A0025**

IPR2013-00636
Patent 6,424,625 B1

to that achieved ordinarily by a fixed network of similar capacity. Ex. 1008, col. 3. Walke discloses "specific measures to ensure that the required connection-specific quality of service parameters 'maximum ATM cell-loss rate' and 'maximum ATM cell delay' are complied with," namely, "error-correction processes involving automatic repeat request (ARQ) processes." *Id.* The error correction process according to the invention uses an improved selective repeat (SR) algorithm by using a Selective Reject (SREJ) order to request retransmission of individual ATM cells. *Id.* at col. 11. In one embodiment of the error correction process, the sending station can reject ATM cells that have exceeded their maximum permitted delay. If a receiver issues a retransmission request for an ATM cell, but the cell reaches its maximum delay in the meantime, the sender rejects the ATM cell. *Id.* at col. 12. The sender informs the receiver that this ATM cell will not be retransmitted by using a delay order, which is treated as an acknowledgement, but is generated by the sender and sent to the receiver. *Id.* at cols. 12–13. The receipt sequence number N(R) in this command is set to the sequence number of the rejected ATM cell. *Id.* The delay command is piggybacked by an N frame and, as a result, the N frame becomes a delay frame. *Id.*

Figure 9 of Walke is reproduced below.

26

**A0026**

IPR2013-00636
Patent 6,424,625 B1



FIG. 9: Treatment of rejected ATM cells

Figure 9 shows an exemplary protocol sequence showing the treatment of outdated ATM cells. *Id.* at cols. 12–13. ATM cell RR(0, X) is received correctly. *Id.* ATM cell RR(1, X) is not received correctly. ATM cell RR(2, X) is received correctly. *Id.* The receiver sends a selective reject message SREJ(X, 1) indicating that ATM cell RR(1, X) was not received. *Id.* The transmitter decides to discard ATM cell RR(1, X) so it sends DELAY(4, 1) to the receiver. The DELAY message "tells the receiver not to wait for anything else on frame 1 and it is able to widen its receive window." *Id.* at col. 13.

> *Analysis*
>
> Independent claim 1 recites
>
> > a transmitter in the data network commanding a receiver in the data network to a) receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet and b) release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet.

27

**A0027**

IPR2013-00636
Patent 6,424,625 B1

Petitioner relies upon Walke's teaching of a DELAY message that instructs the receiver to receive a packet (i.e., packet #4 in the example of Figure 9) and release expectation of receiving an outstanding packet (i.e., packet #1 in the example of Figure 9) having a sequence number prior to the at least one packet. Pet. 44–46 (citing Ex. 1008, cols. 12–13 (Section 2.6)). Petitioner provides an example and acknowledges that, "[i]n this example . . . the DELAY (4,1) message causes the receiver to release packet #1, but not packets #2 and #3 (and thus not 'all packets . . . [that] have sequence numbers prior to the at least one packet' as recited in Claim 1 of the '625 patent)." Pet. 44. Petitioner argues, however, that one of ordinary skill in the art would understand that Walke discloses the claimed method under certain conditions—i.e., where the DELAY message is DELAY(n, n-1). Pet. 44–45, 47.

Patent Owner argues that "Walke does not disclose a receiver releasing any expectation of receiving outstanding packets because the Walke Delay message addresses only a single packet." PO Resp. 49. According to Patent Owner, "[i]f multiple outstanding packets having sequence numbers between the discarded packet identified by the Delay message and the first received message exist, the Delay message would not have released any expectation of receiving those outstanding packets." *Id.*

Petitioner counters that Walke performs the method in certain circumstances and that, "a method claim is anticipated whenever the method is performed, no matter how frequently." Pet. Reply 14 ("For example, when Delay (4, 3) is sent and only packet #3 is outstanding,

28

**A0028**

IPR2013-00636
Patent 6,424,625 B1

the method of releasing expectation of receiving "all" outstanding packets below #4 (*i.e.*, #3) is met.").

We are persuaded by Patent Owner's argument. Because Walke's DELAY message identifies only a single packet, it is a command to release any expectation of receiving only one packet having a particular sequence number, not a command "release any expectation of receiving outstanding *packets* [plural] having sequence numbers prior to the at least one packet," as required by claim 1 (emphasis added).

*Conclusion*

We are persuaded that Petitioner has not demonstrated, by a preponderance of the evidence, that claim 1 is unpatentable as obvious over Walke.

### F. Patent Owner's Motion to Amend

Patent Owner moves to substitute claim 20 for challenged claim 1 if we find claim 1 unpatentable. Mot. to Amend 1. As stated above, we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 1 is unpatentable. Therefore, Patent Owner's Motion to Amend is before us for consideration. For the reasons set forth below, Patent Owner's Motion to Amend is *denied*.

Proposed substitute claim 20 is reproduced below:

20. (Proposed substitute for Original claim 1)    A method for discarding packets in a data network employing a packet transfer protocol including an automatic repeat request scheme, comprising the steps of:

a transmitter in the data network commanding a receiver having a receiver window in the data network to

29

**A0029**

IPR2013-00636
Patent 6,424,625 B1

> a) receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet, <u>wherein the sequence number of the at least one packet is outside of the receiver window</u> and
>
> b) release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet; and
>
> the transmitter discarding all packets for which acknowledgment has not been received, and which have sequence numbers prior to the at least one packet.

Mot. to Amend 1–2.

As the moving party, Patent Owner bears the burden of proof to establish that it is entitled to the relief requested. 37 C.F.R. § 42.20(c). Therefore, Patent Owner's proposed substitute claims are not entered automatically, but only upon Patent Owner having demonstrated by a preponderance of the evidence the patentability of those substitute claims. *See, e.g.*, 37 C.F.R. § 42.1(d) (noting that the "default evidentiary standard [in proceedings before the Board] is a preponderance of the evidence").

### 1. *Written Description Support*

A motion to amend claims must identify clearly the written description support for each proposed substitute claim. 37 C.F.R. § 42.121(b). The requirement that the motion to amend must set forth the support in the original disclosure of the patent is with respect to *each claim*, not for a particular feature of a proposed substitute claim. The written description test is whether the original disclosure of the application relied upon reasonably conveys to a person of ordinary skill in the art that the inventor had possession of the claimed subject

30

IPR2013-00636
Patent 6,424,625 B1

matter as of the filing date. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). Thus, the motion should account for the claimed subject matter as a whole, i.e., the *entire* proposed substitute claim, when showing where there is sufficient written description support for each claim feature. *See Nichia Corp. v. Emcore Corp.*, Case IPR2012-00005, slip op. at 4 (PTAB June 3, 2013) (Paper 27).

In its Motion to Amend, Patent Owner addresses the written description support for the claimed subject matter as a whole. Mot. to Amend 4–8. For the added "wherein" clause, Patent Owner cites two portions of the '625 patent. *Id.* at 6. Petitioner argues that neither passage describes reception of a packet outside of the receiver window. Opp. to Mot. to Amend 4–6. Patent Owner counters that Petitioner's argument "is premised on the faulty assumption that the receiver and transmitter windows must be of identical size W." PO Reply 1–2. We, however, find Petitioner's arguments persuasive.

In the first passage cited by Patent Owner, the '625 patent describes reception of a packet *within* the receiver window (Ex. 1001, 6:32–36 ("If the difference between N(S) and ESN (for example, ESN1 is less than $2^{k-1}$"), not reception of a packet *outside* of the receiver window. Patent Owner's expert, Dr. Akl, testified that the receiver window size may not equal the transmitter window size (Opp. to Mot. to Amend 5 (citing Ex. 1021, 116:3–118:19)), and Patent Owner argues the same (PO Reply 1–2), but this contention is undermined by Patent Owner's acknowledgement that "[t]he receiver and the transmitter must use the same arbitrary value for W so that the

31

**A0031**

IPR2013-00636
Patent 6,424,625 B1

receiver knows which packets to properly receive." PO Reply 1. As a result, we are not persuaded that column 6, lines 32 to 36 of the '625 patent support the proposed "wherein clause."

With respect to the second passage cited by Patent Owner, we agree with Petitioner that "[t]his disclosure simply describes having a receiver window size of up to $2^{k-1}$ positions; it does *not* describe receiving a packet *outside* the receiver window." Opp. to Mot. to Amend 6.

Accordingly, we are not persuaded that Patent Owner has shown adequate written description support for the proposed amendment.

2. *Patentability over Prior Art*

The patent owner bears the burden of proof in demonstrating patentability of the proposed substitute claims over the prior art in general, and, thus, entitlement to add these claims to its patent. *See Idle Free*, Paper 26 at 7. In a motion to amend, the patent owner must show that the conditions for novelty and non-obviousness are met with respect to the prior art available to one of ordinary skill in the art at the time of the invention. With regard to obviousness as the basis of potential unpatentability of the proposed substitute claims, the patent owner should present and discuss facts which are pertinent to the first three underlying factual inquiries of *Graham*: (1) the scope and content of the prior art, (2) differences between the claimed subject matter and the prior art, and (3) the level of ordinary skill in the art, *with special focus on the new claim features* added by the proposed substitute claims. *See Graham v. John Deere Co.*, 383 U.S.

32

**A0032**

IPR2013-00636
Patent 6,424,625 B1

1, 17–18 (1966).  The patent owner should identify each new claim feature, and come forward with technical facts and reasoning about that particular feature.  Some discussion and analysis should be made about the specific technical disclosure of the closest prior art as to each particular feature, and the level of ordinary skill in the art, in terms of ordinary creativity and the basic skill set of a person of ordinary skill in the art, regarding the feature.

Here, we are unpersuaded that Patent Owner has demonstrated, by a preponderance of the evidence, that the proposed substitute claims are patentable.  Specifically, we are not persuaded that the proposed substitute claims are patentable over the combination of Hettich and Vornefeld.

Patent Owner argues that Vornefeld does not anticipate proposed substitute claim 20 because it "creates rather than releases expectation of cells having a lower sequence number."  Mot. to Amend 11.  It also does not render obvious proposed substitute claim 20, according to Patent Owner, because "one ordinary skill in the art would not combine a reference such as Vornefeld that creates expectations with a reference that releases expectations of receiving cells having lower sequence numbers."  *Id.*

Petitioner counters that "[Patent] Owner admits that the concept of receiving packets outside a receiver window is not, by itself, novel, and identifies this mechanism in Vornefeld" and that Patent Owner's expert, Dr. Akl, "testified that it is inherent that one of skill in the art would know to transmit a packet outside the receiver window."  Opp. to Mot. to Amend 7 (citing Mot. to Amend 10; Ex. 1021, 129:4–14,

33

**A0033**

IPR2013-00636
Patent 6,424,625 B1

144:12–144:5).  Moreover, according to Petitioner, Vornefeld does not merely "create expectation of cells having a lower sequence number," as Patent Owner contends.  Rather, it teaches releasing expectation of receiving at least one outstanding I-frame that has a sequence number prior to the most recently received I-frame.  *Id.* at 7–9.

Patent Owner replies that proposed substitute claim 20 is not anticipated by Vornefeld.  PO Reply 2–4.  Patent Owner argues that because "Vornefeld['s] receiver in Fig. 5.3 continues to wait for SN2, expectations for all outstanding packets are not released."  *Id.* at 3.  According to Patent Owner, "[t]he Vornefeld receiver cannot release expectations for outstanding cells because the upper layers in the receiver may require those outstanding cells."  *Id.*  Finally, Patent Owner argues that Broadcom has failed to rebut Patent Owner's showing of patentability because "Broadcom ignores many limitations of the amended claim, including the "releasing" limitation, the "discarding limitation," and the "transmitter limitations."  *Id.*

We find Petitioner's arguments persuasive.  Patent Owner acknowledges that the "concept of receiving packets outside a receiver window is not, by itself, novel," and cites Vornefeld as an example.  Mot. to Amend 10.  Because the added feature is not novel, we must analyze whether proposed substitute claim 20 would have been non-obvious over Vornefeld and other known prior art, such as Hettich.

We are not persuaded by Patent Owner's argument that a person of ordinary skill in the art would not have combined Vornfeled

34

**A0034**

IPR2013-00636
Patent 6,424,625 B1

with a reference such as Hettich. Specifically, we are not persuaded that Vornefeld "creates rather than releases expectation of cells having a lower sequence number" (Mot. to Amend 10), because Vornefeld's mechanism does result in releasing any expectation of outstanding packets having sequence numbers prior to the at least one packet (Opp. to Mot. to Amend 7–9).

We also are not persuaded by Patent Owner's arguments that proposed substitute claim 20 is "not anticipated by Vornefeld" (PO Reply 2) because anticipation is not the sole inquiry with respect to patentability; we also consider non-obviousness. For the same reasons, we are not persuaded by Patent Owner's argument that "Broadcom ignores many limitations of the amended claims, including the 'releasing' limitation, the 'discarding limitation,' and the 'transmitter limitations.'" PO Reply 3. As discussed above, we are persuaded that these other limitations are taught by Hettich.

Finally, we are not persuaded by Patent Owner's argument that Vornefeld does not release expectations for "all" outstanding packets (PO Reply 3) because proposed substitute claim 20 does not require releasing expectations for "all" outstanding packets.

*3. Conclusion*

For the foregoing reasons, Patent Owner has not, in its Motion to Amend, satisfied its burden of proof.

## III.  CONCLUSION

Petitioner has demonstrated, by a preponderance of the evidence, that claim 1 of the '625 patent is unpatentable under

35

**A0035**

IPR2013-00636
Patent 6,424,625 B1

35 U.S.C. § 102(b) as anticipated by Hettich.  Petitoner's Motion to Amend is denied.

## IV.  ORDER

Accordingly, it is

ORDERED that claim 1 of the '625 patent is held unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Amend is *denied*; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

36

**A0036**

IPR2013-00636
Patent 6,424,625 B1

For PETITIONER:

Dominic E. Massa
Michael A. Diner
WILMER CUTLER PICKERING HALE AND DORR LLP
dominic.massa@wilmerhale.com
michael.diener@wilmerhale.com

For PATENT OWNER:

Peter J. Ayers
J. Christopher Lynch
LEE & HAYES PLLC
peter@leehayes.com
chris@leehayes.com
EricssonIPR2013-00601@leehayes.com
EricssonIPR2013-00602@leehayes.com

37

**A0037**

US006424625B1

(12) **United States Patent**
Larsson et al.

(10) Patent No.: **US 6,424,625 B1**
(45) **Date of Patent:**       **Jul. 23, 2002**

(54) **METHOD AND APPARATUS FOR DISCARDING PACKETS IN A DATA NETWORK HAVING AUTOMATIC REPEAT REQUEST**

(75) Inventors: **Peter Larsson**, Euro Asia View; **Mikael Larsson**, Doer Park, both of (SG)

(73) Assignee: **Telefonaktiebolaget LM Ericsson (publ)**, Stockholm (SE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/179,952**

(22) Filed: **Oct. 28, 1998**

(51) Int. Cl.$^7$ ................................................. **H04L 12/26**
(52) **U.S. Cl.** ........................................ **370/236**; 370/410
(58) **Field of Search** ................................. 370/389, 394, 370/410, 426, 428, 429, 470, 471, 473, 236; 714/748, 749, 750

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 4,344,171 | A | * | 8/1982 | Lin et al. | 714/751 |
| 4,726,027 | A | * | 2/1988 | Nakamura et al. | 714/748 |
| 5,483,545 | A | * | 1/1996 | Darmon et al. | 714/748 |
| 5,826,028 | A | | 10/1998 | Bennett et al. | |
| 6,163,861 | A | * | 12/2000 | Yoshioka et al. | 714/712 |

FOREIGN PATENT DOCUMENTS

WO        98/42108        9/1998

OTHER PUBLICATIONS

Heliomar M. de Lima and Otto Carlos M.B. Duarte, "A Go–Back–N Protocol with Multicopy Retransmission for High Speed Satellite Communications", 1994, pp. 859–863.
F. Argenti and G. Benelli, "An ARQ Protocol For Mobile Radio Systems", 1992, pp. 1323–1326.
Nachum Shacham and Byung Cheol Shin, "A Selective–Repeat–ARQ Protocol for Paralle Channels and Its Resequencing Analysis", Apr. 1992, pp. 773–782.
Standard Search Report dated Jul. 16, 1999.

* cited by examiner

*Primary Examiner*—Kwang B. Yao
(74) *Attorney, Agent, or Firm*—Burns, Doane, Swecker & Mathis, L.L.P.

(57)        **ABSTRACT**

Techniques are provided for use with automatic repeat request (ARQ) schemes in a data network to minimize a bandwidth used by a receiver and a transmitter in the network to transfer data packets, by discarding outdated packets that have not yet been successfully transferred. In accordance with an embodiment of the invention, a bit is set in the ARQ packet header to force the receiver to accept packets subsequent to one or more erroneous or unreceived packets that have been discarded and not resent. In accordance with another embodiment of the invention, after data packets have been discarded, sequence numbers are reassigned to the non-discarded data packets that are yet to be sent to the receiver, so that a transmitted stream of the non-discarded packets will have consecutive sequence numbers.

**19 Claims, 12 Drawing Sheets**

A0038



FIG. 1A (PRIOR ART)

FIG. 1B (PRIOR ART)

A0039



FIG. 2 (PRIOR ART)

A0040



A0041

U.S. Patent     Jul. 23, 2002     Sheet 4 of 12     US 6,424,625 B1

A0042



FIG. 4A
(PRIOR ART)

LLC PDUs sent.
All are received.

FIG. 4B
(PRIOR ART)

PACK issued.

FIG. 4C
(PRIOR ART)

LLC PDUs sent
All are received.
BSN is set to N(R)+1.

FIG. 4D
(PRIOR ART)



## FIG. 5
### (PRIOR ART)



## FIG. 6
### (PRIOR ART)




ESN1-3 has successfully been received. Some more new packets have also been sent.

**FIG. 7C**
(PRIOR ART)




ESN1 has been retransmitted and correctly received. ESN2 is currently being retransmitted. BSN is set to ESN1 - 1, i.e. NACK with cumulative PACK for preceeding packets.

**FIG. 7B**
(PRIOR ART)



ESN 1,2,3 are missing. NACK(s) is/are sent for all outstanding packets.

**FIG. 7A**
(PRIOR ART)

A0044

**U.S. Patent**    Jul. 23, 2002    Sheet 7 of 12    US 6,424,625 B1



FIG. 8



FIG. 9



**FIG. 10A**

A0046



FIG. 10B

A0047

Case: 15-1946    Document: 37    Page: 51    Filed: 03/10/2016



# FIG. 11



FIG. 12

**U.S. Patent**    Jul. 23, 2002    Sheet 12 of 12    US 6,424,625 B1



FIG. 13

A0050

US 6,424,625 B1

# 1

## METHOD AND APPARATUS FOR DISCARDING PACKETS IN A DATA NETWORK HAVING AUTOMATIC REPEAT REQUEST

### FIELD OF THE INVENTION

The present invention relates to Automatic Repeat Request (ARQ) techniques for transferring data in fixed/wireless data networks.

### BACKGROUND OF THE INVENTION

ARQ techniques are commonly used in data networks to ensure reliable data transfer and to protect data sequence integrity. Data packets are encoded with an error detecting code, so that when a transmitter in the data network sends or transfers data packets to a receiver in the data network, the receiver receiving the data packets can detect corrupted, erroneous or lost packets and thereby request that the transmitter retransmit the affected data packets. The integrity of a data sequence is normally protected by sequentially numbering packets and applying certain transmission rules.

There are three main ARQ schemes: Stop-and-Wait; Go-Back-N; and Selective Reject (sometimes referred to as Selective Repeat). All three methods provide mechanisms for transferring packets to a receiver in a data network in an appropriate order. In terms of throughput efficiency as a function of the signal to noise ratio, generally Selective Reject is most efficient, Stop-and-Wait is least efficient, and Go-Back-N is intermediate. Also, various mixtures of the Selective Reject and Go-Back-N techniques exist, and fall between pure Selective Reject and pure Go-Back-N techniques in both efficiency and complexity.

With respect to Go-Back-N, several different variants exist which differ in terms of how they use positive acknowledgments (PACKs), negative acknowledgments (NACKs), retransmission timers, polling schemes, etc.

One type of Go-Back-N technique uses both PACKs and NACKs that have the following characteristics:

A PACK for a data packet having a sequence number $N(R)$ gives a cumulative positive acknowledgment for data packets having sequence numbers before $N(R)$, but does not positively acknowledge the data packet having the sequence number $N(R)$, as shown for example in FIG. 1A.

The NACK positively acknowledges all data packets before the data packet it negatively acknowledges. The data packet which the NACK negatively acknowledges is indicated by $N(R)$, as shown for example in FIG. 1B.

FIG. 2 shows a simplified ARQ transmitter window, in which five variables are used to keep track of a transmitter state. The five variables include: a bottom sequence number, BSN; a top sequence number, TSN; a maximum top sequence number, $TSN_{MAX}$; an instant sequence number, ISN; and an expected sequence number, ESN.

BSN denotes the oldest packet in the transmitter buffer, and can also indicate that all packets before the BSN packet have been acknowledged or discarded. Packets prior to the packet indicated by TSN have been sent. ESN denotes the expected sequence number of a packet to be received. ISN indicates the sequence number of the next packet to be sent. When a packet is sent for the first time, TSN and ISN will be identical. However, when a retransmission is performed, ISN will start over from the first retransmitted packet and progress in consecutive order, one packet at a time, up to TSN. TSN cannot exceed $TSN_{MAX}$, which is defined by the window size W. Assuming that a sequence number field has

# 2

k bits, $2^k$ different sequence numbers can be created. Thus, the maximum size W of the window shown in FIG. 2 is $2^k-1$.

Operation of the Go-Back-N technique using both PACKs and NACKs can be envisioned by imagining a clockwise consecutive modulo $2^k$ sequence numbering superimposed upon the circumference of the circles shown in FIGS. 3A–3D. FIG. 3A shows a circle indicating a state where no packets have yet been sent, and TSN, ESN, BSN and ISN all have the same value, i.e., point to the same packet. The circle shown in FIG. 3B indicates that (TSN-BSN) packets have been sent and also received, since ESN=TSN. An erroneous or lost packet causes ESN to stop progressing forward, although more packets have been sent. For example, in FIG. 3C packets up to the packet indicated by TSN and ISN have been sent, but ESN indicates a prior packet which was not received. After a packet is lost or an erroneous packet is received, the ARQ receiver sends a NACK to the ARQ transmitter to inform the ARQ transmitter about the lost or erroneous packet. The NACK includes a returned sequence number $N(R)$ that is set equal to ESN, thereby acknowledging that all previous packets were correctly received. BSN and ISN are set equal to ESN (and $N(R)$) so that BSN moves forward and ISN moves backward to the sequence number representing the lost or erroneous packet. Thereafter, as shown in FIG. 3D, ISN and ESN move forward together as the lost or erroneous packet is retransmitted, and as the succeeding packets are also retransmitted.

FIGS. 4A–4D illustrate use of a PACK. For example, FIG. 4A shows a state where nothing has yet been sent, and TSN=ISN=BSN=ESN. FIG. 4B shows a situation where all sent packets have been correctly received. FIG. 4C shows that a timer-initiated PACK is sent, conveying the sequence number $N(R)$ of a packet between BSN and TSN=ESN=ISN. As shown in FIG. 4D, after the PACK is sent, BSN is set to $N(R)$.

Sending PACKs ensures that sequence number starvation does not occur. Since TSN may not pass BSN, if the transmitter does not receive PACKs, it may continue to send data packets up to $TSN_{MAX}$. However, if data packets up to $TSN_{MAX}$ are sent but no PACKs are received, then $TSN_{MAX}$ cannot progress and sequence number starvation occurs. The transmitter must wait until it receives a PACK, which will allow BSN and thus $TSN_{MAX}$ to progress.

FIG. 5 shows a general example of an ARQ data packet 510. The packet 510 typically includes an ARQ header 512 and a data portion 516. The header 512 contains a k-bit sequence number 514, and can be located at the front of the packet 510 as shown in FIG. 5, or at any predefined position within the packet 510.

FIG. 6 shows an exemplary ACK message 610, with an identifier field 612 that identifies the responding terminal sending the ACK message 610, a NACK/PACK type indicator 614 indicating whether a PACK or a NACK is being sent, and finally a sequence number field $N(R)$ 616 that indicates for which sequence number the ACK message 610 is valid.

In a Selective Reject scheme, a sender window having a size of $2^{k-1}$ or less is normally used in order to avoid certain ambiguities which appear in conjunction with an automatic (timer-initiated) retransmission. The receiver window size in a Selective Reject scheme can include up to $2^{k-1}$ positions, instead of just one position as in a Go-Back-N scheme. In Selective Reject a range of packets can be received since the receiver window can include up to $2^{k-1}$ positions.

As long as packets are received correctly, they are sent or forwarded to the next higher layer. When an outstanding

**A0051**

US 6,424,625 B1

**3**

packet is detected, i.e., a packet that has been sent but not received or not correctly received, the sending of subsequent packets up to the higher layer is halted and a list of correct and missing packets is built up. A NACK is used to initiate a request for a retransmission of the outstanding packet or of a multitude of outstanding packets. When the first detected outstanding packet is correctly received, that packet and all subsequent packets are sent to the higher layer, until the next outstanding packet is detected and the process repeats with respect to the new outstanding packet.

FIG. **7A**, for example, shows a situation wherein three packets are outstanding. The outstanding packets are denoted by ESN1, ESN2 and ESN3. The receiver sends one or several NACKs indicating the sequence number of these outstanding packets. In FIGS. **7B** and **7C**, the transmitter has received the one or several NACKs and in response retransmits the outstanding packets. The transmission of new packets can proceed to the $TSN_{MAX}$ limit, which of course can also occur when no NACKs are received. In particular, FIG. **7B** shows a situation where ESN1 has been retransmitted and correctly received, and ESN2 is currently being retransmitted. BSN has also been set to ESN1. In other words, the NACK for ESN1 functions as a cumulative positive acknowledgment for packets preceding ESN1, and BSN is adjusted accordingly.

Sometimes, NACKs fail to reach the transmitter for unknown reasons. In such a situation, after a specified or predetermined time has expired, packets in the sender buffer that have not been acknowledged (by either a NACK or a PACK) can be automatically retransmitted.

NACKs can be efficiently sent by sending a NACK and explicitly indicating the oldest NACK's sequence number, here represented by ESN1, and using a bitmap to thereafter represent correctly received packets and missing packets. This type of NACK performs a cumulative PACK for the packets preceding the sequence number which is NACKed. Other NACK options can also be used, for example NACK options where a cumulative positive ACK is not performed or sent for the packets preceding the sequence number which is NACKed.

The Selective Reject and Go-Back-N techniques differ in the sense that Selective Reject does not require packets to be sent in any particular order, while the Go-Back-N receiver needs to receive packets in consecutive sequence number order.

Normally, in data networks it is desirable to transfer all packets without any packet loss. Sometimes, however, sending significantly delayed packets provides no benefit, for example where the delay causes the information in the packets to become outdated and therefore useless to the receiver. Examples of delay sensitive applications are, e.g., telephony, video conferencing and delay sensitive control systems.

Furthermore, non-time-critical applications commonly issue higher level retransmissions whenever they detect an absence of responses or acknowledgments from the receiving end, which can give rise to situations where the ARQ buffers are filled with not-yet-successfully transmitted data, and/or with newly retransmitted data. This can be avoided if data is associated with a validity time, and the validity time is set to be slightly shorter than the retransmission time for the application. However, in practice it can be difficult or impossible to discern which retransmission time is used, since the lower layer (LLC) is unaware which application is at the top level. In such a situation one has to assume a certain application and specially design the communication system based on that assumption.

**4**

For certain service classes and after a certain transfer delay time, discarding of data packets is allowed in Asynchronous Transfer Mode (ATM). An ARQ in conjunction with ATM can use transfer delay information provided by the ATM layer in order to adjust connection-specific discard timers in the ARQ function. However, the ARQ in the receiver may detect missing or incomplete packets and require retransmission.

In summary, current ARQ methods do not recognize and allow for situations where data packets have a limited lifetime, and therefore fail to minimize bandwidth usage by not sending (or resending) significantly delayed or outdated data packets.

## SUMMARY OF THE INVENTION

In accordance with exemplary embodiments of the invention, ARQ techniques are provided that minimize bandwidth usage by accounting for data packets that have an arbitrary but limited lifetime. The lifetime can either be assumed to be fixed, or can be deduced from ATM layer information. In particular, exemplary embodiments of the invention variously illustrate enhanced Go-Back-N and also Selective Reject techniques that discard outdated data packets, and which embody principles that can be applied to Stop-and-Wait techniques to discard outdated data packets.

In accordance with an embodiment of the invention, a bit is set in the ARQ header to force the receiver to accept packets subsequent to one or more erroneous or unreceived packets that have been discarded and not resent.

In accordance with another embodiment of the invention, when a NACK has been received and data packets have been discarded, sequence numbers are reassigned to the non-discarded data packets so that a transmitted stream of non-discarded packets will have consecutive sequence numbers.

In accordance with another embodiment of the invention, at a packet discard the transmitter monitors the receiver state. If a packet is expected which has already been discarded, then the transmitter resynchronizes by renumbering data packets or by commanding the receiver to accept an arbitrarily chosen sequence number.

## BRIEF DESCRIPTION OF THE DRAWINGS

Other objects and advantages of the invention will become apparent to those skilled in the art from the following detailed description of preferred embodiments, when read in conjunction with the accompanying drawings. Like elements in the drawings have been designated by like reference numerals.

FIGS. **1A** and **1B** illustrate a prior art Go-Back-N technique.

FIG. **2** illustrates a window in a prior art Go-Back-N technique.

FIGS. **3A–3D** illustrate a transmission sequence in a prior art Go-Back-N technique.

FIGS. **4A–4D** illustrate use of a positive acknowledgment in a prior art Go-Back-N technique.

FIG. **5** illustrates a prior art example of an ARQ data packet.

FIG. **6** illustrates a prior art example of an acknowledgement message.

FIGS. **7A–7C** illustrate use of a negative acknowledgment in a prior art Selective Reject technique.

FIG. **8** illustrates a receiver packet enforcement bit in accordance with an embodiment of the invention.

A0052

US 6,424,625 B1

**5**

FIG. **9** illustrates operation of an embodiment of the invention.

FIGS. **10A** and **10B** illustrate operation of an embodiment of the invention.

FIG. **11** illustrates operation of an embodiment of the invention.

FIG. **12** illustrates operation of an embodiment of the invention.

FIG. **13** illustrates operation of an embodiment of the invention.

## DETAILED DESCRIPTION OF THE INVENTION

In accordance with an exemplary embodiment of the invention involving a communications system wherein a transmitter and a receiver are exchanging data packets, at a packet discard procedure, the progress of a bottom part of a sender window of the transmitter is reported to the receiver in order to allow the receiver to properly skip packets which do not exist anymore because they have been discarded. Thus, the receiver can be commanded to skip or overlook the packets which have been discarded, or in other words, to release any expectation of receiving the packets which have been discarded. To prevent ambiguity problems, special rules are defined for, and followed by, the receiver and the transmitter.

In the case where the transmitter discards a packet, it orders the receiver to accept the next packet, by setting a certain Receiver Packet Enforcement Bit (RPEB) in the ARQ header of the next packet and sending the packet to the receiver. When the receiver receives the packet, the RPEB bit will cause the receiver to accept the packet. FIG. **8** shows an ARQ packet **810** with an ARQ header **812** and a data portion **818**. The header **812** includes a receive packet enforcement bit RPEB **814**, and a k-bit sequence number N(S) **816**. Alternatively, a plurality of enforcement bits can be sent separately from the ARQ packets together with implicit or explicit indications as to which ARQ packet each enforcement bit belongs.

This enforcement function of sending an RPEB associated with a particular ARQ packet, can be used a variety of situations. For example, a situation can arise where a NACK associated with an ARQ packet designated by a sequence number N(R) is sent by the ARQ receiver and properly received by the ARQ transmitter. If the NACK is valid for one discarded data packet, then the next data packet to be retransmitted can have an RPEB set to TRUE.

In another example situation, a retransmission timer expires and one or more data packets have been discarded. The next incoming data packet to be transmitted, or the first data packet to be retransmitted, can have an RPEB set to TRUE.

The system can be further configured so that in all other situations, the RPEB associated with a data packet is set FALSE.

In particular, when the system uses a Go-Back-N type packet exchange, two types of packet enforcement schemes can be used. The first type is a general method with an arbitrary window size W, and the second type is a special case of the general method. In the special case, the window size is $W=2^{k-1}$, i.e., half the maximum sequence number.

In the method of the special case, ambiguities can be circumvented by applying very simple rules. The method of the special case employs a new variable, DSN. DSN is shown, for example, in FIG. **9**, and indicates that all previous

**6**

packets have been acknowledged as having been properly transmitted and received. In FIG. **9**, all packets from DSN through BSN-1 have been discarded due to a packet discard time-out. A packet discard time-out can occur, for example, when the oldest packets in the buffer have been in the buffer for a predetermined amount of time, and are discarded upon expiration of the predetermined amount of time. When the old packets are discarded, the value of BSN is incremented until it points to the oldest remaining (i.e., undiscarded) packet in the buffer. FIG. **9** shows BSN pointing to the oldest remaining packet in the buffer. After the predetermined amount of time expires, the value of TSN is greater than or equal to the new value of BSN. This indicates that packets from BSN through TSN-1 have been sent. TSN indicates the next new packet to send, and ISN has the same function as indicated earlier, namely, to indicate the sequence number of the next packet to be sent. ESN (e.g., ESN1) indicates the sequence number of the next packet that the receiver expects to receive. To prevent ambiguities, TSN must not pass $TSN_{MAX}$. In this alternative, $TSN_{MAX}$ is $DSN+2^{k-1}$.

Although the data packets between DSN and BSN have been discarded as shown in FIG. **9**, for some unknown reason either the previous ACKs have not made their way from the ARQ receiver to the ARQ transmitter or the ARQ packets from ESN1 up to TSN have not been received. That explains why ESN1 is in the sequence of sequence numbers representing discarded ARQ packets, or in other words, why the receiver is expecting a sequence number which has been discarded. At this juncture either a retransmission timer initiates the retransmission, or a NACK is properly received. In both cases, the RPEB is set to TRUE for the next packet to be transmitted. If the difference between N(S) and ESN (for example, ESN1) is less than $2^{k-1}$ and RPEB=TRUE at a packet reception, then the packet will be accepted and forwarded to higher layer as long as the data carried in the packet is also correct.

FIG. **9** also shows that no ambiguity will occur when $TSN_{MAX}$ is defined as $DSN+2^{k-1}$. When ESN (ESN1) lags behind BSN, the receiver can always be forced to receive an ARQ packet whose RPEB=TRUE. If ESN (ESN1) is leading BSN and the RPEB for a received ARQ packet is TRUE, then the packet shall not be accepted. This can be determined by discerning whether BSN-ESN exceeds $W=2^{k-1}$. If a NACK is received in the ARQ transmitter for a higher sequence number than TSN, then a fault has occurred and a reinitialization or a restart is likely to take place. In a reinitialization or a restart, all counters and/or variables are reset to a certain value so that the ARQ can restart anew. For example, the variables can be set so that TSN=ISN=BSN= ESN=DSN, and so forth.

FIGS. **10A** and **10B** show the variable definitions more precisely, by showing two cases. FIG. **10A** shows a case where the content in the buffer is low, and FIG. **10B** shows a case where the buffer is very full. FIGS. **10A** and **10B** also indicate that an upper limit (fixed or dynamic) may exist for the packet buffer. There may also be packets which have been received from the higher layer, but were not allowed to be transmitted since TSN might have reached $TSN_{MAX}$. Such packets would be pending for transmission, and indicated by pending sequence number PSN shown in FIG. **10B**. As soon as clearance is given to proceed, the pending packets will be transmitted. Clearance is given when a NACK or PACK is properly received, thereby causing DSN and perhaps also BSN to progress forward. This allows $TSN_{MAX}$ to progress forward also.

The more general case, on the other hand, requires more complex rules. The function of the ARQ transmitter with an

A0053

US 6,424,625 B1

arbitrary window size representing a more general case is next described.

FIG. **11** shows an arbitrary state of the ARQ. The general case differs from the special case described above in that the window size (W) is defined using BSN rather than DSN. This gives the greatest possible distance between the last acknowledged packet (DSN) and the highest sent packet (TSN). As in the special case, TSN may not pass $TSN_{MAX}$. $TSN_{MAX}=BSN+W$, where $1 \leqq W \leqq 2^{k-1}$.

Below, the sign $\leqq$ is used. It is used more in the "before" and "after" sense than in the ordinary mathematical sense, since we are using modulus arithmetic. For example, assume k=8 bits, BSN=192 and W=128. This yields $BSN+W=(192+128)mod2^k=64$. TSN can be, e.g., 254, which is before BSN+W, even though mathematically $254>(192+128)mod2^k=64$.

Some important conditions are $TSN \leqq DSN-1$, $TSN \leqq TSN_{MAX}$, and $DSN \leqq BSN \leqq TSN$, where $TSN_{MAX}=BSN+W$. W can assume an arbitrary value between 1 and $2^k-1$. However, the receiver and transmitter must both use the same arbitrary value for W.

A packet shall be accepted, apart from the normal Go-Back-N function, when $N(S)-ESN<2^k-W$, RPEB=TRUE and the data in the packet are correct.

An additional rule for the general case is that in order to avoid ambiguity problems, BSN-DSN shall always be less than $2^k-W$. If a situation arises where $(BSN-DSN)=2^k-W$, then typically either a resynchronization will take place, or a notification indicating bad link performance will be sent to the control and management layer. The control and management layer can then implement a countermeasure to handle the problem.

In another exemplary embodiment of the invention illustrated for example in FIG. **12**, a Selective Reject type packet exchange is used that relies on the same basic principles described above with respect to the special and general cases for use with a Go-Back-N type packet exchange. Namely, a receive enforcement bit such as the RPEB described above with respect to other embodiments, is sent to facilitate discarding of packets from a transmitter buffer.

In this embodiment, the basic rules include $DSN \leqq BSN \leqq TSN \leqq TSN_{MAX}$ and $TSN_{MAX}-DSN=2^{k-1}$. The variable definitions are the same as those described above with respect to other embodiments. Some additional rules on how to handle NACK, PACK and automatic retransmission of packets will also be described below.

In a situation where a number of packet retransmissions have taken place, a packet discard time-out can occur that will cause the oldest, not-yet-acknowledged packets in the buffer to be discarded. This can be seen, for example, in FIG. **12**, where the packets having sequence numbers between DSN and BSN have been discarded.

After the old packets have been discarded from the transmitter buffer, two things can happen. Either a packet retransmission command is invoked by a timer expiration, or a NACK is received for a sequence number falling between DSN and BSN. First, consider the NACK case.

Assume that one use of NACK includes the following characteristics. When a NACK is sent, the oldest not-yet-received packet is explicitly indicated by its sequence number. Packets with sequence numbers preceding this oldest, outstanding packet are at the same time positively acknowledged by this NACK message. Accompanying this NACK can be a) a bitmap of length n indicating outstanding packets, wherein, for example, those bits that are set to one

indicate outstanding packets, or b) a number N of explicitly indicated sequence numbers for which packets have not been received, or c) some combination of a) and b).

In a first case, with reference to FIG. **12**, if a NACK is received for ESN1 in the interval DSN to BSN and the covered ACK range for the NACK is less than BSN-ESN1 and at least one packet is not yet discarded ($TSN \neq BSN$), then the packet indicated by BSN with RPEB set to True, is retransmitted. Note that the transmitter can also send a short control message, in order to inform the receiver that packets have been discarded, thereby saving bandwidth.

In a second case, if a NACK is received for ESN1 located in the interval between DSN and BSN and the covered ACK range for the NACK is less than BSN-ESN1 and all packets have been discarded, i.e. BSN=TSN, then a pending packet with RPEB=TRUE is sent. However, if no packet is pending for transmission, then the system either a) waits until the next packet is received from the higher layer and then sends this packet with RPEB=TRUE, or b) informs the receiver that there are currently no more packets to send. A shorter message than the packet can be used instead to inform the receiver that packets have been discarded; thereby conserving bandwidth.

In a third case, if a NACK is received for ESN1 in the interval DSN to BSN, and the covered ACK range for the NACK is greater than BSN-ESN1, and at least one packet is not yet discarded, and at least one outstanding packet exists that has a sequence number $\geqq BSN$, then the first outstanding packet after BSN, as indicated by the NACK message, is retransmitted with RPEB=TRUE.

In a fourth case, if a) a NACK is received for ESN1 in the interval between DSN and BSN, and b) the covered ACK range for the NACK is greater than BSN-ESN1, and c) at least one packet exists that has been sent but not acknowledged either positively or negatively and which has a sequence number after the packet indicated by the NACK message, and d) there are no outstanding packets indicated in the NACK message with sequence numbers $\geqq BSN$, then the first packet after the packets indicated in the NACK message is retransmitted with RPEB=TRUE. A shorter message than the packet can be used instead to inform the receiver that packets have been discarded, thereby saving bandwidth.

In a fifth case, if a) a NACK is received for ESN1 in the interval DSN to BSN, and b) the covered ACK range for the NACK is greater than BSN-ESN1, and c) no packet exists after the packet indicated by the NACK message, and d) there are no outstanding packets indicated in the NACK message with sequence numbers $\geqq BSN$, then a packet which is pending for transmission is sent with RPEB=TRUE. In other words, when all packets having sequence numbers N(S) in the range from BSN to TSN (i.e., $TSN \leqq N(S) \leqq BSN$) have been positively acknowledged, then a packet which is pending for transmission is sent with RPEB=TRUE. However, if no packet is pending for transmission, then the system waits until the next packet is received from the higher layer and then sends this next packet with RPEB=TRUE, or alerts the receiver that there are currently no more packets to send. A shorter message than the packet can be used instead to alert the receiver that packets have been discarded, thereby saving bandwidth.

In a sixth case, when a timer-initiated retransmission of a packet occurs, and ISN=BSN, then RPEB should be set to TRUE. Otherwise, RPEB should be set to FALSE. Alternatively, RPEB can be set to TRUE when ((ISN=BSN) and (BSN≠DSN)), and can otherwise be set to FALSE.

US 6,424,625 B1

9

When a correct packet with RPEB=TRUE is received, then all packets preceding this packet and up to the next outstanding packet will be released from the buffer and forwarded to the higher layer. The application or the other layers decide whether the packets can be used or not, if delay and assembly requirements are met.

In the case where a window of size $<2^{k-1}$ is used, no additional discard capability concerns are necessary to consider, beyond the ordinary requirement imposed by Selective Reject itself.

In another embodiment of the invention for use with a Go-Back-N scheme, it is assumed that resynchronization takes place only when a NACK is received and N(R)<BSN. Then the transmitter will have full knowledge of the receiver state, i.e., ESN is known. Note that there exists a case where a NACK as described above is received and the receiver can wait one round-trip delay period to ensure full knowledge of the receiver state. In other words, when a retransmission of the NACKed packet has just been performed and it is not known if the packet has passed all buffers and other delay-causing functions, the receiver can wait one round-trip delay period. Here, renumbering of packets sequence number can be performed, such that the first ARQ packet sent after the renumbering will carry the same sequence number as that of the packet to which the NACK referred.

In FIG. 13, a NACK is received for a discarded packet, since ESN precedes BSN. Consequently, all subsequent packets from BSN and onwards are renumbered such that the BSN packet starts with ESN, the BSN+1 packet is renumbered to ESN+1, and so on. Note, renumbering is not performed for timer-initiated retransmissions.

In another embodiment of the invention for use with a basic Go-Back-N scheme, the receiver and the transmitter are resynchronized at each discard occasion. In this embodiment, ARQ packets can only be discarded if they have not previously been acknowledged.

The resynchronization is initiated by the transmitter, since it knows when a discard has been performed. The transmitter ask for a sequence number, up to which (but not including) the receiver has accepted ARQ packets. If the sequence number is before the last discarded sequence number, then the transmitter commands the receiver to start over from some arbitrarily chosen, but predefined, sequence number. The next sent packets are numbered upwards from this arbitrarily chosen sequence number. As an alternative, only the transmitter is resynchronized, such that the first packet sent after the resynchronization has the same sequence number as the next packet expected by the receiver.

In various embodiments of the invention, a magnitude of W can be defined when a call is initially set up between a transmitter and a receiver within a data network, in accordance with the particular application involved. For example, when the transmitter is initialized by a higher layer of software in the data network, it can select the magnitude of W and inform the receiver of this magnitude, and vice versa. The information indicating the magnitude of W can be sent from the transmitter to the receiver (or vice versa) using a control message.

In summary, the various embodiments of the invention increase throughput of a communications system using ARQ packets by discarding outdated packets. In addition, the various embodiments of the invention reduce a risk that the ARQ buffer in the transmitter will overflow. Those skilled in the art will also recognize that the principles described above with respect to the various embodiments of the invention can be applied to Stop-and-Wait ARQ schemes.

10

It will be appreciated by those skilled in the art that the present invention can be embodied in other specific forms without departing from the spirit or essential characteristics thereof, and that the invention is not limited to the specific embodiments described herein. The presently disclosed embodiments are therefore considered in all respects to be illustrative and not restrictive. The scope of the invention is indicated by the appended claims rather than the foregoing description, and all changes that come within the meaning and range and equivalents thereof are intended to be embraced therein.

What is claimed is:

1. A method for discarding packets in a data network employing a packet transfer protocol including an automatic repeat request scheme, comprising the steps of:

a transmitter in the data network commanding a receiver in the data network to a) receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet and b) release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet; and

the transmitter discarding all packets for which acknowledgment has not been received, and which have sequence numbers prior to the at least one packet.

2. The method of claim 1, wherein each of the at least one packet includes a receive enforcement bit, and the step of commanding comprises the steps of:

setting the receive enforcement bit for each of the at least one packet to a TRUE value; and

sending the at least one packet to the receiver.

3. The method of claim 1, wherein the step of commanding comprises the steps of:

setting a receive enforcement bit to a TRUE value for each at least one packet; and

sending the at least one receive enforcement bit set to TRUE together with identification of a transmitter sending the packets and the sequence numbers of the packets in a control message to the receiver.

4. The method of claim 1, wherein the method pertains to a go-back-n automatic repeat request scheme and further comprises the steps of:

defining a maximum top sequence number equal to a value $(DSN+2^{k-1})$, where DSN is a sequence number indicating that all packets having sequence numbers previous to DSN have been acknowledged by a receiver in the data network as having been received, and k is a number of bits in a sequence number field for a packet in the data network;

accepting a received packet when a receive enforcement bit for the received packet is set to TRUE and $N(S)-ESN<2^{k-1}$, where N(S) is a sequence number of the received packet and ESN is an expected sequence number of a next packet to be received; and

performing one of a) a restart of the automatic repeat request scheme and b) reporting a failure event to a management control system when the receive enforcement bit for the received packet is set to TRUE and $N(S)-ESN\geq2^{k-1}$.

5. The method of claim 1, wherein the method pertains to a go-back-n automatic repeat request scheme and further comprises the steps of:

constraining a top sequence number TSN according to the rules $(TSN\leq DSN-1)$, $(TSN\leq BSN+W)$ and $(1\leq W\leq2^{k-1})$, where k is a number of bits in a sequence

US 6,424,625 B1

11

number field for a packet in the data network, DSN is a sequence number indicating that all packets having sequence numbers previous to DSN have been acknowledged by a receiver in the data network as having been received, BSN is a bottom sequence number indicating a sequence number of an oldest packet stored in a transmit buffer of a transmitter in the data network, and W is a window size known to both the receiver and the transmitter, within which packets are tracked;

accepting a received packet when a receive enforcement bit for the received packet is set to TRUE and $N(S)-ESN<2^k-W$, where $N(S)$ is a sequence number of the received packet and ESN is an expected sequence number of a next packet to be received;

performing one of a) a restart of the automatic repeat request scheme and b) reporting a failure event to a management control system when the receive enforcement bit for the received packet is set to TRUE and $N(S)-ESN\geq2^k-W$; and

constraining BSN according to the rule $(DSN\leq BSN\leq TSN)$.

6. The method of claim **1**, wherein the method pertains to a selective repeat automatic repeat request scheme and further comprises the steps of:

constraining a bottom sequence number BSN indicating a sequence number of an oldest packet stored in a transmit buffer of a transmitter in the data network, and a top sequence number TSN according to the rules $(DSN\leq BSN\leq TSN\leq TSN_{MAX})$, where DSN is a sequence number indicating that all packets having sequence numbers previous to DSN have been acknowledged by a receiver in the data network as having been received, $TSN_{MAX}$ is a maximum top sequence number, $(TSN_{MAX}-DSN=2^{k-1})$, and k is a number of bits in a sequence number field for a packet in the data network;

accepting a received packet when a receive enforcement bit for the received packet is set to TRUE and $N(S)-ESN<2^{k-1}$, where $N(S)$ is a sequence number of the received packet and ESN is an expected sequence number of a next packet to be received; and

performing one of a) a restart of the automatic repeat request scheme and b) reporting a failure event to a management control system when the receive enforcement bit for the received packet is set to TRUE and $N(S)-ESN\geq2^{k-1}$.

7. The method of claim **6**, further comprising the steps of:

when a) a first packet having a sequence number after DSN and before BSN is negatively acknowledged, b) a number of packets that are prior to the first packet and not positively acknowledged is less than a difference between BSN and the sequence number of the first packet, and c) TSN≠BSN, setting a receive enforcement bit for the packet indicated by BSN and resending the packet indicated by BSN from the transmitter to the receiver.

8. The method of claim **6**, further comprising the steps of:

when a) a first packet having a sequence number after DSN and before BSN is negatively acknowledged, b) a number of packets that are prior to the first packet and not positively acknowledged is less than a difference between BSN and the sequence number of the first packet, and c) TSN=BSN,

if a packet is pending for transmission, then setting a receive enforcement bit for the pending packet to

12

TRUE and sending the pending packet from the transmitter to the receiver;

if no packets are pending for transmission, then performing one of a) waiting until a packet is received from a higher layer and b) informing the receiver that no packets are pending.

9. The method of claim **6**, further comprising the steps of:

when a) a first packet having a sequence number after DSN and before BSN is negatively acknowledged, b) a number of packets that are prior to the first packet and not positively acknowledged is greater than a difference between BSN and the sequence number of the first packet, and c) TSN≠BSN, setting a receive enforcement bit for a first outstanding packet after BSN and resending the first outstanding packet from the transmitter to the receiver.

10. The method of claim **6**, further comprising the steps of:

when a) a first packet having a sequence number after DSN and before BSN is negatively acknowledged, b) a number of packets that are prior to the first packet and not positively acknowledged is greater than a difference between BSN and the sequence number of the first packet, c) at least one packet exists after the first packet, and d) there are no negatively acknowledged packets having sequence numbers after BSN, setting a receive enforcement bit for a first packet after BSN and resending the first packet after BSN from the transmitter to the receiver.

11. The method of claim **6**, further comprising the steps of:

when a first packet having a sequence number after DSN and before BSN is negatively acknowledged, and all packets having sequence numbers greater than or equal to BSN and less than TSN have been positively acknowledged,

if a packet is pending for transmission, then setting a receive enforcement bit for the pending packet to TRUE and sending the pending packet from the transmitter to the receiver;

if no packets are pending for transmission, then performing one of a) waiting until a packet is received from a higher layer and b) informing the receiver that no packets are pending.

12. The method of claim **6**, further comprising the steps of:

when a timer-initiated retransmission of a packet occurs, and ISN=BSN, setting a receive enforcement bit for the packet to TRUE; and

when a timer-initiated retransmission of the packet occurs, and ISN≠BSN, setting the receive enforcement bit for the packet to FALSE; wherein

ISN indicates a sequence number of a next packet to be sent.

13. The method of claim **6**, further comprising the steps of:

when (ISN=BSN) and (BSN≠DSN), setting a receive enforcement bit for the packet to TRUE, and otherwise setting the receive enforcement bit for the packet to FALSE, where ISN indicates a sequence number of a next packet to be sent.

14. A method for discarding packets in a data network employing a packet transfer protocol including a go-back-n automatic repeat request scheme, comprising the steps of:

US 6,424,625 B1

13

discarding at least one packet from a transmitter;

receiving a NACK for the at least one packet from a receiver; and

assigning consecutive sequence numbers to non-discarded packets adjacent to the at least one packet.

15. A method for discarding packets in a data network employing a packet transfer protocol including a go-back-n automatic repeat request scheme, comprising the steps of:

a transmitter in the data network discarding at least one packet that has been sent by the transmitter but has not been acknowledged by a receiver in the data network as received;

after discarding the at least one packet, resynchronizing the transmitter and the receiver so that the last packet received by the receiver and the next packet to be transmitted by the transmitter have consecutive sequence numbers.

16. The method of claim 15, wherein the step of resynchronizing comprises the steps of:

determining what sequence number the receiver expects to receive next; and

when the expected sequence number is different from the sequence number of the packet to be sent next from the transmitter, assigning the expected sequence number to the packet to be sent next from the transmitter.

17. The method of claim 15, wherein the step of resynchronizing comprises the steps of:

14

determining what sequence number the receiver expects to receive next; and

when the expected sequence number is different from the sequence number of the packet to be sent next from the transmitter, commanding the receiver to expect a sequence number of a next packet to be sent from the transmitter to the receiver.

18. The method of claim 15, wherein the step of resynchronizing comprises the step of commanding the receiver to expect a sequence number of a next packet to be sent from the transmitter to the receiver.

19. A method for discarding packets in a data network employing a packet transfer protocol including a go-back-n automatic repeat request scheme, comprising the steps of:

a transmitter in the data network discarding at least one packet that has been sent by the transmitter but has not been acknowledged by a receiver in the data network as received;

after discarding the at least one packet, resynchronizing the receiver and the transmitter by determining what sequence number the receiver next expects, and consecutively renumbering packets pending at the transmitter starting with the expected sequence number.

*    *    *    *    *

**A0057**

Paper No. _____

Filed on behalf of:   Telefonaktiebolaget L. M. Ericsson

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BROADCOM CORPORATION

Petitioner

v.

TELEFONAKTIEBOLAGET L.M. ERICSSON

Patent Owner

_____

Case IPR2013-00636
U.S. Patent Nos. 6,424,625

_____

**PATENT OWNER'S MOTION FOR ADDITIONAL DISCOVERY UNDER 37 C.F.R. § 42.51(b)**

**A0062**

Patent Owner Ericsson ("Ericsson") respectfully submits this motion to take additional discovery of Petitioner Broadcom, Inc. ("Broadcom"). Ericsson submits seven narrowly tailored Requests for Production relevant to whether Broadcom's petitions are barred under 35 U.S.C. §315(b). (Ex. 2001).

These Petitions for IPR were filed shortly after Ericsson obtained a judgment for infringement of the subject patents against several of Broadcom's customers in *Ericsson v. D-Link, el al* ("D-Link Lawsuit"). (Exs. 2002, 2003, 2004). Broadcom clearly had a substantial interest in that case because its "BCM4313 and BCM4321" chips formed the basis for some of the infringement allegations, (Petition at 2), and as Broadcom admits in its SEC filings, it is not uncommon for Broadcom to be "required to indemnify some customers and strategic partners under our agreements if a third party alleges or if a court finds that our products or activities have infringed upon, misappropriated or misused another party's proprietary rights." (Ex. 2005 at 46). To protect these interests, Broadcom "engage[s] in litigation to . . . determine the validity and scope of the proprietary rights of others, including [its] customers." *Id.* These IPRs are one example of Broadcom filing litigation on behalf of its customers pursuant to its indemnity obligations.[1]

For years, Broadcom has been working behind the scenes to help defeat Ericsson's infringement claims against its customers. Indeed, as far back as July 2010, Broadcom assisted Acer, Inc., a D-Link Lawsuit defendant, (Ex. 2002), in analyzing the very patents that are now the subject of Broadcom's petitions. When

---

[1]   Another chip supplier, Intel, actually intervened in the case, stating it had a direct and substantial interest because of its indemnity agreements. (Ex. 2006 at 3).

This page contains confidential information.


Please refer to A0075, which contains the redacted, public version of this page.

of the defendants, (Pet. Ex. 1010); and (2) a majority of the same references that the defendants relied upon for their invalidity claims in the D-Link Lawsuit. This level of coordination raises serious questions about whether Broadcom is in privity with the defendants and is likewise time barred from filing these petitions by §315(b).

Because the certain facts as to Broadcom's standing are not publicly available and because Ericsson has exhausted all efforts to obtain them voluntarily, Ericsson submits this Motion. The requests are useful and relevant to Broadcom's standing, which the PTO has expressly identified as a basis for obtaining discovery. Ericsson worked diligently to obtain this evidence, and Broadcom faces no undue burden in responding. As such, Ericsson meets the interests of justice standard.

## I.    The Discovery Request Is Relevant to Broadcom's Standing.

If Broadcom is a privy to any of the D-Link Defendants, it is barred from obtaining *inter partes* review under 35 U.S.C. § 315(b) because Ericsson served the "D-Link Defendants"[2] more than one year before these petitions were filed. (Ex. 2004). The discovery sought goes directly to Section 315(b)'s application.

The PTO specifically identified standing as an issue that warrants additional discovery. *See* 77 Fed. Reg. 48680, 48689 (Aug. 14, 2012) ("additional discovery may be authorized where patent owner raises sufficient concerns regarding the petitioner's certification of standing."). The PTO also allows the Board to "permit new testimonial evidence where it addresses issues relating to the petitioner's

---

[2] The "D-Link Defendants" include, collectively, D-Link Corp., D-Link Systems, Inc., Netgear, Inc., Acer Inc.("Acer"), Acer America Corp. and Gateway Inc., Dell, Inc., Toshiba Corp., Toshiba America, Inc., Toshiba America Information Systems, Inc., Toshiba America Consumer Products, LLC, and Belkin International, Inc. (Exs. B, C)

3

**A0065**

standing, or where . . . the evidence demonstrates that the trial may not be instituted." *Trial Practice Guide*, 77 Fed. Reg. 48756, 48764 (Aug. 14, 2012) ("TPG"). Thus, the PTO clearly intends to allow additional discovery for standing issues, like § 315.

Under § 315(b), IPR should be denied because Broadcom is in privity with at least one D-Link Defendant. The term "privity" describes a relationship between a litigant and a nonparty that is characterized by a "mutuality of interest," *Black's Law Dictionary*, 5th Ed. (1979), sufficient to justify applying principles of claim or issue preclusion to the nonparty, TPG at 48759. The PTO expanded the doctrine by noting its equitable and practical nature and stating it "should extend to parties to transactions and other activities relating to the property in question." TPG at 48759 (quoting 157 Cong. Rec. S1376 (dialed ed. Mar. 8, 2011) (statement of Sen. Kyl)).

Under this expanded doctrine,[3] the Board must "evaluate what parties constitute 'privies' in a manner consistent with the flexible and equitable considerations established under federal caselaw." TPG at 48759. For example, the TPG cites *Taylor v. Sturgell*, 553 U.S. 880, 893-95 (2008), as support for its interpretation. *Id.* In doing so, the Board must determine if the parties' relationship is "sufficiently close such that both should be bound by the trial outcome and related estoppels." *Id.*; *see* 154 Cong. Rec. S9987 (Sept. 27, 2008) (statement of Sen. Kyl). "A common consideration is whether the non-party exercised or could have exercised control over a party's participation in a proceeding." *Id.*

---

[3] Section 315(b) under the AIA also expanded on former 35 U.S.C. § 317(b) by precluding real parties in interest in addition to privies. *See* former 35 U.S.C. § 317(b) (1999), *amended by* 35 U.S.C. § 317, Pub. L. No. 112-29, § 6(a), 125 Stat. 303 (2011).

4

**A0066**

Also, the Supreme Court set forth six categories for determining whether a nonparty to a suit is bound by its judgment in *Taylor,* and the PTO expressly validated them as guidelines for determining privity. *See* TPG at 48759. One category asks whether the nonparty maintains a "substantive legal relationship" with a party in suit. 553 U.S. at 894. This theory "originated 'as much from the needs of property law as from the values of preclusion by judgment.'" *Id.* (citations omitted).

Indemnity relationships satisfy *Taylor's* reasoning;[4] numerous federal courts agree and state that indemnity relationships justify third party preclusion. *See, F.T.C. v. Garvey,* 383 F.3d 891, 898 (9th Cir. 2004) ("To deny the right of indemnification would be to destroy the indemnitee's right by the result of an action . . . It is far better to preclude the third person . . . who often could have joined both adversaries in the first action."); *SCAC Transp. (USA) Inc. v. S.S. Danaos*, 845 F.2d 1157, 1162 (2d Cir. 1988) (indemnitor is precluded from disputing issues determined in the indemnitee's judgment); *Jennings v. U.S.*, 374 F.2d 983, 985 (4th Cir. 1967) ("where an indemnitor is notified and can take part in – indeed may control – the litigation, he is precluded from contesting the indemnitee's liability in the subsequent indemnity action.").

*Taylor* relies on the Restatement (second) of Judgments, 553 at 893 n. 6, which acknowledges that indemnity relationships justify privity preclusion. If an indemnitor has received "reasonable notice of the action" but declines to participate in the

---

[4] Broadcom relies on *Apple, Inc. v. Achates Ref. Publ'g, Inc.*, IPR2013-00080, Paper No. 18 (2013). However, Achates relied solely on an unsigned, public agreement with no evidence of concerted action. Here, evidence of Broadcom's past influence in negotiations, litigation history, corporate filings, contemporaneous attacks, *and* an indemnity agreement are evidence of control and a substantive legal relationship.

5

This page contains confidential information.

Please refer to A0079, which contains the redacted, public version of this page.

**A0068**

IPR2013-00636
Patent 6,424,625

A. <u>Useful information will be uncovered with additional discovery.</u>

Ericsson is already "in possession of a threshold amount of evidence or reasoning tending to show beyond speculation that something useful will be uncovered." *Garmin, supra,* at 7. "'Useful' means favorable in substantive value to a contention of the party moving for discovery." *Id.* Ericsson has come forward with considerable direct and circumstantial evidence that Broadcom colluded with the Defendants because of its indemnity obligations. (Exs. 2005, 2007, 2008, 2009, 2016). Ericsson has further evidence of the existence of the nature of this relationship but cannot submit this evidence because of confidentiality provisions that Broadcom and others refuse to waive. (Ex. 2012). Broadcom does not deny the existence of such indemnity agreements. *Id.* If produced, these contracts will be useful to reveal the full scope of these substantive legal relationships and Broadcom's participation in the D-Link Lawsuit so that the Board can sufficiently rule on Broadcom's standing.

B. <u>Equivalent information is not obtainable by any other means.</u>

Ericsson has actively pursued discovery from Broadcom and the defendants. First, Ericsson made limited requests from Broadcom related to the contractual relationships. (Ex. 2011). Broadcom did not, and still does not, deny the existence of the contracts, but instead relies on their confidentiality to avoid a 315(b) analysis. (Ex. 2012). Second, Ericsson asked the defendants to permit its IPR counsel to review any contracts relating to the "BCM4312 and BCM4321" chips without being subject

---

reasonably tailored to its genuine need to determine the relationship between Broadcom and the D-Link Defendants. Finally, the requests will not require a significant expenditure of human or financial resources, as they primarily relate to specific contracts and communications. *Garmin supra,* at 6-7.

7

**A0069**

to the "Prosecution Bar" in the Protective Order. (Ex. 2011). Broadcom's customers refused to waive that provision without Broadcom's consent. (Ex. 2013, 2014). Once again, Broadcom stonewalled Ericsson by hiding behind the protective order.[6]

Here, the parties to the relevant contracts and communications possess this evidence and it is amenable to concealment because all actions by the parties are taken behind closed doors, apparently locked by Confidentiality Agreements. Considering the nature and effect of this information, Ericsson has made all possible attempts to obtain it by other means. *Garmin*, *supra*, at 6. Thus, Ericsson has satisfied each factor; its limited requests should be granted in the interests of justice.

**C. Conclusion**

If the Board denies Ericsson's request, it is difficult to conceive of a case in which discovery into standing will be permitted, despite the TPG's indication to the contrary. Patent owners will rarely if ever be in possession of indemnity agreements and, if they are, they will be unable to rely upon them because of a protection order. This will promote collusion among parties and thereby undermine the policy behind §315(b) that encourages litigates to bring their validity challenges to the Board in a timely manner. Without an order from the Board, this evidence will seldom be obtainable by any patent owner. Thus, as the PTO has declared, patent owners require the use of additional discovery; otherwise, § 315(b) will essentially be eviscerated.

---

[6] Ericsson has concurrently filed an Emergency Motion for Relief from the Protective Order in the district court. (*See* Ex. 2015). To the extent the Board is inclined to deny Ericsson's motion as "speculative" in the absence of the underlying indemnity agreements, despite the circumstantial evidence, Ericsson requests that the Board hold the present motion in abeyance until the district rules on Ericsson' motion.

IPR2013-00636
Patent 6,424,625

Dated: December 11, 2013.

/Peter J. Ayers/
PETER AYERS
Lee & Hayes, PLLC
13809 Research Blvd., Suite 405
Austin, TX 78750
Telephone: 512.505.8162
Fax: 509.944.4693
Attorney for Patent Owner Telefinakteibolaget
    LM Ericsson

9

**A0071**

IPR2013-00636
Patent 6,424,625

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 11, 2013 the foregoing PATENT OWNER'S MOTION FOR ADDITIONAL DISCOVERY UNDER 37 C.F.R. § 42.51(b) was served on Lead and Back-up Counsel for Broadcom Corporation by sending the same via Federal Express to the service address provided in Broadcom's Mandatory Notices:

> Dominic E. Massa, Lead Counsel
> Michael A. Diener, Back-up Counsel
> Wilmer Cutler Pickering Hale and Dorr, LLP
> 60 State Street
> Boston, MA 02109

LEE & HAYES PLLC


   /Peter J. Ayers/
Peter J. Ayers, Reg. No. 38,374

10

**A0072**

Paper No. _____

Filed on behalf of:   Telefonaktiebolaget L. M. Ericsson

# UNITED STATES PATENT AND TRADEMARK OFFICE

_____

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

## BROADCOM CORPORATION

Petitioner

v.

## TELEFONAKTIEBOLAGET L.M. ERICSSON

Patent Owner

_____

Case IPR2013-00636
U.S. Patent Nos. 6,424,625

_____

**PATENT OWNER'S MOTION FOR ADDITIONAL DISCOVERY UNDER 37 C.F.R. § 42.51(b)**

Patent Owner Ericsson ("Ericsson") respectfully submits this motion to take additional discovery of Petitioner Broadcom, Inc. ("Broadcom"). Ericsson submits seven narrowly tailored Requests for Production relevant to whether Broadcom's petitions are barred under 35 U.S.C. §315(b). (Ex. 2001).

These Petitions for IPR were filed shortly after Ericsson obtained a judgment for infringement of the subject patents against several of Broadcom's customers in *Ericsson v. D-Link, el al* ("D-Link Lawsuit"). (Exs. 2002, 2003, 2004). Broadcom clearly had a substantial interest in that case because its "BCM4313 and BCM4321" chips formed the basis for some of the infringement allegations, (Petition at 2), and as Broadcom admits in its SEC filings, it is not uncommon for Broadcom to be "required to indemnify some customers and strategic partners under our agreements if a third party alleges or if a court finds that our products or activities have infringed upon, misappropriated or misused another party's proprietary rights." (Ex. 2005 at 46). To protect these interests, Broadcom "engage[s] in litigation to . . . determine the validity and scope of the proprietary rights of others, including [its] customers." *Id.* These IPRs are one example of Broadcom filing litigation on behalf of its customers pursuant to its indemnity obligations.[1]

For years, Broadcom has been working behind the scenes to help defeat Ericsson's infringement claims against its customers. Indeed, as far back as July 2010, Broadcom assisted Acer, Inc., a D-Link Lawsuit defendant, (Ex. 2002), in analyzing the very patents that are now the subject of Broadcom's petitions. When

---

[1] Another chip supplier, Intel, actually intervened in the case, stating it had a direct and substantial interest because of its indemnity agreements. (Ex. 2006 at 3).

1

CONFIDENTIAL MATERIAL REDACTED

discussing an upcoming meeting, Acer noted, "Main purpose is to discuss comments from Acer's vendors, including Intel, Broadcom and Atheros."  (Ex. 2007). More recently, Ericsson provided notice to Acer that it was seeking relief from the Protective Order in the D-Link Lawsuit to obtain the requested information by all other means. (Ex. 2008). In response, Acer admitted that such information was "privileged and [was] inadvertently produced." *Id.* This admission proves that a privilege exists that protects communications between Acer and Broadcom.

When its covert efforts failed to limit its indemnity obligations, Broadcom became more aggressive.

Broadcom now attacks Ericsson by petitioning for review of the same claims found to have been infringed by Broadcom's customers' use of its chips. Broadcom admits that it supplied the "Wi-Fi compliant products, such as the BCM4313 and BCM4321" to the defendants that were found to infringe. (Petition at 2). As Broadcom is now forced to indemnify its customers for damages and an ongoing activity, the timing and coordination of Broadcom's attacks is no coincidence. To be sure, Broadcom's petitions rely heavily on" (1) Ericsson's expert report on validity from the D-Link Lawsuit, a report that Broadcom could only have received from one

2

**A0075**

IPR2013-00636
Patent 6,424,625

of the defendants, (Pet. Ex. 1010); and (2) a majority of the same references that the defendants relied upon for their invalidity claims in the D-Link Lawsuit. This level of coordination raises serious questions about whether Broadcom is in privity with the defendants and is likewise time barred from filing these petitions by §315(b).

Because the certain facts as to Broadcom's standing are not publicly available and because Ericsson has exhausted all efforts to obtain them voluntarily, Ericsson submits this Motion. The requests are useful and relevant to Broadcom's standing, which the PTO has expressly identified as a basis for obtaining discovery. Ericsson worked diligently to obtain this evidence, and Broadcom faces no undue burden in responding. As such, Ericsson meets the interests of justice standard.

## I.    The Discovery Request Is Relevant to Broadcom's Standing.

If Broadcom is a privy to any of the D-Link Defendants, it is barred from obtaining *inter partes* review under 35 U.S.C. § 315(b) because Ericsson served the "D-Link Defendants"[2] more than one year before these petitions were filed. (Ex. 2004). The discovery sought goes directly to Section 315(b)'s application.

The PTO specifically identified standing as an issue that warrants additional discovery. *See* 77 Fed. Reg. 48680, 48689 (Aug. 14, 2012) ("additional discovery may be authorized where patent owner raises sufficient concerns regarding the petitioner's certification of standing."). The PTO also allows the Board to "permit new testimonial evidence where it addresses issues relating to the petitioner's

---

[2] The "D-Link Defendants" include, collectively, D-Link Corp., D-Link Systems, Inc., Netgear, Inc., Acer Inc.("Acer"), Acer America Corp. and Gateway Inc., Dell, Inc., Toshiba Corp., Toshiba America, Inc., Toshiba America Information Systems, Inc., Toshiba America Consumer Products, LLC, and Belkin International, Inc. (Exs. B, C)

3

**A0076**

standing, or where . . . the evidence demonstrates that the trial may not be instituted." *Trial Practice Guide*, 77 Fed. Reg. 48756, 48764 (Aug. 14, 2012) ("TPG"). Thus, the PTO clearly intends to allow additional discovery for standing issues, like § 315.

Under § 315(b), IPR should be denied because Broadcom is in privity with at least one D-Link Defendant. The term "privity" describes a relationship between a litigant and a nonparty that is characterized by a "mutuality of interest," *Black's Law Dictionary*, 5th Ed. (1979), sufficient to justify applying principles of claim or issue preclusion to the nonparty, TPG at 48759. The PTO expanded the doctrine by noting its equitable and practical nature and stating it "should extend to parties to transactions and other activities relating to the property in question." TPG at 48759 (quoting 157 Cong. Rec. S1376 (dialed ed. Mar. 8, 2011) (statement of Sen. Kyl)).

Under this expanded doctrine,[3] the Board must "evaluate what parties constitute 'privies' in a manner consistent with the flexible and equitable considerations established under federal caselaw." TPG at 48759. For example, the TPG cites *Taylor v. Sturgell*, 553 U.S. 880, 893-95 (2008), as support for its interpretation. *Id.* In doing so, the Board must determine if the parties' relationship is "sufficiently close such that both should be bound by the trial outcome and related estoppels." *Id.*; *see* 154 Cong. Rec. S9987 (Sept. 27, 2008) (statement of Sen. Kyl). "A common consideration is whether the non-party exercised or could have exercised control over a party's participation in a proceeding." *Id.*

---

[3] Section 315(b) under the AIA also expanded on former 35 U.S.C. § 317(b) by precluding real parties in interest in addition to privies. *See* former 35 U.S.C. § 317(b) (1999), *amended by* 35 U.S.C. § 317, Pub. L. No. 112-29, § 6(a), 125 Stat. 303 (2011).

4

**A0077**

Also, the Supreme Court set forth six categories for determining whether a nonparty to a suit is bound by its judgment in *Taylor,* and the PTO expressly validated them as guidelines for determining privity. *See* TPG at 48759. One category asks whether the nonparty maintains a "substantive legal relationship" with a party in suit. 553 U.S. at 894. This theory "originated 'as much from the needs of property law as from the values of preclusion by judgment.'" *Id.* (citations omitted).

Indemnity relationships satisfy *Taylor's* reasoning;[4] numerous federal courts agree and state that indemnity relationships justify third party preclusion. *See, F.T.C. v. Garvey*, 383 F.3d 891, 898 (9th Cir. 2004) ("To deny the right of indemnification would be to destroy the indemnitee's right by the result of an action . . . It is far better to preclude the third person . . . who often could have joined both adversaries in the first action."); *SCAC Transp. (USA) Inc. v. S.S. Danaos*, 845 F.2d 1157, 1162 (2d Cir. 1988) (indemnitor is precluded from disputing issues determined in the indemnitee's judgment); *Jennings v. U.S.*, 374 F.2d 983, 985 (4th Cir. 1967) ("where an indemnitor is notified and can take part in – indeed may control – the litigation, he is precluded from contesting the indemnitee's liability in the subsequent indemnity action.").

*Taylor* relies on the Restatement (second) of Judgments, 553 at 893 n. 6, which acknowledges that indemnity relationships justify privity preclusion. If an indemnitor has received "reasonable notice of the action" but declines to participate in the

---

[4] Broadcom relies on *Apple, Inc. v. Achates Ref. Publ'g, Inc.*, IPR2013-00080, Paper No. 18 (2013). However, Achates relied solely on an unsigned, public agreement with no evidence of concerted action. Here, evidence of Broadcom's past influence in negotiations, litigation history, corporate filings, contemporaneous attacks, *and* an indemnity agreement are evidence of control and a substantive legal relationship.

5

**A0078**

CONFIDENTIAL MATERIAL REDACTED

defense, absent a conflict of interest, it is "estopped from disputing the existence and extent of the indemnitee's liability" or "relitigating issues determined in the action" if the indemnitee reasonably defended the action. Restatement (Second) of Judgments § 57(1) (1982). The weight of authority strongly supports that an indemnity agreement constitutes a substantive legal relationship sufficient to establish privity.

Here, evidence will prove that Broadcom has had the opportunity to control and maintains a substantive legal relationship with the D-Link Defendants sufficient to bind Broadcom to the District Court's judgment. Broadcom's corporate policy on litigation on behalf of its customers, its influence in Acer's discussions with Ericsson, and its collateral attacks on the Ericsson patents in ▮▮▮▮▮▮ the PTO contemporaneously with the D-Link Lawsuit demonstrate the nature of their relationship and actions thereon. Each of these attacks is based on the same BCM4313 and BCM4321 chips and the same patent claims. Rather than intervene in the D-Link Lawsuit like Intel, Broadcom launched collateral attacks ▮▮▮▮▮▮ ▮▮▮▮ Broadcom has yet to deny the existence of these contracts – further supporting this collusive attempt to undermine the award.

## II.     Discovery Request Should Be Granted in the Interest of Justice

The Board may grant additional discovery when it is "necessary in the interest of justice." *See* 37 C.F.R. § 42.51(b)(2). Five factors control this standard. *See Garmin Int'l, Inc. v. Cuozzo Speed Tech., LLC*, IPR2012-00001, Notice 20 (2013). Given the length restrictions, Ericsson will concentrate on two factors, as the remaining factors can be proven by the Requests on their face.[5]

---

[5] Ericsson is not seeking Broadcom's litigation position, and the Requests' instructions are clear and concise. Further, each of Ericsson's requests is sensible and

6

**A0079**

IPR2013-00636
Patent 6,424,625

A. <u>Useful information will be uncovered with additional discovery.</u>

Ericsson is already "in possession of a threshold amount of evidence or reasoning tending to show beyond speculation that something useful will be uncovered." *Garmin, supra,* at 7. "'Useful' means favorable in substantive value to a contention of the party moving for discovery." *Id.* Ericsson has come forward with considerable direct and circumstantial evidence that Broadcom colluded with the Defendants because of its indemnity obligations. (Exs. 2005, 2007, 2008, 2009, 2016). Ericsson has further evidence of the existence of the nature of this relationship but cannot submit this evidence because of confidentiality provisions that Broadcom and others refuse to waive.  (Ex. 2012). Broadcom does not deny the existence of such indemnity agreements. *Id.* If produced, these contracts will be useful to reveal the full scope of these substantive legal relationships and Broadcom's participation in the D-Link Lawsuit so that the Board can sufficiently rule on Broadcom's standing.

B. <u>Equivalent information is not obtainable by any other means.</u>

Ericsson has actively pursued discovery from Broadcom and the defendants. First, Ericsson made limited requests from Broadcom related to the contractual relationships. (Ex. 2011). Broadcom did not, and still does not, deny the existence of the contracts, but instead relies on their confidentiality to avoid a 315(b) analysis. (Ex. 2012). Second, Ericsson asked the defendants to permit its IPR counsel to review any contracts relating to the "BCM4312 and BCM4321" chips without being subject

---

reasonably tailored to its genuine need to determine the relationship between Broadcom and the D-Link Defendants.  Finally, the requests will not require a significant expenditure of human or financial resources, as they primarily relate to specific contracts and communications. *Garmin supra,* at 6-7.

7

**A0080**

to the "Prosecution Bar" in the Protective Order. (Ex. 2011). Broadcom's customers refused to waive that provision without Broadcom's consent. (Ex. 2013, 2014). Once again, Broadcom stonewalled Ericsson by hiding behind the protective order. [6]

Here, the parties to the relevant contracts and communications possess this evidence and it is amenable to concealment because all actions by the parties are taken behind closed doors, apparently locked by Confidentiality Agreements. Considering the nature and effect of this information, Ericsson has made all possible attempts to obtain it by other means. *Garmin*, *supra*, at 6. Thus, Ericsson has satisfied each factor; its limited requests should be granted in the interests of justice.

**C. Conclusion**

If the Board denies Ericsson's request, it is difficult to conceive of a case in which discovery into standing will be permitted, despite the TPG's indication to the contrary. Patent owners will rarely if ever be in possession of indemnity agreements and, if they are, they will be unable to rely upon them because of a protection order. This will promote collusion among parties and thereby undermine the policy behind §315(b) that encourages litigates to bring their validity challenges to the Board in a timely manner. Without an order from the Board, this evidence will seldom be obtainable by any patent owner. Thus, as the PTO has declared, patent owners require the use of additional discovery; otherwise, § 315(b) will essentially be eviscerated.

---

[6] Ericsson has concurrently filed an Emergency Motion for Relief from the Protective Order in the district court. (*See* Ex. 2015). To the extent the Board is inclined to deny Ericsson's motion as "speculative" in the absence of the underlying indemnity agreements, despite the circumstantial evidence, Ericsson requests that the Board hold the present motion in abeyance until the district rules on Ericsson' motion.

8

**A0081**

IPR2013-00636
Patent 6,424,625

Dated: December 11, 2013.

/Peter J. Ayers/

PETER AYERS
Lee & Hayes, PLLC
13809 Research Blvd., Suite 405
Austin, TX 78750
Telephone: 512.505.8162
Fax: 509.944.4693
Attorney for Patent Owner Telefinakteibolaget
  LM Ericsson

9

**A0082**

IPR2013-00636
Patent 6,424,625

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 11, 2013 the foregoing PATENT

OWNER'S MOTION FOR ADDITIONAL DISCOVERY UNDER 37 C.F.R. §

42.51(b) was served on Lead and Back-up Counsel for Broadcom Corporation by

sending the same via Federal Express to the service address provided in Broadcom's

Mandatory Notices:

> Dominic E. Massa, Lead Counsel
> Michael A. Diener, Back-up Counsel
> Wilmer Cutler Pickering Hale and Dorr, LLP
> 60 State Street
> Boston, MA 02109

LEE & HAYES PLLC

  /Peter J. Ayers/
Peter J. Ayers, Reg. No. 38,374

10

**A0083**

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

BROADCOM CORPORATION

Petitioner

v.

TELEFONAKTIEBOLAGET L.M. ERICSSON

Patent Owner

Case IPR2013-00636
U.S. Patent No. 6,424,625

**PETITIONER'S OPPOSITION TO PATENT OWNER'S MOTION FOR
ADDITIONAL DISCOVERY UNDER 37 C.F.R. § 42.51(b)**

ActiveUS 119713245v.1

**A0084**

Ericsson's ("Ericsson") Motion for Additional Discovery from Broadcom Corporation ("Broadcom") (the "Motion") should be denied because Broadcom is not in privity with the Texas Defendants[1] and because Ericsson has not demonstrated that its requested additional discovery is "necessary in the interest of justice." 35 U.S.C. § 316(a)(5); 37 C.F.R. § 42.51(b)(2)(i).

Discovery in *inter partes* review ("IPR") is "less than what is normally available in district court patent litigation" because "Congress intended *inter partes* review to be a quick and cost effective alternative to litigation." IPR2013-00080, Paper 18 at 3. The Board must therefore be "conservative in authorizing additional discovery." *Id.* Additional discovery–like that requested in Ericsson's Motion– should only be permitted where such discovery is "necessary in the interest of justice." *Id.*, at 4. And the requested discovery must be more than a speculation or "mere possibility." *Id.* There must be "factual evidence or support" underlying a request for additional discovery that demonstrate that "something useful [to the proceeding] will be found." *Id.* Ericsson, despite all its colorful rhetoric about Broadcom's "covert efforts" (Mot. at 2), and "attacks" on Ericsson and its patents (*id.* at 2), has failed entirely to satisfy this standard.

---

[1] The "Texas Defendants" are the defendants in *Ericsson Inc. v. D-Link Corp. et al.*, Civil Action No. 10-cv-473 (E.D. Tex.) ("Texas Litigation"), namely D-Link Corp., D-Link Systems, Inc., Netgear, Inc., Acer Inc., Acer America Corp., Gateway Inc., Dell, Inc., Toshiba Corp., Toshiba America, Inc., Toshiba America Information Systems, Inc., Toshiba America Consumer Products, LLC, and Belkin International, Inc. Broadcom is not a defendant.

1

Indeed, Ericsson's Motion, which by Ericsson's own admission is premised on "circumstantial evidence," (Mot. at 8, n.6) is precisely the type of "fishing expedition" the Board cautioned against during the December 6, 2013 conference call allowing Ericsson's Motion.  In its Order Authorizing Motion for Additional Discovery, the Board required that Ericsson explain specifically why the discovery sought was "relevant to determining whether any of the [Texas Defendants] are real parties in interest or privies of Petitioner." *Id.* at 3.  Ericsson failed to make such a showing.  And any effort to do so is futile, because Broadcom is not in privity with the Texas Defendants, and no amount of discovery in this proceeding or in the Texas Litigation will prove otherwise.

Ericsson also unreasonably delayed in raising this issue with Broadcom and the Board.  Ericsson has been aware of the facts upon which its Motion is based since Broadcom filed its Petitions in September.  But Ericsson waited until November 15, 2013 to first approach Broadcom regarding this issue.  Ex. 2010.  Ericsson then delayed further in approaching the Board, waiting until December 6, 2013 to seek permission to file this Motion.  Ericsson's behavior suggests that it is more interested in engaging in irrelevant discovery to delay the Board's processes than the central issue for this IPR – the invalidity of Ericsson's patents.

I.    **Ericsson's Requested Discovery Is Futile**

A.    **Broadcom Is Not in Privity with the Texas Defendants**

2

ActiveUS 119713245v.1

Ericsson alleges that additional discovery is necessary to establish that Broadcom is in privity with one or more of the Texas Defendants and therefore barred under 35 U.S.C. § 315(b) from pursuing its IPR petitions. Motion at 3. Ericsson's "evidence" of such purported privity consists of vague and speculative allegations regarding potential indemnity provisions in product purchase agreements between Broadcom and at least one Texas Defendant. Motion at 4. But the existence of indemnity provisions alone is not, as Ericsson asserts, sufficient to establish privity. *See* IPR2013-00175, Paper 20 (July 23, 2013) ("indemnification is not one of the "substantive legal relationships" cited in *Taylor* [] as binding a person not a party to a lawsuit to a judgment in that suit."); *see also* IPR2013-00080, Paper 18 at 6 ("Indemnification is not one of the 'substantive legal relationships' cited in *Taylor* [] and is significantly different from those relationships, which involve successive property interest.")[2]

Whether privity exists focuses on "how courts generally have used the terms to 'describe relationships and considerations sufficient to justify applying conventional principles of estoppel and preclusion.'" IPR2013-000080, Paper 18 at 4. The Board must evaluate "whether a non-party may be recognized as a 'real

---

[2] In *Taylor v. Sturgell*, 553 U.S. 880 (2008), the Supreme Court held that "non-party preclusion may be justified based on a variety of "substantive legal relationship[s]" between the person to be bound and a party to the judgment. Qualifying relationships include, but are not limited to, preceding and succeeding owners of property, bailee and bailor, and assignee and assignor." *Id.* at 894.

3

ActiveUS 119713245v.1

**A0087**

*CONFIDENTIAL MATERIAL REDACTED*

party-in-interest' or 'privy'" and must do so "in a manner consistent with the flexible and equitable considerations established under federal caselaw." Fed. Reg. at 48759-60 (relevant factors for privity include whether the non-party funded or directed the proceedings or "exercised or could have exercised control over a party's participation in a proceeding.") Ultimately, the Board must determine whether the relationship between two parties is "sufficiently close that both should be bound by the trial outcome and related estoppels." 77 Fed. Reg. 48756, 48759.



Ericsson cannot offer evidence to the contrary. In addition to its assertions regarding Broadcom's purported indemnity obligations, Ericsson identifies Exhibits 2005, 2007, 2009 and 2016 as "evidence" in support of its Motion. (Mot.

4

ActiveUS 119713245v.1

**A0088**

*CONFIDENTIAL MATERIAL REDACTED*

at p. 7).[3] But Ericsson's allegations fail under even the most cursory review. For example, Exhibit 2005 is simply a general risk statement in Broadcom's SEC filings discussing the attendant risks for Broadcom of patent litigation brought against its customers. Ex. 2005 at p. 46. Exhibit 2007 is an email chain between Acer, Broadcom, Atheros, and Intel that merely states that Acer is going to discuss technical comments from Broadcom, one of its chipset suppliers, regarding Ericsson's infringement allegations. Ex. 2007 at p.1. Providing technical information to a customer does not establish "control" or "privity." ███████

███████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████████

█████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████.[4]

---

[3] Although Ericsson refers to an "Exhibit 2016", no such Exhibit exists.

[4] Ericsson argues that Exhibit 2008 shows a common interest privilege between Acer and Broadcom because certain documents produced in the Texas Litigation "were inadvertently produced during email discovery," thus proving that "a privilege exists that protects communications between Acer and Broadcom." Mot.

5

ActiveUS 119713245v.1

## II.    Ericsson's Additional Discovery Is Not "Necessary in the Interests of Justice"

The Board may grant additional discovery in IPRs only where such discovery is necessary "in the interests of justice."  37 C.F.R. § 42.51(b)(2).  The requested discovery must be "more than a possibility and mere allegation." IPR2012-00001, Paper No. 26 at 6.  The Board has previously articulated five factors that are relevant to determining whether additional discovery is warranted in IPRs, only two of which are relevant to this Motion.  *Id.*, at 6.[5]  Ericsson's discovery requests fail under each of these two factors.

### 1.    Ericsson's Requested Discovery Will Not Yield "Useful Information"

To prevail in its request for additional discovery, Ericsson must demonstrate that it is "already be in possession of a threshold amount of evidence or reasoning tending to show beyond speculation that something useful will be uncovered."  *See Id.*, at 7.  "Useful" in this context means information that is not merely "relevant"

---

at p. 2.  Ericsson's assertion is without merit.  Existence of (or participation in) a joint defense group is not sufficient to establish privity.  C.F.R. 48760 (party not a "'real party-in-interest' or a 'privy'" based on participation in a Joint Defense Group; *Innovad Inc. v. Microsoft Corp.*, 260 F.3d 1326, 1334 (Fed. Cir. 2001)).
[5] Although Ericsson fails to address the burden associated with responding to its discovery requests or whether the requests seek Broadcom's litigation positions, these factors weigh against the discovery Ericsson seeks.  IPR2012-00001, Paper 26 at 6-7.  Ericsson's request for "communications between Broadcom (or its counsel) and any of the D-Link Defendants (or their counsel) regarding validity" of the patents at issue in the Texas litigation is overly broad, and further evidence that Ericsson's discovery requests are nothing more than a fishing expedition.

6

ActiveUS 119713245v.1

**A0090**

or "admissible" but that which is "favorable in substantive value to a contention of the party moving for discovery." *See id.*, at 7.

Ericsson cannot satisfy this heightened burden. Ericsson asserts its requested additional discovery–which Ericsson concedes is premised on "circumstantial evidence" (Mot. at 8, n.6)–will establish that Broadcom is in privity with the Texas Defendants. But Broadcom is not in privity with the Texas Defendants, and no amount of discovery by Ericsson will establish that it is.

### 2.    Ericsson Cannot Generate "Equivalent Information" Because No Such Information Exists

Ericsson complains that the Board must grant its request for "additional discovery" because it cannot "generate equivalent information by other means." Mot. at 7. This argument fails for, at least, three reasons. *First*, there is no "equivalent information" for Ericsson to generate because the information Ericsson seeks will not establish Broadcom is in privity with any of the Texas Defendants.

*Second*, according to Ericsson's own motion and its conduct in the Texas Litigation, Ericsson's additional discovery is not necessary because Ericsson has sought the same information through other means. On December 6, 2013–two and a half months after Broadcom's IPR filing–Ericsson filed an "emergency" motion in the Texas Litigation seeking production for use in this IPR certain categories of documents that it also seeks through this Motion. Ex. 1018. In its Texas motion, Ericsson requested that the Court order production of such documents in sufficient

7

time for Ericsson to submit those document as part of the Patent Owner's Statement. *Id*. at p. 1. Ericsson's motion in the Texas Litigation is fully briefed and pending before the Texas Court. Ex. 1019.[6]

*Finally*, Ericsson is incorrect that its additional discovery is warranted because Broadcom has "stonewalled Ericsson by hiding behind the [Texas] protective order" and by refusing to allow the Texas Defendants to produce Ericsson's requested information. *Id*. at 8. Broadcom is not a party to the Texas Litigation, and it does not control the conduct of the Texas Defendants. Broadcom therefore cannot require the Texas Defendants to waive the terms of a Protective Order that Broadcom did not negotiate. Ex. 2011 at p.1-2.

## III.    CONCLUSION

For the reasons stated above, Broadcom respectfully requests that Ericsson's Motion be denied.

Dated: December 20, 2013.

<div style="margin-left:50%">

Respectfully submitted,

/Dominic E. Massa/
Dominic E. Massa, Reg. No. 44,905
60 State St.
Boston, MA 02109

</div>

---

[6] The Board should reject Ericsson's request to "hold the present motion in abeyance until the district court rules on Ericsson's motion." Mot. at 8, n.6  As set forth above, even if Ericsson obtains the documents in its Texas motion, such documents will not establish Broadcom is in privity with the Texas Defendants.

8

ActiveUS 119713245v.1

## CERTIFICATE OF SERVICE

I hereby certify that, on December 20, 2013, I caused a true and correct copy of the foregoing PETITIONER'S OPPOSITION TO PATENT OWNER'S MOTION FOR ADDITIONAL DISCOVERY UNDER 37 C.F.R. § 42.51(b) to be served via email on the attorneys identified in Ericsson's Updated Mandatory Notice (Paper 8), whom consented to electronic service:

| | |
|---|---|
| Lead Counsel: | Peter J. Ayers |
| Email Address: | peter@leehayes.com |
| Back-up Counsel: | J. Christopher Lynch |
| Email Address: | chris@leehayes.com |

/Dominic E. Massa/
Dominic E. Massa
Registration No. 44,905

9

ActiveUS 119713245v.1

**A0093**

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

BROADCOM CORPORATION

Petitioner

v.

TELEFONAKTIEBOLAGET L.M. ERICSSON

Patent Owner

Case IPR2013-00636
U.S. Patent No. 6,424,625

**PETITIONER'S OPPOSITION TO PATENT OWNER'S MOTION FOR ADDITIONAL DISCOVERY UNDER 37 C.F.R. § 42.51(b)**

ActiveUS 119713245v.1

**A0094**

Ericsson's ("Ericsson") Motion for Additional Discovery from Broadcom Corporation ("Broadcom") (the "Motion") should be denied because Broadcom is not in privity with the Texas Defendants[1] and because Ericsson has not demonstrated that its requested additional discovery is "necessary in the interest of justice." 35 U.S.C. § 316(a)(5); 37 C.F.R. § 42.51(b)(2)(i).

Discovery in *inter partes* review ("IPR") is "less than what is normally available in district court patent litigation" because "Congress intended *inter partes* review to be a quick and cost effective alternative to litigation." IPR2013-00080, Paper 18 at 3. The Board must therefore be "conservative in authorizing additional discovery." *Id.* Additional discovery–like that requested in Ericsson's Motion– should only be permitted where such discovery is "necessary in the interest of justice." *Id.*, at 4. And the requested discovery must be more than a speculation or "mere possibility." *Id.* There must be "factual evidence or support" underlying a request for additional discovery that demonstrate that "something useful [to the proceeding] will be found." *Id.* Ericsson, despite all its colorful rhetoric about Broadcom's "covert efforts" (Mot. at 2), and "attacks" on Ericsson and its patents (*id.* at 2), has failed entirely to satisfy this standard.

---

[1] The "Texas Defendants" are the defendants in *Ericsson Inc. v. D-Link Corp. et al.*, Civil Action No. 10-cv-473 (E.D. Tex.) ("Texas Litigation"), namely D-Link Corp., D-Link Systems, Inc., Netgear, Inc., Acer Inc., Acer America Corp., Gateway Inc., Dell, Inc., Toshiba Corp., Toshiba America, Inc., Toshiba America Information Systems, Inc., Toshiba America Consumer Products, LLC, and Belkin International, Inc. Broadcom is not a defendant.

1

ActiveUS 119713245v.1

Indeed, Ericsson's Motion, which by Ericsson's own admission is premised on "circumstantial evidence," (Mot. at 8, n.6) is precisely the type of "fishing expedition" the Board cautioned against during the December 6, 2013 conference call allowing Ericsson's Motion. In its Order Authorizing Motion for Additional Discovery, the Board required that Ericsson explain specifically why the discovery sought was "relevant to determining whether any of the [Texas Defendants] are real parties in interest or privies of Petitioner." *Id.* at 3. Ericsson failed to make such a showing. And any effort to do so is futile, because Broadcom is not in privity with the Texas Defendants, and no amount of discovery in this proceeding or in the Texas Litigation will prove otherwise.

Ericsson also unreasonably delayed in raising this issue with Broadcom and the Board. Ericsson has been aware of the facts upon which its Motion is based since Broadcom filed its Petitions in September. But Ericsson waited until November 15, 2013 to first approach Broadcom regarding this issue. Ex. 2010. Ericsson then delayed further in approaching the Board, waiting until December 6, 2013 to seek permission to file this Motion. Ericsson's behavior suggests that it is more interested in engaging in irrelevant discovery to delay the Board's processes than the central issue for this IPR – the invalidity of Ericsson's patents.

## I.    Ericsson's Requested Discovery Is Futile

### A.    Broadcom Is Not in Privity with the Texas Defendants

2

ActiveUS 119713245v.1

**A0096**

Ericsson alleges that additional discovery is necessary to establish that Broadcom is in privity with one or more of the Texas Defendants and therefore barred under 35 U.S.C. § 315(b) from pursuing its IPR petitions.  Motion at 3. Ericsson's "evidence" of such purported privity consists of vague and speculative allegations regarding potential indemnity provisions in product purchase agreements between Broadcom and at least one Texas Defendant.  Motion at 4. But the existence of indemnity provisions alone is not, as Ericsson asserts, sufficient to establish privity.  *See* IPR2013-00175, Paper 20 (July 23, 2013) ("indemnification is not one of the "substantive legal relationships" cited in *Taylor* [] as binding a person not a party to a lawsuit to a judgment in that suit."); *see also* IPR2013-00080, Paper 18 at 6 ("Indemnification is not one of the 'substantive legal relationships' cited in *Taylor* [] and is significantly different from those relationships, which involve successive property interest.")[2]

Whether privity exists focuses on "how courts generally have used the terms to 'describe relationships and considerations sufficient to justify applying conventional principles of estoppel and preclusion.'"  IPR2013-000080, Paper 18 at 4.  The Board must evaluate "whether a non-party may be recognized as a 'real

---

[2] In *Taylor v. Sturgell*, 553 U.S. 880 (2008), the Supreme Court held that "non-party preclusion may be justified based on a variety of "substantive legal relationship[s]" between the person to be bound and a party to the judgment. Qualifying relationships include, but are not limited to, preceding and succeeding owners of property, bailee and bailor, and assignee and assignor." *Id.* at 894.

3

ActiveUS 119713245v.1

This page contains confidential information.

Please refer to A0088, which contains the redacted, public version of this page.

**A0098**

This page contains confidential information.

Please refer to A0089, which contains the redacted, public version of this page.

## II.    Ericsson's Additional Discovery Is Not "Necessary in the Interests of Justice"

The Board may grant additional discovery in IPRs only where such discovery is necessary "in the interests of justice."  37 C.F.R. § 42.51(b)(2).  The requested discovery must be "more than a possibility and mere allegation."  IPR2012-00001, Paper No. 26 at 6.  The Board has previously articulated five factors that are relevant to determining whether additional discovery is warranted in IPRs, only two of which are relevant to this Motion.  *Id.*, at 6.[5]  Ericsson's discovery requests fail under each of these two factors.

### 1.    Ericsson's Requested Discovery Will Not Yield "Useful Information"

To prevail in its request for additional discovery, Ericsson must demonstrate that it is "already be in possession of a threshold amount of evidence or reasoning tending to show beyond speculation that something useful will be uncovered."  *See Id.*, at 7.  "Useful" in this context means information that is not merely "relevant"

---

at p. 2.  Ericsson's assertion is without merit.  Existence of (or participation in) a joint defense group is not sufficient to establish privity.  C.F.R. 48760 (party not a "'real party-in-interest' or a 'privy'" based on participation in a Joint Defense Group; *Innovad Inc. v. Microsoft Corp.*, 260 F.3d 1326, 1334 (Fed. Cir. 2001)).
[5] Although Ericsson fails to address the burden associated with responding to its discovery requests or whether the requests seek Broadcom's litigation positions, these factors weigh against the discovery Ericsson seeks.  IPR2012-00001, Paper 26 at 6-7.  Ericsson's request for "communications between Broadcom (or its counsel) and any of the D-Link Defendants (or their counsel) regarding validity" of the patents at issue in the Texas litigation is overly broad, and further evidence that Ericsson's discovery requests are nothing more than a fishing expedition.

6

ActiveUS 119713245v.1

or "admissible" but that which is "favorable in substantive value to a contention of the party moving for discovery." *See id.*, at 7.

Ericsson cannot satisfy this heightened burden. Ericsson asserts its requested additional discovery–which Ericsson concedes is premised on "circumstantial evidence" (Mot. at 8, n.6)–will establish that Broadcom is in privity with the Texas Defendants. But Broadcom is not in privity with the Texas Defendants, and no amount of discovery by Ericsson will establish that it is.

### 2. Ericsson Cannot Generate "Equivalent Information" Because No Such Information Exists

Ericsson complains that the Board must grant its request for "additional discovery" because it cannot "generate equivalent information by other means." Mot. at 7. This argument fails for, at least, three reasons. *First*, there is no "equivalent information" for Ericsson to generate because the information Ericsson seeks will not establish Broadcom is in privity with any of the Texas Defendants.

*Second*, according to Ericsson's own motion and its conduct in the Texas Litigation, Ericsson's additional discovery is not necessary because Ericsson has sought the same information through other means. On December 6, 2013–two and a half months after Broadcom's IPR filing–Ericsson filed an "emergency" motion in the Texas Litigation seeking production for use in this IPR certain categories of documents that it also seeks through this Motion. Ex. 1018. In its Texas motion, Ericsson requested that the Court order production of such documents in sufficient

7

## A0101

time for Ericsson to submit those document as part of the Patent Owner's Statement. *Id*. at p. 1. Ericsson's motion in the Texas Litigation is fully briefed and pending before the Texas Court. Ex. 1019.[6]

*Finally*, Ericsson is incorrect that its additional discovery is warranted because Broadcom has "stonewalled Ericsson by hiding behind the [Texas] protective order" and by refusing to allow the Texas Defendants to produce Ericsson's requested information. *Id*. at 8. Broadcom is not a party to the Texas Litigation, and it does not control the conduct of the Texas Defendants. Broadcom therefore cannot require the Texas Defendants to waive the terms of a Protective Order that Broadcom did not negotiate. Ex. 2011 at p.1-2.

## III. CONCLUSION

For the reasons stated above, Broadcom respectfully requests that Ericsson's Motion be denied.

Dated: December 20, 2013.

<div style="margin-left:40%">

Respectfully submitted,

/Dominic E. Massa/
Dominic E. Massa, Reg. No. 44,905
60 State St.
Boston, MA 02109

</div>

---

[6] The Board should reject Ericsson's request to "hold the present motion in abeyance until the district court rules on Ericsson's motion." Mot. at 8, n.6 As set forth above, even if Ericsson obtains the documents in its Texas motion, such documents will not establish Broadcom is in privity with the Texas Defendants.

8

ActiveUS 119713245v.1

**A0102**

## CERTIFICATE OF SERVICE

I hereby certify that, on December 20, 2013, I caused a true and correct copy of the foregoing PETITIONER'S OPPOSITION TO PATENT OWNER'S MOTION FOR ADDITIONAL DISCOVERY UNDER 37 C.F.R. § 42.51(b) to be served via email on the attorneys identified in Ericsson's Updated Mandatory Notice (Paper 8), whom consented to electronic service:

| | |
|---|---|
| Lead Counsel: | Peter J. Ayers |
| Email Address: | peter@leehayes.com |
| Back-up Counsel: | J. Christopher Lynch |
| Email Address: | chris@leehayes.com |

/Dominic E. Massa/
Dominic E. Massa
Registration No. 44,905

9

ActiveUS 119713245v.1

**A0103**

Trials@uspto.gov
Tel: 571-272-7822

Paper: 20
Entered: Jan 24, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

BROADCOM CORPORATION
Petitioner

v.

TELEFONAKTIEBOLAGET LM ERICSSON (PUBL)
Patent Owner

———————

Cases IPR2013-00601(Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,446,568 B1)
IPR2013-00636 (6,424,625 B1)[1]

———————

Before KARL D. EASTHOM, KALYAN K. DESHPANDE, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges.*

EASHTOM, *Administrative Patent Judge.*

DECISION
Ericsson's Motion for Additional Discovery
*37 C.F.R. § 42.51(b)(2)*

---

[1] The Board exercises its discretion to issue one Order to be filed in each case. The parties are not authorized to use this heading style.

**A0104**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

*Introduction*

Patent Owner ("Ericsson") filed a redacted motion for additional discovery in the instant proceedings (Paper 13, "Mot." or "Motion"), and Petitioner ("Broadcom") filed a redacted opposition (Paper 16 "Opp." or "Opposition").[2]  In its Motion, Ericsson requests discovery regarding indemnity agreements, defense agreements, payments, and email, or other communications, between Broadcom and defendants ("D-Link Defendants") in related litigation, *Ericsson Inc., et al. v. D-LINK Corp., et al.*, Civil Action No. 6:10-CV-473 (LED/KGF) ("Texas Litigation").  *See* Mot.; Ex. 2001 ("Patent Owner's Requests for Production," hereinafter "Request").

In the Texas Litigation, a jury found Ericsson's challenged patents in the instant proceedings infringed by the D-Link Defendants due partly to their use of Broadcom's Wi-Fi compliant products.  *See* Pet. 1–2.  Broadcom was not a party to the Texas Litigation.  *Id*. at 1.  According to Broadcom, the jury did not address the issue of validity with respect to the patents challenged in IPR2013-00601 and IPR2013-00602.  *See* IPR2013-00601, Paper 3, 2; IPR2013-00602, Paper 2, 1-2.   Ericsson maintains that the requested discovery will show that "Broadcom is in privity with at least one D-Link Defendant" in the Texas Litigation.  Mot. 4.

For the reasons stated below, Ericsson's motion is *denied*.

*35 U.S.C. § 315(b)*

Under 35 U.S.C. § 315(b) , "[a]n inter partes review may not be instituted if the petition requesting the proceeding is filed more than 1 year

---

[2] The parties also filed sealed redacted versions. *See* note 3.  Unless otherwise noted, reference throughout is to redacted papers filed in IPR2013-00636.  The same or similar papers are filed in the other two cases, IPR2013-00601 and IPR2013-00602.

2

**A0105**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

after the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent." Broadcom does not dispute that one or more of the D-Link Defendants were served with a complaint more than one year prior to the filing of the Petition. Therefore, if Ericsson can show privity existed between the D-Link Defendants and Broadcom in the Texas Litigation, an *inter partes* review may not be instituted under 35 U.S.C. § 315(b).  *See* Paper 9 (Order Authorizing Motion for Additional Discovery).

*Request*

Pursuant to its discovery Motion, Ericsson seeks the following discovery items:

1.  All executed contracts or agreements between Broadcom and any of the D-Link Defendants relating to Wi-Fi compliant products, such as the BCM4313 and BCM4321, that are used in any of the D-Link Defendants' products accused of infringement in the D-Link Litigation.

2. All executed contracts or agreements between Broadcom and any of the D-Link Defendants that include any indemnity or duty to defend provisions.

3.  All joint defense agreements, or other agreements addressing cooperation on the defense of the D-Link Litigation, between Broadcom and any of the D-Link Defendants relating to the D-Link Litigation.

4.  All invoices provided to or received from any of the D-Link Defendants, or their counsel, seeking reimbursement for any fees or expenses incurred in the D-Link Litigation.

5.  Records of any payments made by Broadcom to any of the D-Link Defendants, or their counsel, or to Ericsson, pursuant to any actual or alleged contractual duty to defend or

3

**A0106**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

indemnify any [of] the D-Link Defendants for any fees or expenses incurred in the D-Link Litigation.

6. All emails and written correspondence between any of the D-Link Defendants, or their counsel, and Broadcom, or its counsel, relating to any claimed duty of Broadcom to defend or indemnify any of the D-Link Defendants in the D-Link Litigation from January 1, 2010 to the present.

7. All emails and written correspondence between Broadcom, or its counsel, and any of the D-Link Defendants, or their counsel, from January 1, 2010 to the present relating to:
A. The filing of IPR2013-00601, IPR2013-00602, and IPR2013-00636;
B. Intervention by Broadcom in the D-Link Litigation;
C. The claim construction or interpretation of any of the patents at issue in the D-Link Litigation, including, but not limited to, the '568 Patent, the '625 Patent, or the '215 Patent; and
D. The validity or alleged invalidity of any of the patents at issue in the D-Link Litigation, including, but not limit[ed] to, the '568 Patent, the '625 Patent, or the '215 Patent.

Ex. 2001.

*Analysis*

To show privity, Ericsson relies, *inter alia*, on known indemnity agreements, wherein Broadcom agreed to indemnify certain D-Link Defendants. Ericsson also relies on allegations about litigation activity by Broadcom, filing of an amicus appeal brief by Broadcom in the Texas Litigation, SEC filings, communications with Acer, Inc., a D-Link Defendant, Broadcom's use of Ericsson's expert report in the filing of the Petition, timing of the filing of the IPRs, and email correspondence about indemnity and other matters. *See* Mot. 1-7 (citing Ex. 1010; Exs. 2002-

4

**A0107**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

2017).[3] For its part, Broadcom asserts that "Broadcom is not in privity with the Texas Defendants, and no amount of discovery in this proceeding or in the Texas Litigation will prove otherwise." Opp. 2.

Pursuant to the America Invents Act (AIA), certain discovery is available in *inter partes* review proceedings. *See* 35 U.S.C. § 316(a)(5); 37 C.F.R. §§ 42.51-53. Discovery in an *inter partes* review proceeding, however, is less than what is normally available in district court patent litigation, as Congress intended *inter partes* review to be a quick and cost effective alternative to litigation. *See* H. Rep. No. 112-98 at 45-48 (2011). A party seeking discovery beyond what is expressly permitted by rule must do so by motion, and "must show that such additional discovery is in the interests of justice." 37 C.F.R. § 42.51(b)(2)(i); *accord* 35 U.S.C. § 316(a)(5) ("such discovery shall be limited to . . . what is otherwise necessary in the interest of justice").

The AIA legislative history makes clear that additional discovery

---

[3] As indicated above, note 2, in addition to the redacted papers, the parties filed un-redacted papers that remain under seal: Ericsson filed a protected motion, Paper 11, with protected exhibits that remain under seal. Similarly, Broadcom filed a protected opposition, Paper 16, and a protected exhibit, Ex. 1017, that remain under seal. (Broadcom should clarify if Exhibit 1018 is to be placed under seal. It appears, based on the face of the document and related characterizations, that it contains confidential information. It is under seal at PTAB at this time.) After review of the un-redacted materials, the Board determines that they do not alter the outcome. In this Motion Decision, Broadcom's sealed opposition and exhibits are not addressed further, because they do not impact Ericsson's initial burden of showing that the requested discovery is necessary in the interests of justice. Ericsson's sealed motion, Paper 11, additionally shows confidential litigation activity by Broadcom that fails to imply or show control by Broadcom over the Texas Litigation.

5

**A0108**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

should be confined to "particular limited situations, such as minor discovery that PTO finds to be routinely useful, or to discovery that is justified by the special circumstances of the case." 154 Cong. Rec. S9988-89 (daily ed. Sept. 27, 2008) (statement of Sen. Kyl). In light of this, and given the statutory deadlines required by Congress for *inter partes* review proceedings, the Board must be conservative in authorizing additional discovery. *See id.*

An important factor in determining whether additional discovery is in the interests of justice is whether there exists more than a "mere possibility" or "mere allegation that something useful [to the proceeding] will be found." *Garmin International, Inc. et al. v. Cuozzo Speed Technologies LLC*, IPR2012-00001, Paper 20, 2–3, "Order—Authorizing Motion for Additional Discovery" (listing important factors to determine whether a discovery request meets the applicable standard) (hereinafter the "Garmin factors"); *accord Apple v. Achates Reference Publishing, Inc.*, IPR2013-00080, Paper 18, "Decision—Achates Motion for Additional Discovery" (applying the Garmin factors to indemnity agreements). The party seeking discovery must come forward with some factual evidence or support for its request. *See* IPR2012-00001, Paper 26 (decision addressing the Garmin discovery factors).

Whether a non-party is a "real party-in-interest" or "privy" for purposes of an *inter partes* review proceeding is a "highly fact-dependent question" that takes into account how courts generally have used the terms to "describe relationships and considerations sufficient to justify applying conventional principles of estoppel and preclusion." *Office Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,759 (Aug. 14, 2012) ("Trial

6

**A0109**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

Practice Guide" or "TPG").  Whether parties are in privity, for instance,

depends on whether the relationship between a party and its alleged privy is

"sufficiently close such that both should be bound by the trial outcome and

related estoppels." *Id*.  Depending on the circumstances, a number of factors

may be relevant to the analysis, including whether the non-party "exercised

or could have exercised control over a party's participation in a proceeding,"

and whether the non-party is responsible for funding and directing the

proceeding.  *Id*. at 48,759-60.

Ericsson's evidence does not amount to more than a "mere allegation

that something useful will be found" to show privity, as is required by the

first Garmin factor.  To show privity requires a showing that Broadcom

would be bound to the outcome of the Texas Litigation.  To be bound, in

normal situations, Broadcom must have had control over the Texas

Litigation.  According to long-standing precedent, *Bros, Inc. v. W.E. Grace

Mfg. Co.*, 261 F.2d 428, 429 (5th Cir. 1958), when a patent holder sues a

dealer, seller, or distributer of an accused product, as is the case at hand,

indemnity payments and minor participation in a trial are not sufficient to

establish privity between the non-party manufacturer of the accused device

and the defendant parties:

> While the mere payment of counsel fees or participation in a
> trial by one not a named party to it would not alone be
> sufficient, *cf. I.T.S. Rubber Co. v. Essex Co.*, [] 272 U.S. 429
> [(1926)]. . . Restatement, Judgment § 84, comment e (1942),
> the extent and nature of that participation may completely alter
> the consequences.  This is particularly so in patent infringement
> cases in which, from tactical or strategic considerations relating
> to venue, desirability of a particular forum and the like, such
> cases are so often filed and tried against a dealer, a seller, a
> distributor, or a user of the accused device manufactured by

7

**A0110**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

> another.  If the manufacturer stands aloof, he risks a judgment adverse to his interest resulting perhaps from inadequate or incompetent defense by one who has a secondary interest.  *Such judgment, to be sure, would normall[y] not be binding by estoppel or res judicata,* but it would take its place in the jurisprudence where its practical effect as stare decisis might be as decisive.  The alternative, of course, is to jump in and give the case full and active defense as though the manufacturer were the real named party.  This assures that the issues will be presented and contested in a way deemed most effective by the nominally remote, but practically immediate, party at interest.

261 F.2d at 429 (emphases added); cited with approval by *Emerson Elec. Co. v. Black and Decker Mfg. Co.*, 606 F.2d 234, 242, n. 20 (8th Cir. 1979) ("If Emerson does control the Maryland suit, the outcome will be binding on, or inure to the benefit of, Emerson under principles of res judicata."); *see also United States v. Webber,* 396 F.2d 381, 387 (3d Cir.1968) (finding that appellants were "privies" because of their "control over and interest in the earlier litigation.")

*Bros, Inc.* relies on a long line of precedent to support the normal rule that privity requires a finding of active control of the trial:

> Where that course is followed and the non-party actively and avowedly conducts the defense, manages and directs the progress of the trial at its expense and under its supervision, the outcome, which if favorable would have redounded to his benefit, if adverse becomes sauce for goose and gander alike, and binding under principles of res judicata. *Minneapolis-Honeywell Regulator Co. v. Thermoco, Inc.*, 116 F.2d 845 (2d Cir. 1941); *Nash Motors Co. v. Swan Carburetor Co.*, 105 F.2d 305 (4th Cir. 1939); *Warford Corp. v. Bryan Screw Machine Products Co.*, 44 F.2d 713 (6th Cir. 1930); *N. O. Nelson Manufacturing Co. v. F. E. Myers & Bro. Co.*, 25 F.2d 659 (6th Cir. 1928); *Beyer Co. v. Fleischmann Co.*, 15 F.2d 465 (6th Cir. 1926); Restatement, Judgments 84, comment b, illustration 5 (1942).

8

**A0111**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

261 F.2d at 429 (citations reformatted).

Similarly, under *TRW Inc. V. Ellipse Corp.*, 495 F.2d 314, 318 (7th Cir. 1974), "the crucial distinction . . . is the extent of participation, for privity in the law of judicial finality usually connotes representation." In *Dentsply Intern., Inc. v. Kerr Mfg. Co.*, 42 F.Supp.2d 385 (D.Del. 1999), the court characterized *TRW* as requiring control of the trial to show privity:

> In *TRW*, the Court of Appeals for the Seventh Circuit refused to apply the doctrine of res judicata to TRW, a nonparty, who agreed to indemnify a named party in a prior suit, but whose role in the prior suit was limited to observing the proceedings and filing amicus curiae briefs. In reaching this conclusion, the court noted that *the crucial distinction* between *TRW* and other cases, in which nonparty indemnitors were found to have interests sufficiently close for establishing privity for res judicata purposes, was TRW's *limited extent of participation in the prior lawsuit*. Indeed, *the court explicitly distinguished* TRW*'s situation from the situation in which a nonparty indemnitor retained the indemnitee-defendant's counsel and controlled the litigation.*

*Dentsply*, 42 F.Supp.2d at 398 (emphasis added).

Contrary to Ericsson's assertion that "[t]he weight of authority strongly supports that an indemnity agreement . . . establish[es] privity," Mot. 6, *Bros. Inc, TRW*, *Dentsplay* and other cases noted *supra* illustrate that more is required. Control of the litigation, or some sort of representation, constitutes a "crucial" factor. *Dentsply*, 42 F.Supp.2d at 398.

Ericsson relies, *inter alia*, on *Jennings v. U.S.*, 374 F.2d 983, 985 (4th Cir. 1967) for the following proposition: "where an indemnitor is notified and can take part in – indeed may control – the litigation, he is precluded from contesting the indemnitee's liability in the subsequent indemnity action." Mot. 5. Ericsson does not explain how this *dicta* in *Jennings*

9

**A0112**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

applies to the situation at hand or otherwise supports a departure from the long-standing rule that includes control or representation as a crucial factor that may bind a non-party to a trial outcome.

For example, in *Dentsplay*, the court found that "even if Centrix was ultimately relieved of its legal duty to defend and indemnify Kerr, as a factual matter, Centrix did defend Kerr for approximately two years, in a manner which was consistent with various terms of the agreement." 42 FSupp. 2d at 396, n. 4. Certain indemnity agreements involved in *Dentsply* corroborated control of the litigation, and the court found *extensive participation in the litigation* by indemnitor Centrix. *See id.* at 397-399. "Because of the contractual relationship between Centrix and Kerr, Centrix's extensive participation in the litigation and Centrix's knowledge of the injunction, the Court concludes that privity exists between Kerr and Centrix." *Id.* at 399.

Nevertheless, Ericsson seeks to discover indemnity agreements and asserts that certain SEC filings show that "it is not uncommon for Broadcom" to indemnify its customers. Mot. 1 (citing Ex. 2005, 46). Ericsson also asserts that "Broadcom does not deny the existence of such indemnity agreements." Mot. 7. Ericsson attaches an order from the Texas Litigation, Ex. 2016, in which the district court mentions two indemnity agreements and an e-mail communication about indemnity.[4]

---

[4] In the order, the court denied Ericsson's motion to release discovery of those items, partially because it was under a protective order there, and granting the motion would undermine the negotiations which produced the protective order and discovery items. *See* Ex. 2016, 3. The court noted that granting Ericsson's motion would allow Ericsson to employ the district

10

**A0113**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

Ericsson also attaches evidence of other litigation activity by Broadcom (which remains under a protective order in this proceeding), Ex. 2009, and attaches a "Motion of Amici Wi-Fi Chip Companies Broadcom Corporation . . . for Leave to File Amicus Brief" in the Court of Appeals for the Federal Circuit," Ex. 2017, as further evidence of collusion, litigation activity, or control by Broadcom.

The totality of this evidence fails to amount to more than a "mere possibility" that Broadcom controlled, or could have controlled, the Texas Litigation. Paying for trial expenses pursuant to indemnity normally does not establish privity or control. Therefore, the sought-after indemnity agreements, and the requested discovery items seeking evidence of payment pursuant to indemnity or other agreements, fail to amount to more than a "mere allegation that something useful will be found" to establish privity. *See* Ex. 2001 (discovery items 1–6, also listed *supra*).

Similarly, although filing an amicus brief shows interest in the outcome, it only shows some potential future control as a non-party over the appeal of an issue of damages. *See* Ex. 2017, 2 (motion by Broadcom to file amicus brief to address royalties and noting that the "award may also provoke indemnity issues"). Filing an amicus brief on appeal does not bind Broadcom to the trial below outcome or show that Broadcom exercised control over that outcome. *See Dentsplay*, 42 F.Supp.2d at 398 (quoted *supra*, discussing *TRW*—agreeing to indemnify a named party, but having a role limited to observing the proceedings and filing amicus curiae briefs, is insufficient to show privity). The other litigation activity by Broadcom in

---

court's broader "relevancy" standard and circumvent the PTO's narrower standard. *Id*.

<div align="center">11</div>

<div align="center">**A0114**</div>

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

another forum, Ex. 2009 (under seal), appears to have occurred during the Texas Litigation, prior to the court's entry of judgment. Nonetheless, it does not show control of the Texas Litigation or otherwise show that Broadcom would be bound by that outcome.

Ericsson also requests discovery of "emails and written correspondence," Ex. 2001 (discovery requests 6, 7), between Broadcom and the D-Link defendants relating to "[i]ntervention by Broadcom in the D-Link Litigation," *id*. (request 7), relating to a duty to defend or indemnify, *id*. (request 6) and also "agreements addressing cooperation on the defense of the D-Link Litigation," *id*. (request 3). Other than indemnity agreements, Ericsson does not provide sufficient evidence, if any, that any such other agreements exist or were discussed.

Ericsson also does not explain how a discovery request regarding intervention would show privity on the part of non-party Broadcom. For its part, Broadcom asserts that "Ericsson chose, for its own strategic reasons, not to sue [Broadcom] in this case." Opp. 1. The evidence also indicates that Ericsson partially opposed another manufacturer's motion to intervene. *See* Ex. 2006, 1. As Broadcom points out, participation in joint defense groups, even if such a group exists, also fails to show privity. *See* Opp. 5–6, n. 4; TPG 48,760 ("Joint Defense Group," by itself, insufficient to show privity).

Ericsson also asserts that filing a request for IPR (*inter partes* review) and the other noted litigation activity, Ex. 2009, constitutes evidence of "Broadcom filing litigation on behalf of its customers pursuant to its indemnity obligation." *See* Mot. 1; Ex. 2001 (discovery request 7A, IPR filings). Ericsson's allegation amounts to conjecture because Ericsson does

12

**A0115**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

not show how IPR filings and other filings were pursuant to indemnity agreements, and even if they were, the IPR filings fail to show control over the Texas Litigation. The evidence does not amount to more than speculation that any of Broadcom's activity constitutes evidence of collusion with the D-Link defendants in the Texas Litigation in a manner that would bind Broadcom to the outcome thereof.

Ericsson also asserts that Broadcom's reliance, in its IPR filings, on "a majority of the same references that the defendants relied upon for their invalidity claims in the D-Link lawsuit" shows "coordination [that] raises serious questions about wither Broadcom is in privity with the defendants." Mot. 3. Ericsson also asserts that the IPR filings rely heavily on Ericsson's expert report from the Texas Litigation. *Id.* Again, these allegations of "serious questions" amount to just that, questions or speculation about collusion or control. Filing IPRs does not constitute evidence that shows control over prior litigation. Broadcom, as a manufacturer of accused products, had an interest in the trial; however, using some of the same trial evidence, including known prior art, in the IPR proceedings, and using an expert report, does not constitute evidence beyond mere speculation that Broadcom controlled, or should be bound by the outcome of, the Texas Litigation.

Ericsson's assertion that D-Link Defendant Acer sought "to discuss comments from Acer's vendors," including Broadcom, also fails to show control. *See* Mot. 2 (citing Ex. 2007). Even if the record shows that Acer sought to discuss the accused products with Broadcom, the manufacturer of the products, this implies control by Acer, not Broadcom. *See* Ex. 2007. As Broadcom also points out, providing technical information to customers

13

**A0116**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

does not establish control over the trial.  Opp. 5.

Ericsson also asserts that "Acer admitted" that some Texas Litigation discovery that Acer produced was "privileged" and shows that "a privilege exists that protects communications between Acer and Broadcom."  Mot. 2 (discussing Ex. 2008).  The relevance of this assertion is not clear.  The emails show that Acer's counsel relies on the "Protective Order[, which] mandates that designated information may only be used for purposes of litigation between the parties," and that "fact discovery and trial in the Ericsson v. D-Link case concluded long ago."  Ex. 2008 (email dated Dec. 4, 2013 11:44AM; *accord* email Dec. 5, 2013 1:46PM and other emails attached).  Acer's counsel also stated that "as far as we understand it, the IPR is a proceeding initiated by Broadcom to which our clients are not parties" and "[w]e do not believe our clients are under any obligation to respond to your request."  *Id.* (email dated Nov. 12, 2013 4:55 PM).  This email chain shows that Acer's counsel sought to abide by the trial court's protective order, and does not imply any control by Broadcom over Acer's actions in the Texas Litigation.

Ericsson's discovery request for correspondence between Broadcom and the D-Link Defendants regarding claim construction and invalidity positions "including, but not limited to, the '568 Patent, the '625 Patent, or the '215 Patent," Ex. 2001 (requests 7C, 7D), also amounts to a speculative request.  Ericsson does not point the Board to evidence that documents about some of these positions exist or that communication about them occurred.  Moreover, the request is overly broad because it is not limited to patents at issue here.  Ericsson fails to explain how discovering information about other patents bears on control over the Texas Litigation.

14

**A0117**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

The request for "all executed contracts or agreements between Broadcom and any of the D-Link Defendants relating to Wi-Fi compliant products," Ex. 2001 (request 1), seeks discovery that broadly embraces Broadcom's commercial activity including, for example, contracts regarding the sale of such products. Ericsson fails to explain how such broad information "relating" to selling accused products shows that Broadcom was in privy with the D-Link Defendants. The breadth and cost of searching for all potential agreements, which may include sales or other agreements, weighs against Ericsson's request.

The evidence and arguments fail to show that the sought-after discovery would have more than a mere possibility of producing useful privity information, i.e., that Broadcom controlled or could have controlled the Texas Litigation. This Garmin factor weighs heavily against Ericsson. The privity precedent outlined *supra* shows that determining whether privity exists, especially without some evidence of actual control of a trial, typically spirals into what amounts to a separate trial that involves a myriad of considerations. This impacts the PTAB's mandate to expedite the proceedings and provide limited discovery in the interests of justice. In the attached order denying Ericsson's request, the court in the Texas Litigation noted that "*[a]ccording to Ericsson*, the Indemnity documents show Broadcom is in privity with Dell and Toshiba, *or at least show additional discovery is warranted on the issue.*" Ex. 2016, 2 (emphasis added). The AIA discovery procedures do not contemplate allowing discovery on the basis that it may show that "additional discovery is warranted."

The Board agrees with Ericsson that the requests are simple to understand, and that this Garmin factor weighs in Ericsson's favor. *See* Mot.

15

**A0118**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

6–7, n. 5. Nevertheless, that and other Garmin factors, including the ability to generate equivalent information, and seeking litigation positions by other means, do not outweigh the Garmin factor related to discovering useful information discussed above.

Other than the indemnity agreements, certain email correspondence, certain litigation activity, and other tangential items, Ericsson has not provided evidence to show that there is more than a mere possibility that the sought-after discovery even exists. Ericsson has not shown that the sought-after discovery has more than a mere possibility of producing useful evidence on the crucial privity factor—control of the Texas Litigation by Broadcom in a sufficient manner to bind Broadcom through principles of res judicata or estoppel. Notwithstanding that Ericsson argues that no other way exists to obtain the discovery because of the Protective Order, *see* Mot. 7-8 (citing Exs. 2011–2014), the Board cannot determine on this record, with more than conjecture, whether Ericsson otherwise would be able to obtain much of the sought-after discovery, because Ericsson has not shown beyond mere speculation that it exists. For example, Ericsson has not shown that communication about any defense agreements, duty to defend agreements, agreements to intervene, invalidity positions, and claim interpretation, exist.

After weighing the factors surrounding the issue of privity as advanced by Ericsson, including the redacted information and arguments presented by Ericsson and Broadcom that remain under seal, the Board finds that Ericsson has not met its burden of demonstrating that additional discovery is in the interests of justice.

In consideration of the foregoing, it is hereby

ORDERED that Ericsson's motion for additional discovery is *denied*.

16

**A0119**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

Petitioner:

Dominic Massa
Michael Diener
michael.diener@wilmerhale.com
Dominic.massa@wilmerhale.com
Michael.diener@wilmerhale.com

Patent Owner:

Peter J. Ayers
J. Christopher Lynch
Lee & Hayes PLLC
Peter@leehayes.com
chris@leehayes.com

17

**A0120**

Paper No. \_\_\_\_\_

Filed on behalf of:   Telefonaktiebolaget L. M. Ericsson

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BROADCOM CORPORATION

Petitioner

v.

TELEFONAKTIEBOLAGET LM ERICSSON

Patent Owner

_____

Case IPR2013-00636
Patent 6,424,625

_____

**PATENT OWNER' REQUEST FOR REHEARING**

**A0121**

Paper No. _____

## I.    Introduction

Pursuant to 37 C.F.R. § 42.71, Patent Owner Telefonaktiebolaget LM Ericsson ("Ericsson") respectfully requests that the Board reconsider its denial of Ericsson's Motion for Additional Discovery ("Decision") because Ericsson submits that the Board overlooked certain critical legal authorities bearing on the Motion.

## II.    Argument

### A. Standard of Review

The Board will review requests for rehearing for an abuse of discretion. 37 C.F.R. 42.71(d). The Board will grant requests for rehearing where a decision rests on an erroneous application of the law. *Schrader-Bridgeport Int'l, Inc. et al. v. Cont'l Automotive Sys. US, Inc.*, IPR2013-00014 Paper No. 15 at 3; *Star Fruits S.N.C. v. U.S.*, 393 F.3d 1277, 1281 (Fed. Cir. 2005). Ericsson respectfully submits that the Board erred (a) in its holding that limitation of discovery holds a higher statutory priority than limitation of duplicative proceedings; and (b) in its holding that "Broadcom must have had control over the Texas Litigation" before 35 U.S.C. § 315(b) bar may be invoked, *See* Decision at 7.

Paper No. _____

B. <u>The Board Overlooked that the Principal Purpose of the America Invents Act (AIA) is to Limit Multiple Proceedings, and that Limiting Discovery is a Subsidiary Purpose, and Erred by Elevating the Latter Over the Former.</u>

A major goal of the AIA was "to limit unnecessary and counterproductive litigation costs." H. Rep. No. 112-98 at 40 (2011). The AIA limited litigation costs in two ways: (1) by enacting provisions intended to eliminate duplicative, wasteful and harassing proceedings; and (2) by limiting discovery costs.

The first goal of AIA, limiting and constraining repetitive litigation, was plainly a primary goal. Congress expressly condemned "repeated litigation and administrative attacks on the validity of a patent." H. Rep. No. 112-98 at 48. Toward that end, Congress enacted several measures so that AIA could not "be used as [a] tool[ ] for harassment" of patent owners. *Id.*

First, Congress expressly provided that the Board could *not take jurisdiction* of any *inter partes* review unless all real parties in interest were identified. *See* 35 U.S.C. § 312 ("A petition filed under section 311 may be considered *only if* . . . the petition identifies all real parties in interest") (emphasis added). The obvious purpose of this provision was to curtail the ability of related parties to use others as a shill for them while preserving the ability to repeat litigation in other fora. "Real parties in interest" is not a defined term, but Congress did not refer to a "privy", or to "control" anywhere in in Section 312.

Congress further provided in 35 U.S.C. § 315(a)(1) that "*inter partes* review may not be instituted if . . . the petitioner or any real party in interest filed a civil action challenging the validity of a claim of the patent." In addition, it provided for an *automatic* stay of the civil action in the event that the petitioner or real party in interest files a civil action challenging the validity of a claim of the patent. *Id.* at 315(a)(2). These clauses clearly preclude repetitive litigation.

Congress then barred institution of *inter partes* review for any "petitioner, real party in interest, or privy of the petitioner" if any are served with a complaint alleging infringement of the patent by the patent owner if the defendants were served more than one year before filing. *Id.* at 315(b). This clause furthers the statutory imperitive to prevent multiple actions. Congress also provided that multiple proceedings before the Board involving the same action may be consolidated. *Id.* at 315(d). Finally, Congress directed that any final written decision from the PTO shall bind the petitioner, real party in interest, and the privy of the petitioner and estop them from any subsequent attacks before the Office, any district court, or the International Trade Commission. *Id.* at 315(e). Thus, Congress enumerated *multiple* provisions to curb excessive litigation and repetitive attacks on patent owners.

The goal of limiting discovery was clearly a subsidiary method to control costs. Congress authorized discovery in one section, 35 U.S.C. § 316(5).

Nevertheless, Congress permitted discovery as "necessary in the interest of justice." *Id.* Moreover, the PTO specifically stated that discovery can be utilized to resolve the primary goal of reducing repetitive litigation. *See* Changes to Implement Inter Partes Review Proceedings, Post-Grant Review Proceedings, and Transitional Program for Covered Business Method Patents, 77 Fed. Reg. 48680, 48689 (Aug. 14, 2012) ("additional discovery may be authorized where patent owner raises sufficient concerns regarding the petitioner's certification of standing.").

Ericsson respectfully submits that the Decision, which promoted the subsidiary goal – limitation of discovery costs – at the expense of the primary goal – elimination of repetitive and harassing proceedings – was erroneous as a matter of law, and as a matter of discretion because it was not "in the interests of justice." Limited discovery is necessary to determine the facts bearing on whether Broadcom was a real party in interest or privy of the defendants in *Ericsson Inc., et al. v. D-LINK Corp., et al.*, Civil Action No. 6:10-CV-473 (LED/KGF).

C. The Board Erred as a Matter of Law in its Holding that "Broadcom must have had control over the Texas Litigation."

Congress did not define "real party in interest" or "privy," but the text and structure of the AIA militate in favor of a broad and liberal construction to achieve the AIA's intended result of limiting repetitive litigation. Both Congress and the PTO stated that the term "privity" has acquired an "expanded meaning" and that it

REQUEST FOR REHEARING                    5                    IPR2013-00636

**A0125**

Paper No. _____

will give effect to judgments by extending the term "beyond its classical

description." *See* 154 Cong. Rec. S9987 (daily ed. Sept. 27, 2008) (statement of

Sen. Kyl) (citing *Cal. Physicians' Serv. v. Aoki Diabetes Research Inst.,* 163 Cal.

App. 4th 1506 (Cal. App. 2008)); *see also* Trial Practice Guide, 77 Fed. Reg.

48,756, 48,759 (Aug. 14, 2012) ("Trial Practice Guide" or "TPG").

The PTO further acknowledged the broad aim of the AIA in the Trial

Practice Guide, which clearly states that the determination of who is a real party in

interest or privy must be made on the facts of each case. *See* TPG at 48,760. The

PTO cited *Cal. Physicians* with approval in its discussion regarding the expansion

of the scope of privity beyond the "control" test. *Cal. Physicians* held that "[t]he

word 'privy' has acquired expanded meaning. The courts, *in the interest of justice

and to prevent expensive litigation*, are striving to give effect to judgments by

extending 'privies' beyond the classical description. The emphasis is not on a

concept of identity of parties, but on the practical situation . . . The concept refers

'to a relationship between the party to be estopped and the unsuccessful party in

the prior litigation which is 'sufficiently close' so as to justify application of the

doctrine of collateral estoppel.'" 163 Cal. App. 4th at 1521 (citations omitted)

(emphasis added).

The court then declared that "[n]otions of privity have been expanded to the

limits of due process." *Id.* at 1522. The proper test for privity that satisfies due

**A0126**

Paper No. _____

process is to determine if the parties have "an identity or community of interests with, and adequate representation by, the losing party in the first action as well as that the circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication." *Id.* Further, when the appellant argued that it did not control the prior litigation, the court denied the contention and stated, "preclusion can apply even in the absence of such control." *Id.* at 1524.

The PTO adopted that exact language in the Trial Practice Guide, *see* TPG at 48,760; the Board's contrary holding, that "Broadcom must have had control over the Texas Litigation," was, respectfully, in error.

Where Ericsson' burden is to show an identity or community of interest sufficient to make Broadcom expect to be bound by the Texas Litigation, it was error to require a showing of control. The combination of Broadcom's indemnification agreements, ancillary legal actions, discussions with D-Link Defendants, amicus curiae brief, and its reliance on evidence from the Texas Litigation collectively indicate that Broadcom has an identity or community of interest that was served in the Texas Litigation. It was error to refuse to permit discovery sufficient to further show this community of interest.

REQUEST FOR REHEARING                    7                    IPR2013-00636

**A0127**

Paper No. _____

## III.  Conclusion

Ericsson respectfully requests that the Board reconsider its Decision. Allowing limited discovery on the relationship between petitioner and the D-Link Defendants promotes Congress' principal purpose of the AIA – to prevent repeated litigation and multiple attacks on the validity of patents.  It also conforms to the broad doctrine of privity because denying privies the right to *inter partes* review is in the interest of justice, as provided by both Congress and the PTO.

Dated: February 7, 2014.

_____/Peter J. Ayers/_____

PETER AYERS
Lee & Hayes, PLLC
13809 Research Blvd., Suite 405
Austin, TX 78750
Telephone: 512.505.8162
Fax: 509.944.4693
Attorney for Patent Owner Telefonaktiebolaget
    LM Ericsson

REQUEST FOR REHEARING                8                IPR2013-00636

**A0128**

Paper No. _____

## CERTIFICATE OF SERVICE

The undersigned certifies that on February 7, 2014 the foregoing was served

via email on Lead and Back-up Counsel for Broadcom Corporation identified in

Broadcom's Mandatory Notices, whom consented to electronic service:

Dominic E. Massa, Lead Counsel
Michael A. Diener, Back-up Counsel
Wilmer Cutler Pickering Hale and Dorr, LLP
60 State Street
Boston, MA 02109
WH-External-Broadcom-IPR2013-601@wilmerhale.com
dominic.massa@wilmerhale.com
michael.diener@wilmerhale.com

LEE & HAYES PLLC


    /Peter J. Ayers/
Peter J. Ayers, Reg. No. 38,374

**A0129**

Trials@uspto.gov
Tel: 571-272-7822

Paper: 24
Entered: Feb. 20, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BROADCOM CORPORATION
Petitioner

v.

TELEFONAKTIEBOLAGET LM ERICSSON and ERICSSON, INC.
Patent Owner

_____

Case IPR2013-00636
Patent 6,424,625 B1

_____

Before KARL D. EASTHOM, KALYAN K. DESHPANDE, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges.*

EASHTOM, *Administrative Patent Judge.*

DECISION
Request for Rehearing
*37 C.F.R. § 42.71(d)*

Patent Owner, "Ericsson," requests rehearing, Paper 23 ("Reh'g
Req."),of the Decision on Ericsson's Motion for Additional Discovery,
Paper 20 ("Dec. on Mot."), which denies additional discovery by Ericsson of

IPR2013-00636
Patent 6,424,625 B1

material possessed by Petitioner, "Broadcom." Ericsson requests that the Board reverse its decision and allow for limited discovery. Reh'g Req. 8. The request is *denied*.

Ericsson argues that the Board erred "(a) in its holding that limitation of discovery holds a higher statutory priority than limitation of duplicative proceedings; and (b) in its holding that 'Broadcom must have had control over the Texas Litigation' before [the] 35 U.S.C. § 315(b) bar may be invoked."[1] Reh'g Req. 2.

Ericsson's first argument is new. This new rehearing argument is improper. "The [rehearing] request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion . . . ." 37 C.F.R. § 42.71(d); *see also* 37 C.F.R. § 42.71(c) ("a panel will review the [rehearing] decision for an abuse of discretion.")[2]

The Board could not have misapprehended or overlooked an argument presented for the first time in Ericsson's Rehearing Request. Ericsson fails to point the Board to where it made the argument or where the Board made the alleged holding regarding "a higher statutory priority." The Board carefully balanced numerous factors and determined that Ericsson failed to meet the statutorily mandated "interests of justice" standard for additional discovery. *See* Dec. on Mot. 5 (citing 35 U.S.C. § 316(a)(5) ("such

---

[1] *Ericsson Inc., et al. v. D-LINK Corp., et al.*, Civil Action No. 6:10-CV-473 (LED/KGF) ("Texas Litigation").
[2] An abuse of discretion may be determined if a decision is based on an erroneous interpretation of law, if a factual finding is not supported by substantial evidence, or if the decision represents an unreasonable judgment in weighing relevant factors. *Arnold Partnership v. Dudas*, 362 F3d 1338, 1340 (Fed. Cir. 2004).

2

**A0131**

IPR2013-00636
Patent 6,424,625 B1

discovery shall be limited to . . . what is otherwise necessary in the interest of justice")); *id.* at 4–16 (balancing factors, addressing precedent and legislative history).

Ericsson's second argument does not show that the Board erred in determining that the weight of authority requires some control over the Texas Litigation by Broadcom to show privity. *See* Dec. on Mot. 7 (citing and discussing "long-standing precedent"). Ericsson relies heavily on one of the cases cited in the Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,759, 48,760 (Aug. 14, 2012)("TPG")—*Cal. Physicians' Serv. v. Aoki Diabetes Research Inst.* 163 Cal. App. 4th 1506, 1524 (Cal. App. 2008). *See* Reh'g Req. 5–7. Ericsson ignores the weight of authority cited by the Board that shows control over prior litigation is a crucial factor normally required to bind a party to that prior litigation using collateral estoppel. *See* Dec. on Mot. 7-10; Reh'g Req. 5–7.

Immediately before citing *Aoki* as an example, the TPG qualifies *Aoki* as follows: "But whether something less than *complete funding and control* suffices to justify similarly treating the party requires consideration of the pertinent facts. *See e.g., Cal. Physicians' Serv. v. Aoki Diabetes Research Inst.* 163 Cal. App. 4th 1506, 1524 (Cal. App. 2008) . . . ." (Emphasis added). In other words, although the TPG cites *Aoki*, it retains an emphasis on control. In other places, for example, the TPG states that "[a] common consideration is whether the non-party exercised control over a party's participation in a proceeding" and "the rules do not enumerate particular factors regarding a 'control' theory." TPG at 48,759.

Ericsson also quotes selectively from the Board's decision, ignoring the phrase "in normal situations" that qualifies the language it quotes. *See*

3

**A0132**

IPR2013-00636
Patent 6,424,625 B1

Reh'g Req. 7 (discussing the Board's rationale that "Broadcom must have had control over the Texas Litigation"); Dec. on Mot. 7. The Board's characterization of the law in the previous sentence, Dec. on Mot. 7 ("[t]o show privity requires a showing that Broadcom would be bound to the outcome of the Texas Litigation") is consistent with the characterization by the court in *Aoki*, 163 Cal. App. 4th at 1524 ("[t]he question is whether, under the circumstances as a whole, the party to be estopped should reasonably have expected to be bound by the prior adjudication.").

Ericsson is essentially correct in that *Aoki* held that "'preclusion can apply even in the absence of . . . control.'" Reh'g Req. 7 (quoting *Aoki*, 163 Cal. App. 4th at 1524). Nevertheless, *Aoki* also noted that "control over the prior action is commonly present" in collateral estoppel applications. *Id.* *Aoki* is also highly fact specific, as are typical cases involving collateral estoppel. *See* Dec. on Mot. 7-10.

*Aoki* begins its privity analysis by noting that "the doctrine [of collateral estoppel] applies 'only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding.'" *Id.* at 1520 (citation omitted). Departing from the normal privity rule that requires control, and delineating its finding of privity based on a community of interest theory, which included a finding of an identical issue to be precluded, *see id.* at 1521 (discussing exact same single issue of denial of coverage for an experimental procedure), the court cited as an important factor, "prevent[ing] the possibility of a dramatically inconsistent judgment," *id.* at 1524.

4

**A0133**

IPR2013-00636
Patent 6,424,625 B1

On its face, this important factor, preventing a "dramatically inconsistent judgment," underlies or coalesces with the fundamental threshold requirement enunciated by *Aoki*—precluding only the identical issue previously litigated—which issue, of course, is necessary to produce a (later) inconsistent judgment. That concern is not present in this proceeding. In general, as compared to district courts, different burdens of proof, different presumptions, different claim construction standards for unexpired patents, and different prior art, typically apply to PTAB proceedings. *See* 37 C.F.R. § 42.100(b); TPG at 48,766 (the broadest reasonable construction standard). Of course, Congress was aware of the differences between the two proceedings when it listed a "privy" as precluded from a time-barred *inter partes* proceeding under 35 U.S.C. 315(b). Therefore, although identical issues may not be required to establish privity through collateral estoppel at the PTAB, the TPG emphasizes control, which implies that control is an important factor to establish privity in the absence of identical issues and otherwise.

In other words, while the TPG and 35 U.S.C. 315(b) may indicate a relaxation, to a certain extent, of collateral estoppel principles, and *Aoki* generally may present guiding principles regarding privity, *Aoki* also recognizes that "[n]otions of privity have been expanded *to the limits of due process*." 163 Cal. App. 4th at 1522 (citation omitted) (emphasis added). In order to bind a non-party under collateral estoppel, this expansion cannot exceed the bounds of due process. Ultimately, Ericsson does not show that the Board overlooked a material consideration in determining that Ericsson failed to meet its burden of showing that additional discovery would have

5

**A0134**

IPR2013-00636
Patent 6,424,625 B1

more than a mere possibility of showing that Broadcom should be bound by the Texas Litigation.  *See* Dec. on Mot. 11-13.


DECISION on REHEARING

Ericsson's sought-after relief is DENIED.


PETITIONER:

Dominic Massa
Michael Diener
michael.diener@wilmerhale.com
Dominic.massa@wilmerhale.com


PATENT OWNER:

Peter J. Ayers
J. Christopher Lynch
Lee & Hayes PLLC
Peter@leehayes.com
chris@leehayes.com

6

**A0135**

Trials@uspto.gov
571-272-7822

Paper 25
Entered:  March 10, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BROADCOM CORPORATION
Petitioner

v.

TELEFONAKTIEBOLAGET L. M. ERICSSON
Patent Owner

_____

Case IPR2013-00636
Patent 6,424,625

_____

Before KARL D. EASTHOM, KALYAN K. DESHPANDE, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges*.

CLEMENTS, *Administrative Patent Judge*.

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

A0136

Case IPR2013-00636
Patent 6,424,625

## I.     INTRODUCTION

Broadcom Corporation ("Petitioner") filed a petition requesting *inter partes* review of claim 1 of U.S. Patent No. 6,424,625 (Ex. 1001, "the '625 patent"). Paper 3 ("Pet."). Telefonaktiebolaget L. M. Ericsson ("Patent Owner") filed an election to waive its preliminary response. Paper 19. We have jurisdiction under 35 U.S.C. § 314.

The standard for instituting an *inter partes* review is set forth in 35 U.S.C. § 314(a), which provides as follows:

> THRESHOLD.—The Director may not authorize an inter partes review to be instituted unless the Director determines that the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.

Upon consideration of the petition, we determine that the information presented by Petitioner establishes that there is a reasonable likelihood that Petitioner would prevail in showing unpatentability of claim 1 of the '625 patent. Accordingly, pursuant to 35 U.S.C. § 314, we institute an *inter partes* review of claim 1 of the '625 patent.

### A.  Related Proceedings

Petitioner and Patent Owner indicate that the '625 patent is involved in a case captioned *Ericsson Inc., et al. v. D-LINK Corp., et al.,* Civil Action No. 6:10-cv-473 (E.D. Tex.) ("Texas Litigation"). Pet. 1-2; Paper 6 at 1. Patent Owner also identifies an appeal at the Federal Circuit captioned *Ericsson Inc., et al. v. D-LINK Corp., et al.*, Case Nos. 2013-1625, -1631, -1632, and -1633. Paper 6 at 1. Petitioner also has filed two petitions for

2

**A0137**

Case IPR2013-00636
Patent 6,424,625

*inter partes* review of related patents:  IPR2013-00601 (U.S. Patent No. 6,772,215), IPR2013-00602 (U.S. Patent No. 6,466,568).  Pet. 2.

## B.  The '625 patent

The '625 patent relates generally to Automatic Repeat Request (ARQ) techniques for transferring data in fixed/wireless data networks.  Ex. 1001, col. 1, ll. 7-9.  ARQ techniques are commonly used in data networks to ensure reliable data transfer and to protect data sequence integrity.  *Id.* at ll. 13-15.  The integrity of data sequence is normally protected by sequentially numbering packets and applying certain transmission rules.  *Id.* at ll. 20-22.  By doing so, the receiver receiving packets can detect lost packets and thereby request that the transmitter retransmit the affected data packets.  *Id.* at ll. 15-20.  According to the '625 patent, there were three main ARQ schemes:  Stop-and-Wait; Go-Back-N; and Selective Reject.  *Id.* at ll. 23-25.  All three provide a mechanism for transferring packets to a receiver in a data network in an appropriate order.  *Id.* at ll. 25-27.

Normally, it is desirable to transfer all packets without data loss.  *Id.* at col. 3, ll. 46-47.  Sometimes, however, sending significantly delayed packets provides no benefit—e.g., where the delay causes the information in the packets to become outdated and therefore useless to the receiver.  *Id.* at ll. 47-51.  Examples of delay-sensitive applications are, e.g., telephony, video conferencing, and delay-sensitive control systems.  *Id.* at ll. 51-53.  According to the '625 patent, prior art ARQ methods did not recognize and allow for situations where data packets have a limited lifetime and therefore

3

Case IPR2013-00636
Patent 6,424,625

fail to minimize bandwidth usage by not sending (or resending) significantly delayed or outdated data packets. *Id.* at col. 4, ll. 9-13.

To address these issues, the '625 patent discloses an ARQ technique that minimizes bandwidth usage by accounting for data packets that have an arbitrary but limited lifetime. *Id.* at col. 4, ll. 16-19. Exemplary embodiments of the invention include enhanced "Go-Back-N" and "Selective Reject" techniques that discard outdated data packets. *Id.* at ll. 21-25. In an exemplary embodiment of the invention, the progress of a bottom part of a sender window of the transmitter is reported to the receiver in order to allow the receiver to properly skip packets which do not exist anymore because they have been discarded. *Id.* at col. 5, ll. 15-21. Thus, the receiver can be commanded to skip or overlook the packets that have been discarded or, in other words, to release any expectation of receiving the packets that have been discarded. *Id.* at ll. 22-27. In the case where the transmitter discards a packet, it orders the receiver to accept the next packet by setting a Receiver Packet Enforcement Bit ("RPEB") in the ARQ header of the next packet and sending the packet to the receiver. *Id.* at ll. 28-32. When the receiver receives the packet, the RPEB will cause the receiver to accept the packet. *Id.* at ll. 32-33.

Figure 8 is reproduced below.



FIG. 8

4

Case IPR2013-00636
Patent 6,424,625

Figure 8 shows ARQ packet 810 with ARQ header 812 and data portion 818. *Id.* at ll. 33-35. Header 812 includes RPEB 814 and k-bit sequence number N(S) 816. *Id.* at ll. 35-37. RPEB 814 may be used in a variety of situations. *Id.* at ll. 41-43. For example, if a NACK is sent by a receiver, received by the transmitter, and is valid for one discarded data packet, then the next data packet to be retransmitted can have RPEB set to TRUE. *Id.* at ll. 43-48. In another example, if a retransmission timer expires and one or more data packets have been discarded, the next incoming data packet to be transmitted (or the first data packet to be retransmitted) can have RPEB set to TRUE. *Id.* at ll. 49-53. If RPEB is TRUE and the difference between the sequence number and the Expected Sequence Number (ESN) of the next packet to be received is less than the window size (i.e., half the maximum sequence number), the packet will be accepted and forwarded to a higher layer (as long as the data in the packet is also correct). *Id.* at col. 5, ll. 62-63; col. 6, ll. 32-36. In this way, the various embodiments of the invention increase throughput of a communications system using ARQ packets by discarding outdated packets. *Id.* at col. 9, ll. 60-62.

### C. Exemplary Claim

Claim 1, the sole challenged claim, is reproduced below:

1.    A method for discarding packets in a data network employing a packet transfer protocol including an automatic repeat request scheme, comprising the steps of:

a transmitter in the data network commanding a receiver in the data network to a) receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet and b) release any

5

**A0140**

Case IPR2013-00636
Patent 6,424,625

expectation of receiving outstanding packets having sequence numbers prior to the at least one packet; and

the transmitter discarding all packets for which acknowledgment has not been received, and which have sequence numbers prior to the at least one packet.

### D. References Relied Upon

Petitioner relies upon the following references:

| | | | |
|---|---|---|---|
| Garrabrant | US 5,610,595 | Mar. 11, 1997 | Ex. 1002 |
| Andreas Hettich, "Development and performance evaluation of a Selective Repeat-Automatic Repeat Request (SR-ARQ) protocol for transparent, mobile ATM access" (April 17, 1996) (diploma paper, Aachen Tech. University)("Hettich") | | | Ex. 1003 |
| Walke | DE 19543280 | May 22, 1997 | Ex. 1004 |
| Kemp | US 6,621,799 | Sept. 16, 2003 (filed Oct. 5, 1998) | Ex. 1005 |
| Hettich (English language translation)[1] | | | Ex. 1007 |
| Walke | DE 19543280 (English translation)[2] | May 22, 1997 | Ex. 1008 |
| Dimitri Bertsekas, et al., DATA NETWORKS, Prentice-Hall, 1987, pp. 58-74 ("Bertsekas") | | | Ex. 1012 |

### E. The Asserted Grounds of Unpatentability

Petitioner argues that claim 1 is unpatentable based upon the following grounds:

---

[1] All references in this decision to "Hettich" are to the English translation (Ex. 1007) of the German thesis.
[2] All references in this decision to "Walke" are to the English translation (Ex. 1008) of the German patent publication.

Case IPR2013-00636
Patent 6,424,625

| Reference[s] | Basis |
|---|---|
| Garrabrant (Figures 8A and 8B) | § 102 |
| Garrabrant (Failure Recovery) | § 102 |
| Hettich | § 102 |
| Walke | § 103 |
| Kemp | § 102 |
| Bertsekas, Go-Back-N Technology, Walke, and the Teaching to Discard Packets in an ARQ System | § 103 |

## II.  ANALYSIS

### A.  Claim Construction

In an *inter partes* review, claim terms in an unexpired patent are interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear.  37 C.F.R. § 42.100(b); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).  Also, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure.  *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

### 1.  Preamble

Petitioner proposes that the preamble of claim 1 should not be construed to limit claim 1.  Pet. 17-18.  Specifically, Petitioner argues that the terms used in the preamble are not later referred to or necessary to understand the body of claim 1, and that the preamble merely states the

7

Case IPR2013-00636
Patent 6,424,625

purpose or intended use of the invention. *Id.* at 17. Petitioner further argues that, during prosecution of the '625 patent, the Patent Owner did not rely on the preamble to distinguish the prior art. *Id.* at 18. On this record, because claim 1 defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention, we agree that the preamble does not limit claim 1.

   2. *"commanding"*

   Petitioner argues that "commanding" should be construed to mean "an instruction represented in a control field to cause an addressed device to execute a specific control function." Pet. 18-19 (emphasis and internal quotation marks omitted). Petitioner's proposed construction is similar to the definition of "command" from the IEEE Dictionary. Pet. 19 n.3 (citing Ex. 1011, 214-215). Petitioner argues that this construction is consistent with the claims and specification of the '625 patent, which describes the commanding step being carried out by an enforcement bit ("RBEP bit"). *Id.* (citing Ex. 1001, Abstract, claim 3). Petitioner argues that the definition proposed by Patent Owner in the Texas Litigation was overly broad because one of ordinary skill would not understand a packet to be a command to receive simply because the receiver receives it. Pet. 19-20 (citing Ex. 1006 ¶ 38). The '625 patent states that, "the receiver can be *commanded* to skip or overlook the packets which have been discarded, or in other words, to release any expectation of receiving the packets which have been discarded." Ex. 1001, col. 5, ll. 22-25 (emphasis added). The '625 patent further explains that, "[i]n the case where the transmitter discards a packet, it orders

8

Case IPR2013-00636
Patent 6,424,625

the receiver to accept the next packet, by setting a certain Receiver Packet
Enforcement Bit (RPEB) in the ARQ header of the next packet and sending
the packet to the receiver." *Id.* at ll. 28-32. The result is that, "[w]hen the
receiver receives the packet, the RPEB bit will cause the receiver to accept
the packet." *Id.* at ll. 32-33. Thus, not every packet "commands" the
receiver to perform the rest of the claimed limitation; only a packet whose
RPEB bit is set "commands" the receiver to do so. We are, therefore,
persuaded that "commanding" does not encompass merely receiving.
Moreover, Petitioner's proposed construction is consistent with how a
person of ordinary skill in the art would have understood the term at the time
that the '625 patent was filed. *See* Ex. 1011, 214-215. Accordingly, we
construe "commanding" to mean "an instruction represented in a control
field to cause an addressed device to execute a specific control function."

### B. Claim 1 – Anticipated by Garrabrant

Petitioner argues that claim 1 is unpatentable under 35 U.S.C.
§ 102(b) as anticipated by Garrabrant. Pet. 28-37. In support of this ground
of unpatentability, Petitioner provides detailed explanations as to how each
claim limitation is disclosed by Garrabrant, and relies upon the Declaration
of Dr. Bims. *Id.* (citing Ex. 1006 ¶¶ 47-70).

#### *Garrabrant (Exhibit 1002)*

Garrabrant describes a method and apparatus for transmitting data in a
packet radio communication system having data sources, destinations, and
intermediate repeaters. Ex. 1002, Abstract. According to a packet protocol,
a sequence index is used to prevent duplicate packets from being received by

9

**A0144**

Case IPR2013-00636
Patent 6,424,625

requiring that the sequence number fall within a sequence number window at each device. *Id.* The sequence number window is incremented each time a packet is received. *Id.* The sequence number also is used to cause the retransmission of packets that are lost, at which time the sequence number window in the devices that are affected are reset to allow transmission of the lost packet. *Id.*

Figure 7A is reproduced below.



Fig. 7A

Figure 7A illustrates a window used with the packet radio communication system of the present invention according to the protocol of the present invention before the transmission of a message. *Id.* at col. 9, ll. 9-13. The window has circle 140 with sequence numbers on the circumference of the circle representing the possible values that can be contained in a set of possible sequence numbers. *Id.* at ll. 13-16. Some predetermined fraction of the set of possible sequence numbers constitutes the set of sequence numbers in "valid" window 142, and the set of remaining possible sequence numbers

10

A0145

Case IPR2013-00636
Patent 6,424,625

constitutes the set of sequence numbers in "rejection" window 144. *Id.* at ll. 20-24.

When the message source does not receive a response ("UA") acknowledging receipt of the transmitted message, the message is retransmitted for a certain predetermined number of times. *Id.* at col. 10, ll. 4-8. A source unit and a destination unit will allow as many messages as there are in "valid" window 142 to become lost while still maintaining synchronization. *Id.* at ll. 15-17.

Figures 8A and 8B, reproduced below, show what happens if five packets are lost. *Id.* at ll. 17-18.



Fig. 8A    Fig. 8B

Figure 8A illustrates rejection window 160 in circle set of acceptable sequence numbers 162 at a destination unit of the packet radio communication system *before* the rejection window is updated in response to the receipt of a "lost" message. *Id.* at ll. 18-24. Figure 8B illustrates rejection window 170 in circle set of acceptable sequence numbers 172 at the destination unit *after* the rejection window is updated in response to the

11

Case IPR2013-00636
Patent 6,424,625

receipt of a "lost" message. *Id.* at ll. 24-28. In Figure 8A, it is assumed that out of 8 packets sent, packets 0 and 1 were successfully received to define "valid" window 164 and packets 2 through 6 were lost. *Id.* at ll. 28-30. As a result, "valid" window 164 did not advance further. *Id.* at ll. 30-32. Each time a packet was transmitted, the sender unit incremented its sequence count. *Id.* at ll. 32-34. However, because these packets were lost, the destination unit did not receive them and "valid" window 164 is still set between 2 and 17. *Id.* at ll. 34-37. When packet 7 eventually arrives at the destination unit, it falls within "valid" window 164 and is accepted by the destination unit. *Id.* at ll. 37-39. The destination unit then sets its internal sequence count to 8 as shown in Figure 8B and slides its "valid" window 164 to the position of "valid" window 174, shown in Figure 8B, to allow packets 8 through 23. *Id.* at ll. 39-42.

*Analysis*

In light of the arguments and evidence, Petitioner has established a reasonable likelihood that claim 1 is unpatentable as anticipated by Garrabrant.

For example, independent claim 1 recites

> a transmitter in the data network commanding a receiver in the data network to a) receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet and b) release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet.

Garrabrant discloses sending a "lost" message that instructs the receiver to move its window forward upon receipt of the next received

12

**A0147**

Case IPR2013-00636
Patent 6,424,625

packet.  Ex. 1002, Figs. 8A, 8B; col. 10, ll. 14-42.  In the example illustrated in Figures 8A and 8B, the "lost" message instructs the receiver to receive a packet (packet 7) having a sequence number that is not consecutive with a sequence number of a previously received packet (packets 0 and 1), and release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet (i.e., moving "valid" window forward to allow packets 8 through 23, thereby giving up on packets 2 through 5).  *Id.*

Claim 1 also recites "the transmitter discarding all packets for which acknowledgment has not been received, and which have sequence numbers prior to the at least one packet."  Garrabrant discloses that the sender discards packets 2 through 6 after retransmitting each a certain predetermined number of times.  *Id.* at col. 10, ll. 7-8, 16, 23-25; *see also id.* at Fig. 12, col. 12, ll. 43-44 ("A flow chart of an algorithm which may be used to discard repeated packets is shown in FIG. 12.").

*Conclusion*

We are persuaded that Petitioner has established a reasonable likelihood that it would prevail in showing that claim 1 is unpatentable as anticipated by Garrabrant.

*C. Claim 1 – Anticipated by Hettich*

Petitioner argues that claim 1 is unpatentable under 35 U.S.C. § 102(b) as anticipated by Hettich.  Pet. 37-41.  In support of this ground of unpatentability, Petitioner provides detailed explanations as to how each

13

**A0148**

Case IPR2013-00636
Patent 6,424,625

claim limitation is disclosed by Hettich, and relies upon the Declaration of
Dr. Bims. *Id.* (citing Ex. 1006 ¶¶ 79-90).

*Hettich (Exhibit 1007)*

Hettich describes a new link access protocol based on known ARQ
protocols and adjusted for the special requirements of the Mobile Broadband
System ("MBS") project. Ex. 1007, 4-5. Specifically, Hettich discloses an
Adaptive Selective Repeat ("ASR") ARQ protocol that is a modified
Selective Reject ("SR") ARQ and uses a Selective Reject (SREJ) PDU to
request an individual frame again. *Id.* at 29-30. Hettich further discloses a
Delay PDU that "is used to inform receivers that cells have been discarded."
*Id.* at 34. The Delay PDU "is sent in the opposite direction instead of an
acknowledgement"—i.e., from transmitter to receiver—and has RN (the
lowest frame number that has not yet been correctly received) set equal to
SN, where SN is the highest number of all of the discarded cells. *Id.* at 28,
34. If the receiver receives a Delay PDU, it stops waiting for cells with
sequence numbers less than or equal to RN. *Id.* at 35. The receiver then
shifts its window and issues a corresponding acknowledgement. *Id.*

*Analysis*

In light of the arguments and evidence, Petitioner has established a
reasonable likelihood that claim 1 is unpatentable as anticipated by Hettich.

For example, independent claim 1 recites

a transmitter in the data network commanding a receiver in the
data network to a) receive at least one packet having a sequence
number that is not consecutive with a sequence number of a
previously received packet and b) release any expectation of

14

**A0149**

Case IPR2013-00636
Patent 6,424,625

receiving outstanding packets having sequence numbers prior to the at least one packet.

Hettich discloses that the Delay PDU is a command to a receiver to shift its window, thereby releasing any expectation of receiving packets having sequence numbers less than or equal to SN and allowing the receiver to receive packets with sequence numbers greater than SN. Pet. 34-35.

Claim 1 also recites "the transmitter discarding all packets for which acknowledgment has not been received, and which have sequence numbers prior to the at least one packet." Hettich discloses that the transmitter sets RN=SN in the Delay PDU, where "*SN* is the highest number of all the discarded cells," and "there cannot be valid (not discarded) cells with lower sequence numbers." *Id.* at 34. Thus, the transmitter discards all packets with sequence numbers below SN.

*Conclusion*

We are persuaded that Petitioner has established a reasonable likelihood that it would prevail in showing that claim 1 is unpatentable as anticipated by Hettich.

*D. Claim 1 – Obvious over Walke*

Petitioner argues that claim 1 is unpatentable under 35 U.S.C. § 103(a) as obvious over Adams. Pet. 41-47. In support of this ground of unpatentability, Petitioner provides detailed explanations as to how each claim limitation is taught or suggested by Walke, and relies upon the Declaration of Dr. Bims. *Id.* (citing Ex. 1006 ¶¶ 91-99).

15

**A0150**

Case IPR2013-00636
Patent 6,424,625

*Walke (Exhibit 1008)*

Walke describes a mobile communication system in which Asynchronous Transfer Mode ("ATM") network cells can be transmitted via a radio interface with a quality of service comparable to that achieved ordinarily by a fixed network of similar capacity. Ex. 1008, col. 3. Walke discloses "specific measures to ensure that the required connection-specific quality of service parameters 'maximum ATM cell-loss rate' and 'maximum ATM cell delay' are complied with," namely, "error-correction processes involving automatic repeat request (ARQ) processes." *Id.* The error correction process according to the invention uses an improved selective repeat (SR) algorithm by using a Selective Reject (SREJ) order to request retransmission of individual ATM cells. *Id.* at col. 11. In one embodiment of the error correction process, the sending station can reject ATM cells that have exceeded their maximum permitted delay. If a receiver issues a retransmission request for an ATM cell, but the cell reaches its maximum delay in the meantime, the sender rejects the ATM cell. *Id.* at col. 12. The sender informs the receiver that this ATM cell will not be retransmitted by using a delay order, which is treated as an acknowledgement, but is generated by the sender and sent to the receiver. *Id.* at cols. 12-13. The receipt sequence number N(R) in this command is set to the sequence number of the rejected ATM cell. *Id.* The delay command is piggybacked by an N frame and, as a result, the N frame becomes a delay frame. *Id.*

Figure 9 of Walke is reproduced below.

16

**A0151**

Case IPR2013-00636
Patent 6,424,625



FIG. 9: Treatment of rejected ATM cells

Figure 9 shows an exemplary protocol sequence showing the treatment of outdated ATM cells. *Id.* at cols. 12-13. ATM cell RR(0, X) is received correctly. *Id.* ATM cell RR(1, X) is not received correctly. ATM cell RR(2, X) is received correctly. *Id.* The receiver sends a selective reject message SREJ(X, 1) indicating that ATM cell RR(1, X) was not received. *Id.* The transmitter decides to discard ATM cell RR(1, X) so it sends DELAY(4, 1) to the receiver. The DELAY message "tells the receiver not to wait for anything else on frame 1 and it is able to widen its receive window." *Id.* at col. 13.

*Analysis*

In light of the arguments and evidence, Petitioner has established a reasonable likelihood that claim 1 is unpatentable as obvious over Walke.

For example, independent claim 1 recites

> a transmitter in the data network commanding a receiver in the
> data network to a) receive at least one packet having a sequence

17

**A0152**

Case IPR2013-00636
Patent 6,424,625

number that is not consecutive with a sequence number of a previously received packet and b) release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet.

Walke teaches a DELAY message that instructs the receiver to receive a packet (i.e., packet #4 in the example of Figure 9) and release expectation of receiving an outstanding packet (i.e., packet #1 in the example of Figure 9) having a sequence number prior to the at least one packet. *Id.* at cols. 12-13.

Claim 1 also recites "the transmitter discarding all packets for which acknowledgment has not been received, and which have sequence numbers prior to the at least one packet." Petitioner acknowledges that, in the example of Figure 9,

> packet #4 is consecutive with a previously received packet #3, and the DELAY(4,1) message causes the receiver to release packet #1, but not packets #2 and #3 (and thus not "all packets … [that] have sequence numbers prior to the at least one packet" as recited in Claim 1 of the '625 patent).

Pet. 44 (alteration in original). However, Petitioner argues that, "[i]t would have been inherent in the system disclosed in Walke that many possible sets of packets are sent and acknowledged." *Id.* at 44-45 (citing Ex. 1006 ¶¶ 87, 88). Dr. Bims testifies as follows:

> 87. One of ordinary skill in the art would have understood that Walke renders obvious challenged claim 1. The teachings of Walke effectively disclose many different scenarios for lost packets - one by itself, multiple consecutively, etc. When sending packet #0 through packet #6 as shown in FIG. 9 of Walke, any combination of packets could be lost and could time out. Further, in a burst of data, there will always be a first, and

18

**A0153**

Case IPR2013-00636
Patent 6,424,625

often a last packet and intermediate packets. It would be readily apparent that just the first, or just the last, or just one intermediate, or any combination could be lost.

In the specific example, the DELAY message (DELAY (4, 1) is in the form of DELAY(n, n-3), but it could have been DELAY(n, n-2) or DELAY(n, n-4), or any other combination of packet numbers. If the situation is such that the DELAY message is DELAY(n, n-1), the system in Walke would perform the method of causing the receiver to "receive at least one packet having a sequence number that is not consecutive with a previously received packet" (the n packet), and for the transmitter to "discard[] all packets for which acknowledgment has not been received, and which have sequence numbers prior to the at least one packet", as claimed in claim 1 of the '625 patent."

88.  For example, if after sending RR(1,X) there was some delay in transmission, e.g., due to packet #1 being the last frame in a burst. In this case, the timer to retransmit would time out as shown in Figure 9 of Walke, and the next packet to be sent could be packet 2. Thus, the message would be DELAY(2,1). (*See, e.g.,* Walke, Section 2.6, Ex. 1008). In that case, packet #2 would not be consecutive with a previously received packet #0, and the receiver would release expectations of receiving all the non-acknowledged outstanding packets, i.e., packet #1. (*See, e.g.,* Walke, Section 2.6, Ex. 1008). Further, it would be possible to retransmit packet 2 and at the same time indicate the discarding of packet #1. In each case, the effect of the DELAY command is for the receiver to "no longer wait[] on [packet] 1" – i.e., to release any expectations [of receiving packet #1]. (*See, e.g.,* Walke, FIG. 9, Ex. 1008). . . .

Ex. 1006 ¶¶ 87, 88.  We are persuaded by the above-quoted analysis of Dr. Bims.

19

**A0154**

Case IPR2013-00636
Patent 6,424,625

*Conclusion*

We are persuaded that Petitioner has established a reasonable likelihood that it would prevail in showing that claim 1 is unpatentable as obvious over Walke.

### E. Other Grounds

Petitioner also asserts the following grounds of unpatentability:

| Reference[s] | Basis |
|---|---|
| Kemp | § 102 |
| Bertsekas, Go-Back-N Technology, Walke, and the Teaching to Discard Packets in an ARQ System | § 103 |

Pet. 48-54. Those asserted ground are redundant in light of the determination that there is a reasonable likelihood that the challenged claim is unpatentable based on the grounds of unpatentability on which we institute an *inter partes* review. *See* 37 C.F.R. § 42.108(a).

### III. CONCLUSION

For the foregoing reasons, we determine that the information presented in the petition establishes that there is a reasonable likelihood that Petitioner would prevail in establishing the unpatentability of claim 1 of the '625 patent.

The Board has not made a final determination on the patentability of the challenged claim.

20

**A0155**

Case IPR2013-00636
Patent 6,424,625

IV.  ORDER

Accordingly, it is

ORDERED that pursuant to 35 U.S.C. § 314, an *inter partes* review is hereby instituted as to claim 1 of the '625 patent on the following grounds:

1.  35 U.S.C. § 102 as anticipated by Garrabrant;

2.  35 U.S.C. § 102 as anticipated by Hettich;

3.  35 U.S.C. § 103 as obvious over Walke;

FURTHER ORDERED that all other grounds raised in Petitioner's petition are *denied* because they are deficient for the reasons discussed above;

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(d) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial on the grounds of unpatentability authorized above; the trial commences on the entry date of this decision; and

FURTHER ORDERED that an initial conference call with the Board is scheduled for 2:00 PM Eastern Time on April 1, 2014; the parties are directed to the Office Patent Trial Practice Guide[3] for guidance in preparing for the conference call, and should be prepared to discuss any proposed changes to the Scheduling Order entered concurrently herewith and any motion the parties anticipate filing during the trial.

---

[3] Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,765-66 (Aug. 14, 2012).

21

**A0156**

Case IPR2013-00636
Patent 6,424,625

For PETITIONER:

Dominic E. Massa
Michael A. Diner
WILMER CUTLER PICKERING HALE AND DORR LLP
dominic.massa@wilmerhale.com
michael.diener@wilmerhale.com

For PATENT OWNER:

Peter J. Ayers
J. Christopher Lynch
LEE & HAYES PLLC
peter@leehayes.com
chris@leehayes.com

22

**A0157**

Case IPR2013-00636

## STATEMENT OF MATERIAL FACTS IN DISPUTE

Petitioner did not submit a statement of material facts in its petition for *inter partes* review. Accordingly, the Patent Owner cannot properly submit, as required by 37 CFR §42.23, a statement of material facts in dispute.  Out of an abundance of caution, however, Patent Owner identifies the following disputed material facts:

A.    Whether U.S. Pat. No. 5,610,595 to Garrabrant renders claim 1 of the '625 Patent unpatentable under 35 U.S.C. § 102(b);

B.    Whether German Pat. No. DE 19543280 to Hettich renders claim 1 of the '625 Patent unpatentable under 35 U.S.C. § 102(b);

C.    Whether Walke renders claim 1 of the '625 Patent unpatentable under 35 U.S.C. § 103(a); and

D.    Whether this *inter partes review* is barred under 35 U.S.C. §315(b).

1

**A0165**

Case IPR2013-00636

## PATENT OWNER RESPONSE TO PETITION

### I.   Statement of Precise Relief Requested

Pursuant to 35 U.S.C. § 316 and 37 C.F.R. § 42.120, Patent Owner requests that the Board confirm the validity of claim 1 of the '625 Patent.  Specifically, Patent Owner requests that the Board find:

A.   Claim 1 of the '625 patent is not anticipated under 35 U.S.C. § 102(b) by the Garrabrant reference or by the Hettich reference;

B.   Claim 1 of the '625 patent is not anticipated under 35 U.S.C. § 102(b) by the Hettich reference;

C.   Claim 1 of the '625 patent is non-obvious under 35 U.S.C. § 103(a) over the Walke reference; and

D.   That this *inter partes review* is barred under 35 U.S.C. §315(b).

2

**A0166**

Case IPR2013-00636

## II.    Statement of Facts

Over three years before Broadcom filed the present Petition, Ericsson served a complaint against D-Link Corporation and D-Link Systems, Inc. ("D-Link"), Netgear, Inc. ("Netgear"), Acer Inc. and Acer America Corporation ("Acer"), and Gateway Inc. ("Gateway") for infringement of its patents. *Ericsson Inc. v. D-Link Corp.*, No. 6:10-CV-473 (LED/KGF) ("D-Link Lawsuit"); (Ex. 2002).  Ericsson later amended its complaint and added Dell, Inc. ("Dell"), Toshiba Corporation, Toshiba America, Inc., Toshiba America Information Systems, Inc. and Toshiba America Consumer Products, LLC ("Toshiba"), and Belkin International, Inc. ("Belkin") as defendants.[1] (Ex. 2003).

The complaint alleged infringement of U.S. Patent Nos. 6,424,625, 6,519,215, and 6,466,568.  (Ex. 2003).  The D-Link Defendants challenged the validity of Ericsson's patents and denied infringement. With respect to validity, the D-Link Defendants served thousands of pages of invalidity contentions and expert reports, involving many of the same assertions that are now the basis for Broadcom's IPR petition. With respect to infringement, the Defendants' supplier, Broadcom, produced technical documents relating to the design and operation of its chips and agreed to voluntarily appear and testify at trial on behalf of the D-

---

[1] The defendants listed in the Complaint and the Amended Complaint shall collectively be referred to as "D-Link Defendants."

3

**A0167**

Case IPR2013-00636

Link Defendants.  (Exs. 2004, 2015).  On the eve of trial, the D-Link Defendants abandoned their invalidity case regarding the '215 Patent and the '568 Patent, but continued challenging validity with respect to the '625 Patent.  At the end of the trial, the jury found that the D-Link Defendants infringed three Ericsson patents based on their WLAN-compliant products.  (Ex. 2018). The D-Link Defendants appealed to the Federal Circuit (where the appeal is now pending), D-Link Lawsuit, Nos. 2013-1625, -1631, -1632, -1633.

Broadcom has been working behind the scenes for years to help its customers defeat Ericsson's infringement claims.  As far back as July 2010, Broadcom assisted Acer, during negotiations with Ericsson, in analyzing the very patents that are now the subject of Broadcom's petition.  (Ex. 2007). Discussing an upcoming meeting on that topic, an Acer executive noted, "[The] [m]ain purpose is to discuss comments from Acer's vendors, including Intel, Broadcom and Atheros." *Id*.  As part of its effort to bring to the attention of the Board information bearing on the relationship among Broadcom and the D-Link Defendants, Ericsson provided notice to Acer that it was seeking relief from the Protective Order in the D-Link Lawsuit. (Ex. 2008).  In response, Acer asserted that the information Ericsson sought to give the Board was "privileged and [was] inadvertently produced." *Id.* Acer obviously believes that its relationship with Broadcom is

4

**A0168**

This page contains confidential information.


Please refer to A0232, which contains the redacted, public version of this page.

This page contains confidential information.

Please refer to A0233, which contains the redacted, public version of this page.

Case IPR2013-00636

Link Lawsuit. (Ex. 2017). In that motion, Broadcom specifically stated that the damages verdict "affect[s] amici even though they were not parties to the case" because "the award would affect demand for those chips and *may also provoke indemnification issues*." (*Id.* at p. 4) (emphasis added). This demonstrates not only the effect of the relationship, but also Broadcom's willingness to take action in support of the D-Link Defendants.

Broadcom cannot deny the existence of indemnity agreements and other evidence bearing on its community of interests with the D-Link Defendants, but Ericsson was prevented from bringing these to the attention of the Board because they are subject to a Protective Order. (Ex. 2016). The contents and scope of these documents continues to remain secret, but their existence is not: in its public order denying Ericsson Inc.'s Emergency Motion for Relief from the Protective Order, the district court recited that "[d]uring the course of the litigation, Ericsson discovered (1) an indemnity agreement between Toshiba and non-party Broadcom Corporation ('Broadcom'), (2) an indemnity agreement between Dell and Broadcom, and (3) an email between Dell and Broadcom discussing indemnification[.]" (Ex. 2016). There is no question an indemnity relationship exists between Broadcom and at least two of the D-Link Defendants and there was

7

**A0171**

Case IPR2013-00636

communication regarding the relationship during the pendency of the D-Link lawsuit.

The Board denied Ericsson's request for discovery that would have established the existence of the indemnity relationships, the substance of the conversation between Dell and Broadcom pertaining to Broadcom's indemnity obligation, and likely produced additional evidence establishing Broadcom's privity relationship with the defendants. Paper No. 20. Ericsson filed a Request for Rehearing that the Board denied. Paper No. 24. The Board issued its Decision for Institution of *Inter Partes* Review on March 10, 2014, Paper No. 25, and Ericsson now submits its Patent Owner's Response.

## III.    The Petition is Barred by 35 U.S.C. §315(b)

The D-Link Defendants were formally served with a complaint more than one year before the filing date of the Petition; Petitioner is subject to the 35 U.S.C. § 315(b)[3] bar as a privy to the D-Link Defendants, and because the D-Link

---

[3] Under 35 U.S.C. § 315(b), "[a]n inter partes review may not be instituted if the petition requesting the proceeding is filed more than 1 year after the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent."

8

**A0172**

Case IPR2013-00636

Defendants are real parties-in-interest to this action, despite Petitioner's failure to designate them as such under 35 U.S.C. § 312(a)(2).

**A. Broadcom is in Privity with the D-Link Defendants**

Broadcom has an indemnity relationship with Dell and Toshiba, and has initiated multiple legal actions on behalf of the community of interest. These actions specifically relate to the '625 Patent and Broadcom's BCM4313 and BCM4321 chips, the property in question here. The result of these legal actions will directly impact both Broadcom and these D-Link Defendants, demonstrating that their relationship is sufficiently close that both should be bound by the trial outcome and related estoppels.

The term "privity" describes a relationship between a litigant and a nonparty that is characterized by a "mutuality of interest," Ex. 2019 (*Black's Law Dictionary*, 9th Ed. (2009)), "sufficiently close such that both should be bound by the trial outcome and related estoppels," Office Patent Trial Practice Guide, 77 Fed. Reg. at 48759. Both Congress and the PTO expanded the meaning of privity for use in the AIA and acknowledged that the PTO will give effect to judgments by extending the term "beyond the classical description." 154 Cong. Rec. S9987 (daily ed. Sept. 27, 2008) (statement of Sen. Kyl) (citing *Cal. Physicians' Serv. v. Aoki Diabetes Research Inst.,* 163 Cal. App. 4th 1506 (Cal. App. 2008)); *see also*

9

**A0173**

Case IPR2013-00636

Trial Practice Guide, 77 Fed. Reg. at 48,759. The PTO further noted that "privity is an equitable rule that takes into account the 'practical situation,' and should extend to parties to transactions and other activities relating to the property in question." Trial Practice Guide, 77 Fed. Reg. at 48759 (quoting 157 Cong. Rec. S1376 (dialed ed. Mar. 8, 2011) (statement of Sen. Kyl)). Thus, both Congress and the PTO specifically expanded the traditional notions of privity to cater the doctrine to the unique context of IPR proceedings.

The PTO acknowledged the aim of the AIA in the Trial Practice Guide and stated that there are *multiple* factors relevant to the "real party-in-interest" and "privity" analysis, and it specifically cited both *Taylor v. Sturgell*, 553 U.S. 880 (2008) and *Aoki*, 163 Cal. App. 4th 1506. *Taylor* listed six distinct bases on which a party in a later case could be bound by the judgment in an earlier case to which he was not a party. 553 U.S. at 894–95. Two relevant factors listed in *Taylor* are whether the parties maintain a pre-existing "substantive legal relationship," or whether the later party had the *opportunity* to control the original party's participation in a proceeding. *Id.* Each of these factors is applicable here.

When discussing "substantive legal relationships," *Taylor* specifically stated that these relationships "are sometimes collectively referred to as 'privity.'" *Id.* at 894 n.8. The Court then cited to the Restatement:

10

**A0174**

Case IPR2013-00636

> [A] person standing in one of a variety of pre-existing legal relationships with a party may be bound by a judgment affecting that party. These relationships are often referred to as involving "privity." The circumstances under which such relationships result in preclusion are the subject of specific rules such as those governing . . . *indemnitor and indemnitee*[.]

2 Restatement of Judgments § 62, Comment a (emphasis added); *see also Speedtrack, Inc. v. Office Depot, Inc.*, No. C 07-3602 PJH, 2014 WL 1813292, at *5-6 (N.D. Cal. May 6, 2014) (an indemnification agreement between the defendants and their software supplier established that the parties were in privity despite a lack of control over the suit, barring the infringement claims as res judicata). The Supreme Court specifically relied on the Restatement, and explained that the term "privity" has "come to be used more broadly, as a way to express the conclusion that nonparty preclusion is appropriate on any ground." *Taylor*, 553 U.S. at 894 n. 8 (citing 18A Wright & Miller § 4449, pp. 351-353, and n. 33). Thus, the Court not only relied on authority that prescribes an indemnity relationship as a pre-existing substantive legal relationship, but also confirmed the broader interpretation of the term "privity."

The substantive legal relationship between Broadcom and the D-Link Defendants, specifically Dell and Toshiba, relates to the property in question. Ericsson's patents are the property in question both here and in the previous litigation—and, as Broadcom admits, both proceedings are closely related: "Patent

11

**A0175**

Case IPR2013-00636

Owner's infringement allegations were based in part on Defendants' use of Petitioner's WiFi compliant products, such as the BCM4313 and BCM4321." Paper No. 3 at 1. Ericsson proved the existence of Broadcom's indemnity relationships that dictate its contractual relationship to the property, and also that Broadcom has an express policy of initiating litigation to control the property, and did take several actions relating to the property in question during the D-Link Lawsuit. (*See* Exs. 2005 at 53/65; 2009, 2015 at p. 3, 6, 2016, 2017). Thus, not only does Broadcom maintain substantive legal relationships with the D-Link Defendants, but it has carried out multiple legal actions to control the property in question, and could have exercised control the D-Link Lawsuit. These substantive legal relationships and corresponding actions to control the '625 Patent prove that Broadcom is in privity with the Dell and Toshiba, among others, and therefore barred under Section 315(b).

**B. The D-Link Defendants are Real Parties-in-Interest.**

The D-Link Defendants' substantive legal relationships with Broadcom and the parties' coordinated activity demonstrate that the D-Link Defendants are real parties in interest to this IPR. In IPR proceedings, "the 'real party-in-interest' is the party that desires review of the patent. Thus, the 'real party-in-interest' may be the petitioner itself, and/or it may be the party or parties at whose behest the

12

**A0176**

Case IPR2013-00636

petition has been filed." Trial Practice Guide, 77 Fed. Reg. at 48759. The same factors for determining privity apply to real parties in interest. *Id.* In addition, the PTO also relies on *In re Guan Inter Partes Reexamination* Proceeding, Control No. 95/001,045, Decision Vacating Filing Date, at 8 (Aug. 25, 2008), which states that the petitioner must identify another entity as the real party in interest if it "[a]llow[s] another entity to direct or control the content (e.g., *provide the prior patents/printed publication on which the reexam is to be based*) of the request whether such is termed 'technical review' or some other phrase." (emphasis added). Broadcom's substantive legal relationships with at least Dell and Toshiba, Broadcom's use of the same prior art references as the D-Link Defendants, and the timing of Broadcom's Petition for IPR confirm that both Broadcom and the D-Link Defendants are real parties in interest.

On August 8, 2013, Ericsson obtained a judgment of infringement against the D-Link Defendants for three patents. (Ex. 2018). Less than three months later, Broadcom filed its Petition for IPR of the same claims infringed by the D-Link Defendants' use of its chips, relying on the same reference the D-Link Defendants used in their invalidity case. For obvious reasons, Broadcom did not seek review of the claims the district court found to *not* be infringed. (*See* Ex. 2018).

13

**A0177**

Case IPR2013-00636

Broadcom instead made the rote assertion that there were no other real parties in interest. However, Broadcom admitted that it supplied the property in question, namely the "Wi-Fi compliant products, such as the BCM4313 and BCM4321" to the D-Link Defendants. Paper No. 3 at 1. The only logical inference is that Broadcom's duty to indemnify some or all the D-Link Defendants triggered the successive attack on Ericsson's patents, and that the D-Link Defendants desire review of the '215 Patent.

In addition, Broadcom made it clear that both itself and the D-Link Defendants desire review of the '625 patent in its "Motion of Amici Wi-Fi Chip Companies." Broadcom specifically stated that the damages verdict in the D-Link Lawsuit "affect[s] amici even though they were not parties to the case" because "the award would affect demand for those chips and *may also provoke indemnification issues*." (Ex. 2017 at p. 4) (emphasis added). This demonstrates that Broadcom and the D-Link Defendants have common interests in the '625 Patent, and that Broadcom is willing to take action on behalf of the D-Link Defendants. Broadcom cannot hide behind its rote assertions when it is clear that the D-Link Defendants "desire[ ] review of the patent" and, therefore, are real parties in interest.

14

**A0178**

Case IPR2013-00636

packet reception.    Thus, Hettich does not disclose a transmitter "exercising dominating influence over" or "having command of" the receiver.  (Akl Dec. ¶ 59.)

### 2.  The Hettich Delay PDU does not command a receiver to release expectations of receiving outstanding packets

Broadcom's petition is further flawed because a Delay PDU does not command a receiver to release expectations of receiving outstanding packets having a sequence number *prior to* a received out of sequence packet.  The Hettich Delay PDU would merely release expectation of receiving outstanding packets having sequence numbers equal to or less than the sequence number of the *Delay PDU*, not packets having sequence numbers *prior to the out of sequence packet* as recited by claim 1.

The Delay PDU provides no information about cells that have sequence numbers higher than the sequence number of the Delay PDU.  For example, if the first cell received by the receiver after receipt of a Delay PDU has a sequence number that is not sequential to the Delay PDU (*i.e.*, the first cell received is out-of-order as compared to the sequence number referenced by the Delay PDU), then the receiver is either expecting or has received cells with sequence numbers between the discarded cells and that first received cell.  (Akl Dec. ¶ 62.)  A packet that a receiver is expecting to receive, such as "a packet that has been sent but not received or not correctly received" is an outstanding packet.  ('625 patent at 2:67-

40

**A0204**

Case IPR2013-00636

3:2.)  Cells that have not been received (or not correctly received)—outstanding cells—may exist between the discarded cells associated with the Delay PDU and that first received cell, and accordingly, Hettich does not "release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet." (Akl Dec. ¶ 62.)

Based on Ericsson's cross-examination of Broadcom's expert, Ericsson anticipates that Broadcom may try to argue in reply that the sequence number of the first cell received after the Delay PDU command *could* be sequential to those numbers associated with the Delay PDU so that no outstanding cells would exist between the Delay PDU and that first received cell.  But Hettich neither explicitly nor inherently discloses such a theory.  Nor would one of ordinary skill in the art understand Hettich to disclose such a theory because Hettich addresses efficient communication of packets.  (Hettich at 26; Akl Dec. ¶ 63.)

The aforementioned theoretical situation could only arise if a sufficient delay is inserted immediately between transmission of the Delay PDU to allow the receiver to (1) receive the Delay PDU, (2) shift its window appropriately, and (3) request the cell with the next sequential sequence number so that the very next cell placed in the transmit buffer after the Delay PDU, and thereafter transmitted, would be the cell with the next sequential sequence number. (Akl Dec. ¶ 64.)  To

41

**A0205**

Case IPR2013-00636

do so would require ceasing loading additional cells into the transmit buffer upon placing a Delay PDU in the transmit buffer for transmission. (*Id.*) Such a delay would dramatically decrease transmitter throughput and would eviscerate the stated efficiency advantages of the Hettich system. (*Id.*) Moreover, even if the first non-sequential packet received corresponded to the last packet in a "burst," Hettich fails to address how the transmitter addresses transmission of information between bursts. (*Id.*) Additional cells would be expected to be transmitted immediately after a burst, rather than halting transmission until the last transmitted cell has been acknowledged as Broadcom's theory requires. (*Id.*) One of ordinary skill in the art would expect the transmitter in a high throughput system, immediately after transmitting a burst, to send a packet related to the next information to be transmitted, rather than waiting to retransmit the last packet. (*Id.*) Accordingly, Hettich does not teach or suggest the "releasing" limitation. (*Id.*)

Because the Hettich receiver can expect to receive outstanding packets between the discarded cells and the first received cell after reception of the Delay PDU, Hettich does not "release any expectation of receiving outstanding packets having sequence number prior to the at least one packet." (Akl Dec. ¶ 65.)

### 3. The transmitter in Hettich does not "discard all packets"

Hettich also does not disclose "the transmitter discarding all packets for which acknowledgement has not been received, and which have sequence numbers

42

**A0206**

**UNITED STATES PATENT AND TRADEMARK OFFICE**

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

BROADCOM CORPORATION
Petitioner

v.

TELEFONAKTIEBOLAGET LM ERICSSON (PUBL)
Patent Owner

_____

Case IPR2013-00636
Patent 6,424,625
Title: Method and Apparatus for Discarding Packets in a Data Network
Having Automatic Repeat Request

**PATENT OWNER'S RESPONSE
BY ERICSSON UNDER 37 C.F.R. § 42.120**

**A0221**

Case IPR2013-00636

## STATEMENT OF MATERIAL FACTS IN DISPUTE

Petitioner did not submit a statement of material facts in its petition for *inter partes* review. Accordingly, the Patent Owner cannot properly submit, as required by 37 CFR §42.23, a statement of material facts in dispute. Out of an abundance of caution, however, Patent Owner identifies the following disputed material facts:

A.   Whether U.S. Pat. No. 5,610,595 to Garrabrant renders claim 1 of the '625 Patent unpatentable under 35 U.S.C. § 102(b);

B.   Whether German Pat. No. DE 19543280 to Hettich renders claim 1 of the '625 Patent unpatentable under 35 U.S.C. § 102(b);

C.   Whether Walke renders claim 1 of the '625 Patent unpatentable under 35 U.S.C. § 103(a); and

D.   Whether this *inter partes review* is barred under 35 U.S.C. §315(b).

1

Case IPR2013-00636

**PATENT OWNER RESPONSE TO PETITION**

**I.  Statement of Precise Relief Requested**

Pursuant to 35 U.S.C. § 316 and 37 C.F.R. § 42.120, Patent Owner requests

that the Board confirm the validity of claim 1 of the '625 Patent.  Specifically,

Patent Owner requests that the Board find:

A.   Claim 1 of the '625 patent is not anticipated under 35 U.S.C. § 102(b)

by the Garrabrant reference or by the Hettich reference;

B.   Claim 1 of the '625 patent is not anticipated under 35 U.S.C. § 102(b)

by the Hettich reference;

C.   Claim 1 of the '625 patent is non-obvious under 35 U.S.C. § 103(a)

over the Walke reference; and

D.   That this *inter partes review* is barred under 35 U.S.C. §315(b).

2

**A0229**

Case IPR2013-00636

## II.    Statement of Facts

Over three years before Broadcom filed the present Petition, Ericsson served a complaint against D-Link Corporation and D-Link Systems, Inc. ("D-Link"), Netgear, Inc. ("Netgear"), Acer Inc. and Acer America Corporation ("Acer"), and Gateway Inc. ("Gateway") for infringement of its patents. *Ericsson Inc. v. D-Link Corp.*, No. 6:10-CV-473 (LED/KGF) ("D-Link Lawsuit"); (Ex. 2002). Ericsson later amended its complaint and added Dell, Inc. ("Dell"), Toshiba Corporation, Toshiba America, Inc., Toshiba America Information Systems, Inc. and Toshiba America Consumer Products, LLC ("Toshiba"), and Belkin International, Inc. ("Belkin") as defendants.[1] (Ex. 2003).

The complaint alleged infringement of U.S. Patent Nos. 6,424,625, 6,519,215, and 6,466,568. (Ex. 2003). The D-Link Defendants challenged the validity of Ericsson's patents and denied infringement. With respect to validity, the D-Link Defendants served thousands of pages of invalidity contentions and expert reports, involving many of the same assertions that are now the basis for Broadcom's IPR petition. With respect to infringement, the Defendants' supplier, Broadcom, produced technical documents relating to the design and operation of its chips and agreed to voluntarily appear and testify at trial on behalf of the D-

---

[1] The defendants listed in the Complaint and the Amended Complaint shall collectively be referred to as "D-Link Defendants."

3

**A0230**

Case IPR2013-00636

Link Defendants.  (Exs. 2004, 2015).  On the eve of trial, the D-Link Defendants abandoned their invalidity case regarding the '215 Patent and the '568 Patent, but continued challenging validity with respect to the '625 Patent.  At the end of the trial, the jury found that the D-Link Defendants infringed three Ericsson patents based on their WLAN-compliant products.  (Ex. 2018). The D-Link Defendants appealed to the Federal Circuit (where the appeal is now pending), D-Link Lawsuit, Nos. 2013-1625, -1631, -1632, -1633.

Broadcom has been working behind the scenes for years to help its customers defeat Ericsson's infringement claims.  As far back as July 2010, Broadcom assisted Acer, during negotiations with Ericsson, in analyzing the very patents that are now the subject of Broadcom's petition.  (Ex. 2007). Discussing an upcoming meeting on that topic, an Acer executive noted, "[The] [m]ain purpose is to discuss comments from Acer's vendors, including Intel, Broadcom and Atheros." *Id.*  As part of its effort to bring to the attention of the Board information bearing on the relationship among Broadcom and the D-Link Defendants, Ericsson provided notice to Acer that it was seeking relief from the Protective Order in the D-Link Lawsuit. (Ex. 2008).  In response, Acer asserted that the information Ericsson sought to give the Board was "privileged and [was] inadvertently produced." *Id.* Acer obviously believes that its relationship with Broadcom is

4

**A0231**

Case IPR2013-00636

sufficiently close, and their interests are sufficiently aligned, to support a privilege covering relevant communications between the two.

Broadcom's SEC filings furnish additional evidence that it was a real party-in-interest in the D-Link Lawsuit, in privity with the D-Link Defendants, and that the D-Link Defendants are real parties in interest to its IPR petition. (Ex. 2005). Broadcom states in these filings that it is not uncommon for Broadcom "to indemnify some customers and strategic partners under our agreements if a third party alleges or if a court finds that our products or activities have infringed upon, misappropriated or misused another party's proprietary rights." (*Id.* at 53/65). To protect these interests, Broadcom "engage[s] in litigation to . . . determine the validity and scope of the proprietary rights of others, including [its] customers." (*Id.*) This IPR is just another instance of Broadcom filing litigation on behalf of its customers pursuant to its indemnity obligations.

[REDACTED] (Ex. 2009). [REDACTED]

5

**A0232**

Case IPR2013-00636



(*Id.* at ¶101).

Less than three months after Ericsson obtained a judgment of infringement against the D-Link Defendants, Broadcom filed its petition for IPR of the same claims infringed by the D-Link Defendants' use of its chips, relying on the same references the D-Link Defendants used in their invalidity case.[2] Broadcom made the rote assertion that there were no other real parties in interest, but in the body of its petition admitted that it supplied "Wi-Fi compliant products, such as the BCM4313 and BCM4321" to the D-Link Defendants that were found to infringe. Paper No. 3 at 1. It requires no logical leap to see first, that Broadcom has a duty to indemnify (and a community of interest with) some or all D-Link Defendants because its own products caused the D-Link Defendants to infringe Ericsson's patents, and second, that the coordination of Broadcom's successive attack on Ericsson's patents is no coincidence.

There is further evidence that the D-Link Defendants are real parties in interest to Broadcom's IPR proceeding. Broadcom filed a "Motion of Amici Wi-Fi Chip Companies" in this Court, in the pending appeal from the judgment in the D-

---

[2] Broadcom immediately petitioned for *inter partes* review ("IPR") of the three patents the D-Link Defendants were found to infringe—U.S. Patent Nos. 6,466,568 ("the '568 Patent") (IPR2013-00602), 6,424,625 ("the '625 Patent") (IPR2013-00636, and 6,772, 215 ("the '215 Patent") (IPR2013-00601).

6

**A0233**

Case IPR2013-00636

Link Lawsuit. (Ex. 2017). In that motion, Broadcom specifically stated that the damages verdict "affect[s] amici even though they were not parties to the case" because "the award would affect demand for those chips and *may also provoke indemnification issues*." (*Id.* at p. 4) (emphasis added). This demonstrates not only the effect of the relationship, but also Broadcom's willingness to take action in support of the D-Link Defendants.

Broadcom cannot deny the existence of indemnity agreements and other evidence bearing on its community of interests with the D-Link Defendants, but Ericsson was prevented from bringing these to the attention of the Board because they are subject to a Protective Order. (Ex. 2016). The contents and scope of these documents continues to remain secret, but their existence is not: in its public order denying Ericsson Inc.'s Emergency Motion for Relief from the Protective Order, the district court recited that "[d]uring the course of the litigation, Ericsson discovered (1) an indemnity agreement between Toshiba and non-party Broadcom Corporation ('Broadcom'), (2) an indemnity agreement between Dell and Broadcom, and (3) an email between Dell and Broadcom discussing indemnification[.]" (Ex. 2016). There is no question an indemnity relationship exists between Broadcom and at least two of the D-Link Defendants and there was

7

**A0234**

Case IPR2013-00636

communication regarding the relationship during the pendency of the D-Link lawsuit.

The Board denied Ericsson's request for discovery that would have established the existence of the indemnity relationships, the substance of the conversation between Dell and Broadcom pertaining to Broadcom's indemnity obligation, and likely produced additional evidence establishing Broadcom's privity relationship with the defendants. Paper No. 20. Ericsson filed a Request for Rehearing that the Board denied. Paper No. 24. The Board issued its Decision for Institution of *Inter Partes* Review on March 10, 2014, Paper No. 25, and Ericsson now submits its Patent Owner's Response.

### III.    The Petition is Barred by 35 U.S.C. §315(b)

The D-Link Defendants were formally served with a complaint more than one year before the filing date of the Petition; Petitioner is subject to the 35 U.S.C. § 315(b)[3] bar as a privy to the D-Link Defendants, and because the D-Link

---

[3] Under 35 U.S.C. § 315(b), "[a]n inter partes review may not be instituted if the petition requesting the proceeding is filed more than 1 year after the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent."

8

**A0235**

Case IPR2013-00636

Defendants are real parties-in-interest to this action, despite Petitioner's failure to designate them as such under 35 U.S.C. § 312(a)(2).

### A. Broadcom is in Privity with the D-Link Defendants

Broadcom has an indemnity relationship with Dell and Toshiba, and has initiated multiple legal actions on behalf of the community of interest. These actions specifically relate to the '625 Patent and Broadcom's BCM4313 and BCM4321 chips, the property in question here. The result of these legal actions will directly impact both Broadcom and these D-Link Defendants, demonstrating that their relationship is sufficiently close that both should be bound by the trial outcome and related estoppels.

The term "privity" describes a relationship between a litigant and a nonparty that is characterized by a "mutuality of interest," Ex. 2019 (*Black's Law Dictionary*, 9th Ed. (2009)), "sufficiently close such that both should be bound by the trial outcome and related estoppels," Office Patent Trial Practice Guide, 77 Fed. Reg. at 48759. Both Congress and the PTO expanded the meaning of privity for use in the AIA and acknowledged that the PTO will give effect to judgments by extending the term "beyond the classical description." 154 Cong. Rec. S9987 (daily ed. Sept. 27, 2008) (statement of Sen. Kyl) (citing *Cal. Physicians' Serv. v. Aoki Diabetes Research Inst.,* 163 Cal. App. 4th 1506 (Cal. App. 2008)); *see also*

9

**A0236**

Case IPR2013-00636

Trial Practice Guide, 77 Fed. Reg. at 48,759. The PTO further noted that "privity is an equitable rule that takes into account the 'practical situation,' and should extend to parties to transactions and other activities relating to the property in question." Trial Practice Guide, 77 Fed. Reg. at 48759 (quoting 157 Cong. Rec. S1376 (dialed ed. Mar. 8, 2011) (statement of Sen. Kyl)). Thus, both Congress and the PTO specifically expanded the traditional notions of privity to cater the doctrine to the unique context of IPR proceedings.

The PTO acknowledged the aim of the AIA in the Trial Practice Guide and stated that there are *multiple* factors relevant to the "real party-in-interest" and "privity" analysis, and it specifically cited both *Taylor v. Sturgell*, 553 U.S. 880 (2008) and *Aoki*, 163 Cal. App. 4th 1506. *Taylor* listed six distinct bases on which a party in a later case could be bound by the judgment in an earlier case to which he was not a party. 553 U.S. at 894–95. Two relevant factors listed in *Taylor* are whether the parties maintain a pre-existing "substantive legal relationship," or whether the later party had the *opportunity* to control the original party's participation in a proceeding. *Id.* Each of these factors is applicable here.

When discussing "substantive legal relationships," *Taylor* specifically stated that these relationships "are sometimes collectively referred to as 'privity.'" *Id.* at 894 n.8. The Court then cited to the Restatement:

10

**A0237**

Case IPR2013-00636

> [A] person standing in one of a variety of pre-existing legal relationships with a party may be bound by a judgment affecting that party. These relationships are often referred to as involving "privity." The circumstances under which such relationships result in preclusion are the subject of specific rules such as those governing . . . *indemnitor and indemnitee*[.]

2 Restatement of Judgments § 62, Comment a (emphasis added); *see also Speedtrack, Inc. v. Office Depot, Inc.*, No. C 07-3602 PJH, 2014 WL 1813292, at *5-6 (N.D. Cal. May 6, 2014) (an indemnification agreement between the defendants and their software supplier established that the parties were in privity despite a lack of control over the suit, barring the infringement claims as res judicata). The Supreme Court specifically relied on the Restatement, and explained that the term "privity" has "come to be used more broadly, as a way to express the conclusion that nonparty preclusion is appropriate on any ground." *Taylor*, 553 U.S. at 894 n. 8 (citing 18A Wright & Miller § 4449, pp. 351-353, and n. 33). Thus, the Court not only relied on authority that prescribes an indemnity relationship as a pre-existing substantive legal relationship, but also confirmed the broader interpretation of the term "privity."

The substantive legal relationship between Broadcom and the D-Link Defendants, specifically Dell and Toshiba, relates to the property in question. Ericsson's patents are the property in question both here and in the previous litigation—and, as Broadcom admits, both proceedings are closely related: "Patent

11

**A0238**

Case IPR2013-00636

Owner's infringement allegations were based in part on Defendants' use of Petitioner's WiFi compliant products, such as the BCM4313 and BCM4321." Paper No. 3 at 1. Ericsson proved the existence of Broadcom's indemnity relationships that dictate its contractual relationship to the property, and also that Broadcom has an express policy of initiating litigation to control the property, and did take several actions relating to the property in question during the D-Link Lawsuit. (*See* Exs. 2005 at 53/65; 2009, 2015 at p. 3, 6, 2016, 2017). Thus, not only does Broadcom maintain substantive legal relationships with the D-Link Defendants, but it has carried out multiple legal actions to control the property in question, and could have exercised control the D-Link Lawsuit. These substantive legal relationships and corresponding actions to control the '625 Patent prove that Broadcom is in privity with the Dell and Toshiba, among others, and therefore barred under Section 315(b).

**B. The D-Link Defendants are Real Parties-in-Interest.**

The D-Link Defendants' substantive legal relationships with Broadcom and the parties' coordinated activity demonstrate that the D-Link Defendants are real parties in interest to this IPR. In IPR proceedings, "the 'real party-in-interest' is the party that desires review of the patent. Thus, the 'real party-in-interest' may be the petitioner itself, and/or it may be the party or parties at whose behest the

12

**A0239**

Case IPR2013-00636

petition has been filed." Trial Practice Guide, 77 Fed. Reg. at 48759. The same factors for determining privity apply to real parties in interest. *Id.* In addition, the PTO also relies on *In re Guan Inter Partes Reexamination* Proceeding, Control No. 95/001,045, Decision Vacating Filing Date, at 8 (Aug. 25, 2008), which states that the petitioner must identify another entity as the real party in interest if it "[a]llow[s] another entity to direct or control the content (e.g., *provide the prior patents/printed publication on which the reexam is to be based*) of the request whether such is termed 'technical review' or some other phrase." (emphasis added). Broadcom's substantive legal relationships with at least Dell and Toshiba, Broadcom's use of the same prior art references as the D-Link Defendants, and the timing of Broadcom's Petition for IPR confirm that both Broadcom and the D-Link Defendants are real parties in interest.

On August 8, 2013, Ericsson obtained a judgment of infringement against the D-Link Defendants for three patents. (Ex. 2018). Less than three months later, Broadcom filed its Petition for IPR of the same claims infringed by the D-Link Defendants' use of its chips, relying on the same reference the D-Link Defendants used in their invalidity case. For obvious reasons, Broadcom did not seek review of the claims the district court found to *not* be infringed. (*See* Ex. 2018).

13

**A0240**

Case IPR2013-00636

Broadcom instead made the rote assertion that there were no other real parties in interest. However, Broadcom admitted that it supplied the property in question, namely the "Wi-Fi compliant products, such as the BCM4313 and BCM4321" to the D-Link Defendants. Paper No. 3 at 1. The only logical inference is that Broadcom's duty to indemnify some or all the D-Link Defendants triggered the successive attack on Ericsson's patents, and that the D-Link Defendants desire review of the '215 Patent.

In addition, Broadcom made it clear that both itself and the D-Link Defendants desire review of the '625 patent in its "Motion of Amici Wi-Fi Chip Companies." Broadcom specifically stated that the damages verdict in the D-Link Lawsuit "affect[s] amici even though they were not parties to the case" because "the award would affect demand for those chips and *may also provoke indemnification issues*." (Ex. 2017 at p. 4) (emphasis added). This demonstrates that Broadcom and the D-Link Defendants have common interests in the '625 Patent, and that Broadcom is willing to take action on behalf of the D-Link Defendants. Broadcom cannot hide behind its rote assertions when it is clear that the D-Link Defendants "desire[ ] review of the patent" and, therefore, are real parties in interest.

14

**A0241**

Case IPR2013-00636

The coordination between Broadcom and the D-Link Defendants and their indemnity agreements clearly demonstrate that the D-Link Defendants are real parties in interest. Broadcom failed to properly designate them as such under 35 U.S.C. § 312(a)(2), and because the D-Link Defendants were served with a complaint alleging infringement of the '625 Patent more than one year before Broadcom filed its Petition, Broadcom is barred from review under Section 315(b).

IV.    **The '625 Patent is Valid**

**A. Overview of Ericsson's '625 Patent**

The '625 patent "relates to Automatic Repeat Request (ARQ) techniques for transferring data in fixed/wireless data networks." (Ex. 1001, ('625 pat.) at 1:7-10.) ARQ techniques are "used to ensure reliable data transfer and protect data sequence integrity." (*Id.* at 1:13-15.) Detecting data sequence integrity allows the receiver to request retransmission of data packets that have been lost or corrupted. (*Id.* at 15-20.) Data integrity is commonly enforced by applying transmission rules to sequentially numbered data packets. (*Id.* at 1:20-22.)

There are three main ARQ protocols for providing transmission rules for transferring packets to a receiver in a particular order: Stop-and-Wait, Go-Back-N, and Selective Reject (or Selective Repeat). (*Id.* at 1:23-25.) Generally, "Selective Reject is most efficient, Stop-and-Wait is least efficient, and Go-Back-N is intermediate." (*Id.* at 1:28-30.) Packets received in the correct order are forwarded

15

**A0242**

Case IPR2013-00636

### 1. The Hettich Delay PDU commands a receiver to ignore, and not receive cells

Broadcom contends that Hettich discloses "commanding a receiver in the data network to a) receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet" because Hettich, § 5.2.4, describes that after "the receiver receives a Delay PDU, [and] it stops waiting for cells where the following applies for the number: N<=RN" and "moves its window forward." (Pet. at 39.) The Delay PDU is merely a delay command. Receipt of the Delay PDU causes Hettich's receiver to "stop[] waiting for cells" (Hettich at 35.) The Delay PDU does not "command" or "order" the receiver to accept any packet, as required by the claim language. (Akl Dec. ¶ 58.)

Furthermore, Hettich's receiver uses a "window" for receiving or rejecting packets, similar to Garrabrant. If a packet falls within the window, it is accepted; if not, it is rejected. (Hettich at 28, eq. 5.7.) Because the receiver, not the transmitter maintains the receive window, the transmitter is unaware of the details—including the sequence numbers—of the receiver's receive window. (Akl Dec. ¶ 59.) Nothing in the packet "commands" or "orders" the receiver to accept a packet. (*Id.*) That the receiver moves its window forward to allow it "to receive a packet after SN" (Pet. at 39) shows that the receiver, not the transmitter controls

39

**A0266**

Case IPR2013-00636

packet reception.    Thus, Hettich does not disclose a transmitter "exercising dominating influence over" or "having command of" the receiver.  (Akl Dec. ¶ 59.)

## 2. The Hettich Delay PDU does not command a receiver to release expectations of receiving outstanding packets

Broadcom's petition is further flawed because a Delay PDU does not command a receiver to release expectations of receiving outstanding packets having a sequence number *prior to* a received out of sequence packet.  The Hettich Delay PDU would merely release expectation of receiving outstanding packets having sequence numbers equal to or less than the sequence number of the *Delay PDU*, not packets having sequence numbers *prior to the out of sequence packet* as recited by claim 1.

The Delay PDU provides no information about cells that have sequence numbers higher than the sequence number of the Delay PDU.  For example, if the first cell received by the receiver after receipt of a Delay PDU has a sequence number that is not sequential to the Delay PDU (*i.e.*, the first cell received is out-of-order as compared to the sequence number referenced by the Delay PDU), then the receiver is either expecting or has received cells with sequence numbers between the discarded cells and that first received cell.  (Akl Dec. ¶ 62.)  A packet that a receiver is expecting to receive, such as "a packet that has been sent but not received or not correctly received" is an outstanding packet.  ('625 patent at 2:67-

40

**A0267**

Case IPR2013-00636

3:2.) Cells that have not been received (or not correctly received)—outstanding cells—may exist between the discarded cells associated with the Delay PDU and that first received cell, and accordingly, Hettich does not "release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet." (Akl Dec. ¶ 62.)

Based on Ericsson's cross-examination of Broadcom's expert, Ericsson anticipates that Broadcom may try to argue in reply that the sequence number of the first cell received after the Delay PDU command *could* be sequential to those numbers associated with the Delay PDU so that no outstanding cells would exist between the Delay PDU and that first received cell. But Hettich neither explicitly nor inherently discloses such a theory. Nor would one of ordinary skill in the art understand Hettich to disclose such a theory because Hettich addresses efficient communication of packets. (Hettich at 26; Akl Dec. ¶ 63.)

The aforementioned theoretical situation could only arise if a sufficient delay is inserted immediately between transmission of the Delay PDU to allow the receiver to (1) receive the Delay PDU, (2) shift its window appropriately, and (3) request the cell with the next sequential sequence number so that the very next cell placed in the transmit buffer after the Delay PDU, and thereafter transmitted, would be the cell with the next sequential sequence number. (Akl Dec. ¶ 64.) To

41

**A0268**

Case IPR2013-00636

do so would require ceasing loading additional cells into the transmit buffer upon placing a Delay PDU in the transmit buffer for transmission. (*Id.*) Such a delay would dramatically decrease transmitter throughput and would eviscerate the stated efficiency advantages of the Hettich system. (*Id.*) Moreover, even if the first non-sequential packet received corresponded to the last packet in a "burst," Hettich fails to address how the transmitter addresses transmission of information between bursts. (*Id.*) Additional cells would be expected to be transmitted immediately after a burst, rather than halting transmission until the last transmitted cell has been acknowledged as Broadcom's theory requires. (*Id.*) One of ordinary skill in the art would expect the transmitter in a high throughput system, immediately after transmitting a burst, to send a packet related to the next information to be transmitted, rather than waiting to retransmit the last packet. (*Id.*) Accordingly, Hettich does not teach or suggest the "releasing" limitation. (*Id.*)

Because the Hettich receiver can expect to receive outstanding packets between the discarded cells and the first received cell after reception of the Delay PDU, Hettich does not "release any expectation of receiving outstanding packets having sequence number prior to the at least one packet." (Akl Dec. ¶ 65.)

### 3. The transmitter in Hettich does not "discard all packets"

Hettich also does not disclose "the transmitter discarding all packets for which acknowledgement has not been received, and which have sequence numbers

42

**A0269**

Case IPR2013-00636

prior to the at least one packet," as recited by claim 1. Broadcom argues that Hettich § 5.2.4 discloses that "SN is the highest number of all of the discarded cells. Prerequisite for doing so is that the sender discard the cells in the proper order, i.e., there cannot be valid (not discarded) cells with lower sequence numbers." (*Hettich* at 39.) Yet this section of Hettich discloses that the Delay PDU addresses only a *subset*—not all—of the cells having sequence numbers less than the received cell (*i.e.*, the recited at least one packet). (Akl Dec. ¶ 66.)

Hettich is silent as to whether acknowledgment has been received for any of the non-discarded cells having sequence numbers between the Delay PDU and the next received out of order packet. (Akl Dec. ¶ 67.) This is fatal to Broadcom's position. Non-discarded cells not correctly received by the receiver and having sequence numbers higher than the sequence numbers referenced by the Delay PDU have not been acknowledged. (*Id.*) Consequently, if the sequence number of the next packet received by the receiver is out-of-order compared to the Delay PDU, then any unacknowledged packets have not been discarded by the transmitter. Accordingly, the transmitter in Hettich may contain one or more non-discarded cells for which acknowledgement has not been received, and which have sequence numbers prior to the first cell that the receiver received after reception of the Delay PDU. (*Id.*) Therefore, Hettich does not teach "the transmitter discarding all

43

**A0270**

Case IPR2013-00636

packets for which acknowledgement has not been received, and which have
sequence numbers prior to the at least one packet." (*Id.*)

That Hettich does not anticipate claim 1 can also be illustrated by comparing
Fig. 12 of the '625 patent to the Hettich disclosure:



FIG. 12

Assume that the transmitter receives a request to retransmit ESN1, and the covered
ACK range in this situation is between ESN1 and BSN. In this case, the
transmitter according to the '625 patent will respond with a packet having
sequence number BSN and its RPEB bit set to true. ('625 pat. at 8:4-11; (Akl Dec.
¶ 69.) When the receiver receives this packet, "all packets preceding this packet
and up to the next outstanding packet [ESN2] will be released from the buffer and
forwarded to the higher layer." ('625 pat. at 9:1-4.) Additionally, all packets
having sequence numbers less than BSN have been deleted by the transmitter.
(Akl Dec. ¶ 69.) Thus, the transmitter in the '625 patent will (a) command the

44

**A0271**

Paper No. __

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

BROADCOM CORPORATION

Petitioner

v.

WI-FI ONE, LLC

Patent Owner

———————————

Case IPR2013-00636
U.S. Patent No. 6,424,625

———————————

**PETITIONER'S REPLY TO PATENT OWNER'S RESPONSE**

**UNDER 37 C.F.R. § 42.120**

**A0284**

Petitioner's Reply to Patent Owner's Response (IPR2013-00636)

## I.    BROADCOM'S PETITION IS NOT BARRED BY 35 U.S.C. § 315(B)

Owner[1] asserts that Broadcom's Petition is barred because Broadcom is a "privy" of the D-Link Defendants, the alleged "real parties-in-interest to this Action." (Resp. at 8; Paper No. 34). Owner has raised this identical argument twice, and has failed each time. This Board previously denied Owner's Motion for Additional Discovery regarding privity and real party-in interest issues and the Federal Circuit subsequently denied Owner's Petition for a Writ of Mandamus seeking to overturn this Board's decision. This third attempt relies on *exactly the same arguments Owner made to this Board and the Federal Circuit* and should be rejected for the same reasons. Owner offers no new reason whatsoever for this Board to reverse its prior decision that Owner's proffered "evidence" and legal authorities fail to amount to anything more than "speculation" or "a mere possibility" that Broadcom is in privity with the D-Link Defendants or that the D-Link Defendants are real parties-in-interest.

### A.    Broadcom is Not in Privity with the D-Link Defendants

Owner again relies on unsubstantiated allegations of Broadcom's "substantive legal relationship" of indemnity with the D-Link Defendants, "multiple legal actions on behalf of the community of interest," and Broadcom's

---

[1]    After institution, Ericsson transferred the '625 patent to Wi-Fi One, LLC. This Reply refers to the current and prior owners as "Owner".

- 1 -

**A0287**

Petitioner's Reply to Patent Owner's Response (IPR2013-00636)

"attendance" at the Texas trial to support its claim of privity.  (*Id.*; Paper No. 34).

Owner's arguments, which rely on the same flawed and speculative "evidence"

asserted previously, fail to establish Broadcom as a privy.  As the Board correctly

held, "indemnity payments and minor participation at trial are not sufficient to

establish privity."  (Discovery Decision at 7 (citing *Bros, Inc. v. W.E. Grace Mfg.*

*Co*, 261 F.2d 428, 429 (5th Cir. 1958)); Paper No. 20).  Instead, Owner must

demonstrate that Broadcom actively controlled the Texas Litigation.  (*Id.* at 7-8;

Paper No. 20; *see also Goodman v. Super Mold Corp.*, 103 F.2d 474,482 (9th Cir.

1939) (no privity where there was no evidence manufacturer of accused infringing

device "had the right to control the defense of the suit.")).  Owner cannot, however

satisfy this burden, because Broadcom did not control – actively or otherwise – the

- 2 -

**A0288**

Petitioner's Reply to Patent Owner's Response (IPR2013-00636)

Texas Litigation. (Ex. 1020.[2]) Indeed, this Board has already found that "the totality of [the] evidence fails to amount to more than a 'mere possibility' that Broadcom controlled, or could have controlled, the Texas Litigation." (Discovery Decision at 11; Paper No. 20). Such a mere possibility, insufficient even to warrant further discovery, cannot possibly rise to the level sufficient to bar this Petition.

### B.    Broadcom, Not the D-Link Defendants, is the Real Party-in-Interest

Owner's infringement allegations in the Texas Litigation (and its foreign litigation activities) accuse functionality found entirely within Broadcom's Wi-Fi products, not within other components of the end-user products sold by the D-Link Defendants. As the manufacturer of the accused functionality, Broadcom has a

---

[2]    The Board should again reject Owner's argument that if Broadcom had the "opportunity to control" the Texas Litigation, this is sufficient to establish it as a privy. *First*, Owner offers no evidence that Broadcom had any "opportunity" to control the Texas Litigation. *Second*, mere "opportunity" to control litigation cannot create privity; a party must have *actual control* of the related litigation. (*Id.* at 9 (citing *Dentsply Intern., Inc. v. Kerr Mfg. Co.*, 42 F.Supp.2d 385, 398 (D. Del. 1999) (no privity where party's role in a prior suit was "limited to observing the proceedings and filing amicus curiae briefs.")); Paper No. 20).

- 3 -

**A0289**

Petitioner's Reply to Patent Owner's Response (IPR2013-00636)

very real interest in demonstrating that Owner's patents are invalid. And, because Broadcom was not a party to – and did not control – the Texas Litigation, it has had no prior opportunity to raise the arguments in its Petition. That Broadcom's Petition uses "some of the same evidence, including known prior art" as in the Texas Litigation, does not demonstrate that Broadcom controlled the Texas litigation or that the D-Link Defendants controlled Broadcom's Petition. Again, this Board has already found that the evidence proffered by Owner "does not amount to more than speculation that any of Broadcom's activity constitutes evidence of collusion with the D-Link Defendants." (Discovery Decision at 13; Paper No. 20). Again, such speculation, insufficient even to warrant further discovery, cannot possibly bar this Petition.

## II.    CLAIM CONSTRUCTION

Owner disputes the Board's broadest reasonable interpretation of "commanding" and questions the use of an IEEE dictionary; instead, Owner relies on a non-technical dictionary that proposes a definition of "commanding" ("exercising a dominating influence over; has command of") seemingly more appropriate in a military context than in a technical one. (Resp. at 18-20; Paper No. 34). This "dominating influence" interpretation is not based on the '625 patent specification, and is not appropriate for claim 1, which is directed to a method

- 4 -

**A0290**

Petitioner's Reply to Patent Owner's Response (IPR2013-00636)

transmitter commands the receiver to "release expectations" or that the transmitter discards. (Resp. at 34-37; Paper No. 34). By resetting, the SABM command causes a release of packets below the next sequence number, and the transmitter discards those packets.

## IV.    CLAIM 1 IS INVALID OVER HETTICH

### A.    Hettich Discloses Commanding To Receive

Owner says that Hettich's DELAY command causes the receiver to "ignore" and to "stop waiting," and thus is not a command to receive. (Resp. at 39-40; Paper No. 34). This semantic twist does not differentiate Hettich from claim 1 of the '625 patent. DELAY N causes a receiver to "release expectations," as required in claim 1, and to be ready to receive packets starting with N+1.

Apparently, Owner believes that "commanding" requires identifying a specific sequence number, and that the sequence number must be the "at least one packet" received by the receiver that is not consecutive with a previously received packet. But claim 1 does not require identifying a specific sequence number. Nor does it require that the next received packet have that specific sequence number. Claim 1 only requires that there be a command to receive "at least one packet," which in Hettich are sequence numbers to N+1, N+2, N+3, etc.

### B.    Hettich Discloses Releasing Expectations

The DELAY N command tells the receiver to release any expectation of receiving unacknowledged packet N (and any of N-1, N-2, etc.), and to start

- 11 -

**A0297**

Petitioner's Reply to Patent Owner's Response (IPR2013-00636)

receiving packets beginning with N+1.  Owner argues that it would be *possible* for the transmitter to send a packet other than N+1 as the next packet.  (Resp. at 40-42; Paper No. 34).  However, transmitter would be able to send the DELAY N command and then send packet N+1 next, and this would be readily understood.  At a minimum, Hettich implicitly discloses (and certainly does not exclude) sending N+1 as the next packet.  (Bims Reply Decl. at ¶ 6; Ex. 1022).

Even if it were possible for Hettich to send some packet other than N+1 as the next packet, claim 1 does not require the next packet actually sent to have any particular sequence number, only that the receiver be ready to receive "at least one packet" not consecutive with a previously received packet (such as N+1) and release expectations of receiving prior packets (such as N, N-1, etc.).  Claim 1 is not an apparatus claim that <u>requires</u> the next packet sent to <u>always</u> be just after the discarded ones – it is a method claim that is met whenever the method is performed, regardless of frequency.  (*Bell Commc'n Research, Inc. v. Vitalink Commc'n Corp.*, 55 F.3d 615, 622–23 (Fed. Cir. 1995) ("an accused product that sometimes, but not always, embodies a claimed method nonetheless infringes")).

### C.    Hettich Discloses Discarding Packets

Owner contends Hettich does not disclose "discarding" as claimed.  (Resp. at 42-46; Paper 34).  This is not true.  Owner suggests, comparing Hettich to Figure 12 of the '625 patent, that Hettich would send DELAY ESN1; but in that

- 12 -

**A0298**

scenario of the '625 patent, all packets between DSN and BSN are being discarded. ('625, Fig. 10B; Ex. 1001). So Hettich would logically send DELAY BSN (or BSN-1), meeting claim 1 of the '625 patent, as described in the Petition. (Bims Reply Decl. at ¶ 7; Ex. 1022).

Owner also seems to argue that Hettich does not disclose the discarding step because it is ***possible*** that the transmitter may contain non-discarded cells having sequence numbers between the DELAY PDU and the next received packet. (Resp. at 43; Paper No. 34). While possible, it is understood that the transmitter could send DELAY N and then send packet N+1. Furthermore, as long as the transmitter discards packets meeting the conditions of claim 1, claim 1 is met whether or not the transmitter discards other packets. (Bims Reply Decl. at ¶ 8; 1022).

## V.    CLAIM 1 IS INVALID OVER WALKE

Owner contends that Walke's delay command is not a command to receive, but a command to "ignore." (Resp. at 48-49; Paper 34). But this is not true. Delay (n, m) commands the receiver to receive packet #n ***and*** to ignore packet #m (*i.e.*, "release expectations" of receiving #m). (Walke at 13; Ex. 1008; Bims Reply Decl. at ¶ 10; Ex. 1022).

Owner contends Petitioner admits Walke does not disclose the claimed "releasing" limitation. (Resp. at 50; Paper No. 34). This is true only as it relates to

- 13 -

Paper No. <u>64</u>

Filed on behalf of: Wi-Fi One, LLC

# UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

BROADCOM CORPORATION,

Petitioner,

V.

WI-FI ONE, LLC,

Patent Owner.

CASE NO.: IPR2013-00636
PATENT NO. 6,424,625 B1

## PATENT OWNER'S REQUEST FOR REHEARING OF FINAL WRITTEN DECISION (PAPER NO. 60)

Pursuant to 37 CFR § 42.71(d)(2), Patent Owner submits this Request for Rehearing of the Board's Final Written Decision (Paper No. 60).

## I.    INTRODUCTION

In its Final Written Decision, the Board made certain fundamental errors with respect to its determination that this IPR Petition is not time-barred under 35 U.S.C. § 315(b). This case is a prime example of concerns expressed less than two weeks ago by USPTO Director Michelle Lee, who noted that Patent Owners frequently are not given sufficient discovery on the "real party in interest" issue, meaning that panels often decide this issue on an inadequate evidentiary record.[1] In light of Director Lee's comments, the Board should take a close look at this request for rehearing.

**First**, in this case the Board misapprehended the purpose and effect of the "real party in interest, or privy" language in § 315(b), as plainly set forth in the text of the statute, and as confirmed by the legislative history and the USPTO's public

---

[1] *See* http://www.uspto.gov/blog/director/entry/ptab_s_quick_fixes_for, USPTO Director Michelle K. Lee, "PTAB's Quick-Fixes for AIA Rules are to be Implemented Immediately," (March 27, 2015) (last visited April 6, 2015) ("[W]e understand that the existence of ample discovery to establish the real-party-in-interest (RPI) of the petitioner has been a concern. And we want to be sure that the availability of appropriate RPI evidence does not pose a problem for patent owners.")

REQUEST FOR REHEARING              1                    IPR2013-00636

comments. As a result, the Board applied the wrong legal standard for assessing the §

315(b) issue, focusing too narrowly (and exclusively) on whether Petitioner has

controlled the co-pending District Court Litigation, and ignoring other relevant facts,

such as whether the District Court Defendants are controlling this IPR.[2]

**Second**, the Board overlooked the substantial evidence Patent Owner has

presented showing that Broadcom and the District Court Defendants share a

common economic and legal interest, and have been in cahoots in opposing the '625

Patent for many years. This evidence shows **both** that (1) Broadcom's District Court

Defendant customers are real-parties in interest to this IPR proceeding, **and also** that

(2) the District Court Defendant customers are in privity with Broadcom for purposes

of this IPR and the District Court Litigation.

The Board's refusal to permit any discovery at all on this issue – even the

introduction of Broadcom's known indemnity agreements – is a clear abdication of

the Board's duty to consider a full and reasonable evidentiary record on matters

related to its own jurisdiction, and inherently renders the Board's decision suspect.

**Third**, the Final Written Decision itself presents additional administrative law

issues that Patent Owner raises in this request for rehearing. Because the Petition was

---

[2] The terms "District Court Litigation" and "District Court Defendants" refer to

parallel infringement litigation and defendants as cited in the Board's Decision

denying additional discovery.  Paper No. 20, at 2.

REQUEST FOR REHEARING            2            IPR2013-00636

and is time-barred under § 315(b), the Board's Final Written Decision is an *ultra vires* action that exceeds the Board's delegated statutory authority. Moreover, the Board's Final Written Decision is contrary to several provisions of the Administrative Procedures Act ("APA"), as discussed more fully below.

It is undisputed that the Board would have no authority, under § 315(b), to consider this IPR Petition if it had been filed by the District Court Defendants themselves. It would have been time-barred. Section 315(b) does not permit Broadcom to assist its customers in circumventing the one-year time-bar. That is precisely what the "real party in interest, or privy" language was intended to prevent.

## II.    IDENTIFICATION OF BASIS FOR REHEARING REQUEST

As required by 37 C.F.R. § 42.71(d), Patent Owner hereby specifically identifies the matters Patent Owner contends the Board misapprehended or overlooked:

(1)    The Board misapprehended the purpose of the "real party in interest or privy" language in 35 U.S.C. § 315(b), and misapprehended the correct legal standard for determining whether a non-party is a "real party in interest or privy of petitioner" under § 315(b). *See, e.g.* Patent Owner's Request for Rehearing, Paper No. 23 at 3-7.

(2)    The Board misapprehended the entirety of the factual record and overlooked evidence supporting Patent Owner's contention that certain District Court Defendants are real parties in interest and/or privies of petitioner in this IPR. *See* Patent Owner's Response, Paper No. 34 at 3-15.

In addition, the Board's Final Written Decision itself raises certain administrative law issues that Patent Owner could not have previously raised. *See* Section III(D), *infra.*

## III.   ARGUMENT

### A.   The Board misapprehended the purpose of the "real party in interest, or privy" language in § 315(b).

#### 1.   The purpose of § 315(b), in general, is to prevent district court litigants from using IPR petitions as a delay tactic.

By its plain language, and as confirmed by the legislative history, § 315(b) was intended to impose a time-bar on the filing of IPR Petitions so that district court litigants could not use IPR Practice for purposes of delaying the district court litigation. The statute states:

> An inter partes review may not be instituted if the petition requesting the proceding is filed more than 1 year after the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent. . . .

§ 315(b). The legislative purpose of this statute is to ensure IPR Petitions are *not used as a litigation tactic for purposes of delay*. *See*, *e.g.*, 157 Cong. Rec. S1326 (daily ed. March 7, 2011) (statement of Sen. Reid) ("The bill . . . imposes time limits on starting an inter partes or post-grant review when litigation is pending. . . . [T]hese reforms will help ensure that post-grant review operates fairly and *is not used for purposes of harassment or delay*." (emphasis added)); H. Judiciary Comm. Rep., H.

Rep. No. 112-98, at 47-48 (discussing that certain amendments, including the time-bar

of § 315(b), are intended to prevent harassment of Patent Owners and delay of

infringement litigation); 154 Cong. Rec. S9989 (daily ed. Sept. 27, 2008) (statement by

Sen. Kyl) ("The real reforms in this bill that would protect patent owners from

abusive and duplicative proceedings are the various restrictions imposed in section

327" – which included a three-month time bar that was later amended to become the

one-year period as codified in § 315(b)). *See also Zoll Lifecor Corp. v. Philips Elec. N. Am.*

*Corp.*, IPR2013-00609, Paper No. 15 at 8-9 (discussing the legislative history of §

315(b)).

> **2.    The purpose of the "real party in interest, or privies" language is to ensure that litigation defendants do not subvert the statute by using their cohorts to file an IPR Petition when they themselves are time-barred.**

The plain text of the statute makes clear that the "real party in interest, or privy

of the petitioner" language in § 315(b) is intended to prevent litigation defendants

from subverting the statutory time-bar by having their agents or cohorts file an IPR

petition that they themselves are barred from filing. The statutory time-bar applies not

only to the petitioner, but also to (1) any real party in interest **and also** (2) any privy

of the petitioner. *See* 35 U.SC. § 315(b). The Patent Trial Guide confirms that this is

the purpose of the "real party in interest, or privy" language in § 315(b). *See* Trial

Practice Guide, 77 Fed. Reg. 48,756, 48,759 (Aug. 14, 2012) (One of the "core

functions" of the real-parties-in-interest or privies language is to "protect patent

REQUEST FOR REHEARING                5                IPR2013-00636

**A0311**

owners from harassment via successive petitions *by the same or related parties . . .* .") Without this language in § 315(b), district court litigants could easily circumvent the time bar by simply having others file a time-barred petition on their behalf.

**B.    The Board misapprehended the legal test that should be applied to determine whether a non-party is a "real party in interest, or privy" for purposes of § 315(b).**

**1.    The legislative history and the USPTO's public comments indicate that "real party in interest, or privy" in § 315(b) is to be read broadly and flexibly.**

It goes without saying that the legal standard for determining whether a third party is a "real party in interest, or privy of petitioner" under § 315(b) should draw from and coincide with the legislative purpose behind the statute. The legal standard must be aimed at determining whether a given set of facts shows that an IPR petitioner is sufficiently related or connected to a time-barred third party, such that the petitioner should also be subject to the time-bar. To serve the statutory purpose, the legal standard must be sufficiently flexible to capture all the various ways that parties might collude or conspire to circumvent the § 315(b) time-bar. For example: (1) a time-barred third party employing the petitioner as its agent or shill, specifically for the purpose of circumventing the statute; (2) where parties are "in cahoots" to execute a coordinated divide-and-conquer strategy designed to subvert the § 315(b) time-bar in an effort to harass or delay a patent owner; or (3) a scenario where any one party controls both the litigation and IPR activity in a coordinated effort.

IPR2013-00636
Patent 6,424,625 B1

The legislative history and official public comments of the USPTO demonstrate that the applicable legal standard is flexible and multi-faceted so that individual cases can be judged on their unique circumstances. *See* 154 Cong. Rec. S9989 (daily ed. Sept. 27, 2008) (statement of Sen. Kyl) (discussing the breadth of "privy" as explained by recent case law developments). This breadth and flexibility of "real party in interest, or privy" was also recognized by the USPTO in its official public comments in the Office Patent Trial Practice Guide. *See* Trial Practice Guide, 77 Fed. Reg. at 48759-60. As articulated by the USPTO and by Senator Kyl in the legislative history, this legal standard is purposefully broad and flexible so that the Board can determine, on a case-by-case basis and in light of all relevant facts, whether particular parties are attempting to circumvent the § 315(b) time-bar.

2.   **The Board erred as a matter of law in applying a legal standard imposing an inflexible standard requiring that Petitioner must have exercised control over the District Court Defendants in the District Court Litigation.**

In its decision on the § 315(b) issue, the Board did not apply a broad and flexible standard for "real party in interest or privy." Instead, the Board applied a narrow and rigid standard that is erroneous as a matter of law.

The standard applied by the Board requires – as an absolute and necessary condition – that Broadcom controlled or could have exercised control over one or more of the District Court Defendants in relation to the District Court Litigation. *See* Decision on Ericsson's Motion for Additional Discovery, Paper No. 20 at 7 ("To

show privity requires a showing that Broadcom would be bound by the outcome of the Texas litigation. To be bound, in normal situations, Broadcom *must have had control over the Texas Litigation*."); *id.* at 11 ("The totality of the evidence fails to amount to more than a 'mere possibility' that Broadcom *controlled, or could have controlled, the Texas litigation*."); *id.* at 12-13 ("[T]he IPR filings fail to show control over the Texas litigation. . . . The evidence does not amount to more than speculation that any of Broadcom's activity constitutes evidence of collusion with the Texas Defendants in the Texas litigation *in a manner that would bind Broadcom to the outcome thereof*."); *id.* at 15 ("The evidence and arguments fail to show that the sought-after discovery would have more than a mere possibility of producing useful privity information, i.e., *that Broadcom controlled or could have controlled the Texas Litigation*."); *see also* Final Written Decision, Paper No. 60 at 7-8.

The legal standard applied by the Board in this case is narrower and inconsistent with the legal standard applied by the Board in other cases. *See, e.g., Zoll,* IPR2013-00609, Paper No. 15 at 9-16 (considering "real party in interest" and "privy" separately; and also considering, *inter alia,* the non-party's control over the IPR).

The legal standard applied by the Board in this case does not reflect – and in fact undermines - the legislative purpose of § 315(b). Under the Board's standard, even if there were irrefutable evidence that the District Court Defendants had expressly hired Broadcom to file this IPR petition, and that the District Court Defendants were paying for and controlling every aspect of Broadcom's IPR activity,

the Board's standard **still** would not be satisfied - because the evidence would not show that Broadcom was controlling the District Court Litigation or that Broadcom would be bound by the result of that litigation. That would be an *absurd result*, in direct contravention of the plain text of § 315(b) and its clear legislative purpose. This example conclusively demonstrates that the Board's legal standards for "real party in interest, or privy" under § 315(b) is fundamentally wrong because it is too rigid and narrow. It is not grounded in the text or purpose of the statute, and it does not capture all the ways that parties might conspire to subvert the statutory time-bar.

Under § 315(b), Broadcom's control of the District Court Litigation might be sufficient to establish that the District Court Defendants are real parties in interest or privies, but it should not be a necessary condition. A showing that petitioner controls the litigation should be one path to that result, but not the only path. An exclusive focus on whether Broadcom would be bound by a judgment in the District Court litigation is misplaced, because no one is seeking to bind Broadcom to the results of the District Court litigation by virtue of this IPR, or otherwise.

Instead, the issue under § 315(b) is whether the District Court Defendants have attempted to circumvent the one-year statutory time-bar, *i.e.* whether Broadcom and one or more of the District Court Defendants should be treated collectively for purposes of determining whether the petition is time-barred. Under the plain language of § 315(b), they should be treated as one if a **District Court Defendant is a "real party in interest or privy" of Broadcom**. The standard applied by the Board,

REQUEST FOR REHEARING                9                IPR2013-00636

**A0315**

focusing exclusively on Broadcom's connection to the District Court litigation, turns the real issue on its head.

Patent Owner respectfully submits that the Board's misapprehension of the correct legal standard may stem from the fact that a separate statutory provision, § 315(e), also uses the phrase "real party in interest or privy" in the context of defining the scope of estoppel that results from a final written decision by the Board. Most of the discussion of "real party in interest or privy" in the Trial Practice Guide also relates to estoppel. *See* Trial Practice Guide, 77 Fed. Reg. at 78,759-60. In the context of § 315(e) estoppel, it might make sense to focus on the "control" factor, like common law estoppel cases do.

But § 315(b) is not an estoppel provision, and the "real party in interest, or privy" language in § 315(b) serves a much different purpose. The standard applied by the Board ignores the statutory language and purpose, and serves to undermine the statute altogether by not capturing most of the ways parties could purposefully circumvent the statutory time-bar.

**C.    The Board misapprehended the entirety of the evidentiary record on the § 315(b) issue, and overlooked evidence establishing that certain District Court Defendants are real parties in interest and/or privies of Broadcom.**

The evidentiary record before the Board strongly indicates that one or more of the District Court Defendants are real parties in interest, and/or that they are in privity with Petitioner for purposes of this IPR.

Significantly, Petitioner had an opportunity to present evidence that the District Court Defendants are not coordinating or controlling aspects of this IPR – but they presented no evidence on this point at all. Tellingly, Petitioner's proof seems carefully worded to focus **exclusively** on Broadcom's ties to the District Court litigation and avoid any mention of the District Court Defendants' role in this IPR. *See* Petitioner's Opposition to Motion for Additional Discovery, Paper No. 17 at 2-5 (including cited exhibits). Petitioner, who had every opportunity to illuminate the District Court Defendants' role (or lack thereof) in this IPR, purposefully chose to offer no evidence as to whether the District Court Defendants are paying all or part of the costs of this IPR; whether Petitioner filed this IPR for the benefit of, or at the behest of, the District Court Defendants; or whether the District Court Defendants have coordinated or controlled any aspects of this IPR proceeding. *See Zoll*, IPR2013-00609, Paper No. 15 at 11-12 (placing weight on Petitioner's failure to provide evidence of the non-party's lack of participation in or control over the IPR).

Patent Owner, on the other hand, has made a strong circumstantial showing that Petitioner and at least some of their District Court Defendant customers are in cahoots in defending against the '625 Patent, both in the District Court Litigation and in this IPR. *See* Patent Owner's Response, Paper No. 34, at 3-15. It is not disputed in the evidence that there are indemnity agreements between Broadcom and certain District Court Defendants (as expressly stated in Judge Davis's order denying relief from the litigation protective order). *See* Ex. 1020. Nor is it disputed that Broadcom

and its District Court Defendant customers share a common economic and legal interest in opposing the '625 Patent. *See* Ex. 2008 (asserting a common interest privilege); Ex. 2009 at ¶ 101. It is not disputed that Broadcom has been coordinating with the District Court Defendants for many years in an effort to oppose the '625 Patent. *See* Patent Owner's Response, Paper No. 34 at 4-8. And it is not disputed that Petitioner has taken concrete steps, such as the filing of this IPR and otherwise, to oppose the '625 Patent on behalf of its customers. *See id.*

The Board should presume that the indemnity agreement contains some covenants related to the funding and control of efforts to oppose claims of patent infringement. Any indemnity agreement will expressly allocate the obligation to pay for defense of claims and also the rights to control the defense and settlement. Failing to do so would be drafting malpractice. For this reason, the Board erred when it decided the § 315(b) issue without reviewing the known indemnity agreements, which are likely the most crucial documents. These agreements could have been provided to the Board with no burden whatsoever to Broadcom.

Even without the agreements in evidence, the circumstantial evidence overwhelmingly shows that Petitioner has been in cahoots with its District Court Defendant customers since long before this IPR petition was filed. Petitioner's declaration is conclusory, carefully worded, and narrowly tailored to avoid addressing issues central to the § 315(b) issue. As such it obscures the true nature of the relationship between Broadcom and its District Court Defendant customers.

The only reasonable conclusion in light of this evidentiary record is that the Petition is time-barred under § 315(b) because Broadcom's District Court Defendant customers are a real party in interest in this IPR, and/or the District Court Defendants are privies of Petitioner in this case. In light of this record, it is unreasonable to conclude that Petitioner should not be bound by the statutory time-bar, just like the District Court Defendants are. At a minimum, the Board should reopen these proceedings for further fact-finding so the Board can make a determination on a full evidentiary record, including having the benefit of the indemnity agreements.

**D.   The Board's Final Written Decision violates fundamental principles of administrative law.**

**1.   The Final Written Decision is an *ultra vires* action that exceeds the Board's statutory authority as delegated by Congress.**

Section 315(b) is a jurisdictional limit on the power delegated to the Board by Congress. *See* 35 U.S.C. § 315(b); 37 C.F.R. § 42.3(b) ("**Jurisdiction** . . . A petition to institute a trial must be filed with the Board consistent with any time period required by statute."). The Board's Final Written Decision and other actions in this IPR are *ultra vires*, undertaken without statutory authority.

The Board's determination of the § 315(b) issue will be reviewed on appeal with little (if any) deference. *See City of Arlington, Texas v. FCC*, 133 S. Ct. 1863, 1874 (2013) (appellate courts must "tak[e] seriously, and appl[y] rigorously, in all cases, statutory limits on agencies' authority. Where Congress has established a clear line, the

agency cannot go beyond it; and where Congress has established an ambiguous line, the agency can go no further than the ambiguity will fairly allow.").

The USPTO Director has taken the position that the Board's determinations under § 315(b) are never reviewable. *See* Brief for Intervenor – Director of the USPTO at 14-16, *Achates Reference Publ'g, Inc. v. Apple, Inc.*, Appeal No. 2014-1767 (Fed. Cir. Feb. 24, 2015). This position is contrary to a wealth of United States Supreme Court authority directly on point. *See Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 672 n.3 (1986) (collecting authority). It is also contrary to the APA. *See* 5 U.S.C. § 706(2)(C). Patent Owner fully intends to present this *ultra vires* argument to the Federal Circuit on appeal.

### 2.   The Board's Final Written Decision and other actions violate the Administrative Procedures Act.

The Board's refusal to consider a reasonably full evidentiary record in connection with the § 315(b) issue; its denial of all discovery on the issue; and its refusal to consider the terms of the known indemnity agreement and other known facts all violate the Board's duties under the APA. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1581 (10th Cir. 1994); *Intel Corp. v. U.S. Int'l Trade* Commiss'n, 946 F.2d 821, 836-39 (Fed. Cir. 1991).

Moreover, the Board's actions in this proceeding are contrary to the USPTO's own official public statements made during the rulemaking process. *See* 77 Fed. Reg. 48,680, 48,694-95 (Aug. 14, 2012) ("Additional discovery may be authorized where a

patent owner raises sufficient concerns regarding the petitioner's certification."); 77 Fed. Reg. at 48760 (discussing the legal standard). The Board's actions are inconsistent with these comments and, therefore violate the APA. *See* 5 U.S.C. § 552(a), § 706(2)(A),(C); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

The Board's Final Written Decision is also contrary to the Board's own promulgated substantive rules – specifically, 37 C.F.R. § 42.3(b). The Board's failure to follow its own rules is contrary to the APA. *See* 5 U.S.C. § 552(a), § 706(2)(C), (D); *Align Tech., Inc. v. ITC*, 771 F.3d 1317, 1322 (Fed. Cir. 2014).

Finally, the Board's Final Written Decision does not set forth proper findings of fact or conclusions of law establishing that the Board has jurisdiction to hear this petition in light of 35 U.S.C. §315(b). This is contrary to the requirements of the APA, 5 U.S.C. § 557(c). *See Austin Road Co. v. Occupational Safety and Health Review Comm'n*, 683 F.2d 905, 908 (5th Cir. 1982).

## IV.   CONCLUSION

For the foregoing reasons, the Board should grant this request for rehearing, vacate its Final Written Decision, and dismiss the Petition pursuant to 35 U.S.C. §315(b). In the alternative, the Board should vacate the Final Written Decision and reopen this proceeding so additional fact-finding can be done on the §315(b) issue.

Dated  April 6, 2015

Respectfully submitted,

/s/ Sarah E. Spires
Sarah E. Spires (Reg. No. 61,501)

Peter Ayers (Reg. No. 38,374)
Lee & Hayes, PLLC
11501 Alterra Parkway, Suite 450
Austin, TX 78758
Telephone: 512.605.0252
Fax: 512.605.0252
**Lead Counsel for Patent Owner**
Wi-Fi One, LLC

Sarah E. Spires (Reg. No. 61,501)
Skiermont Puckett LLP
2200 Ross Ave. Ste. 4800W
Dallas, TX 75201
P: 214-978-6600/F: 214-978-6601
**First Back-Up Counsel for Patent Owner**

J. Christopher Lynch (Reg. No. 34,216)
Lee & Hayes, PLLC
601 W. Riverside Ave., Suite 1400
Spokane, WA 99201
Telephone: 509.324.9256
Fax: 509.323.8979
Attorney for Patent Owner
Wi-Fi One, LLC

John Shumaker (Reg. No. 52,223)
Lee & Hayes, PLLC
11501 Alterra Parkway, Suite 450
Austin, TX 78758
Telephone: 512.605.0260
Fax: 509.323.8979
Attorney for Patent Owner
Wi-Fi One, LLC

**A0322**

IPR2013-00636
Patent 6,424,625 B1

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 6, 2015 the foregoing PATENT OWNER'S REQUEST FOR REHEARING OF FINAL WRITTEN DECISION was served via email on Lead and Back up Counsel for Broadcom Corporation identified in Broadcom's Mandatory Notices, whom consented to electronic service:

Dominic E. Massa, Lead Counsel
Zachary Piccolomini, Back-up Counsel
Wilmer Cutler Pickering Hale and Dorr, LLP
60 State Street
Boston, MA 02109
Dominic.massa@wilmerhale.com
Zachary.piccolomini@wilmerhale.com

Skiermont Puckett LLP

/s/ Sarah E. Spires
Sarah E. Spires (Reg. No. 61,501)

**A0323**

Trials@uspto.gov
571-272-7822

Paper 65
Entered: June 1, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

BROADCOM CORPORATION,
Petitioner,

v.

WI-FI ONE, LLC,
Patent Owner.

————————

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)[1]

————————

Before KARL D. EASTHOM, KALYAN K. DESHPANDE, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges*.

CLEMENTS, *Administrative Patent Judge*.

DECISION
Request for Rehearing
*37 C.F.R. § 42.71(d)*

———————

[1] We exercise our discretion to issue one Order to be filed in each case. The
parties are not authorized to use this style heading for any subsequent
papers.

A0324

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

I.    SUMMARY

Patent Owner, Wi-Fi One, LLC,[2] requests rehearing of the Final Written Decisions (IPR2013-00601, Paper 66, "601 Dec."; IPR2013-00602, Paper 60, "602 Dec."; IPR2013-00636, Paper 60, "636 Dec."). Paper 70 ("Req.").[3] Patent Owner seeks rehearing on the grounds that:

1. The Board misapprehended the purpose of the "real party in interest or privy" language in 35 U.S.C. § 315(b), and misapprehended the correct legal standard for determining whether a non-party is a "real party in interest or privy of petitioner" under § 315(b); and

2. The Board misapprehended the entirety of the factual record and overlooked evidence supporting Patent Owner's contention that certain district court defendants are real parties in interest and/or privies of Petitioner in this proceeding.

Req. 2. Patent Owner also argues that our Final Written Decisions raise administrative law issues. *Id.* at 4, 13–15.

The Requests for Rehearing are *denied*.

---

[2] On July 11, 2014, Patent Owner filed an Updated Mandatory Notice in IPR2013-00601 indicating that the patent-at-issue had been assigned to Wi-Fi One, LLC, and that Wi-Fi One, LLC and PanOptis Patent Management, LLC are now the real parties-in-interest. Paper 43. The same paper was filed in IPR2013-00602 (Paper 40) and IPR2013-00636 (Paper 38).
[3] Patent Owner filed a Request for Rehearing in each of IPR2013-00601 (Paper 70), IPR2013-00602 (Paper 64), and IPR2013-00636 (Paper 64). All three requests put forward substantively the same arguments and, thus, we address them together with reference to the Request in IPR2013-00601. Citations are to IPR2013-00601, unless otherwise noted.

2

**A0325**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

## II.    DISCUSSION

The applicable standard for a request for rehearing is set forth in 37 C.F.R. § 42.71(d), which provides in relevant part:

> A party dissatisfied with a decision may file a request for rehearing, without prior authorization from the Board. The burden of showing a decision should be modified lies with the party challenging the decision. The request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion, opposition, or a reply.

### A.  35 U.S.C. § 315(b)

Patent Owner argues that the Board misapprehended the purpose of the "real party in interest, or privy" language of § 315(b). Req. 4. Specifically, Patent Owner argues that "the legislative purpose of [35 U.S.C. § 315(b)] is to ensure IPR Petitions are not used as a litigation tactic for purposes of delay" (*id.* at 4), and that "[t]he plain text of the statute makes clear that . . . § 315(b) is intended to prevent litigation defendants from subverting the statutory time-bar by having their agents or cohorts file an IPR petition that they themselves are barred from filing" (*id.* at 5). Patent Owner also argues that the legal standard for determining whether a third party is a "real party in interest, or privy of petition" under § 315(b) "is purposefully broad and flexible so that the Board can determine, on a case-by-case basis and in light of all relevant facts, whether particular parties are attempting to circumvent the § 315(b) time-bar." Req. 7.

Patent Owner has not argued in its Patent Owner Response the legislative purpose of § 315(b). We could not have misapprehended or overlooked arguments not before us. Moreover, Patent Owner identifies

3

**A0326**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

nothing in our Decision that it contends mischaracterizes the legislative purpose of § 315(b). We are not persuaded, therefore, that we have overlooked or misapprehended the legislative purpose of § 315(b).

Patent Owner also argues that we misapprehended the legal test that should be applied to determine whether a non-party is a "real party in interest, or privy" for purposes of § 315(b). Req. 6. Specifically, Patent Owner contends that "the Board applied a narrow and rigid standard that is erroneous as a matter of law" (*id.* at 7) because it "requires — as an absolute and necessary condition — that Broadcom controlled or could have exercised control over one or more of the District Court Defendants in relation to the District Court Litigation" (*id.*) without "also considering, *inter alia*, the non-party's control over the IPR" (*id.* at 8). According to Patent Owner, "the issue under § 315(b) is whether the District Court Defendants have attempted to circumvent the one-year statutory time-bar." Req. 9.

Although our Decision on Patent Owner's Motion for Additional Discovery (Paper 23) focuses primarily on Broadcom's ("Petitioner") exercise of control, or opportunity to exercise control over the prior District Court lawsuit (Req. 8), that is because that was the focus of Patent Owner's Motion for Additional Discovery. *See, e.g.,* Paper 14, 6 ("Here, evidence will prove that Broadcom has had the opportunity to control and maintains a substantive legal relationship with the D-Link Defendants sufficient to bind Broadcom to the District Court's judgment.").

That decision, however, did not characterize the legal standard, for all cases, as being limited strictly to a petitioner's control, or opportunity to control, a non-party in previous litigation. To the contrary, it addressed

4

**A0327**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

control, or opportunity to control, by a non-party generally as one of a number of factors:

> Whether parties are in privity, for instance, depends on whether the relationship between a party and its alleged privy is "sufficiently close such that both should be bound by the trial outcome and related estoppels." [*Office Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,759 (Aug. 14, 2012]. Depending on the circumstances, a number of factors may be relevant to the analysis, including whether the non-party "exercised or could have exercised control over a party's participation in a proceeding," and whether the non-party is responsible for funding and directing the proceeding. *Id*. at 48,759-60.

Paper 23, 7.

That decision also addresses Patent Owner's theory that the indemnity agreements imply that the District Court Defendants are real parties in interest in these *inter partes* reviews ("IPRs"). *See id*. at 12–13. Patent Owner relied on substantively the same arguments and evidence in its Patent Owner Response as in its Motion for Additional Discovery, and our Final Written Decision, thus, applied essentially the same analysis. 601 Dec. 8–9. Accordingly, we are not persuaded that we misapprehended the proper legal standard for establishing privity or real party in interest.

### B. *District Court Defendants*

Patent Owner argues that we misapprehended and overlooked evidence establishing that certain District Court defendants are real parties in interest and/or are in privity with Petitioner for purposes of this proceeding. Req. 10–13. Specifically, Patent Owner argues that it has made "a strong circumstantial showing that Petitioner and at least some of their District Court Defendant customers are in cahoots" because "there are indemnity

<div align="center">5</div>

<div align="center">A0328</div>

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

agreements," they "share a common economic and legal interest," and "[Petitioner] has been coordinating with the District Court Defendants for many years." *Id.* at 11–12. According to Patent Owner, "the Board erred when it decided the § 315(b) issue without reviewing the known indemnity agreements." *Id.* at 12.

Patent Owner's arguments are not persuasive. The evidence cited by Patent Owner were Paper 3, and Exhibits 2005 and 2015–2018. PO Resp. 8–14. Exhibit 2018 is a final judgment of infringement in the co-pending district court litigation that sheds no light on whether Broadcom controlled, or could have controlled, the district court defendants, or vice-versa. All of the other evidence was considered in our Decision on Patent Owner's Motion for Additional Discovery. For example, we considered, and rejected, Patent Owner's argument that an indemnity relationship is sufficient to establish privity:

> Contrary to Ericsson's assertion that "[t]he weight of authority strongly supports that an indemnity agreement . . . establish[es] privity," Mot. 6, *Bros. Inc, TRW, Dentspl[]y* and other cases noted *supra* illustrate that more is required. Control of the litigation, or some sort of representation, constitutes a "crucial" factor. *Dentsply*, 42 F.Supp.2d at 398.

Paper 23, 9. As we indicated in our Final Written Decision, Patent Owner's Response relied on substantively the same arguments and evidence as its Motion for Additional Discovery, and we were not persuaded for the same reasons as explained in our decision on that motion. 601 Dec. 8–9. Accordingly, we are not persuaded that we misapprehended or overlooked the evidence relied upon by Patent Owner. To the extent Patent Owner is arguing that we should have granted its Motion for Additional Discovery

6

**A0329**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

directed to the indemnity agreements, the argument is untimely because our decision denying that discovery was issued well over a year before our Final Written Decision, Patent Owner requested rehearing (Paper 27) and we denied that request (Paper 28).  *See* 37 C.F.R. § 42.71(d)(1).

In these proceedings, Patent Owner does not set forth a persuasive argument, supported by evidence, that the District Court Defendants funded, controlled, or could have controlled these proceedings, or that Petitioner's indemnity agreements even mention IPRs, let alone would show funding, control, or ability to control IPRs, or would have obligated Broadcom to file specific, if any, IPRs.  *See* Req. 12.  Instead, Patent Owner generally asserts that "Broadcom's duty to indemnify triggered the successive attack on [it]s patents," without specifying, based on cited precedent supporting the theory, how even a generic trigger for some unspecified future action, even if it existed, elevates the District Court Defendants to real parties in interest in the IPRs.  *See* PO Resp. 13.

Patent Owner also argues that Petitioner failed to provide evidence of the non-party's lack of participation in, or control over, this proceeding, and that the Declaration of David Djavaherian (Ex. 1007) submitted by Petitioner in its Opposition to Patent Owner's Motion for Additional Discovery is carefully worded to obscure the true nature of the relationship between Petitioner and the District Court defendants.  Req. 11, 12.  Patent Owner did not make these arguments in the Patent Owner Response.  We, therefore, could not have misapprehended or overlooked them.

7

**A0330**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

### C. Administrative Law Issues

Patent Owner argues that "the Board's Final Written Decision and other actions in this IPR are *ultra vires*, undertaken without statutory authority." Req. 13. Specifically, Patent Owner argues the following:

> The Board's refusal to consider a reasonably full evidentiary record in connection with the § 315(b) issue; its denial of all discovery on the issue; and its refusal to consider the terms of the known indemnity agreement and other known facts all violate the Board's duties under the APA. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1581 (10th Cir. 1994); *Intel Corp. v. U.S. Int'l Trade [Comm'n]*, 946 F.2d 821, 836-39 (Fed. Cir. 1991).

*Id.* at 14. Patent Owner also argues that (1) our actions are inconsistent with public statements made during the rulemaking process and, therefore, violate the Administrative Procedure Act ("APA"); (2) our Decision is contrary to 37 C.F.R. § 42.3(b) and our failure to follow our rules is contrary to the APA; and (3) our Decision does not establish that we have jurisdiction to hear this petition in light of 35 U.S.C. § 315(b), contrary to the APA. *Id.* at 15.

Patent Owner's arguments are predicated on its contention that we lack jurisdiction under § 315(b) because the defendants in the co-pending district court litigation are real parties-in-interest who were served with a complaint alleging infringement more than one year before the filing of the Petitions in these proceedings. As discussed above, we are not persuaded that we erred in determining that those defendants are not real parties in interest. As a result, we are not persuaded that the Petitions were time-barred under § 315(b), and we are, therefore, not persuaded that our Final Written Decisions are *ultra vires* actions that exceed our statutory authority.

8

**A0331**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

### III.  Conclusion

For the foregoing reasons, Patent Owner has not shown that our Final Written Decision in IPR2013-00601 should be modified.  For the same reasons, Patent Owner also has failed to show that our Final Written Decisions in IPR2013-00602 and IPR2013-00636 should be modified.

### ORDER

Accordingly, it is:

ORDERED that Patent Owner's Requests for Rehearing are *denied*.

9

**A0332**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

For PETITIONER:

Dominic E. Massa
Michael A. Diner
Zachary Piccolomini
WILMER CUTLER PICKERING HALE AND DORR LLP
Dominic.massa@wilmerhale.com
michael.diener@wilmerhale.com
Zachary.piccolomini@wilmerhale.com

For PATENT OWNER:

Peter J. Ayers
J. Christopher Lynch
Sarah Spires
LEE & HAYES PLLC
peter@leehayes.com
chris@leehayes.com
Sarah.spires@skiermontpuckett.com

10

**A0333**

Paper No. <u>66</u>

Filed on behalf of: Wi-Fi One, LLC

## UNITED STATES PATENT AND TRADEMARK OFFICE

_____

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BROADCOM CORPORATION,

Petitioner,

V.

WI-FI ONE, LLC,

Patent Owner.

_____

CASE NO.: IPR2013-00636
PATENT NO. 6,424,625 B1

_____

**PATENT OWNER'S NOTICE OF APPEAL**

In accordance with 35 U.S.C. §§ 141-142, 319 and 37 CFR § 90.2(a), 90.3, Patent Owner Wi-Fi One, LLC ("Wi-Fi One") appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision of the Patent Trial and Appeal Board (the "Board") entered on March 6, 2015 (Paper No. 60) (the "Final Written Decision") and the Board's Decision on Patent Owner's Request for Rehearing entered on June 1, 2015 (Paper No. 65) (the "Rehearing Decision"), and from all underlying orders, decisions, rulings, opinions and/or findings, including without limitation the Board's Decision on Institution of *Inter Partes* Review entered on March 10, 2014 (Paper No. 25) regarding Wi-Fi One's U.S. Patent No. 6,424,625.

For the limited purposes of compliance with 37 C.F.R. § 90.2(a)(3)(ii), Wi-Fi One expects that the issues on appeal may include the following, along with any underlying findings, determinations, rulings, opinions, orders, decisions, or other related issues:

- The Board's determination of unpatentability of claim 1 of U.S. Patent 6,424,625 (the "'625 patent"), under 35 U.S.C. § 102(b), and any finding or determination (factual or legal) supporting that determination;

IPR2013-00636
Patent 6,424,625 B1

- The Board's determination that it had invalidation authority to render its Final Written Decision;

- The Board's determination that this Petition is not barred by 35 U.S.C. § 315(b), and any other finding or determination (factual or legal) supporting or related to this determination;

- The Board's failure to terminate this Petition after institution under 35 U.S.C. § 315(b), and any other finding or determination (legal or factual) supporting or related to this failure; and

- The Board's decision to deny Wi-Fi One's motion for additional discovery related to the issue of real-party-in-interest or privity under 35 U.S.C. § 315(b), and any other finding or determination (legal or factual) supporting or related to this determination.

Wi-Fi One reserves the right to challenge any finding or determination supporting or related to the issues listed above and to challenge the other issues decided adversely to Wi-Fi One in the Board's Final Written Decision, the Board's Decision on Request for Rehearing regarding the Final Written Decision, and/or any orders, decisions, or rulings underlying the Board's Final Written Decision or Decision on Request for Rehearing regarding the same.

Copies of this Notice of Appeal are being filed simultaneously with the Director of the United States Patent and Trademark Office, the Patent Trial and

IPR2013-00636
Patent 6,424,625 B1

Appeal Board, the Court of Appeals for the Federal Circuit, and served on the

Petitioner.

NOTICE OF APPEAL                    3                    IPR2013-00601

Dated  July 13, 2015

Respectfully submitted,

/s/ Sarah E. Spires
Sarah E. Spires (Reg. No. 61,501)

Peter Ayers (Reg. No. 38,374)
Lee & Hayes, PLLC
11501 Alterra Parkway, Suite 450
Austin, TX 78758
Telephone: 512.605.0252
Fax: 512.605.0252
**Lead Counsel for Patent Owner**
Wi-Fi One, LLC

Sarah E. Spires (Reg. No. 61,501)
SKIERMONT PUCKETT LLP
2200 Ross Ave. Ste. 4800W
Dallas, TX 75201
P: 214-978-6600/F: 214-978-6601
**First Back-Up Counsel for Patent Owner**

J. Christopher Lynch (Reg. No. 34,216)
Lee & Hayes, PLLC
601 W. Riverside Ave., Suite 1400
Spokane, WA 99201
Telephone: 509.324.9256
Fax: 509.323.8979
Attorney for Patent Owner
Wi-Fi One, LLC

John Shumaker (Reg. No. 52,223)
Lee & Hayes, PLLC
11501 Alterra Parkway, Suite 450
Austin, TX 78758
Telephone: 512.605.0260
Fax: 509.323.8979
Attorney for Patent Owner
Wi-Fi One, LLC

IPR2013-00636
Patent 6,424,625 B1

## CERTIFICATE OF FILING

The undersigned certifies that on July 13, 2015, in addition to being filed electronically through the Patent Trial and Appeal Board's PRPS System, the foregoing PATENT OWNER'S NOTICE OF APPEAL was filed via Express Mail with the Director of the United States Patent and Trademark Office, at the following address (in accordance with 37 C.F.R. §§ 90.2(a), 104.2):

Director of the United States Patent and Trademark Office
c/o Office of the General Counsel
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, Virginia 22313-1450

## CERTIFICATE OF FILING

The undersigned certifies that on July 13, 2015, a true and correct copy of the foregoing PATENT OWNER'S NOTICE OF APPEAL was filed via Express Mail with the Clerk's Office of the United States Court of Appeals for the Federal Circuit at the following address:

Clerk of Court
United States Court of Appeals for the Federal Circuit
717 Madison Place NW
Washington, DC 20005

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 13, 2015 the foregoing PATENT OWNER'S NOTICE OF APPEAL was served via email on Lead and Back up Counsel for Broadcom Corporation identified in Broadcom's Mandatory Notices, whom consented to electronic service:

Dominic E. Massa, Lead Counsel
Zachary Piccolomini, Back-up Counsel
Wilmer Cutler Pickering Hale and Dorr, LLP
60 State Street
Boston, MA 02109
Dominic.massa@wilmerhale.com
Zachary.piccolomini@wilmerhale.com

**A0339**

IPR2013-00636
Patent 6,424,625 B1

Skiermont Puckett LLP

/s/ Sarah E. Spires
Sarah E. Spires (Reg. No. 61,501)

**UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

**WI-FI ONE, LLC,**
**Owner/Appellant**

**v.**

**BROADCOM CORPORATION,**
**Petitioner/Appellee**

**Proceeding No: IPR2013-00636**

### NOTICE FORWARDING CERTIFIED LIST

A Notice of Appeal to the United States Court of Appeals for the Federal

Circuit was timely filed on July 13, 2015, in the United States Patent and

Trademark Office in connection with the above identified *Inter Partes Review*

proceeding. Pursuant to 35 U.S.C. § 143, a Certified List is this day being

forwarded to the Federal Circuit.

Respectfully submitted,

By: _Macia L. Fletcher_____
Macia L. Fletcher
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035

Under Secretary of Commerce for
Intellectual Property and Director of the
United States Patent and Trademark Office

Date: August 24, 2015

**A0350**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing has been served on Appellant and Appellee this 24th day of August, 2015, as follows:

For PETITIONER:

Dominic E. Massa
Michael A. Diner
Zachary Piccolomini
WILMER CUTLER PICKERING HALE AND DORR LLP
Dominic.massa@wilmerhale.com
michael.diener@wilmerhale.com
Zachary.piccolomini@wilmerhale.com

For PATENT OWNER:

Peter J. Ayers
J. Christopher Lynch
Sarah Spires
LEE & HAYES PLLC
peter@leehayes.com
chris@leehayes.com
Sarah.spires@skiermontpuckett.com

By: _____
Macia L. Fletcher
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035

**A0351**

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

**August 24, 2015**

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**BROADCOM CORPORATION,**
**Petitioner,**
**v.**

**WI-FI ONE, LLC,**
**Patent Owner.**

**Case: IPR2013-00636**
**Patent No. 6,424,625 B1**

By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

*Macia L. Fletcher*

*Certifying Officer*



**A0352**

**Prosecution History IPR2013-00636**

| Date | Document |
|---|---|
| 9/30/2013 | Petition for Inter Partes Review |
| 9/30/2013 | Petitioner's Power of Attorney |
| 9/30/2013 | Fee Authorization |
| 10/3/2013 | Notice of Filing Date Accorded to Petition |
| 10/21/2013 | Patent Owner's Power of Attorney |
| 10/21/2013 | Patent Owner's Mandatory Notices |
| 11/1/2013 | Patent Owner's Power of Attorney |
| 11/1/2013 | Patent Owner's Updated Mandatory Notice |
| 12/11/2013 | Order - Authorizing Motion for Additional Discovery |
| 12/11/2013 | Patent Owner's Motion to Seal (confidential) |
| 12/11/2013 | Patent Owner's Motion for Additional Discovery (confidential) |
| 12/16/2013 | Patent Owner's Motion to Seal |
| 12/16/2013 | Patent Owner's Motion for Additional Discovery |
| 12/20/2013 | Petitioner's Motion to Seal (Redacted) |
| 12/20/2013 | Petitioner's Motion to Seal (confidential) |
| 12/20/2013 | Petitioner's Opposition to Motion for Additional Discovery (Redacted) |
| 12/20/2013 | Petitioner's Opposition to Motion for Additional Discovery (confidential) |
| 12/20/2013 | Petitioner's Exhibit List |
| 1/3/2014 | Patent Owner'sElection to Waive Its Preliminary Response |
| 1/24/2014 | Decision - Motion for Additional Discovery |
| 1/27/2014 | Petitioner's Motion to Seal |
| 2/7/2014 | Patent Owner's Request for Rehearing |
| 2/20/2014 | Decision - Request for Rehearing |
| 3/10/2014 | Decision - Institution of Inter Partes Review |
| 3/10/2014 | Scheduling Order |
| 3/28/2014 | Patent Owner's List of Proposed Motions |
| 4/1/2014 | Patent Owner's Notice of Related Matters |
| 4/2/2014 | Order - Conduct of the Proceeding |
| 5/15/2014 | Patent Owner's Power of Attorney |
| 5/15/2014 | Notice of Appearance - Shumaker |
| 6/11/2014 | Patent Owner's Motion to Seal (confidential) |
| 6/11/2014 | Patent Owner's Motion to Seal (Redacted) |
| 6/11/2014 | Patent Owner's Response (confidential) |
| 6/11/2014 | Patent Owner's Response (Redacted) |
| 6/11/2014 | Patent Owner's Motion to Amend |
| 6/30/2014 | Decision - Motions to Seal |
| 7/11/2014 | Patent Owner's Updated Mandatory Disclosure |
| 7/11/2014 | Patent Owner's Updated Power of Attorney |
| 7/17/2014 | Petitioner's Standard Acknowledgement for Access to Protective Order Material - Massa |
| 7/17/2014 | Petitioner's Standard Acknowledgement for Access to Protective Order Material - Diener |

**A0353**

**Prosecution History IPR2013-00636**

| Date | Document |
|---|---|
| 8/29/2014 | Notice of Stipulated Modification of Due Dates 2-3 |
| 9/17/2014 | Notice of Appearance - Piccolomini |
| 10/1/2014 | Petitioner's Opposition to Motion to Amend |
| 10/1/2014 | Petitioner's Reply to Patent Owner's Response |
| 10/29/2014 | Notice of Stipulated Modification of Due Dates 4-5 |
| 11/3/2014 | Patent Owner's Reply to Opposition to Motion to Amend |
| 11/12/2014 | Petitioner's Request for Oral Argument |
| 11/12/2014 | Patent Owner's Motion for Observations on Cross-Examination |
| 11/12/2014 | Patent Owner's Updated Exhibit List |
| 11/12/2014 | Transmittal Letter for New Exhibits |
| 11/17/2014 | Order - Trial Hearing |
| 11/19/2014 | Petitioner's Response to Motion for Observations |
| 12/4/2014 | Petitioner's Demonstratives for Oral Argument |
| 12/4/2014 | Patent Owner's Updated Exhibit List |
| 12/7/2014 | Patent Owner's Notice of Related Matters |
| 12/7/2014 | Letter from Ayers to Vignone re service of New Exhibit |
| 12/19/2014 | Petitioner's Revised Mandatory Notice |
| 2/5/2015 | Oral Hearing Transcript |
| 3/6/2015 | Final Written Decision |
| 4/3/2015 | Patent Owner's Power of Attorney |
| 4/3/2015 | Patent Owner's Revised Mandatory Notice |
| 4/3/2015 | Patent Owner's Standard Acknowledgment for Access to Protective Order Material - Spires |
| 4/6/2015 | Patent Owner's Request for Rehearing |
| 6/1/2015 | Decision - Request for Rehearing |

## I.     MANDATORY NOTICES

### A.     Real Parties-in-Interest

Broadcom Corporation ("Petitioner") is the real party-in-interest and submits this Petition for *Inter Partes* Review ("Petition") to review Claim 1 of U.S. Patent No. 6,424,625 ("the '625 patent") (Ex. 1001).

### B.     Related Matters

In September 2010, Ericsson Inc. *et al.* (the "Patent Owner") filed suit in the Eastern District of Texas against D-Link Systems, Inc., Netgear, Inc., Belkin International, Inc., Dell, Inc., Toshiba Corporation, Acer Inc., and Gateway Inc. (the "Defendants") alleging infringement of several U.S. patents, including the '625 patent.  (*See  Ericsson Inc., et al. v. D-LINK Corp., et al.*, Civil Action No. 6:10-CV-473 (LED/KGF) ("Texas Litigation")).[1]  The Patent Owner's infringement allegations were based in part on Defendants' use of Petitioner's Wi-Fi compliant products, such as the BCM4313 and BCM4321.  Following an eight day trial on five patents, the jury found Claim 1 of the '625 patent infringed.

The Patent Owner did not allege that Petitioner infringed any patent asserted in the Texas Litigation, and Petitioner was not a party to the Texas Litigation.  As a result, Petitioner has not had access to many documents in case, such as

---

[1]     On November 19, 2011, Intel Corporation filed a Motion to Intervene in the Texas Litigation, which the court granted on May 4, 2012.

1

**A0358**

prior art under (pre-AIA) 35 U.S.C. § 102(e).

5.     Bertsekas, et al., DATA NETWORKS, Prentice-Hall, 1987, pp. 58-74 "Bertsekas") (Ex. 1012), which is prior art under (pre-AIA) 35 U.S.C. § 102(b).

## B.     Grounds for Challenge

Petitioner requests cancellation of Claim 1 as unpatentable under 35 U.S.C. §§ 102 and 103, as set out in the Grounds below:

**Ground 1**: Challenged Claim 1 is Anticipated under 35 U.S.C. § 102 by Garrabrant (Figures 8A and 8B).

**Ground 2**: Claim 1 is Anticipated under 35 U.S.C. § 102 by Garrabrant (Failure Recovery).

**Ground 3**: Claim 1 is Anticipated under 35 U.S.C. § 102 by Hettich.

**Ground 4**: Claim 1 Would Have Been Obvious Over Walke under 35 U.S.C. § 103.

**Ground 5**: Claim 1 is Anticipated under 35 U.S.C. § 102 by Kemp.

**Ground 6:**  Claim 1 Would Have Been Obvious Over Bertsekas and Go-Back-N Technology, in View of Walke and the Teaching to Discard Packets in an ARQ System under 35 U.S.C. § 103.

This Petition, supported by the Declaration of Harry Bims, Ph.D ("Bims Declaration" or "Bims Decl.") (Ex. 1006) filed with this Petition, demonstrates that there is a reasonable likelihood that Petitioner will prevail with respect to

Challenged Claim 1 and that the claim is unpatentable. *See* 35 U.S.C. § 314(a).

## III.  OVERVIEW OF THE '625 PATENT – TECHNICAL BACKGROUND

### A.    Automatic Repeat Request Protocols

Automatic repeat request ("ARQ") refers to a class of protocols for packet data networks that allow a transmitter to retransmit packets that are not received or are incorrectly received by a receiver. (*See, e.g.*, '625 patent, 1:34-37, Ex. 1001). These packets may also be referred to interchangeably as protocol data units ("PDUs"), cells, or frames.

A receiver receives packets.  In response to receipt of a packet, a receiver can transmit back to the transmitter a positive acknowledgement ("ACK" or "PACK") that one or more data packets have been received, and/or a negative acknowledgement ("NAK" or "NACK") indicating that one or more data packets have not been received.  The transmitter can retransmit the packets if the transmitter has received a NACK, if the transmitter has not received a PACK (e.g., because a timer in the transmitter times out), or if the transmitter's transmit buffer fills up.  (*See, e.g., id.* at 1:34-49 and 2:28-57, Ex. 1001).

ARQ systems typically assign sequence numbers ("SNs") to packets and use those SNs to identify and to track packets.  (*See, e.g., id.* at 1:50-2:2, Ex. 1001). Sequence numbers can be re-used in a modulo manner, and thus can be represented as a circular buffer.  The sequence numbers can be numbered, for example, 0, 1, 2,

## I.  INTRODUCTION

In the event that the challenged claims are found unpatentable, Patent Owner Telefonaktiebolaget L.M. Ericsson ("Ericsson") hereby moves pursuant to the Board's March 10, 2014 Order, Paper No. 25, and 37 C.F.R. § 42.121 to cancel claim 1 of U.S. Pat. No. 6,424,625 ("the '625 Patent") and submit proposed substitute claim 20 in its place.

## II.  LISTING OF PROPOSED SUBSTITUTE CLAIM

The following claim listing clearly identifies the changes to the '625 Patent so that the Board can easily and quickly identify the new limitations and deletions of limitations.  *See* 37 C.F.R. § 42.121(b); *Nichia Corp. v. Emcore Corp.*, IPR2012-00005, Paper 68 at *50 (PTAB Feb. 11, 2014).  Specifically, Petitioner has used underlining to indicate text inserted in the corresponding original claim, as suggested by the Board.  *Toyota Motor Corp. v. Am. Vehicular Sciences LLC*, IPR2013-00419, Paper 32 at *2 (PTAB March 7, 2014).

Proposed Substitute Claim

20.  (Proposed Substitute for Original Claim 1)  A method for discarding packets in a data network employing a packet transfer protocol including an automatic repeat request scheme, comprising the steps of:

a transmitter in the data network commanding a receiver having a receiver window in the data network to

1

**A0426**

a) receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet<u>, wherein the sequence number of the at least one packet is outside of the receiver window</u> and

b) release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet; and the transmitter discarding all packets for which acknowledgment has not been received, and which have sequence numbers prior to the at least one packet.

### III.  STATEMENT OF SUBSTITUTION CONTINGENCIES

Consistent with 37 C.F.R. § 42.121(a)(3), this Motion includes one proposed substitute claim for the one challenged claim to be replaced.  Further, under 37 C.F.R. § 42.121(a)(2), the amendment herein does not seek to enlarge the scope of claim 1 of the '625 Patent or introduce new subject matter.  Proposed Substitute claim 20 merely adds features to claim 1 and does not remove any limitation therefrom.  *See Synopsis, Inc. v. Mentor Graphics Corp.*, IPR2012-00042, Paper No. 60 at *43 (PTAB Feb. 19, 2014).

Proposed substitute claim 20 is a contingent substitute claim to replace original claim 1.  Claim 20 adds two additional limitations to original claim 1.  First, claim 20 explicitly recites a "a receiver <u>having a receiver window</u>."  Second, the amendment recites the phrase "<u>wherein the sequence number of the at least one packet is outside of the receiver window</u>."  As discussed further below, such a

2

**A0427**

Case IPR2013-00601 Patent 6,772,215; Case IPR2013-00602
Patent 6,466,568; Case IPR2013-00636 Patent 6,424,625

packet then becomes the last sequence number of the received window. The received window then is adjusted so that the packet that's been received now is the sequence number of the last section of the received window as opposed to the first part of the received window as normal.

So what this means is that Vornefeld as opposed to releasing expectations of packets having prior sequence numbers actually creates expectations, and that's shown in the figure -- the wheel figure in the bottom, which has a 0, 1 and 2 in the gray section, and that gray section is the packets that the receiver is now expecting to receive rather than being released.

And I'll stop there, Your Honor, unless you have questions and I'll reserve the rest of my time for rebuttal.

JUDGE EASTHOM: Thank you, counsel. I don't have any questions. Any questions? Actually I had one bookkeeping question. Are you now Wi-Fi One or --

DR. SHUMAKER: Wi-Fi One owns the patents at suit now. Ericsson owns an interest in some of the patents in terms of the past damage issue, but Wi-Fi One owns the patents going forward.

JUDGE EASTHOM: So should we -- we should change the name to --

DR. SHUMAKER: To Wi-Fi One?

JUDGE EASTHOM: Right.

DR. SHUMAKER: Yes, Wi-Fi One, LLC.

JUDGE EASTHOM: Thank you.

75

**A0556**

Lehrstuhl für Kommunikationsnetze
Rheinisch-Westfälische Technische Hochschule Aachen
Prof. Dr.-Ing. B. Walke

Diplomarbeit

# Entwicklung und Leistungsbewertung eines *Selective Repeat-Automatic Repeat Request* (SR-ARQ)-Protokolls für transparenten, mobilen ATM-Zugriff

von

Andreas Hettich

Matr.-Nr. 181475

Aachen, den 17.1.1996

Betreuung durch:
o. Prof. Dr.-Ing. B. Walke
Dipl.-Ing. D. Petras

Die Arbeit ist nur zum internen Gebrauch bestimmt. Alle Urheberrechte liegen beim betreuenden Lehrstuhl. Für den Inhalt wird keine Gewähr übernommen. Vervielfältigungen und Veröffentlichungen jeglicher Art sind nur mit Genehmigung des Lehrstuhls gestattet.

BROADCOM 1003

**A0609**

DOCKET NO: 0111168-00239

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

PATENT:        6,424,625

INVENTOR:      Larsson, P. et al.

FILED:         October 29, 1998        ISSUED:    July 23, 2002

TITLE:    METHOD AND APPARATUS FOR DISCARDING PACKETS IN A DATA NETWORK HAVING AUTOMATIC REPEAT REQUEST

Mail Stop PATENT BOARD
Patent Trial and Appeal Board
U.S. Patent & Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

## DECLARATION OF HARRY BIMS, PH.D.

I, Harry Bims, declare as follows:

### General Background

1.      My name is Harry Bims.  I have been asked to offer opinions regarding whether the claims of U.S. Patent No. 6,424,625 (the '625 patent) are anticipated or would have been obvious in view of the prior art, and to review a Petition for *Inter Partes* Review of the '625 patent.

2.      I received my B.S. in computer and systems engineering from Rensselaer Polytechnic Institute in 1985, my M.S. in electrical engineering from Stanford University in 1988, and my Ph.D. in electrical engineering from Stanford University in 1993.  Since receiving my doctorate, I have worked on a number of

ActiveUS 116548286v.1                                                    BROADCOM 1006

**A0738**

wireless and mobile technologies, including wireless pagers, wireless home LAN protocols, cellular products including 2.5G and 3G products, wireless network infrastructures based on the 802.11 wireless specification, and wireless networks in the 4G technology known as WiMAX, an implementation of 802.16.

3.    I have been actively involved in the development of the 802.16 standards, which is a series of wireless broadband standards written by the Institute of Electrical and Electronics Engineers (IEEE), including as a vice-chair of the 802.16 working group, and chair of two task groups.  Previously, I was the vice-chair and secretary of the IEEE 802.16h License Exempt Task Group.

4.    I am currently working as both a technology consultant in the industry and an expert consultant for litigation matters.

5.    I began my technical career in 1992 just before completing my Ph.D. as one of the first employees at Glenayre Technologies, where I worked until 1998. While at Glenayre, I designed and built a 4-channel wireless pager demonstration based on the ReFLEX wireless protocol developed by Motorola, which led to an award for Narrowband Personal Communications Service (PCS) development.  I invented, designed, and built a two-way pager test system for the ReFLEX protocol that was deployed around the country for testing pagers.  Additionally, I co-developed a wireless application protocol for sending and receiving encrypted

2

ActiveUS 116548286v.1

**A0739**

email messages over the paging channel, which was ultimately deployed for government agencies.

6.     In 1999, I was a member of the technical staff at T-SPAN Systems Corporation LLC, where I designed a wireless home LAN protocol.  In 1999 I also served as a technical leader to Gigabit Wireless, Inc., where I lead the Wireless Media Access Control (MAC) design group.  My work at Gigabit Wireless involved analyzing competing wireless MAC protocol standards, creation of a proprietary MAC protocol specification document, simulation of the protocol, and ultimate implementation of the protocol in a prototype.  I also participated in meetings for the 802.16 standards starting at about that time.

7.     From 1999 to 2001, I served as the director of software architecture at Symmetry Communications Systems LLC, where I was responsible for the software architecture for their core products for the GPRS market.  In 2001, I also worked as an entrepreneur in residence at the venture capital firm Bay Partners LLC, where I served as a technology expert to the partners of the firm on a range of wireless and networking subjects.

8.     From 2001 to 2004 I founded my own company, AirFlow Networks, Inc. LLC, where I served as CEO and CTO.  AirFlow Networks was involved with a wireless network infrastructure based on the 802.11 wireless specification.

3

**A0740**

9.    From 2007 to 2009 I worked as a technology consultant to Apple, Inc., including participating in IEEE 802.16 standards meetings.

10.    I am a named inventor on nineteen U.S. Patents that involve various aspects of wireless and mobile communications. Examples of my patents include U.S. Patent No. 6,788,658 entitled "Wireless communication system architecture having split MAC layer," which issued on September 7, 2004; and U.S. Patent No. 6,557,134 entitled "ARQ method for wireless communication," which issued on April 29, 2003; and most recently, U.S. Patent No. 8,468,426 entitled "Multimedia-aware quality-of-service and error correction provisioning," which issued on June 18, 2013. Additionally, I have authored or co-authored a number of articles in the fields of electrical engineering and computer science.

11.    I have been a member or vice-chair of numerous associations, including the chair of the Silicon Valley Chapter of the IEEE Engineering Management Society, and vice-chair of the 802.16 Working Group of the IEEE 802 Standards Development Committee.

12.    A copy of my latest *curriculum vitae* (CV) is attached as Appendix A.

13.    I am being compensated at my normal consulting rate for my work. My compensation is not dependent on and in no way affects the substance of my statements in this Declaration.

4

Figure 12 and at 12:43-13:3, Ex. 1002, once the counter reaches zero, the packet is discarded.

**Hettich Anticipates Challenged Claim 1(Exs. 1003, 1007)**

71.    To the extent the preamble is a limitation of the claim, Hettich discloses "[a] method for discarding packets in a data network employing a packet transfer protocol including an automatic repeat request scheme."

72.    Hettich is a thesis relating to the use of a synchronous transfer mode (ATM) for mobile devices. (Hettich, Title, Ex. 1007). Hettich describes various ARQ protocols, including Go Back N and selective reject (*Id.* at Sections 5.1.2 and 5.1.3, 5.2, and 5.2.4, Ex. 1007). Hettich discloses different types of broadband services that can be used, including interactive services, retrieval services, and data communication. (Hettich, Section 2.1, Ex. 1007).

73.    Hettich discloses "[a] a transmitter in the data network commanding a receiver in the data network to a) receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet and b) release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet." (Hettich Section 5.2.4, Ex. 1007).

74.    Hettich discloses several methods by which packets can be discarded in a selective reject (SR) ARQ system. One method involves use of a Delay PDU

26

(protocol data unit) command sent from a transmitter to a receiver, i.e., in the "opposite direction instead of an acknowledgement." (*Id.* at Section 5.2.4, Ex. 1007). This Delay PDU identifies a request number (RN) that is equal to the sequence number (SN) that "is the highest number of all the discarded cells." (*Id.* at p. 34, Ex. 1007). There "cannot be valid (not discarded) cells with lower sequence numbers." (*Id.*, Ex. 1007). In response, "the receiver receives a Delay PDU, [and] stops waiting for cells where the following applies for the number: N<=RN." (*Id.* at p. 35, Ex. 1007). "Stops waiting" for packets means "releases any expectation" of receiving those packets. The Delay PDU is thus a command that causes the receiver to move its reception window forward to a new sequence number that is not consecutive with the sequence number of a previously received packet, in the same manner as the '625 patent and as claim 1 of the '625 patent, and to release expectations of receiving earlier SNs.

75.    Hettich discloses "the transmitter discarding all packets for which acknowledgment has not been received, and which have sequence numbers prior to the at least one packet."

76.    As Hettich states, "the SN is the highest number of all of the discarded cells. Prerequisite for doing so is that the sender discard[s] the cells in the proper order, i.e., there cannot be valid (not discarded) cells with lower sequence

27

**A0764**

numbers." The transmitter is thus discarding all cells below RN=SN in the Delay PDU. (Hettich Section 5.2.4, Ex. 1007).

<div align="center">Patent Owner's Response</div>

77. In the Patent Owner's Report, the sole dispute on the merits raised by the Patent Owner was that Hettich " fails to teach a 'command' to receive a packet having a sequence number that is not consecutive with a sequence number of a previously received packet," because Hettich "disclosed a system in which the receiver may reject an out-of-sequence packet sent by the transmitter if the packet is outside of the reception window." (Report at 81, Ex. 1010).

78. I disagree that the fact that a receiver may reject an out-of-sequence packet outside the reception window distinguishes Claim 1. As noted above, claim 1 of the '625 patent says nothing about whether a packet needs to be accepted or not if outside the reception window. Further, as noted above, embodiments in the specification and dependent claims 4 and 6 indicate that an enforcement bit can be sent with a packet that is within the window and that was previously received, and that the receiver can reject packets outside the reception window.

**Challenged Claim 1 Would Have Been Obvious in View of Walke**

79. Walke relates to a mobile system for broadband using an asynchronous transfer mode (ATM) network. (Walke, Section 2:1, Ex. 1008). Walke uses an ARQ protocol with selective reject. (*Id.* at Section 2.2, Ex. 1008).

<div align="center">28</div>

ActiveUS 116548286v.1

<div align="center">**A0765**</div>



ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC

City of New York, State of New York, County of New York

I, Connie Wong, hereby certify that the following is, to the best of my knowledge and belief, within the given parameters, a true and accurate translation, of the following document "Diplomarbeit Hettich" from German into English.

_____

Connie Wong

Sworn to before me this

Thursday, December 08, 2011

_____

Signature, Notary Public

KEVIN M KELLEY JR
Notary Public - State of New York
No. 01-KE-6229268
Qualified in Queens County
Commission Expires October 4, 2014

Stamp, Notary Public

BROADCOM 1007

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016   T 212.689.5555   F 212.689.1059   WWW.TRANSPERFECT.COM

Department of Communication Networks
Aachen Technical University (RWTH)
Prof. Dr.-Ing. B. Walke

Diploma Paper

# Development and performance evaluation of a Selective Repeat-Automatic Repeat Request (SR-ARQ) protocol for transparent, mobile ATM Access

by

Andreas Hettich

Student ID No. 181475

Aachen, April 17, 1996

Mentors:
Prof. Dr.-Ing. B. Walke, Associate Professor
Dipl.-Ing. D. Petras

This paper is for internal use only. All copyrights reserved by the mentoring department. We give no warranty for its content. Reproduction and publication of any kind are subject to the Department's permission.

**A0796**

*2.2   Switching technology in B-ISDN:* Asynchronous transfer mode *(ATM)*     5

14 dB/km and can increase by another 10 dB/km when it rains. This high damping ensures that the frequencies can be reused at a close distance.

The data is transmitted service neutral, and only the QoS (quality of service) parameters as defined in the ATM standards and the defined ATM service classes are specified. CAC (**C**onnection **A**dmission **C**ontrol) analyzes the QoS parameters and traffic characteristics prior to setting up the connection. A connection that has been set up has to be monitored for compliance with the traffic characteristics agreed during setup, otherwise the quality of other connections may be impaired.

A physical channel in the MBS can carry 34 Mbit/s as gross data rate. If a virtual channel has a data rate of more than 34 Mbit/s, it will have to be split up over multiple frequency channels (multi-link transfer).

The protocols of the link layer have to meet special requirements; new concepts have to be implemented. A mobile ATM terminal is to be integrated into a landline ATM network while retaining the end-to-end relationship of the ATM adaptation layer. Poor transmission quality on the radio interface represents a special problem because does not allow the bit error rate required by ATM without additional measures. This can be remedied using forward error correction (FEC) in combination with a protocol for repeated transmission of ATM cells (**A**utomatic **R**epeat Re**Q**uest (ARQ)).

It is the purpose of this paper to design a new link access protocol and to assess it using a simulation. The protocol is based on known ARQ protocols and is adjusted to the special requirements of MBS.

At the outset, the paper gives an overview of *broadband ISDN* (Chapter 2) and the *Mobile Broadband System* (Chapter 3). Chapter 4 presents the logic link control (LLC) layer designed for mobile transparent ATM access and describes the special requirements of MBS. After an introduction to conventional ARQ protocols, Chapter 5 outlines the ASR ARQ protocol developed and implemented in this paper. Chapter 6 describes the implementation of the protocol in the system simulator. Chapter 7 presents the SIMCO3++/MBS simulator used for simulative performance assessment. Chapter 8 evaluates the capabilities of the protocol elements based on simulations. Chapter 9 concludes this paper with a summary and outlook.

The range of valid sequence numbers can be determined from equations (5.1) and (5.2) with equation (5.7):

$$RN - n \leq SN \leq RN + n - 1 \tag{5.8}$$

From equation (5.8) it follows that the following must be true for model $m$ to ensure unique coding of the sequence numbers:

$$m > 2 \cdot n - 1 \tag{5.9}$$

If model $m$ is given, the maximum window size for SR-ARQ is:

$$\tag{5.10}$$

$$n_{max} = \frac{m}{2}$$

Based on (5.10), the accuracy of the SR ARQ is determined in the same manner as for the Go Back $n$ ARQ (chapter 5.1.2).

There are multiple ways to request the retransmission of erroneous frames:

- Positive acknowledgements are used if there are no errors. If one or more frames are missing, they are requested using a negative REJ (**REJ**ect), in which $RN$ indicates the number starting at which all of the frames should be repeated. In this case, the SR ARQ behaves in the same manner as the Go Back $n$ ARQ and does not offer a significant advantage.
- Positive acknowledgments are sent if the receipt is error-free, at which point the sender shifts his window. Missing frames are requested using an SREJ (*Selective* **REJ***ect*), in which $RN$ indicates the number of the missing frame. The sender only re-transmits that specific frame. If multiple frames are missing, each one must be requested individually.
- A field is sent in the acknowledgment that indicates which frames were sent successfully and which contained errors. The sender can then simply retransmit the missing frames. These acknowledgements can create considerable overhead depending on the size of the window.

The individual acknowledgement types do not exclude one another and can be combined to create the highest possible efficiency among the requests.

## 5.2    The Adaptive Selective Repeat (ASR) ARQ Protocol

The ASR ARQ protocol [10] is based on the SQ ARQ. The properties of the ASR ARQ can be divided into three areas:

1. Elements from the standard ISO 8802-2
2. Handling time-critical ATM cells
3. Advantages of parallel ARQ instances

The individual properties are described in detail in the following.

*5.    Security Protocols*                                                    30

**5.2.1    Elements of the AQR in the Standard ISO 8802-2**

The ARQ protocol specified in ISO 8802-2 (IEEE 802.2) serves as the basic protocol and is a modified Go Back *n* ARQ with the following elements [17]:

**Acknowledgement Timer**

The Acknowledgement Timer monitors the time in which an acknowledgement is expected once one or more frames have been sent. If an acknowledgement is not received, the sender begins to *poll*.

**P-Bit Timer**

The P=Bit Timer monitors the time in which an answer to a *poll* is expected. The poll is repeated if an answer is not received.

**Reject Timer**

The Reject Timer monitors the time in the receiver in which an answer to a new request is expected. The request is resent is an answer is not received.

**N2**

N2 indicates the maximum number of repetitions if an Acknowledgment, P-Bit or Reject Timer runs out. The virtual channel is reset if N2 is exceeded.

***Receive Ready (RR) Protocol Data Unit (PDU)***

The RR DPU is used to send positive acknowledgements, i.e. all frames are acknowledged for which the following is true: $SN < RN$

**REJ***ect (REJ) PDU*

The REJ PDU is used to send negative acknowledgements, i.e. acknowledgements are issued in the same manner as the RR PDU and all frames are repeated for which the following is true: $SN \geq RN$

Furthermore, the standard provides measures for *flow control*. The LLC layer of the MBS does not have *flow control*, which is why these measures will not be examined in detail herein.

The ASR ARQ inherits all of the above-mentioned elements. The *Acknowledgement Timer* is required for the stability of the protocol. Both the *P-Bit* and the *Reject Timer* are measures used to reduce frame delays. The effectiveness of the three timers is examined using simulations (chapter 8), which is why they were implemented in a manner that allows them to be activated and deactivated. The *Timer Delays* of all three timers are free parameters, which must be adjusted to the respective conditions.

The ASR ARQ is a modified SR ARQ and uses a S*elective* **REJ***ect (SREJ)* PDU, which itself is used to request an individual frame again. Similar to the REJ PDU, all frames where $SN < RN$ are acknowledged, but only the frames where the number is $SN = RN$ are resent. With ASR ARQ, the RR PDUs are interpreted in manner similar to the REJ PDUs in the ISO 8802-2. This approach is only reasonable when used in combination with the *Ignore Timer* and REJ PDUs are not used in this case. If the receipt buffer contains fewer frames than the number of frames that are missing in the receipt order (Figure 5.1, Case A), an RR PDU will be sent instead of requesting each frame individually using SREJ PDUs. Otherwise, the missing frames will be requested individually using SREJ PDUs (Figure 5.1, Case B).

### 5.2.3  Handling Time-Critical ATM Cells

ATM uses a QoS parameter for the maximum delay for time-critical services. If adherence to that parameter is more important than adherence to the maximum cell loss rate, the ASR ARQ has mechanisms for ensuring the maximum delay is not exceeded, which is does by discarding specific cells when there is a high load. This type of service could include a video conference connection, where the loss of individual cells is not significant, but where the maximum delay must be adhered to due to the synchronizations and echo effects.

Three measures are provided to discard cells:

1. Cells from the first transmission are discarded once they have exceeded the maximum delay. These cells are not transferred to the transmission window, i.e. are removed from the transmission window and replaced with newer cells. This is the only case where the receiver does not need to be informed of the discard, before the first transmission.
2. A *Delay Timer* is set in the sender to control the remaining lifecycle of the cells in the transmission window. If the time expires, the cell is discarded. If the cell was already being transmitted, the receiver must be informed that it was discarded. This information is transmitted using a *Delay* PDU (chapter 5.2.4).
3. The remaining lifecycle of cells in the receiver that had to be stored temporarily as the receiver was waiting for frames missing in the sequence are monitored. If the time runs out, the wait process is terminated and any cells that have already been received are forwarded to the upper layer. The remaining lifecycle must be transmitted as well for this measure, which means it involves an increased overhead. This measure is only reasonable in connection with measure 2.

These three measures are consecutive, building on one another, i.e. measure 1 is required for measure 2. Strict adherence to the maximum delay can only be achieved by using all three measures; otherwise, individual cells could exceed the maximum delay. These measures increase the complexity of the protocol considerably. Accuracy is no longer a given and exceptions must be considered as certain conditions could lead to a deadlock.

### 5.2.4  The *Delay* PDU

The Delay PDU is used to inform receivers that cells have been discarded. It is only sent if the receiver requested a discarded cell (using RR or SREJ). In this case, the Delay PDU is sent in the opposite direction instead of an acknowledgement and $RN = SN$, in which $SN$ is the highest number of all of the discarded cells. Prerequisite for doing so is that the sender discard the cells in the proper order, i.e. there cannot be valid (not discarded) cells with lower sequence numbers. For this reason, the number of the most recently discarded cell has the greatest informational value and may, under certain conditions, be sent instead of the requested cell.

If the receiver receives a Delay PDU, it stops waiting for cells where the following applies for the number: $N \leq RN$. It then shifts the window and issues a corresponding acknowledgement. When using bi-directional communication it is important to remember that the Delay PDU competes with the acknowledgments. It must be ensured that both acknowledgments, as well as Delay PDUs can be transmitted within a finite time.

Figure 5.4 shows the deadlock that may occur if the Delay PDU has priority over the acknowledgments:



**Figure 5.4:** Deadlock Resulting from Delay PDU Prioritization

In channel 1, the receiver in the BS is waiting for frames (1) and would thus like to send an SREJ(1). However, since the sender in the BS (channel 2) has a Delay(2) with a higher priority that is sent instead. The sender in the MS (channel 1) cannot, however, continue until it has received an acknowledgement. The same is true for the sender in the BS (channel 2), which cannot shift its window until it has received an acknowledgment. If the sender continues to permanently transmit its Delay PDUs, a deadlock arises, which cannot be resolved until a reset is triggered by a timeout.

A deadlock arises in the other extreme as well, where the acknowledgement has priority over the Delay PDU, as shown in Figure 5.5:

In this case, the receiver in the BS uses an SREJ(1) in channel 1 to request the frames (1). This was discarded, but since the receiver in the MS (channel 2) has also requested frames using an RR(1), the cell discard notifications (Delay PDUs) cannot be transmitted. In this situation, neither the sender nor the receiver can shift their window. If the receivers continue to behave in the same manner, a deadlock is created that can only be resolved by a reset.

Thus, it must be ensured that the priorities change dynamically and in a manner that ensures both acknowledgements and Delay PDUs can be transmitted within a finite time. The simplest case is to

Application No. 09/179,952
Attorney's Docket No. 040000-101
Page 4

## REMARKS

Claims 1-19 are pending in the application. By this Amendment, claims 1, 14-15 and 19 are amended. A Request for Approval of Drawing Changes is also filed herewith.

In the Office Action, the Examiner objects to Figures 1-7 and indicates that Figures 1-7 should be designated with a legend "Prior Art". Applicants respectfully submit that the Request for Approval of Drawing Corrections filed herewith obviates this objection. Withdrawal of the objection to Figures 1-7 is respectfully requested.

Applicants gratefully acknowledge the indication in the Office Action that claims 4-13 contain allowable subject matter. For at least the reasons below, Applicants respectfully submit that all of the claims are allowable over the applied references.

In the Office Action, the Examiner rejects claim 15 under 35 U.S.C. § 102(b) over U.S. Patent No. 4,726,027 to Nakamura, *et al.* (Nakamura). This rejection is respectfully traversed.

Nakamura is directed to a method for retransmitting non-received or corrupted data packets from a transmitter to a receiver. As shown for the example by a comparison of Figure 1 with Figure 5 of Nakamura, Nakamura's invention the transmitter to resend only negatively-acknowledged packets, instead of also resending packets that were transmitted after the non-received or corrupted data packet but before the transmitter received the negative acknowledgment.

However, Nakamura fails to disclose or suggest a *transmitter* in the data network discarding at least one packet that has been sent by the transmitter but has not been acknowledged by a receiver in the data network as received, as recited in claim 15.

4



**A1190**

Application No. 09/179,952
Attorney's Docket No. 040000-101
Page 5

Withdrawal of the rejection of claim 15 under 35 U.S.C. § 102(b) over Nakamura is respectfully requested.

In the Office Action, the Examiner rejects claims 1-3 , 14 and 16-19 under 35 U.S.C. § 103(a) over Nakamura in view of U.S. Patent No. 6,163,861 to Yoshioka, *et al.*(Yoshioka). This rejection is respectfully traversed.

Yoshioka is directed to an error compensation scheme, wherein reception equipment tracks sequence numbers of received data packets, and then sends a control message to a transmitter, indicating data packet sequence numbers that the reception equipment has not yet received. See for example the Abstract of Yoshioka. See also Figure 4, which illustrates operation of the reception equipment shown in Figure 2.

However, Yoshioka and also Nakamura fail to disclose all of the features recited in the independent claims.

Specifically, Nakamura and Yoshioka, when considered both separately and in combination, fail to disclose or suggest a transmitter in the data network *commanding* a receiver in the data network to receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet, as recited in claim 1.

Nakamura and Yoshioka, when considered both separately and in combination, each fail to disclose or suggest the transmitter *commanding* the receiver to *release any expectation* of receiving outstanding packets having sequence numbers prior to the at least one packet that the transmitter has commanded the receiver to receive, as recited in claim 1.

**A1191**



Application No. 09/179,952
Attorney's Docket No. 040000-101
Page 1

**Attachment to Amendment dated 31 October 2001**

**Marked-up Claims 1, 14-15 and 19**

1. A method for discarding packets in a data network employing a packet transfer protocol including an automatic repeat request scheme, comprising the steps of:

a transmitter in the data network commanding a receiver in the data network to a) receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet and b) release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet; and

the transmitter discarding all packets for which acknowledgment has not been received, and which have sequence numbers prior to the at least one packet.

14. A method for discarding packets in a data network employing a packet transfer protocol including a go-back-n automatic repeat request scheme, comprising the steps of:

discarding at least one packet from a transmitter;

receiving a NACK for the at least one packet from a receiver; and

assigning consecutive sequence numbers to non-discarded packets adjacent to the at least one packet.

15. A method for discarding packets in a data network employing a packet transfer protocol including a go-back-n automatic repeat request scheme, comprising the steps of:

8



**A1194**

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

BROADCOM CORPORATION

Petitioner

v.

TELEFONAKTIEBOLAGET L.M. ERICSSON

Patent Owner

Case IPR2013-00636
U.S. Patent No. 6,424,625

**DECLARATION OF DAVID DJAVAHERIAN**

Broadcom v. Ericsson
IPR2013-00636
Broadcom 1017

ActiveUS 119704348v.1

**A1446**

**CONFIDENTIAL PAGES REMOVED**

**A1447-A1448**

**Garrabrant Anticipates Claim 1 of the '625 Patent**

3.      In my original declaration, I explained why Garrabrant anticipates claim 1 of the '625 patent.  Below I provide an additional discussion of Garrabrant in reply to Patent Owner's Response.

4.      Owner argues that none of the commands listed in Garrabrant relate to commanding to receive.  Response at 26.  The list of commands are general types, such as "RR" for flow and "RNR" for control.  A transmitter could use, for example, a control message (RNR) to send a "lost" message that commands the receiver to receive the next packet and move the receive window.

**Hettich Anticipates Claim 1 of the '625 Patent**

5.      In my original declaration, I explained why Hettich anticipates claim 1 of the '625 patent.  Below I provide an additional discussion of Hettich in reply to Patent Owner's Response.

6.      The DELAY N command tells the receiver to release any expectation of receiving unacknowledged packet N (and any of N-1, N-2, etc)., and to start receiving packets beginning with N+1.  Therefore it would make sense for the transmitter to send the DELAY N command and then send packet N+1.  At a minimum, Hettich implicitly discloses (and certainly does not preclude) sending N+1 as the next packet and thus discloses the method step of claim 1.  I believe a person of ordinary skill would understand that Hettich implicitly teaches various

2

**A1665**

combinations of scenarios of missing packets, such as one discarded packet, multiple discarded packets, and packets sent in different orders.

7.    Hettich discloses "discarding" as claimed in claim 1 of the '625 patent. In the example of Figure 12 of the '625 patent, all packets between DSN and BSN are discarded, and a subsequent packet with RBEP=TRUE tells the receiver to move its window forward. (*See* '625 patent, Fig. 10B; Ex. 1001). In like manner, Hettich discloses that the transmitter discards cells (packets) because a timer in the transmitter has expired. (Hettich at §5.2.3; Ex. 1007) Then Hettich sends a DELAY PDU to inform the receiver that cells have been discarded. (Hettich, §5.2.4; Ex. 1007). After this discarding of cells has occurred, A DELAY PDU command with RN = BSN or BSN-1 (to use the terminology of the '625 patent) is sent from the transmitter to the receiver, causing the receiver to "stop waiting for cells where the following applies for the number:  $N <= RN$. It then shifts the window and issues a corresponding acknowledgement." (Hettich, p. 35; Ex. 1007). This step anticipates the "commanding" step as required by claim 1 of the '625 patent.

8.    While it is possible that the transmitter may contain non-discarded cells having sequence numbers between the DELAY SN and the next received packet, Hettich implicitly discloses that the transmitter can send DELAY N in order to start sending the next packet at N+1. Furthermore, as long as the

3

**A1666**

transmitter discards packets meeting the claimed conditions ("all packets for which acknowledgement has not been received, and which have sequence numbers prior to the at least one packet"), the discarding step of claim 1 is met whether or not the transmitter discards or does not discard other packets as well. Hettich states that sending a DELAY command with SN means "SN is the highest number of all the discarded cells."

### Walke Renders Claim 1 of the '625 Patent Obvious

9. In my original declaration, I explained why Walke renders claim 1 of the '625 patent obvious. Below I provide an additional discussion of Walke in reply to Patent Owner's Response.

10. Walke's Delay command is not just a command to "ignore." Delay (n, m) commands the receiver to receive packet #n and to ignore packet #m (*i.e.*, it "releases expectations" of receiving #m).

11. Walke is not limited to "releasing expectations" only for packets with the specific numbers in the example in Walke where the transmitter sends Delay (4, 1). Walke would also release expectations where the release causes a next packet to be sent just after the released one, and therefore non-consecutive with a previously received packet. For example, if packet #3 was discarded and the next packet to be sent was #4, Walke could send Delay (4,3), and the packet

4

**A1667**

EXHIBIT 2001

Filed on behalf of:   Telefonaktiebolaget L. M. Ericsson

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BROADCOM CORPORATION

Petitioner

v.

TELEFONAKTIEBOLAGET L.M. ERICSSON

Patent Owner

_____

Case IPR2013-00601, -602, and -636
Patent Nos. 6,772,215, 6,466,568, and 6,424,625

_____

**Patent Owner's Requests For Production**

**A1672**

# PATENT OWNER'S REQUESTS FOR PRODUCTION

Pursuant to 37 C.F.R.§ 42.51(b), Patent Owner Ericsson Telefonaktiebolaget L.M. Ericsson ("Ericsson") hereby requests that Petitioner Broadcom, Inc. ("Broadcom") produce for inspection and copying the documents requested below, within 20 days of the Board's Order, service thereof at the offices of Lee & Hayes, 13809 Research Blvd., Suite 405, Austin, TX 78750. Due to the timing and scheduling order, Ericsson requests that Broadcom produce its responses on a rolling basis, with any contracts or agreements in Request Nos. 1-3 being produced as early as possible.

## INSTRUCTIONS

1.    If any of the following requests cannot be answered in full after exercising due diligence to secure the information, please so state and answer to the extent possible, specifying your inability to answer the remainder and stating whatever information you have concerning the unanswered portions.

2.    You must produce all documents responsive to these requests which are in your actual or constructive possession, custody or control, including all documents within the actual or constructive possession, custody or control of any representative, agent, employee, attorney, accountant, investigator or any person acting for you or on your behalf.

3.    All documents are to be produced as they are kept in the usual course of business, in the files in which such documents have been maintained, and in the order within each file in which such documents have been maintained; or all documents shall be organized and labeled to correspond with the requests below.

4.    If you withhold any document(s) from production on the basis of a claim of attorney-client or any other privilege, or on the basis of the attorney work-product doctrine, you must set

# A1673

forth with specificity the privilege or work product claim and furnish a list identifying each document for which the privilege or work product doctrine is claimed and a description thereof.

5.    If, in responding to the requests, you claim that there is any ambiguity in either a particular request or in a definition or an instruction applicable to the request, that claim shall not be used by you as a basis for refusing to respond, but you shall set forth as part of the response the language deemed to be ambiguous and the interpretation chosen or used in responding to the particular request.

6.    Electronic records and computerized information are to be produced in an intelligible format together with a description of the system from which it is derived sufficient to permit rendering the material intelligible.

7.    The requests are to be regarded as continuing, and you are requested to provide any additional information or documents by way of supplemental responses as specified in Federal Rule of Civil Procedure 26(e).

## **DEFINITIONS**

1.    The terms "you," "your," "Broadcom," and "Petition" refer to Broadcom Corporation and each of its directors, officers, employees, agents, representatives, affiliates, predecessors, successors, assigns, or licensees, privies, and any other person or entity acting or purporting to act on its behalf, and, unless privileged, its attorneys.

2.    The term "the D-Link Litigation" refers to *Ericsson Inc. et al. v. D-Link Corp., et al.*, Civil Action No. 6:10-CV-473 (LED/KGF) in the United States District Court for the Eastern District of Texas.

3.    The term "the D-Link Defendants" refers to the Defendants in *Ericsson Inc. et al. v. D-Link Corp., et al.*, Civil Action No. 6:10-CV-473 (LED/KGF), collectively, including D-Link

**A1674**

Corporation, D-Link Systems, Inc., Netgear, Inc., Acer Inc., Acer America Corporation,

Gateway Inc., Dell, Inc., Toshiba Corporation, Toshiba America, Inc., Toshiba America

Information Systems, Inc., Toshiba America Consumer Products, LLC, Belkin International,

Inc., and Intel Corporation.

4.    The term "the '568 Patent" refers to U.S. Patent No. 6,466,568.

5.    The term "the '625 Patent" refers to U.S. Patent No. 6,424,625.

6.    The term "the '215 Patent" refers to U.S. Patent No. 6, 772,215.

### REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

**REQUEST FOR PRODUCTION NO. 1:**   All executed contracts or agreements between Broadcom and any of the D-Link Defendants relating to Wi-Fi compliant products, such as the BCM4313 and BCM4321, that are used in any of the D-Link Defendants' products accused of infringement in the D-Link Litigation.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 2:**   All executed contracts or agreements between Broadcom and any of the D-Link Defendants that include any indemnity or duty to defend provisions.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 3**:   All joint defense agreements, or other agreements addressing cooperation on the defense of the D-Link Litigation, between Broadcom and any of the D-Link Defendants relating to the D-Link Litigation.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 4:** All invoices provided to or received from any of the D-Link Defendants, or their counsel, seeking reimbursement for any fees or expenses incurred in the D-Link Litigation.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 5:** Records of any payments made by Broadcom to any of the D-Link Defendants, or their counsel, or to Ericsson, pursuant to any actual or alleged contractual duty to defend or indemnify any the D-Link Defendants for any fees or expenses incurred in the D-Link Litigation.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 6:** All emails and written correspondence between any of the D-Link Defendants, or their counsel, and Broadcom, or its counsel, relating to any claimed duty of Broadcom to defend or indemnify any of the D-Link Defendants in the D-Link Litigation from January 1, 2010 to the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 7:** All emails and written correspondence between Broadcom, or its counsel, and any of the D-Link Defendants, or their counsel, from January 1, 2010 to the present relating to:

A. The filing of IPR2013-00601, IPR2013-00602, and IPR2013-00636;

**A1676**

B.  Intervention by Broadcom in the D-Link Litigation;

C.  The claim construction or interpretation of any of the patents at issue in the D-Link Litigation, including, but not limited to, the '568 Patent, the '625 Patent, or the '215 Patent; and

D.  The validity or alleged invalidity of any of the patents at issue in the D-Link Litigation, including, but not limit to, the '568 Patent, the '625 Patent, or the '215 Patent.

**RESPONSE:**

Dated: December 11, 2013.

     /Peter J. Ayers/
PETER AYERS, Reg. No. 38,374
Lee & Hayes, PLLC
13809 Research Blvd., Suite 405
Austin, TX 78750
Telephone: 512.505.8162
Fax: 509.944.4693
Attorney for Patent Owner Telefonaktiebolaget
   L.M. Ericsson

**A1677**

CERTIFICATE OF SERVICE

The undersigned certifies that on December 3, 2013 the foregoing PATENT

OWNER'S REQUESTS FOR PRODUCTION was served on Lead and Back-up

Counsel for Broadcom Corporation by sending the same via Federal Express to the

service address provided in Broadcom's Mandatory Notices:

> Dominic E. Massa, Lead Counsel
> Michael A. Diener, Back-up Counsel
> Wilmer Cutler Pickering Hale and Dorr, LLP
> 60 State Street
> Boston, MA 02109

       /Peter J. Ayers/
> Peter J. Ayers, Reg. No. 38,374

**A1678**

Table of Contents

 Due to the nature of our compensation programs, most of our executive officers sell shares of our common stock each quarter or otherwise periodically, often pursuant to trading plans established under Rule 10b5-1 of the Securities Exchange Act of 1934, as amended, or the Exchange Act. As a result, sales of shares by our executive officers may not be indicative of their respective opinions of Broadcom's performance at the time of sale or of our potential future performance. Nonetheless, the market price of our stock may be affected by sales of shares by our executive officers.

**We may be required to defend against alleged infringement of intellectual property rights of others and/or may be unable to adequately protect or enforce our own intellectual property rights.**

Companies in the semiconductor industry and the wired and wireless communications markets aggressively protect and pursue their intellectual property rights. From time to time, we receive notices that claim we have infringed upon, misappropriated or misused other parties' proprietary rights. Additionally, we receive notices that challenge the validity of our patents. Some of these notices involve "non-practicing entities," or NPEs, asserting claims addressing certain of our products. Intellectual property litigation can be expensive, time consuming and distracting to management. An adverse determination in any of these types of disputes could prevent us from manufacturing or selling some of our products or could prevent us from enforcing our intellectual property rights. Further, settlements can involve royalty or other payments that could reduce our profit margins and adversely affect our financial results.

We may also be required to indemnify some customers and strategic partners under our agreements if a third party alleges or if a court finds that our products or activities have infringed upon, misappropriated or misused another party's proprietary rights. We have received requests from certain customers and strategic partners to include increasingly broad indemnification provisions in our agreements with them. These indemnification provisions may, in some circumstances, extend our liability beyond the products we provide to include liability for combinations of components or system level designs and for consequential damages and/or lost profits. Even if claims or litigation against us are not valid or successfully asserted, these claims could result in significant costs and diversion of the attention of management and other key employees to defend.

Our products may contain technology provided to us by other parties such as contractors, suppliers or customers. We may have little or no ability to determine in advance whether such technology infringes the intellectual property rights of a third party. Our contractors, suppliers and licensors may not be required to indemnify us in the event that a claim of infringement is asserted against us, or they may be required to indemnify us only up to a maximum amount, above which we would be responsible for any further costs or damages. Any of these claims or litigation may materially and adversely affect our business, financial condition and results of operations.

Furthermore, our success and future revenue growth will depend, in part, on our ability to protect our intellectual property. It is possible that competitors or other unauthorized third parties may obtain, copy, use or disclose our technologies and processes, or confidential employee, customer or supplier data. Any of our existing or future patents may be challenged, invalidated or circumvented. We engage in litigation to enforce or defend our intellectual property rights, protect our trade secrets, or determine the validity and scope of the proprietary rights of others, including our customers. We also enter into confidentiality agreements with our employees, consultants and strategic partners and control access to and distribution of our technologies, documentation and other proprietary information. Despite these efforts, internal or external parties may attempt to copy, disclose, obtain or use our products, services or technology without our authorization. If we cannot adequately protect our technology, our competitors may be able to offer products similar to ours.

Our software may be derived from "open source" software, which is generally made available to the public by its authors and/or other third parties. Open source software is often made available under licenses, which impose certain obligations in the event we distribute derivative works of the open source software. These obligations may require us to make
source code for the derivative works available to the public, and/or license such derivative works on different terms than those customarily used to protect our intellectual property. With respect to our proprietary software, we generally license such software under terms that prohibit combining it with open source software. Despite these restrictions, parties may combine our proprietary software with open source software without our authorization, in which case we might nonetheless be required to release the source code of our proprietary software.

We cannot assure you that our efforts to prevent the misappropriation or infringement of our intellectual property or the intellectual property of our customers will succeed. Identifying unauthorized use of our products and technologies is difficult and time consuming. The initiation of litigation may adversely affect our relationships and agreements with certain customers that have a stake in the outcome of the litigation proceedings. Litigation is very expensive and may divert the attention of management and other key employees from the operation of the business, which could negatively impact our business and results of operations.

46

**Brad Caldwell**

**Subject:** FW: (Acer): Ericsson GPLA(PC/End-User-Terminal) - following steps

**From:** Kate_Ci_Shang@acer.com.tw [mailto:Kate_Ci_Shang@acer.com.tw]
**Sent:** Friday, June 04, 2010 11:02 AM
**To:** ROGER TU
**Subject:** RE: (Acer): Ericsson GPLA(PC/End-User-Terminal) - following steps

Dear Roger, for Wilan patents, we've been gathering vendors' inputs, and would need to discuss further. Is it possible to arrange another meeting before meeting in Sweden?

**Main purpose is to discuss comments from Acer's vendors, including Intel, Broadcom and Atheros.**
**Orrick will lead the discussion so I don't mind if we meet in US  with your counsels there.**

Kate

| | | |
|---|---|---|
| ROGER TU <roger.tu@ericsson.com> | To | "Kate_Ci_Shang@acer.com.tw" <Kate_Ci_Shang@acer.com.tw> |
| | cc | |
| 2010/06/04 上午 10:54 | Subject | RE: (Acer): Ericsson GPLA(PC/End-User-Terminal) - following steps |

Dear Kate,

We don't expect any technical discussion for the meeting in Sweden. Both parties should aim to conclude the commercial discussion then.

BR/Roger

**From:** Kate_Ci_Shang@acer.com.tw [mailto:Kate_Ci_Shang@acer.com.tw]
**Sent:** Friday, June 04, 2010 10:47 AM
**To:** ROGER TU
**Subject:** Re: (Acer): Ericsson GPLA(PC/End-User-Terminal) - following steps

Dear Roger, regarding the technical discussion about Wlan patents, do you expect that we do it the same day when we visit Sweden?

Kate

6/30/2010

**A1913**

**ROGER TU**
**<roger.tu@ericsson.com>**

To "lydiawu@acer.com.tw" <lydiawu@acer.com.tw>

2010/06/01 上午 11:29

cc Kasim Alfalahi <kasim.alfalahi@ericsson.com>, Andreas Iwerb跰k <andreas.iwerback@ericsson.com>, Martin Karlsson <martin.karlsson@ericsson.com>, "bj_lin@acer.com.tw" <bj_lin@acer.com.tw>, "Kate_Ci_Shang@acer.com.tw" <Kate_Ci_Shang@acer.com.tw>

Subject (Acer): Ericsson GPLA(PC/End-User-Terminal) - following steps

Dear Lydia,

Thanks for the meeting dated May 19th. Both parties have reached certain consensus regarding the issue of Ericsson patent license(PC/End-User-Terminal). I hereby summarize the action points for your reference:

**PC (WLAN/WiMAX patent license)**
Acer requested to have more technical discussion with the chipset suppliers. To facilitate the technical discussion, Ericsson agreed with that Acer can disclose the Chipworks documents(reverse-engineering, Acer PC vs. Ericsson WLAN patent) to Acer's suppliers. Since Ericsson has provided all the necessary technical information, we don't expect a long technical discussion in this case. Acer should make the decision and conclude the commercial discussion as soon as possible.

As both parties agreed, the next meeting will be held in Sweden. The tentative schedule is below:

Date: June 29th, 2010

Time: 09:30AM~12:00PM

Place: Ericsson office

Torshamnsgatan 21-23, Stockholm, Sweden

**A1914**

6/30/2010

I would need Acer's confirmation in order to arrange the meeting. If any questions, please don't hesitate to call me.

**A1915**

Best Regards

**ROGER TU**
**IPR Director, Licensing & Patent Development**

Ericsson (China) Communications Co. Ltd.
No.5 Lize East Street, Chaoyang District
Beijing, China
Phone +86-10-84769600
Fax +86-10-84767765
Mobile +86-13581626085
roger.tu@ericsson.com
www.ericsson.com



This Communication is Confidential. We only send and receive email on the basis of the terms set out at www.ericsson.com/email_disclaimer

6/30/2010

**A1915**

EXHIBIT 2009

**CONFIDENTIAL PAGES REMOVED**

**A1924-A1959**

Please refer to A2140

Please refer to A2141

**A2041**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **ERICSSON INC., et al.,** | § § § | |
| **Plaintiffs,** | § § § | |
| **vs.** | § § | **CASE NO. 6:10-CV-473** |
| **D-LINK CORPORATION, et al.,** | § § § | |
| **Defendants.** | § § § | |

## ORDER

Before the Court are Plaintiff Ericsson Inc.'s Emergency Motion for Relief from the Protective Order (Docket No. 662) and Ericsson's Emergency Motion for Expedited Briefing (Docket No. 664). For the following motions, the motions are **DENIED**.

## BACKGROUND

On August 8, 2013, the Court entered final judgment against Defendants Toshiba Corporation and Toshiba America Information Systems, Inc., (collectively, "Toshiba") and Dell, Inc. ("Dell") in favor of Plaintiffs Ericsson Inc. and Telefonakiebolaget LM Ericsson (collectively, "Ericsson"). During the course of the litigation, Ericsson discovered (1) an indemnity agreement between Toshiba and non-party Broadcom Corporation ("Broadcom"), (2) an indemnity agreement between Dell and Broadcom, and (3) an email between Dell and Broadcom discussing indemnification (collectively "Indemnity Documents"). Dell and Toshiba disclosed the Indemnity Documents pursuant to the Court's Protective Order, originally issued on October 18, 2011. Docket No. 148.

**A2089**

In the Motion for Relief from the Protective Order, Ericsson requests to disclose the Indemnity Documents in an inter partes review proceeding ("IPR") at the Patent Trial and Appeal Board ("PTAB"), which was initiated by Broadcom on September 20, 2013.  According to Ericsson, the Indemnity Documents show Broadcom is in privity with Dell and Toshiba, or at least show additional discovery is warranted on the issue.  Docket No. 662 at 1.  If Broadcom is in privity with Dell or Toshiba, Broadcom would be ineligible to petition for an IPR pursuant to the one-year bar of 35 U.S.C. § 315(b) ("An inter partes review may not be instituted if the petition requesting the proceeding is filed more than 1 year after the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent.").  In opposition, Dell and Toshiba argue the potential benefit to Ericsson for modifying the Protective Order will be outweighed by the potential harm they will suffer. Specifically, Dell and Toshiba argue indemnification agreements do not show privity under the PTAB's recent rulings, and that as non-parties to the IPR, they will no longer in control of their confidential materials.  Docket Nos. 668 at 5, 669 at 2–3.

In the Motion for Expedited Briefing, Ericsson requests the Court to order Toshiba and Dell to file redacted, non-confidential versions of their briefs in response to the Motion for Relief from the Protective Order.  Docket No. 664 at 2.  Ericsson intends to use these briefs to "update the PTAB on the status" of Ericsson's Motion for Relief from the Protective Order and to show the PTAB the Defendants' "stated basis for opposing the motion."  *Id.*  Dell has agreed to this request and Toshiba opposes.  Docket Nos. 666, 667.

2

**A2090**

# ANALYSIS

## *Motion for Relief from Protective Order*

Compared to district courts, the PTAB has an intentionally narrower scope of discovery. *See* 35 U.S.C. § 316(a)(5)(B) (limiting discovery to what is "necessary for the interest of justice").   Additionally, the PTAB has a corresponding narrower protection for the confidentiality of discoverable materials.  *See* "Office Patent Trial Practice Guide," 77 Fed. Reg. 48761 ("Confidential information that is subject to a protective order ordinarily would become public 45 days after denial of a petition to institute a trial or 45 days after final judgment in a trial.").  Granting Ericsson's request for relief from the Protective Order would allow Ericsson to circumvent this balance between IPR discovery and confidentiality.  In essence, Ericsson would be able to use the Court's broader Rule 26 "relevancy" standard for discovery, yet subject Dell and Toshiba to the PTAB's narrower protections of confidentiality.  *Id.*  Relatedly, Ericsson only is aware of the Indemnity Documents as a matter of coincidence because of its former litigation and the broad scope of discovery pursuant to Rule 26.

Moreover, granting Ericsson relief from the Protective Order in this case would undermine the negotiations which produced the Protective Order.  Ericsson, as the plaintiff in the district court litigation and the patent owner in any potential IPR, was in the best position to negotiate whether it may disclose documents discovered during litigation in an IPR.[1]  Accordingly, Ericsson's Emergency Motion for Relief from the Protective Order is **DENIED**.

---

[1] For example, the parties considered proceedings at the PTAB when they negotiated the protective order, and agreed that anyone who viewed confidential information "may not participate, directly or indirectly, in the drafting preparation, or amending of any patent claim [and] may not reveal the content of [confidential] materials to reexamination counsel or agents."  Docket No. 148 at 10–11.  Ericsson has failed to show why this protection should not apply to the IPR.

3

# A2091

Case: 15-1946   Document: 37   Page: 292   Filed: 03/10/2016

*Motion for Expedited Briefing*

Ericsson requests an expedited briefing schedule and for Dell and Toshiba to provide redacted, non-confidential briefs in response to Ericsson's Motion for Relief from Protective Order.  The Court has ordered an expedited briefing schedule.  Docket No. 665.  Accordingly, Ericsson's requests concerning the briefing schedule are **DENIED AS MOOT**.  Additionally, Dell has agreed to provide a redacted response brief.  Docket No. 667.  Furthermore, the Court has denied Ericsson's underlying request for relief from the Protective Order.  Consequently, there is little, if any, benefit in ordering Toshiba to supply a redacted response brief.  Accordingly, Ericsson's request to require Toshiba to file a redacted brief is **DENIED**.

**So ORDERED and SIGNED this 20th day of December, 2013.**

**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

4

**A2092**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **ERICSSON. INC., ET AL.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | **CASE NO. 6:10-CV-473** |
| | § | |
| **D-LINK CORPORATION. ET AL.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## FINAL JUDGMENT PURSUANT TO FED. R. CIV. P. 54(b)

On September 14, 2010, Ericsson Inc. and Telefonaktiebolaget LM Ericsson ("Ericsson") filed this action against D-Link Corporation[1] and D-Link Systems, Inc. ("D-Link"), Netgear, Inc. ("Netgear"), Acer, Inc. and Acer America Corporation ("Acer") and Gateway, Inc. ("Gateway"). Ericsson filed an amended complaint on June 8, 2011. The amended complaint added the following defendants: Dell, Inc. ("Dell"); Toshiba Corporation, Toshiba America, Inc.,[2] Toshiba America Information Systems, Inc., and Toshiba America Consumer Products, LLC ("Toshiba"); and Belkin International, Inc. ("Belkin"). Intel Corporation ("Intel") intervened in this action on June 22, 2012, and Ericsson brought a counterclaim against Intel on July 3, 2012. The Court conducted an eight day trial beginning June 3, 2013. Final judgment is now appropriate because all issues between Ericsson and the Defendants have been finally resolved by either the jury or the Court's Memorandum Opinion and Order (Docket No. 615).

---

[1] The Court dismissed D-Link Corporation on January 31, 2011. Docket No. 54.
[2] The Court dismissed Toshiba America, Inc. and Toshiba America Consumer Products, LLC on August 16, 2011. Docket No. 120.

Broadcom v. Ericsson
IPR2013-00636
Ericsson Ex. 2018

**A2102**

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BROADCOM CORPORATION
Petitioner

v.

TELEFONAKTIEBOLAGET LM ERICSSON (PUBL)
Patent Owner

_____

Case IPR2013-00636
Patent 6,424,625
Title: Method and Apparatus For Discarding Packets In A Data Network Having
Automatic Repeat Request

_____

**DECLARATION OF ROBERT AKL, D.Sc.,
IN SUPPORT OF PATENT OWNER'S RESPONSE**

Broadcom v. Ericsson
IPR2013-00636
Ericsson Ex. 2020

**A2106**

Case IPR2013-00636

transmitter discarding all packets for which acknowledgement has not been received, and which have sequence numbers prior to the at least one packet" as recited by claim 1.

56.    Hettich discloses a design for a new link access protocol that "is based on known ARQ protocols and is adjusted to the special requirements of MBS [mobile broadband systems]." *Id.* at 5. Hettich implements an Adaptive Selective Repeat (ASR) ARQ protocol that is based on the Selective Repeat ARQ Protocol. *Id.* at 29. Similar to Garrabrant, Hettich discloses receivers having a "receive" window that maintains the sequence numbers of cells to be accepted. *Id.* at 28, eq. 5.7. To ensure that cells have a finite life span, "[a] Delay Timer is set in the sender to control the remaining lifecycle of the cells in the transmission window." *Id.* at 34. Hettich further discloses that "[i]f the time expires, the cell is discarded." *Id.* Hettich also discloses that "[i]f the cell was already being transmitted, the receiver must be informed that it was discarded." *Id.* "This information is transmitted using a Delay PDU [protocol data unit]." *Id.* Hettich discloses that the receiver is unaware of any cells discarded by the transmitter, unless and until the receiver requests a discarded cell. *Id.*

57.    The "Delay PDU is used to inform receivers that cells have been discarded." *Id.* The Delay PDU "is only sent if the receiver requested a discarded cell." *Id.* The Delay PDU represents the highest sequence number of the

31

**A2136**

Case IPR2013-00636

contiguous block of discarded cells. Specifically, Hettich discloses that "if the receiver receives a Delay PDU, it stops waiting for cells where the following applies for the number: N <= RN," where RN "is the highest number of the discarded cells," provided that "there cannot be valid (not discarded cells) with lower sequence numbers." *Id.* at 34-35. The receiver "then shifts the window and issues a corresponding acknowledgement." *Id.* This aspect is similar to Garrabrant, in which a valid window is moved in response to a received packet. The valid window determines which sequence numbers, and therefore which cells, the receiver can receive.

### 1. The Hettich Delay PDU commands a receiver to ignore, and not receive cells

58. Broadcom contends that Hettich discloses "commanding a receiver in the data network to a) receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet" because Hettich, § 5.2.4, describes that after "the receiver receives a Delay PDU, [and] it stops waiting for cells where the following applies for the number: N<=RN" and "moves its window forward." Pet. at 39. Although receipt of the Delay PDU causes Hettich's receiver to "stop[] waiting for cells," the Delay PDU does not "command" or "order" the receiver to accept any packet, as required by the claim language. Rather the Delay PDU is merely a delay command: the Delay PDU

32

Case IPR2013-00636

Delay PDU would merely release expectation of receiving outstanding packets having sequence numbers equal to or less than the sequence number of the *Delay PDU*, not packets having sequence numbers *prior to the out of sequence packet* as recited by claim 1.

61.    Broadcom argues that because a receiver, after receiving a Delay PDU, stops waiting for cells with sequence numbers less than or equal to RN, Hettich discloses commanding a receiver to release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet. (Pet. at 39, Paper 25 at 15). Even if this were true, the Delay PDU would merely release expectation of receiving outstanding packets having sequence numbers equal to or less than the sequence number of the Delay PDU, not sequence numbers prior to the out of sequence packet

62.    The Delay PDU provides no information about cells that have sequence numbers higher than the sequence number of the Delay PDU. For example, if the first cell received by the receiver after receipt of a Delay PDU has a sequence number that is not sequential to the Delay PDU (*i.e.*, the first cell received is out-of-order as compared to the sequence number referenced by the Delay PDU), then the receiver is either expecting or has received cells with sequence numbers between the discarded cells and that first received cell. A packet that a receiver is expecting to receive, such as "a packet that has been sent

34

**A2139**

Case IPR2013-00636

but not received or not correctly received" is an outstanding packet. '625 patent at 2:67-3:2. In other words, cells that have not been received (or not correctly received)—outstanding cells—may exist between the discarded cells associated with the Delay PDU and that first received cell. Accordingly, Hettich does not "release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet."

63.    I have been informed that Broadcom may argue that the sequence number of the first cell received after the Delay PDU command could be sequential to those numbers associated with the Delay PDU so that no outstanding cells would exist between the Delay PDU and that first received cell. But Hettich neither explicitly nor inherently discloses such a theory. Nor in my opinion would one of ordinary skill in the art understand Hettich to disclose such a theory because Hettich addresses efficient communication of packets. (Hettich at 26.)

64.    The aforementioned theoretical situation could only arise if a sufficient delay is inserted immediately between transmission of the Delay PDU to allow the receiver to (1) receive the Delay PDU, (2) shift its window appropriately, and (3) request the cell with the next sequential sequence number so that the very next cell placed in the transmit buffer after the Delay PDU, and thereafter transmitted, would be the cell with the next sequential sequence number. To do so would require ceasing loading additional cells into the transmit buffer upon placing

35

**A2140**

Case IPR2013-00636

a Delay PDU in the transmit buffer for transmission. Such a delay would dramatically decrease transmitter throughput and would eviscerate the stated efficiency advantages of the Hettich system. Moreover, even if the first non-sequential packet received corresponded to the last packet in a "burst," Hettich fails to address how the transmitter addresses transmission of information between bursts. Additional cells would be expected to be transmitted immediately after a burst, rather than halting transmission until the last transmitted cell has been acknowledged as Broadcom's theory requires. One of ordinary skill in the art would expect the transmitter in a high throughput system, immediately after transmitting a burst, to send a packet related to the next information to be transmitted, rather than waiting to retransmit the last packet. Accordingly, Hettich does not teach or suggest the "releasing" limitation.

65. Because the Hettich receiver can expect to receive outstanding packets between the discarded cells and the first received cell after reception of the Delay PDU, Hettich does not "release any expectation of receiving outstanding packets having sequence number prior to the at least one packet."

### 3. The transmitter in Hettich does not "discard all packets"

66. Hettich also does not disclose "the transmitter discarding all packets for which acknowledgement has not been received, and which have sequence numbers prior to the at least one packet," as recited by claim 1. Broadcom argues

36

**A2141**

Case IPR2013-00636

that Hettich § 5.2.4 discloses that "SN is the highest number of all of the discarded cells. Prerequisite for doing so is that the sender discard the cells in the proper order, i.e., there cannot be valid (not discarded) cells with lower sequence numbers." Hettich at 39. Yet this section of Hettich discloses that the Delay PDU addresses only a subset—not all—of the cells having sequence numbers less than the received cell (i.e., the recited at least one packet).

67.   Hettich is silent as to whether acknowledgment has been received for any of the non-discarded cells having sequence numbers between the Delay PDU and the next received out of order packet. This is fatal to Broadcom's position. Non-discarded cells not correctly received by the receiver and having sequence numbers higher than the sequence numbers referenced by the Delay PDU have not been acknowledged. Consequently, if the sequence number of the next packet received by the receiver is out-of-order compared to the Delay PDU, then any unacknowledged packets have not been discarded by the transmitter. Accordingly, the transmitter in Hettich may contain one or more non-discarded cells for which acknowledgement has not been received, and which have sequence numbers prior to the first cell that the receiver received after reception of the Delay PDU. Therefore, Hettich does not teach "the transmitter discarding all packets for which acknowledgement has not been received, and which have sequence numbers prior to the at least one packet."

37

**A2142**

| N - 2 | N - 1 | N | N + 1 | N + 2 |
|---|---|---|---|---|

**5.2.4   The *Delay* PDU**

The Delay PDU is used to inform receivers that cells have been discarded. It is only sent if the receiver requested a discarded cell (using RR or SREJ). In this case, the Delay PDU is sent in the opposite direction instead of an acknowledgement and *RN = SN*, in which *SN* is the highest number of all of the discarded cells. Prerequisite for doing so is that the sender discard the cells in the proper order, i.e. there cannot be valid (not discarded) cells with lower sequence numbers. For this reason, the number of the most recently discarded cell has the greatest informational value and may, under certain conditions, be sent instead of the requested cell.

*Hettich Translation (Ex. 1007)*

# United States Court of Appeals
# for the Federal Circuit

*WiFi One, LLC v. Broadcom Corporation*, No. 2015-1946

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by NELSON BUMGARDNER PC, attorneys for Appellant to print this document. I am an employee of Counsel Press.

On **March 10, 2016** counsel has authorized me to electronically file the foregoing **JOINT APPENDIX (confidential and non-confidential versions)**, with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

DOMINIC E. MASSA, ESQ.
KEVIN GOLDMAN, ESQ.
ZACHARY PICCOLOMINI, ESQ.
KATIE SAXTON, ESQ.
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
617-526-6000
dominic.massa@wilmerhale.com
kevin.goldman@wilmerhale.com
zachary.piccolomini@wilmerhale.com
kate.saxton@wilmerhale.com
*Attorneys for Appellee*

Additionally on this date, the confidential version will be emailed to the above counsel and paper confidential copies will also be mailed to the above principal counsel.

Upon acceptance by the Court of the e-filed document, six confidential paper copies will be filed with the Court within the time provided in the Court's rules.

March 10, 2016                                    /s/ Robyn Cocho
                                                 Counsel Press