**Nos. 15-1944, 15-1945, 15-1946**

# United States Court of Appeals for the Federal Circuit

WI-FI ONE, LLC,

*Appellant,*

v.

BROADCOM CORPORATION,

*Appellee,*

MICHELLE K. LEE, Director, U.S. Patent and Trademark Office,

*Intervenor.*

*Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in IPR-2013-00601, IPR2013-00602, IPR2013-00636*

**BRIEF OF *AMICUS CURIAE* BIOTECHNOLOGY INNOVATION ORGANIZATION (BIO) IN SUPPORT OF NEITHER PARTY**

Nathan Nobu Lowenstein
Kenneth Weatherwax
Jonathan H. Steinberg, *of counsel*
LOWENSTEIN & WEATHERWAX LLP
1880 Century Park East, Suite 815
Los Angeles, California 90067
Tel.: (310) 307-4500
Fax: (310) 307-4509
*Attorneys for* Amicus Curiae *Biotechnology Innovation Organization*

February 23, 2017

COUNSEL PRESS, LLC (888) 277-3259

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Wi-Fi One, LLC v. Broadcom Corporation

Case Nos. 2015-1944, -1945, -1946

**CERTIFICATE OF INTEREST**

Counsel for the:
☐ (petitioner) ☐ (appellant) ☐ (respondent) ☐ (appellee) ☒ (amicus) ☐ (name of party)

Biotechnology Innovation Organization ("BIO")

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held Companies that own 10 % or more of stock in the party |
|---|---|---|
| Biotechnology Innovation Organization | None | None |
| | None | None |
| | | |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

Nathan Nobu Lowenstein
Kenneth Weatherwax
Jonathan H. Steinberg
LOWENSTEIN & WEATHERWAX LLP

February 23, 2017
Date

/s/ Kenneth Weatherwax
Signature of counsel

Please Note: All questions must be answered

Kenneth Weatherwax
Printed name of counsel

cc:

# TABLE OF CONTENTS

***Page***

CERTIFICATE OF INTEREST .......................................................................i

TABLE OF AUTHORITIES .......................................................................iv

STATEMENT OF INTEREST OF *AMICUS CURIAE* ..........................................1

ARGUMENT .......................................................................................4

I. THIS COURT SHOULD HARMONIZE ITS PANEL DECISIONS INTERPRETING THE AIA'S APPEALABILITY PROVISIONS. ............6

A. *Achates* Is One Of A Series Of Panel Decisions Holding That Courts Cannot Enforce The AIA's Important Limits On PTO Authority. ..........................................................................7

B. *Achates*'s View That The PTO's Transgressions Of Its Statutory Limits Are Unreviewable Has Been Persistently Controversial. ............12

1. Five Judges Of This Court Have Called For Revisiting *Achates*. .....13

2. Many Panels Have Ignored Or Flouted *Achates*'s Reasoning. ..........14

II. *ACHATES*'S RATIONALE HAS BEEN REJECTED. ..............................19

A. In *Cuozzo*, The Supreme Court Repudiated *Achates*'s Rationale. .........19

1. The Supreme Court's Decision Displaces *Achates*'s Precedent. ........20

2. The Supreme Court Drew A Different Line Than *Achates*'s. ...........21

3. The Supreme Court's Reasoning Collides With *Achates*. .................23

B. *Magnum Oil* Confirms *Cuozzo*'s Repudiation Of *Achates*'s Rationale. ..........................................................................26

III. NO FLOODGATES WILL OPEN IF THE COURT ENFORCES THE PTAB'S STATUTORY LIMITS AS CONGRESS INTENDED. ......27

CONCLUSION..........30

CERTIFICATE OF SERVICE..........31

CERTIFICATE OF COMPLIANCE..........33

# TABLE OF AUTHORITIES

***Page(s)***

**CASES**


*Achates Reference Publishing, Inc. v. Apple Inc.*,
803 F.3d 652 (Fed. Cir. 2015), *cert. dismissed*,
136 S. Ct. 998 (2016) ........ *passim*

*Bartlett v. Bowen*,
816 F.2d 695 (D.C. Cir. 1987) ........ 22

*Bowen v. Mich. Academy of Family Physicians*,
476 U.S. 667 (1986) ........ 22, 24-25

*City of Arlington v. FCC*,
133 S. Ct. 1863 (2013) ........ 24

*Click-To-Call Techs., LP v. Oracle Corp.*,
2016 U.S. App. LEXIS 20592 (Fed. Cir. Nov. 17, 2016) (nonprecedential) ...... 14

*Cuozzo Speed Techs., LLC v. Lee*,
136 S. Ct. 2131 (2016), *aff'g In re Cuozzo Speed Techs., LLC*,
793 F.3d 1268 (Fed. Cir. 2015) ........ *passim*

*Ethicon Endo-Surgery, Inc. v. Covidien LP*,
812 F.3d 1023 (Fed. Cir. 2016), *reh'g denied, reh'g en banc denied*,
826 F.3d 1366 (Fed. Cir. 2016), *cert. denied*,
196 L. Ed. 2d 580 (2017) ........ 15

*Husky Injection Molding Sys. Ltd. v. Athena Automation Ltd.*,
838 F.3d 1236 (Fed. Cir. 2016) ........ 7, 12-14, 20, 24-27

*In re Cuozzo Speed Techs., LLC*,
778 F.3d 1271 (Fed. Cir.), *withdrawn and amended*,
793 F.3d 1268 (Fed. Cir. 2015), *aff'd sub nom.*
*Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131 (2016) ........ 8, 10

*In re Magnum Oil Tools Int'l, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016) .................................................. 17, 18, 19, 26, 27

*In re NuVasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016) .................................................................. 28

*Larrabee v. Derwinski*,
968 F.2d 1497 (2d Cir. 1992) ...................................................................... 28

*Shaw Industries Group v. Automated Creel Systems*,
817 F.3d 1293 (Fed. Cir. 2016), *cert. denied*,
137 S. Ct. 374 (2016)................................................................................. 10

*SightSound Techs., LLC v. Apple Inc.*,
809 F.3d 1307 (Fed. Cir. 2015), *cert. denied*,
85 U.S.L.W. 3344 (2017) ............................................................................ 10

*Synopsys, Inc. v. Mentor Graphics Corp.*,
814 F.3d 1309 (Fed. Cir. 2016) ........................................................ 13, 16, 17, 24

*Traynor v. Turnage*,
485 U.S. 535 (1988)............................................................................... 28, 29

*TriVascular, Inc. v. Samuels*,
812 F.3d 1056 (Fed. Cir. 2016) .................................................................. 15

*Versata Dev. Group, Inc. v. SAP Am., Inc.*,
793 F.3d 1306 (Fed. Cir. 2015), *cert. denied*,
136 S. Ct. 2510 (2016)......................................................................... 9, 10, 18

*Wi-Fi One, LLC v. Broadcom Corp.*,
837 F.3d 1329 (Fed. Cir. 2016), *vacated, reh'g en banc granted*,
Dkt. 67 (Fed. Cir. Jan. 4, 2017) ............................................................. 11, 13, 26

**STATUTES**

5 U.S.C. § 704 .......... 21

5 U.S.C. §§ 706(2)(A)-(D) .......... 25

35 U.S.C. § 314(a) .......... 21

35 U.S.C. § 314(d) .......... *passim*

35 U.S.C. § 315(b) .......... 4, 5, 6, 8, 10, 16, 29

35 U.S.C. § 318(a) .......... 29

35 U.S.C. § 319 .......... 26, 29

35 U.S.C. § 324(e) .......... 6, 7

35 U.S.C. § 329 .......... 26

**OTHER AUTHORITIES**

BRYAN A. GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT (2016) .......... 20-21

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

**The Biotechnology Innovation Organization** ("**BIO**") is the principal trade association representing the biotechnology industry. BIO has more than 1,100 members, which span the for-profit and non-profit sectors and range from small startup companies and biotechnology centers to research universities and Fortune 500 companies. Approximately 90 percent of BIO's corporate members are small or mid-size businesses with annual revenues of under $25 million.

Because modern biotechnological products commonly involve lengthy, resource-intensive development periods, BIO's members depend on a strong, stable, uniform system of patent rights and protections. According to a recent study, the average cost to discover, develop and pursue regulatory approval for a new drug (including projects that do not succeed) is $2.558 billion. These costs are greatest in the last stages of the drug's development. Without effective patent rights, these investments are difficult or impossible. Many of BIO's members devote years and millions of dollars to innovations protected by a single patent, leaving members especially vulnerable to the misapplication of patentability doctrines. In biopharma technology, compared to many other fields, vague patent claims and overbroad patent thickets are rare; patents are generally sought to protect exclusivity, not to extract industrywide royalties; and evaluating prior art combinations for obviousness purposes is an unusually sophisticated inquiry.

Patents have faced daunting odds in America Invents Act proceedings. According to the most recent available statistics, 63 percent of petitions to institute review in these proceedings are granted. Of patents that reach a final written decision after institution, over 80 percent have had at least some claims cancelled. Of those decisions from which appeals are taken and heard, over 90 percent are affirmed. AIA petitions have therefore been consistently popular with petitioners, with 5,656 filed in their first four years of existence. Biopharmaceutical patents are becoming an increasingly common target of petitions. The share of AIA petitions challenging biopharmaceutical patent claims has risen from 6 percent in 2014, to 9 percent in 2015, to 13 percent in 2016. Such petitions targeting biopharma patents are increasingly brought, not by fellow biopharma concerns who wish to compete, but by third parties such as hedge funds making market wagers by challenging a patent in an AIA petition while shorting the patent owner's (or licensee's) stock.

The majority opinion in the now-vacated panel decision in the present case would have left in place and extended a broad ban on judicial review of the PTO's exercise of its authority to institute review of issued patent claims in AIA proceedings. This Court's doctrine regarding preclusion of judicial review of such questions has led to continuing confusion among BIO's members (as well as other members of the public) regarding which matters this Court can review on appeal

from a final decision by the Board. Given the importance of patents to BIO's members and biopharmaceutical innovation, and the increasingly grave significance of AIA challenges to their patents, BIO's members have a strong interest in ensuring appropriate judicial review is available to ensure that the PTO's Patent Trial and Appeal Board acts consistently and predictably within its statutory and regulatory authority.

*Amicus* has no direct stake in the result of this appeal. No counsel for a party authored this brief in whole or in part, and no such counsel or party, nor any person other than *amicus curiae* or its counsel, made a monetary contribution intended to fund preparation or submission of this brief. This brief is solely the work of *amicus* and its counsel, and reflects *amicus's* organizational view, but not necessarily the view of any of its individual members. The Court's January 4, 2017 Order granting rehearing *en banc* (Dkt. 67) authorized and invited the filing of this brief.

*Amicus* takes no position on any other matters not expressly addressed herein.

## **ARGUMENT**

The Court has reinstated these appeals to consider *en banc* whether "judicial review is available for a patent owner to challenge the PTO's determination that the petitioner satisfied the timeliness requirement of 35 U.S.C. § 315(b) governing the filings of petitions for inter partes review" ("IPR"), contrary to the decision of a panel of this Court in *Achates Reference Publishing, Inc. v. Apple Inc.*, 803 F.3d 652 (Fed. Cir. 2015), *cert. dismissed*, 136 S. Ct. 998 (2016). Dkt. 67.

The Court should take this opportunity to explicitly overrule *Achates*, and to place this Court's interpretation of the judicial review provisions of the America Invents Act ("AIA") on sounder footing. The America Invents Act, the Supreme Court's rationale in *Cuozzo Speed Technologies, LLC v. Lee*, 136 S. Ct. 2131 (2016), and black letter principles of administrative law call for the availability of judicial review of the PTO's transgressions of AIA statutory provisions.

Petitioner has ably set forth the context and history of judicial review of the decisions of the PTO and other agencies, the strong presumption of reviewability of such determinations, and the changes Congress made in the America Invents Act to the statutory limits on such judicial review. Supplemental *En Banc* Brief Of Petitioner ("Pet. Supp. En Banc Br.") (Dkt. 81) at 13-21, 30. *Amicus* seeks to assist the Court by focusing on another flaw in how the *Achates* panel framed the issue of judicial reviewability.

*Achates* is one of a line of panel decisions of this Court that have broadly interpreted § 315(b) to preclude judicial review of ***all*** determinations by the PTAB regarding its authority (or lack thereof) to institute IPR of a patent claim based on a particular petition, and held that the PTAB's exercise of power is shielded from judicial correction so long as the PTO would have had the "ultimate authority" to institute IPR on that claim if presented with some other hypothetical petition, perhaps by a different party, or at a different time, or on a different record, or on different grounds. Meanwhile, another continuing line of panel decisions has not followed this broad interpretation of § 315(b) and had repeatedly held similar questions to be judicially reviewable. Even after the Supreme Court issued its decision in *Cuozzo*, analyzing reviewability based on a very different rationale than the one espoused by *Achates* and similar cases, panels of this Court (as well as individual judges within panels) have continued to disagree on the breadth of the PTAB's judicial immunity. This continuing confusion in the Court's decisions has led to continuing confusion among members of the public.

The Court should harmonize its understanding of the scope of judicial reviewability of PTAB decisions with that of the Supreme Court and Congress, and clarify its *en banc* view of the scope of § 315(b). By making clear that the limits on the PTO's authority are enforceable in individual IPR cases, the Court will not

unleash a flood of unintended consequences, but, rather, will simply be faithful to the guidance of the Supreme Court and the intent of Congress.

*Achates*'s rationale contradicts the AIA, has failed to lead to a predictable rule for the public, and has been superseded by the Supreme Court's decision in *Cuozzo*. The *en banc* Court should expressly overrule *Achates*, and hold that judicial review is available for a patent owner to challenge the PTO's determination that an IPR petition has satisfied the statutory limits placed on the institution of IPR under, *e.g.*, 35 U.S.C. § 315(b).

## I. THIS COURT SHOULD HARMONIZE ITS PANEL DECISIONS INTERPRETING THE AIA'S APPEALABILITY PROVISIONS.

This Court's interpretation of the "no appeal" provisions of the AIA, 35 U.S.C. §§ 314(d) & 324(e), has been a subject of persistent disagreement since the passage of the AIA. One line of panel decisions, including *Achates*, has applied an unsupportably narrow test for when PTAB determinations are judicially reviewable under those AIA provisions, and has continued to apply that test under a narrow view of the Supreme Court's decision in *Cuozzo* interpreting the same language. Another line of panel decisions has persistently disagreed with this rationale. These two lines of panel decisions have never become reconciled. The time is ripe for doing so.

### A. *Achates* Is One Of A Series Of Panel Decisions Holding That Courts Cannot Enforce The AIA's Important Limits On PTO Authority.

A series of decisions by panels of this Court have found that the AIA, 35 U.S.C. § 314(d) & 324(e), imposes a "broad ban on [judicial] review of the decision whether to institute," subject to only "narrow exceptions." *Husky Injection Molding Sys. Ltd. v. Athena Automation Ltd.*, 838 F.3d 1236, 1247 (Fed. Cir. 2016). To better understand *Achates*, it is instructive to trace this line of decisions.

According to these panels' view of § 314(d) (and therefore § 324(e)), the Patent Office has unreviewable discretion in how it decides any question "closely tied to [its] application and interpretation of statutes related to the Patent Office's decision to initiate" review, so long as the rule in question "simply limits the parties that may ask the tribunal for [the requested] evaluation" of a particular patent claim, and does not "foreclose ***all*** challenges to [the] patent's validity in that proceeding from [all members] of the general public." *Husky*, at 1243-44, 1247 (citations, emphasis and quotation marks omitted, emphasis added). Under this view, so long as the Office ***could*** have the "*ultimate authority*," based on "the patent challenged and the type of the review requested," to invalidate the particular patent claim in response to some other, hypothetical, idealized petition, the PTO may simply ignore that statutory limit if it wishes. *Id.* at 1243-44 (emphasis in original).

*Achates* exemplifies this line of panel decisions. *Achates* dismissed a patent owner's appeal of an IPR final written decision. 803 F.3d at 657. The patent owner had argued that the PTAB erred in holding that it had statutory authority under the time-bar provisions of § 315(b) to grant the IPR on the facts of the case. *Id.* The *Achates* panel dismissed the appeal for lack of jurisdiction, holding that the question was not judicially reviewable because "the § 315(b) time bar does not impact the Board's authority to invalidate a patent claim." *Id.* That is, according to the panel, even if it were true that the PTAB had erred in holding that § 315(b) by its terms permitted IPR in that case, the PTAB's determination was still unappealable because "[t]he Board may still invalidate a claim challenged in a time-barred petition via a properly-filed petition from another petitioner," had such "a properly-filed petition from another petitioner" hypothetically been filed. *Id*.

*Achates* was not the first panel decision to espouse such an interpretation of this statutory language. The notion apparently first arose in the original *Cuozzo* panel decision. There, the majority of the divided panel dismissed the patent owner's appeal from an IPR for lack of jurisdiction under § 314(d). *In re Cuozzo Speed Techs., LLC*, 778 F.3d 1271, 1277 (Fed. Cir.), *withdrawn and amended*, 793 F.3d 1268 (Fed. Cir. 2015), *aff'd sub nom. Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131 (2016). The panel majority reasoned that, even if the patent owner were correct that the PTAB had erred in finding the statutory requirements

satisfied, "[t]he fact that the petition was defective is irrelevant because a proper petition ***could have been*** drafted." *Id*. at 1274 (emphasis added). The *Cuozzo* panel cited almost no case law for this novel approach to evaluating the appealability of agency action.

Shortly after the original *Cuozzo* panel decision was filed, a second divided panel in *Versata Development Group, Inc. v. SAP America, Inc.*, 793 F.3d 1306 (Fed. Cir. 2015), *cert. denied*, 136 S. Ct. 2510 (2016), characterized the *Cuozzo* majority's reasoning as resting on the PTAB's "ultimate authority to invalidate" if only "[a] proper petition" had been drafted and filed instead:

> [The panel in] *Cuozzo* did not address, and had no occasion to address, the question whether (despite § 314(d)) a final written decision can be reviewed for compliance with a limit on the PTAB's invalidation authority. Recognizing the distinction between initiation and final invalidation, the court ruled only on review of the initiation decision itself, not about whether the final decision breached any limit on invalidation authority. . . . The challenge was simply that the IPR petition at issue had not cited particular prior art the PTAB ultimately relied on for invalidation. ***A proper petition*** undisputedly could have cited it, thereby plainly ***giving the PTAB authority to invalidate*** the patent at issue in the IPR**.** The alleged error in initiation was 'irrelevant' . . . . The court in [the original] *Cuozzo* [panel decision] did not rule on or have before it an asserted violation of a limit on the PTAB's ***ultimate authority to invalidate*** that could not have been cured by a proper pleading.

*Versata*, 793 F.3d at 1322 (citations, internal quotation marks, paragraph break, and footnote omitted) (quoting *Cuozzo*, 778 F.3d at 1277 (withdrawn opinion)).

In *SightSound Technologies, LLC v. Apple Inc.*, 809 F.3d 1307 (Fed. Cir. 2015), *cert. denied*, 85 U.S.L.W. 3344 (2017), the panel relied on *Achates* to dismiss another patent owner's appeal challenging the PTAB's authority to institute IPR. According to the *SightSound* panel, under *Achates*

> a challenge based on a defect in the initiation that could have been cured by a proper pleading is not reviewable. Only limitations on the Board's authority to issue a final decision are subject to review.

*Id.* at 1313 (citation omitted).

Additionally, in *Shaw Industries Group v. Automated Creel Systems*, 817 F.3d 1293 (Fed. Cir. 2016), *cert. denied*, 137 S. Ct. 374 (2016), the patent owner "challenge[d] the Board's decision that [an] IPR was not barred pursuant to 35 U.S.C. § 315(b)," arguing that it was "not challenging the Board's institution decision but rather the Board's interpretation of § 315(b)." *Id.* at 1301. The divided panel dismissed that part of the appeal, holding that,

> based on *Achates*, we lack jurisdiction to review this aspect of the Board's decision. We note that the Supreme Court's decision to grant certiorari as to the second question in *Cuozzo* . . . may affect this court's holding regarding the reviewability of the decision to institute in *Achates*. As of now, we are constrained by our earlier precedent.

*Id.*

The Supreme Court's decision in *Cuozzo* came and went, and panels have continued to employ *Achates* reasoning after the Supreme Court's decision. The first to hold that the Supreme Court's decision did ***not*** affect the rationale of *Achates* was the now-vacated panel decision in this case, about three months after the Supreme Court's decision. 837 F.3d 1329 (Fed. Cir. 2016).

In the vacated panel opinion, the panel majority ruled that *Achates* effectively survived *Cuozzo* unchanged. *Id*. at 1334. The majority could find nothing in the Supreme Court's decision "that casts doubt on" *Achates*'s "reasoning" that the question of judicial reviewability turns on "the Board's ultimate authority to invalidate." *Id.* at 1335. According to the panel majority, under the *Cuozzo* Supreme Court decision, whether the challenge is related to the question of reviewability on the merits remains irrelevant. *Id.* at 1334. Board practice, and specifically the fact that "Board practice allows parties to argue [time-bar] issues at trial," is also irrelevant: the fact "[t]hat the Board considered the time-bar in its final determination does not mean the issue suddenly becomes available for review." *Id.* at 1335 (citation omitted). Therefore, reasoned the panel majority, any question not going to the Board's "ultimate authority to invalidate" remains judicially unreviewable, even if it is turns on an express statutory bar to institution that has nothing to do with the merits—just as was the case before the Supreme Court's decision. *Id*.

Nor, according to the vacated panel decision, had the Board engaged in "shenanigans" of the sort the Supreme Court said would be appealable. Even if the PTAB had erred in finding no time bar, or in denying discovery on the question, or both, according to the majority, "the entire thrust of the [Supreme Court's] *Cuozzo* decision" was that issues like the sufficiency of showings of time bars, or showings sufficient to permit discovery of evidence on dispositive jurisdictional issues like time bars, are generally immune from review or enforcement. *Id.*

Subsequently, yet another deeply divided panel, in *Husky Injection Molding Systems v. Athena Automation Ltd.*, 838 F.3d 1236 (Fed. Cir. 2016), relying on the now-vacated panel decision in this case, reaffirmed *Achates*'s "ultimate authority"-under-a-properly-filed-petition rationale. *Id.* at 1246-47.

In sum, according to this line of panel decisions, (i) the PTO's application or misapplication of the statutory limits on its institution of IPR is generally immune from judicial review, so long as any other petition filed by any other possible petitioner hypothetically could have satisfied those limits; and (ii) the Supreme Court's decision in *Cuozzo* left this rule undisturbed.

### B. *Achates*'s View That The PTO's Transgressions Of Its Statutory Limits Are Unreviewable Has Been Persistently Controversial.

The panel decisions following the reasoning of *Achates*, despite their number, have failed to yield a predictable or navigable rule. Their broad interpretation of the appeal bar of § 314(d) has been criticized by numerous

members of this Court, has often generated spirited dissents from their reasoning, and (as one of those dissents observed) has generated "confusion regarding which matters this court can review on appeal from a final decision by the Board." *Husky Injection Molding*, 838 F.3d at 1249 (Plager, J., concurring-in-part and dissenting-in-part). Among those who regularly express such confusion are many of BIO's members with patent rights in the biotechnology industry.

Furthermore, not only have these decisions often been divided, *see supra* Section I, but another, equally persistent line of panel decisions have followed a different rationale, and reached and reviewed issues on appeal that are difficult to square with *Achates*'s sweeping reasoning. This lack of consistency is harmful and has only added to the public's confusion.

**1. Five Judges Of This Court Have Called For Revisiting *Achates*.**

At least five judges of this Court have publicly called for the Court to revisit whether *Achates*'s reasoning remains good law. In the now-vacated panel decision in the present case, Judge Reyna wrote separately to disagree with the majority's reaffirmance of *Achates*'s rationale. 837 F.3d at 1340 (Reyna, J., concurring). Judges Plager and Newman have likewise written separately to register disagreement with this reasoning, both before the Supreme Court issued its decision in *Cuozzo*, *see Synopsys, Inc. v. Mentor Graphics Corp.*, 814 F.3d 1309, 1326 (Fed. Cir. 2016) (Newman, J., dissenting) ("The non-appealability of the

institution determination should not mean that substantive rulings material to the final decision or to the propriety of the entire proceeding are immunized on review of the final decision, if such aspects arose at the institution phase," such as, *e.g.*, "whether certain prior patent litigation is a statutory or jurisdictional bar"), and after it, *see Husky Injection Molding*, 838 F.3d at 1249 (Plager, J., concurring-in-part and dissenting-in-part). In addition, Judge O'Malley has called for *en banc* review of whether the "reasoning in *Achates*" survived "the Supreme Court's language in *Cuozzo*," and Judge Taranto has concluded "that *Achates* is incorrect." *Click-To-Call Techs., LP v. Oracle Corp.*, 2016 U.S. App. LEXIS 20592, at *6 (Fed. Cir. Nov. 17, 2016) (nonprecedential) (O'Malley, J., concurring in judgment), and *27 (Taranto, J., concurring). The disagreement goes deeper, for numerous other judges of this Court have written or joined other panel decisions that do not follow the rationale of these panel decisions. *See infra* Section II.

**2. Many Panels Have Ignored Or Flouted *Achates*'s Reasoning.**

Appellee Broadcom Corp. has suggested that *Achates* should be considered settled law because its reasoning has continued to be used, and even expanded upon, in other later cases. Response Br. of Appellee, Dkt. 65, at 2. In fact, numerous other panels have declined to follow or cite *Achates* at all, and have seemingly had no difficulty finding similar issues reviewable on appeal. These cases are exceedingly difficult to reconcile with *Achates* and its progeny.

In *Ethicon Endo-Surgery, Inc. v. Covidien LP*, 812 F.3d 1023 (Fed. Cir. 2016), *reh'g denied*, *reh'g en banc denied*, 826 F.3d 1366 (Fed. Cir. 2016), *cert. denied*, 196 L. Ed. 2d 580 (2017), a divided panel held that it had jurisdiction to decide an appeal challenging the PTO Director's delegation to the PTAB of the decision whether to institute IPR. Although the challenge was based on the PTO's adherence to Section 314 itself—the very section that the *Cuozzo* and *Achates* panels had interpreted to broadly bar appeal—the *Ethicon* majority reasoned that the patent owner's challenge to the Director's delegation of authority to the PTAB "d[id] not challenge the institution decision, but rather alleges a defect in the final decision"—namely, "that the final decision is invalid because it was made by the same panel that instituted" review—and that therefore the unappealability provision in "Section 314(d) does not prevent us from hearing a challenge to the authority of the Board to issue a final decision." *Id.* at 1029. The *Ethicon* panel majority attempted to distinguish the *Cuozzo* panel decision, but it did not even mention *Achates*. *Id.* Nor did it explain how the time-bar challenge found to be unappealable in, for example, *Achates* was not equally "a challenge to the authority of the Board to issue a final decision" canceling the patent claims in that case. There is no immediately apparent way to readily reconcile the two holdings.

Next, in *TriVascular, Inc. v. Samuels*, 812 F.3d 1056 (Fed. Cir. 2016), the panel held that "the Board is not bound by any findings made in its Institution

Decision" because they are "preliminar[y]" and made "without the benefit of a full record." *Id.* at 1068. Such preliminary findings could not diminish an aggrieved patent owner's rights to review of the final decision in the IPR, the panel reasoned, because if "any findings made in [the Board's] Institution Decision . . . were somehow binding with respect to the Board's final decision, . . . the patentee's appeal rights as to that second determination would be close to illusory." *Id.* The panel did not mention any of the *Achates* line of cases, or explain how their holding that such findings were unappealable could be reconciled with its holding that such were "preliminary" and could not diminish "the patentee's appeal rights" on these questions. *Id.*

In *Synopsys, Inc. v. Mentor Graphics Corp.*, 814 F.3d 1309 (Fed. Cir. 2016), another divided panel held that it was bound by *Achates*'s determination "that the PTO's decisions concerning the § 315(b) time bar, including determinations of the real party in interest and rulings on discovery related to such determinations, are non-appealable," *id.* at 1323—but that it ***could*** hear an appeal challenging the PTAB's conclusion that it had the statutory authority to institute review on fewer than all claims challenged in the petition, *id.* at 1314. The panel reasoned that this latter issue had not been before the Court in *Achates*, and that, although "[t]he decision of the Board to institute inter partes review cannot be appealed" at any time, the appeal in *Synopsys* "d[id] not challenge the decision to institute but rather

the ***scope*** of the final decision itself." *Id.* (emphasis added, citation omitted).[1] As in prior decisions in this line of cases, the panel provided no clear explanation why decisions such as *Achates* itself did not also, equally, involve a challenge to "the scope of the final decision itself" by virtue of challenges to institution of review.

Finally, following the Supreme Court's decision in *Cuozzo*, a unanimous panel in *In re Magnum Oil Tools International, Ltd.*, 829 F.3d 1364 (Fed. Cir. 2016), considered whether it had appellate jurisdiction to review the propriety of the PTAB's *sua sponte* adoption in its institution decision of "an obviousness argument on behalf of" the petitioner that the petitioner had not raised as a proposed ground of review. The panel concluded that it ***could*** review this issue on appeal, and overturned the Board's determination. *Id.* at 1373-74. Despite the fact that *Achates* had held, prior to the Supreme Court's decision in *Cuozzo*, that the mere circumstance "[t]hat the Board considered [a procedural limit] in its final determination does not mean the issue suddenly becomes available for review or that the issue goes to the Board's ultimate authority to invalidate," *Achates*, 803

[1] Judge Newman dissented from the dismissal of the time-bar appeal issue, arguing that "[i]t is unlikely that such issues material to statutory compliance—issues of privity, standing, and jurisdiction—were intended to be excluded from appellate review." *Id.* at 1339.

F.3d at 658, *Magnum Oil* interpreted the Supreme Court's reasoning in *Cuozzo* to support its conclusion that "we have jurisdiction to review determinations made during institution that are subsequently incorporated into the Board's final written decision." 829 F.3d at 1374. "Nothing in either 35 U.S.C. § 314(d) or *Cuozzo Speed Tech[nologie]s[]* shields aspects of the Board decision which are critical to its ultimate judgment merely because its final analysis relies on statements made when it initially considered the petition." *Id.* Despite the fact that other panels had reasoned, before the Supreme Court's decision, that the PTAB's *sua sponte* citation of prior art in IPR institution decisions was immune from judicial review because "[a] proper petition undisputedly could have cited it, thereby plainly giving the PTAB authority to invalidate the patent at issue in the IPR," *Versata*, 793 F.3d at 1322, *Magnum Oil* held, seemingly to the contrary, that it was consistent with the Supreme Court's decision for this Court to review, and overturn as *ultra vires*, the Board's making of an "obviousness argument on behalf of [petitioner]." *Id.* at 1380 (citing *Cuozzo*, 136 S. Ct. at 2144). *Magnum Oil* even explicitly considered whether the Board's *sua sponte* adoption of this ground should be left undisturbed under the now-superseded *Cuozzo* panel decision on the basis that the ground "'could have been included in a properly-drafted petition,'" *id.* (quoting *Cuozzo*, 793 F.3d at 1275), and squarely rejected that notion, *id.*

Thus, *Achates* has failed to produce a consistent binding rule.

## II. *ACHATES*'S RATIONALE HAS BEEN REJECTED.

*Achates*'s doctrinal instability is unsurprising, because its reasoning was flawed. The PTO's "ultimate authority" to revisit its grant of a patent in ***hypothetical*** circumstances should not be the test for whether its assertion of statutory authority to do so is judicially reviewable in a particular ***non***-hypothetical proceeding. The Supreme Court's decision in *Cuozzo* made this clear, for the Supreme Court did not follow the line *Achates* drew. In fact, the reasoning employed by the Supreme Court casts grave doubt on whatever support remains for the unusual line *Achates* drew between what is and is not appealable.

As discussed above, *Magnum Oil* was this Court's first panel decision to interpret the Supreme Court's decision, and therefore binding precedent for later panels (including the one in this case) on the meaning of *Cuozzo*. *Magnum Oil* made clear that the Supreme Court's decision undermined *Achates*'s remaining doctrinal support. Nevertheless, the now-vacated panel decision in this case improperly ignored *Magnum Oil*, and came to conclusions inconsistent with it.

### A. In *Cuozzo*, The Supreme Court Repudiated *Achates*'s Rationale.

In *Cuozzo*, the Supreme Court applied § 314(d) in a way that is difficult at best to reconcile with *Achates*'s "ultimate authority" test of judicial unreviewability. The Supreme Court never reviewed *Achates* directly. A petition for certiorari was filed in the case, but it was dismissed pursuant to settlement just

before the Court was to take it under consideration. 136 S. Ct. 998 (2016). However, while the Supreme Court did not have the opportunity to review *Achates* directly, it contemporaneously granted review in *Cuozzo*, which also addressed the scope of reviewability under the AIA. The Supreme Court did not adopt the rationale of the *Cuozzo* panel—the forerunner of *Achates*'s rationale—and instead applied a quite different framework. Although the divided *Husky* panel and the divided (and now-vacated) panel in this case later applied *Achates* as if the Supreme Court's decision had embraced its rationale, the Supreme Court, in fact, undermined it.

### 1. The Supreme Court's Decision Displaces *Achates*'s Precedent.

*Achates* relied on the original *Cuozzo* panel decision for its reasoning. The Supreme Court's grant of certiorari and opinion in that case has weakened the precedential force of the *Cuozzo* panel decision, even though its judgment was affirmed. "If an appellate court with discretionary review—such as the U.S. Supreme Court . . . grants review in a case, the authority of the decision under review is weakened. . . even if the judgment is affirmed, because the higher court's opinion will displace the lower court's as the authoritative law on the issues under review (though the lower-court decision may remain good law for points not raised before or addressed by the higher court)." BRYAN A. GARNER ET AL., THE LAW OF

JUDICIAL PRECEDENT 260 (2016). *Achates* cannot lean on the affirmance of the judgment in *Cuozzo* for support.

**2. The Supreme Court Drew A Different Line Than *Achates*'s.**

The Supreme Court did not merely displace the panel decision in *Cuozzo*. The Supreme Court conspicuously declined to embrace the novel hypothetical-petition or "ultimate authority" test that the *Cuozzo* and *Achates* panels employed. Instead, the Supreme Court drew a different line between reviewable and unreviewable issues under § 314(d).

According to the Supreme Court, the issues appealable under § 314(d) include allegations that the agency in "effect" "***substantially*** departed from ***important*** procedural rights," or "act[ed] outside its statutory limits"; as well as allegations of "due process problem[s]," caused by, for example, "a petition fail[ing] to give 'sufficient notice'" of the grounds of the challenge. *Cuozzo*, 136 S. Ct. at 2141 (emphasis added, alterations and citations omitted). On the other hand, the issues ***un***appealable under § 314(d) include "***minor***" and "***ordinary*** dispute[s] about the application" of statutory provisions that are "closely related to" the Director's "'preliminary'" or "initial determination" that "'the information presented in the petition'" shows "a 'reasonable likelihood' that the claims are unpatentable ***on the grounds asserted***," *id.* at 2139-41 (emphases added, quoting 5 U.S.C. § 704 and 35 U.S.C. § 314(a) respectively). The Supreme Court made no

mention at all of hypothetical petitions or whether the PTAB had "ultimate authority" to review the patent claims in the IPR under a different set of facts than those actually in the case.

Instead of drawing a line between "ultimate authority" and lack thereof, the Supreme Court drew a line between substantial departures from important rights or limits on authority, which are reviewable under § 314(d), and "minor" or "ordinary" disputes closely related to the fact-dependent initial determination regarding likely unpatentability, which are not reviewable under § 314(d). While the Supreme Court left it to later cases to flesh out these distinctions, in judicial interpretation of statutes limiting appeal rights from agency decisions, there is nothing unusual about drawing such a line between "substantial" and "minor" questions. The Supreme Court and others have drawn such lines for decades. *See, e.g. Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 680 & n.11 (1986) (stating that Congress had precluded judicial review of agency's determinations on "trivial" or "minor matters" such as "*determinations* of [particular] amounts of benefits," but not review of "substantial statutory . . . challenges" such as the "*method* by which [benefit] amounts are determined" across multiple cases) (emphases in original); *Bartlett v. Bowen*, 816 F.2d 695, 701 (D.C. Cir. 1987) (per Edwards, J.) (holding that Medicare Act was enacted "as a unified scheme to protect the federal courts from overload by having *all* statutory

questions decided first by the Secretary and by permitting only those *non-trivial* statutory decisions to be passed on to the courts") (emphases in original).

### 3. The Supreme Court's Reasoning Collides With *Achates*.

It is hardly surprising that the Supreme Court's opinion made no mention of the difference (relied on heavily by the now-displaced *Cuozzo* panel decision) between the "ultimate authority" to institute review of a claim based on a hypothetical "properly-filed" petition and the authority to institute review of a claim based on the particular patent before the PTAB. Aside from the *Achates* line of decisions, such a test for appealability appears virtually absent from the pages of American common-law jurisprudence. And the "ultimate authority" test also makes little sense, because it would render the statutory limits a nullity under the AIA's structure if the PTO so chose—thus clashing with the Supreme Court's assurance that § 314(b) does not "enable the agency to act outside its statutory limits." *Cuozzo*, 136 S. Ct. at 2141.

The "ultimate authority" test is tantamount to holding that the detailed procedural limits in the AIA on IPR and CBM review are unenforceable. These provisions are, however, on their face limitations on the agency's statutory authority. Therefore, if the procedural limits on the agency's authority were to be committed to the agency's unreviewable discretion, such an interpretation of the AIA would have the effect of figuratively consigning the henhouse to the fox. The

Supreme Court has counseled against such an interpretation, and, on the contrary, indicated that strong judicial policing of agency authority is precisely the way to avoid such undesirable consequences. *See City of Arlington v. FCC*, 133 S. Ct. 1863, 1874 (2013) ("The fox-in-the-henhouse syndrome is to be avoided . . . by taking seriously, and applying rigorously, in all cases, statutory limits on agencies' authority.").

The AIA's express statutory "procedural limits," *Husky*, 838 F.3d at 1244, are there for a reason. They are express statutory limits on the agency's authority to act, which Congress added to attract votes for the bill that became law as the AIA. They are not illusory, and are not simply guidelines to be dispensed with at the Patent Office's immunized discretion if it thinks a patent needs canceling.[2]

Finally, the Supreme Court's guidance and line-drawing must be interpreted in light of the "'strong presumption that Congress intends judicial review of administrative action'" that the Supreme Court recognized. *Synopsys*, 814 F.3d at 1339-40 (Newman, J., concurring-in-part and dissenting-in-part) (quoting *Bowen*,

[2] Indeed, as the Supreme Court itself pointed out, if the PTO concludes on its own initiative that a patent needs canceling, "the Director of the Patent Office can, on her 'own initiative,' trigger" reexamination on any substantial new questions of patentability she chooses. *Cuozzo*, 136 S. Ct. at 2137.

476 U.S. at 670); *Cuozzo*, 136 S. Ct. at 2140. In *Cuozzo* the Supreme Court did not purport to impose a broad ban on appealability subject to narrow exceptions.[3] Rather, the Supreme Court limited its holding of unappealability to "the kind of mine-run," "minor statutory technicality" before it in that case, leaving further development of the scope of judicial review for later cases, and emphasizing that § 314(d) should not be interpreted to "enable the agency to act outside its statutory limits . . . in inter partes review," or to block review "under the Administrative Procedure Act" under "5 U.S.C. §§ 706(2)(A)-(D)," *Cuozzo*, 136 S. Ct. at 2136, 2140-42.[4] However, later decisions of this Court flesh out the Supreme Court's framework, whether by concluding that the most meaningful distinction between "substantial" or "important" reviewable issues and "minor" or "mine-run" unreviewable issues is the distinction between merits determinations (such as legal sufficiency of the grounds presented) and jurisdictional or other limits to whether

---

[3] *Compare Husky*, 838 F.3d at 1331 (holding that § 314(d) imposed "broad ban on review of the decision whether to institute" subject to "narrow exceptions").

[4] Section 706 is a provision of the Administrative Procedure Act that enables reviewing courts to "set aside agency action" that is, *e.g.*, "in excess of statutory jurisdiction," or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(C), (D).

the Board should hear the case (such as time bar, estoppel, etc.), or on some other basis, this Court should not apply a thumb in the scale in favor of a broad ban on review, *see, e.g.*, *Husky*, 838 F.3d at 1247, but instead the other way around.[5]

**B. *Magnum Oil* Confirms *Cuozzo*'s Repudiation Of *Achates*'s Rationale.**

The now-vacated panel majority opinion in this case analyzed the impact of the Supreme Court's decision in *Cuozzo* as a matter of first impression. 837 F.3d at 1334-35. It failed to address the Supreme Court's statement that questions of whether the agency is "act[ing] outside its statutory limits," such as the time bar in a particular case, are appealable. *Cuozzo*, 136 S. Ct. at 2141. Nor did it even mention the Supreme Court's drawing of a distinction between "minor statutory technicalit[ies]" versus "substantial" statutory or constitutional questions. *Id.* at 2140. Based on this questionable analysis, the vacated panel majority concluded that nothing in the Supreme Court's decision "casts doubt on" the *Achates* panel's "reasoning" that judicial reviewability turns on "the Board's ultimate authority to invalidate." *Wi-Fi One*, 837 F.3d at 1335. However, the panel failed to acknowledge that, in *Magnum Oil*, this Court had already interpreted the Supreme

[5] Moreover, in the AIA there is not only a nonreviewabilty provision but a broad, unencumbered, ***reviewability*** provision. 35 U.S.C. §§ 319 & 329. Whether under *Cuozzo* or under elementary principles of administrative law, the tension between these provisions should not be resolved by favoring ***un***appealability.

Court's decision, and had come to dramatically different conclusions about its teachings.[6] That prior decision should have been followed by the panel in this case. As discussed above, it suggests that the scope of appealability may be quite different under the Supreme Court's reasoning than under *Achates*'s. *See supra* Section I-B.2.

## III. NO FLOODGATES WILL OPEN IF THE COURT ENFORCES THE PTAB'S STATUTORY LIMITS AS CONGRESS INTENDED.

There is no danger that judicial review of the PTAB's exercise of authority in institution determinations will interfere with the just administration of the patent laws.

First, it should be noted that the arrival of numerous appeals of PTAB decisions in AIA proceedings is not an untoward or unintended result. The consolidation of appeal rights from PTO proceedings that were previously available in multiple courts into this Court was just what Congress intended when it drafted the AIA. *See* Pet. Supp. En Banc Br. at 25-26. The AIA is hardly the first statute in which Congress has broadened its preclusion of appeals from agency

[6] The later divided panel in *Husky*, 838 F.3d 1236, for its part, follows the now-vacated divided panel decision in this case—yet still fails to mention the precedential decision in *Magnum Oil*.

proceedings, previously available in multiple federal courts, and consolidated appeal rights so that all appeals "must be pursued within the appellate mill" of "the Federal Circuit" alone. *Larrabee v. Derwinski*, 968 F.2d 1497, 1501 (2d Cir. 1992). Indeed, for example, the Veterans' Judicial Review Act, which consolidated "for the first time[] judicial review of veterans' benefits determinations in the Federal Circuit," was simply "Congress's response" to the Supreme Court's "reluctance," in *Traynor v. Turnage*, 485 U.S. 535, 545 (1988), "to construe the [Rehabilitation Act] as barring judicial review of substantial statutory and constitutional claims" arising from agency administrative determinations—applying, coincidentally, the very same presumption of reviewability invoked in *Cuozzo*. *Larrabee*, 968 F.2d at 1501.

Second, it should also be noted that the PTAB's decisions are already partially insulated from judicial review by the limited standard of review they enjoy. Because the PTAB is an arm of the government, its factual determinations are subject to only substantial-evidence review. *See, e.g.*, *In re NuVasive, Inc.*, 842 F.3d 1376, 1379 (Fed. Cir. 2016), citing *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000).

Third, it cannot be assumed that permitting review of PTAB determinations that burden substantial rights "will enmesh the courts in . . . technical or complex determinations or applications of" patent law or policy connected with Board

decisions, or "burden the courts and the [PTO] with expensive and time-consuming litigation." *Traynor v. Turnage*, 485 U.S. 535, 544-545 (1988) (cited by Supreme Court in *Cuozzo*). Such reviewable questions involving substantial rights of parties, such as the § 315(b) time-bar, are precisely those where the PTO would not be expected to have any special expertise. *See id.* And even, "[o]f course, if experience proves otherwise," and the PTO considers appeals to substantially increase its workload, "the [PTO] is fully capable of seeking appropriate relief from Congress." *Id*.

Fourth, the number of appeals are further limited by the fact that they may only arise from appeals from final written decisions. 35 U.S.C. § 319 ("A party dissatisfied ***with the final written decision*** of the Patent Trial and Appeal Board under section 318(a) may appeal…") (emphasis added). Consequently, overruling *Achates* would not open up the floodgates to either interlocutory appeals of institution decisions or appeals of non-institution decisions.

## CONCLUSION

The *en banc* Court should make clear that the particular petition before the Board is the measure of its statutory authority in each IPR case—not the "ultimate authority" of the Patent Office in the presence of another, hypothetical petition. The Court should make clear that, consistent with the statute and the Supreme Court's guidance, any reasoning to the contrary in past cases, including *Achates*, is overruled.

Respectfully submitted:

/s/ Kenneth Weatherwax
Kenneth Weatherwax
Nathan Lowenstein
Jonathan H. Steinberg
LOWENSTEIN & WEATHERWAX LLP
1880 Century Park East, Suite 815
Los Angeles, CA 90067
Tel.: (310) 307-4500
Fax.: (310) 307-4509
*Counsel for Amicus Curiae Biotechnology Innovation Organization*

**United States Court of Appeals**
**for the Federal Circuit**

*Wi-Fi One, LLC v Broadcom Corporation*, 2015-1944, -1945, -1946

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by LOWENSTEIN & WEATHERWAX LLP, Attorneys for Amicus Curiae to print this document. I am an employee of Counsel Press.

On **February 23, 2017,** counsel has authorized me to electronically file the foregoing **Brief of Amicus Curiae** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including the following principal counsel for the parties:

Dominic E. Massa
Wilmer Cutler Pickering Hale
and Dorr LLP
60 State Street
Boston, Massachusetts 02109
617-526-6000
dominic.massa@wilmerhale.com
Principal Counsel for Appellee

Nathan K. Kelley
U.S. Patent and Trademark Office
Office of the Solicitor
PO Box 1450, Mail Stop 8
Alexandria, VA 22313
571-272-9035
nathan.kelley@uspto.gov
Principal Counsel for Intervenor

G. Donald Puckett
NELSON BUMGARDNER PC
3131 West 7th Street, Suite 300
Fort Worth, TX 76107
817-377-9111
puckett@nelbum.com
Principal Counsel for Appellant

Paper copies will also be mailed to the above principal counsel on this date.

All counsel for Amicus Curiae, appearing at the time of this filing, will also be served via CM/ECF notice.

Thirty paper copies will be filed with the Court within the time provided in the Court's rules.

February 23, 2017

/s/ Robyn Cocho
Robyn Cocho
Counsel Press

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(c)(5).

   X The brief contains 6,807 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

   __ The brief uses a monospaced typeface and contains _ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

   __X_ The brief has been prepared in a proportionally spaced typeface using MS Word 2013 in a 14 point Times New Roman font or

   __ The brief has been prepared in a monospaced typeface using _____ _in a ___characters per inch______ font.

February 23, 2017

/s/ Kenneth Weatherwax
Kenneth Weatherwax
*Counsel for Amicus Curiae BIO*