Nos. 2015-1944, -1945, -1946

---

# United States Court of Appeals for the Federal Circuit

---

WI-FI ONE, LLC,
*Appellant*,
v.

BROADCOM CORPORATION,
*Appellee*,

MICHELLE K. LEE, DIRECTOR, U.S. PATENT AND TRADEMARK OFFICE,
*Intervenor*.

---

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in IPR2013-00601, IPR2013-00602, IPR2013-00636

---

## BRIEF OF *AMICUS CURIAE* WESTERNGECO LLC IN SUPPORT OF APPELLANT

---

Sean D. Jordan
JACKSON WALKER L.L.P.
100 Congress Ave., Suite 1100
Austin, Texas 78701
[Tel.] (512) 236-2281
[Fax] (512) 391-2101
*sjordan@jw.com*

COUNSEL FOR AMICUS CURIAE

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rules 29 and 47.4, counsel for *amicus curiae* WesternGeco LLC certifies the following:

1. **The full name of every party or amicus represented by me is:**

   WesternGeco LLC

2. **The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

   WesternGeco LLC

3. **All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:**

   WesternGeco LLC is an indirectly, wholly owned subsidiary of Schlumberger Limited, which is a publicly-traded company.

4. **The names of all law firms and the partners or associates that appeared for the party or *amicus* now represented by me in the trial court or are expected to appear in this court are:**

   Sean D. Jordan
   JACKSON WALKER L.L.P.

## TABLE OF CONTENTS

Certificate of Interest .......... i

Table of Authorities .......... iii

Interest of *Amicus Curiae* .......... 1

Argument .......... 7

I. Longstanding Doctrines Limiting Agency Authority Preclude the Conclusion That Congress Insulated PTAB Decisions Under Section 315(b) from Judicial Review. .......... 7

1. *Achates* Failed to Apply the Strong Presumption in Favor of Judicial Review. .......... 7

2. Judicial Review is Available to Ensure Agencies Act Within the Scope of Their Authority. .......... 10

3. The AIA Should Be Construed To Avoid Constitutional Concerns. .......... 12

II. Judicial Review is Necessary To Preserve the Balance Congress Struck in the AIA, and To Prevent Gamesmanship by Patent Challengers. .......... 14

Conclusion .......... 28

Proof of Service .......... 30

Certificate of Compliance .......... 31

# TABLE OF AUTHORITIES

## Cases

*Achates Reference Publishing, Inc. v. Apple, Inc.*,
803 F.3d 652 (Fed. Cir. 2015) .......... 4, 8, 12, 28

*Bowen v. Mich. Acad. of Family Physicians*,
476 U.S. 667 (1986) .......... 7, 8, 10, 12-13

*City of Arlington, Tex. v. F.C.C.*,
133 S.Ct. 1863 (2013) .......... 10

*Click-to-Call Tech., LP v. Oracle Corp.*, No. 2015-1242,
2016 WL 6803054 (Fed. Cir. Nov. 17, 2016) .......... 12, 13

*Cuozzo Speed Technologies, LLC v. Lee*,
136 S.Ct. 2131 (2016) .......... *passim*

*Johnson v. Robison*,
415 U.S. 361 (1974) .......... 8, 14

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) .......... 10

*Mach Mining, LLC v. E.E.O.C.*,
135 S.Ct. 1645 (2015) .......... 8, 9, 26-27

*Marbury v. Madison*,
5 U.S. 137 (1803) .......... 7

*MCM Portfolio LLC v. Hewlett-Packard Co.*,
812 F.3d 1284 (Fed. Cir. 2015) .......... 25

*Synopsis, Inc. v. Mentor Graphics Corp.*,
814 F.3d 1309 (Fed. Cir. 2016) .......... 24

*United States v. Nourse*,
34 U.S. 8 (1835) .......... 7

*WesternGeco L.L.C. v. ION Geophysical Corp. ("WesternGeco I")*, 953 F.Supp.2d 731 (S.D. Tex. 2013) .......... 15

*WesternGeco L.L.C. v. ION Geophysical Corp. ("WesternGeco II"),* 791 F.3d 1340 (Fed. Cir. 2015), *vacated by* *WesternGeco LLC v. ION Geophysical Corp.*, 136 S.Ct. 2486 (2016) .......... 15, 16, 18

*WesternGeco L.L.C. v. ION Geophysical Corp. ("WesternGeco III")* 837 F.3d 1358 (Fed. Cir. 2016) .......... 16, 18

*WesternGeco LLC v. ION Geophysical Corp.*, 136 S.Ct. 2486 (2016) .......... 15, 16

*Wi-Fi One, LLC v. Broadcom Corp.*, 837 F.3d 1329 (Fed. Cir. 2016) .......... 11

**Statutes**

5 U.S.C. § 702 .......... 8

5 U.S.C. § 706 .......... 8

5 U.S.C. § 706(2)(C) .......... 10

35 U.S.C. § 100 *et seq.* .......... 3

35 U.S.C. §§ 301-307 .......... 3

35 U.S.C. §§ 311-319 .......... 3

35 U.S.C. § 314(a) .......... 4, 9, 14

35 U.S.C. § 314(d) .......... 4, 9, 14

35 U.S.C. § 315(a)(1) .......... 11

35 U.S.C. § 315(b) .......... *passim*

35 U.S.C. § 315(c) .......... 25

**Rules and Regulations**

37 C.F.R. 104(a) .......... 11

37 C.F.R. 42.3(b) .......... 11

FED. R. APP. P. 29(c)(5) .......... 3

**Other Authorities**

*Hewlett-Packard Co. v. MCM Portfolio LLC*, IPR2013-00217, 2013 WL 8595889 (P.T.A.B. Sept. 10, 2013) .......... 25

S. REP. NO. 752 (1945) .......... 10

*Synopsis, Inc. v. Mentor Graphics Corp.*, IPR2012-00042, 2014 WL 722009 (P.T.A.B. Feb. 19, 2014) .......... 24

*Target Corp. v. Destination Maternity Corp.*, IPR2014-00508, 2015 WL 636415 (P.T.A.B. Feb. 12, 2015) .......... 24, 25

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* WesternGeco LLC is a geophysical exploration company that invests substantial resources into developing and patenting technology designed to overcome challenges faced by the seismic surveying industry. Accordingly, WesternGeco relies on the predictability and regularity of the patent laws.

WesternGeco has a particular interest in the question presented for the *en banc* Court's review. Like Appellant Wi-Fi One, WesternGeco has experienced the negative effects of gamesmanship premised on abuse of Section 315(b)'s timeliness bar. Specifically, after investing in years of costly patent litigation, and obtaining a judgment in its favor, WesternGeco found itself mired in untimely, duplicative, collateral attacks through IPR processes initiated by the contracting partner and customer of WesternGeco's litigation adversary. And, just as happened in this case, the PTAB denied WesternGeco's repeated discovery requests regarding the relationships between the patent-infringement

---

[1] No party, party's counsel, or person other than *amicus curiae* and counsel for *amicus curiae* authored this brief, in whole or in part, or contributed money towards its preparation and filing. FED. R. APP. P. 29(c)(5).

defendant and the stalking horse IPR petitioner, thwarting WesternGeco's due process rights with no possibility of judicial review under *Achates*. *See infra* Part II; *see also WesternGeco LLC v. Petroleum Geo-Services, Inc., ION Geophysical Corporation, ION International S.A.R.L.*, Nos. 2016-2099, -2100, -2101; and *WesternGeco LLC v. Petroleum Geo-Services, Inc.*, Nos. 2016-2332, -2333, -2334.

*Amicus* WesternGeco has a strong interest in the fairness, accuracy, and integrity of the patent system, including the interaction between IPRs and district court infringement proceedings, both as a respondent in IPR proceedings to defend its patent rights, and as a participant in litigation to enforce those rights. The question before the *en banc* Court concerns an issue that directly addresses the integrity of IPR proceedings and their interplay with district court patent litigation.

TO THE HONORABLE U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT:

The America Invents Act (AIA), 35 U.S.C. § 100 *et seq*, created several new procedures for challenging patents in the U.S. Patent and Trademark Office (PTO), including *inter partes* review (IPR), which supplements the *ex parte* reexamination system and replaced its variant, *inter partes* reexamination.[2] The new IPR procedures provide patent challengers with expanded participation rights, creating within the PTO a Patent Trial and Appeal Board (PTAB) to conduct review proceedings, reach conclusions, and set forth its reasons. *Cuozzo Speed Technologies, LLC v. Lee*, 136 S.Ct. 2131, 2137 (2016).

The IPR procedures were enacted to fulfill two purposes: (1) to provide an efficient alternative to district court litigation over the validity of a patent and (2) to enable the PTO to review a previously granted patent in order to combat the perception that too many low-quality patents were being issued. *Cuozzo*, 136 S.Ct. at 2143-44. Despite congressional intent to provide an efficient *alternative* to litigation, the IPR process is increasingly being used *in addition* to

[2] *See* 35 U.S.C. §§ 311-319 (supplanting the *inter partes* reexamination procedure); 35 U.S.C. §§ 311-17 (pre-AIA—enacted in 1999); 35 U.S.C. §§ 301-07 (supplementing *ex parte* reexamination).

district court litigation to mount a second attack on a patent, thereby unsettling the careful balance struck by Congress in the AIA.

Section 314(a) of the AIA provides a "[t]hreshold" requirement that the Director determine that an IPR petition shows "a reasonable likelihood that the petitioner would prevail." 35 U.S.C. § 314(a). Section 314(d) provides that the agency's initial decision "whether to institute an inter partes review under this section shall be final and nonappealable." 35 U.S.C. § 314(d). Section 315 provides a separate bar to the institution of an IPR proceeding: "An inter partes review *may not be instituted* if the petition requesting the proceeding is filed more than 1 year after the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent." 35 U.S.C. § 315(b) (emphasis added).

The question raised here is whether a PTAB finding under Section 315(b)'s timeliness requirement is insulated from all judicial review by virtue of being decided in connection with a determination to institute an IPR proceeding under Section 314. It is not. As discussed herein, the Court's contrary decision in *Achates Reference Publishing, Inc. v. Apple, Inc.*, 803 F.3d 652 (Fed. Cir. 2015), contravenes well-established

principles limiting agency authority and thwarts Congress' design for IPR procedures to streamline the resolution of patent disputes.

First, longstanding doctrines concerning the scope of agency authority preclude the conclusion that Congress insulated decisions concerning Section 315(b)'s timeliness requirement from judicial review. To begin, there is a strong presumption in favor of judicial review of all agency actions that cannot be overcome as to Section 315(b) given the text and purpose of the AIA. Further, agencies have traditionally been judicially confined to the express scope of the power granted them by Congress, and Section 315(b) serves as just such a limitation on the PTAB's authority to institute proceedings. In addition, allowing the PTAB unchecked authority under Section 315(b) raises constitutional questions, particularly concerning Due Process, that should be avoided through a narrow construction of Section 314(d)'s restriction on judicial review of agency action. These guiding principles uniformly point in the direction of Congress knowingly preserving judicial review of Section 315(b) decisions.

Second, left undisturbed *Achates* will only exacerbate grave problems of gamesmanship that have arisen under the IPR regime,

undermining congressional intent to provide an efficient and less costly alternative to litigation. Litigants have deployed creative theories designed to use IPR procedures as a "second bite at the apple" to collaterally attack patent claims that have already been fully litigated, rather than as an alternative path to resolving patent-validity challenges. And the PTAB has increasingly accepted them, even though such stratagems work directly against the AIA's design, frustrating rather than furthering its objectives.

The consolidated cases in this appeal—and a similar appeal currently pending before this Court involving *amicus curiae* WesternGeco LLC—provide stark examples of the misuse of the IPR process that has been enabled by the *Achates* decision. The *en banc* Court should take this opportunity to overrule *Achates* and hold that patent owners are permitted to seek judicial review of a PTAB finding that an IPR petitioner satisfied the timeliness requirement of 35 U.S.C. § 315(b).

# ARGUMENT

## I. LONGSTANDING DOCTRINES LIMITING AGENCY AUTHORITY PRECLUDE THE CONCLUSION THAT CONGRESS INSULATED PTAB DECISIONS UNDER SECTION 315(b) FROM JUDICIAL REVIEW.

Three doctrinal principles governing agency decision-making demonstrate Congress intended to subject PTAB timeliness findings under Section 315(b) to judicial review.

### 1. *Achates* Failed to Apply the Strong Presumption in Favor of Judicial Review.

As Wi-Fi One noted in its supplemental *en banc* brief, neither the now-vacated panel decision in this case, Wi-Fi Suppl. Br. at 13, nor the *Achates* decision upon which the panel decision was founded, Wi-Fi Suppl. Br. at 34-35, began with the proper analytical framework: There is a "strong presumption in favor of judicial review" of agency actions that can be overcome only by "clear and convincing indications . . . that Congress intended to bar [judicial] review," *Cuozzo* 136 S.Ct. at 2140 (quotation omitted). This presumption flows from early principles of civil liberty and the protection of the laws laid out by Chief Justice Marshall, *see Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 671 (1986) (citing *United States v. Nourse*, 34 U.S. 8 (1835); *Marbury v. Madison*, 5 U.S. 137 (1803)), and the presumption finds its current

home both in legislative pronouncements (for example, in the Administrative Procedure Act, *e.g.* 5 U.S.C. §§ 702, 706), and in the longstanding jurisprudence of the Supreme Court, *e.g. Cuozzo*, 136 S.Ct. at 2140; *Johnson v. Robison*, 415 U.S. 361, 367-68 (1974).

To overcome this strong presumption, the agency bears "a heavy burden" to show that Congress "prohibited all judicial review of the agency's compliance with a legislative mandate." *Mach Mining, LLC v. E.E.O.C.*, 135 S.Ct. 1645, 1651 (2015) (citation and punctuation omitted). The agency must satisfy its burden with "clear and convincing indications . . . that Congress intended to bar review," *Cuozzo*, 136 S.Ct. at 2140, and "where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling," *Bowen*, 476 U.S. at 672 n.3.

Among the reasons the Court should overrule *Achates* is that it failed to account for the strong presumption in favor of judicial review, relying instead only on an analysis whether a Section 315(b) timeliness decision was "jurisdictional." *Achates*, 803 F.3d at 657-58. Applying the strong presumption of judicial review to the question at hand makes

*Achates*' error plain. As just one example, Section 314(d)'s bar on judicial review is explicitly limited to decisions rendered "under this section;" *i.e.*, the petitioner's reasonable likelihood of success, 35 U.S.C. 314(a). Deciding whether a petitioner's real party in interest or privy previously was served with a complaint alleging patent infringement occurs under a different section, Section 315(b). Section 314(d) does not express "clear and convincing indications" that the PTAB's real-party-in-interest and privy decisions under Section 315(b) are beyond the reach of judicial review. *See* Wi-Fi Suppl. Br. at 15-17, 35-40.

The Supreme Court recently acknowledged the necessity of preserving judicial review over agency action: "Absent such review, the [agency's] compliance with the law would rest in the [agency's] hands alone . . . Congress knows []that legal lapses and violations occur, and especially so when they have no consequence. That is why this Court has so long applied a strong presumption favoring judicial review of administrative action." *Mach Mining*, 135 S.Ct. at 1652-53. Sections 314 and 315 of the AIA do not even come close to providing the "clear and convincing indications" necessary to overcome the strong

presumption that judicial review is available for a PTAB decision that a petition is not time-barred under section 315(b).

### 2. Judicial Review is Available to Ensure Agencies Act Within the Scope of Their Authority.

Agencies are powerless to act beyond the scope of Congress' authorization: "an agency literally has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *see also Bowen*, 476 U.S. at 671 (noting Congress' intent that agencies are "'judicially confined to the scope of authority granted or to the objectives specified'" in statute, lest administrative officers be given "'blank checks'") (quoting S. REP. NO. 752, at 26 (1945)); 5 U.S.C. § 706(2)(C) (instructing that reviewing courts "shall hold unlawful and set aside agency action, findings and conclusions found to be in excess of statutory jurisdiction, authority, or limitations . . . "). And an agency action taken beyond the scope of its congressional authorization is *ultra vires*. *City of Arlington, Tex. v. F.C.C.*, 133 S.Ct. 1863, 1869 (2013).

As the Supreme Court recently confirmed in *Cuozzo*, the PTAB is not afforded an opportunity "to act outside its statutory limits" or to act "in excess of statutory jurisdiction." 136 S.Ct. 2141-42. The PTAB has

no discretion to institute an IPR for a time-barred petitioner. 35 U.S.C. § 315(b) ("An inter partes review may not be instituted . . ."); *see also* 35 U.S.C. § 315(a)(1) (same). Thus, this is not an issue of any deference to be afforded to agency discretion, nor a determination in which particular agency expertise bears upon the agency's decision. Indeed, the PTO recognizes as much in its own regulations. *See* 37 C.F.R. 42.3(b) (noting in a section called "Jurisdiction" that "[a] petition to institute a trial must be filed with the Board consistent with any time period required by statute"); 37 C.F.R. 104(a) (recognizing that the time-bar in section 315(b) implicates a petitioner's standing).

As Judge Reyna has observed, *Cuozzo* "does not enable the agency to act outside its statutory limits" thus "allegations that the [PTAB] has ignored, or erred in the application of, the statutory time bar" in Section 315(b) are "properly reviewable." *Wi-Fi One, LLC v. Broadcom Corp.*, 837 F.3d 1329, 1341 (Fed. Cir. 2016) (Reyna, J., concurring) (citing *Cuozzo*, 136 S.Ct. at 241-42). Likewise, *Cuozzo* explained that judicial review would be available for an IPR proceeding that addressed a statutory provision (Section 112) that Congress did not authorize the PTAB to consider (only challenges under §§102-03 are authorized). *See*

*Click-to-Call Tech., LP v. Oracle Corp.*, No. 2015-1242, 2016 WL 6803054, *2 (Fed. Cir. Nov. 17, 2016) (O'Malley, J., concurring) (citing *Cuozzo*, 136 S.Ct. at 2141-42). And Judge O'Malley has correctly noted that the same reasoning would apply "to the [PTAB's] institution of an IPR proceeding contrary to the direct statutory command that" an untimely IPR "'*may not be instituted*.'" *Id.* at *2 (quoting 35 U.S.C. § 315(b); emphasis in original).

Finally, in holding that the PTAB's timeliness finding under Section 315(b) was not judicially reviewable, the *Achates* Court acknowledged that the patent holder failed to argue that the PTAB's decision to institute an IPR was outside the scope of the PTAB's statutory authority. *Achates*, 803 F.3d at 659. Thus, this Court did not make its decision on a fully briefed and presented argument in *Achates*; the *en banc* Court should now reverse that erroneous decision.

### 3. The AIA Should Be Construed To Avoid Constitutional Concerns.

Agency actions implicating the constitutional rights of private entities demand yet another hurdle before they can be insulated from judicial review. Statutes purporting to deny a constitutional challenge to agency action would raise a "serious constitutional question," *Bowen*,

476 U.S. at 681 n.12 (quotation and citations omitted), and must be narrowly construed to avoid that result, if possible.

As demonstrated *infra* in Part II and in Wi-Fi One's supplemental brief, *see* Wi-Fi Suppl. Br. 9-12, PTAB timeliness decisions under Section 315(b) are often made after the PTAB has refused patent owners' requests for discovery into the relationships between the IPR petitioner and entities that have been sued (and lost) for patent infringement. Due Process demands that patent owners be permitted sufficient opportunity to defend their patents before the PTAB can cancel these valuable property rights. If the AIA actually did preclude judicial review of the Section 315(b) timeliness determination, then both the statute and the PTAB determinations would pose grave Due Process concerns for the property rights embodied in the challenged patents. *See Click-to-Call*, 2016 WL 6803054, *9 (Taranto, J., concurring) (recognizing that the need for judicial review of decisions related to Section 315(b)'s time bar stems, in part, from the possibility that definitive resolution of the Section 315(b) issue might not come until after the PTAB's institution decision, as additional discovery occurs and facts develop).

The Court would avoid this problem, of course, by narrowly construing Section 314(d) to preclude judicial review only of the "reasonable likelihood" determination made "under this section," 35 U.S.C. § 314(a), (d). *See Johnson*, 415 U.S. at 367 (recognizing there would be "serious questions concerning the constitutionality" of a statute if it were construed to bar federal courts from deciding constitutional questions and noting the "cardinal principle that [the Supreme Court] will first ascertain whether a construction of the statute is fairly possible by which the (constitutional) question(s) may be avoided") (citation omitted).

## II. JUDICIAL REVIEW IS NECESSARY TO PRESERVE THE BALANCE CONGRESS STRUCK IN THE AIA, AND TO PREVENT GAMESMANSHIP BY PATENT CHALLENGERS.

In addition to contravening established principles limiting agency authority, *see supra* Part I, the absence of judicial review endorsed by *Achates* encourages patent challengers to undermine the congressional design of the IPR process. Specifically, under *Achates* patent challengers are incentivized to devise new strategies to push the envelope of petition and initiation requirements, knowing that if any PTAB panel accepts their theory, the decision is irreversible.

Like Wi-Fi One, *amicus* WesternGeco has experienced firsthand the results of such unchecked gamesmanship of the IPR process. WesternGeco developed and patented superior technology used in geological surveys to search for oil and gas under the ocean floor. Under preexisting technology, a ship tows an array of streamers (miles long cables filled with sensors) over the area to be surveyed, and an air gun sends soundwaves toward the ocean floor and into the underlying geology. *WesternGeco L.L.C. v. ION Geophysical Corp.*, 791 F.3d 1340, 1343 (Fed. Cir. 2015) ("*WesternGeco II*"), *vacated by WesternGeco LLC v. ION Geophysical Corp.*, 136 S.Ct. 2486 (2016).[3] The sensors detect

[3] The vacated decision of this Court, *WesternGeco II*, addressed WesternGeco's suit against ION for infringement of several patents. *See WesternGeco L.L.C. v. ION Geophysical Corp.* ("*WesternGeco I*"), 953 F.Supp.2d 731 (S.D. Tex. 2013). The jury found infringement and no invalidity as to all asserted claims and awarded WesternGeco $93.4 million in lost profits and a reasonable royalty of $12.5 million. The jury also found that ION's infringement had been subjectively reckless under the "subjective" prong of the then-prevailing test. *WesternGeco II*, 791 F.3d at 1344. The district court denied WesternGeco's motion for enhanced damages for willful infringement. *WesternGeco I*, 953 F.Supp.2d at 753.

This Court affirmed the district court in all respects except as to lost profits. *WesternGeco II*, 791 F.3d at 1343. WesternGeco petitioned for certiorari requesting, *inter alia*, that the petition be held in view of *Halo Electronics, Inc. v. Pulse Electronics, Inc.* and *Stryker Corp. v. Zimmer, Inc.*, which involved the standard for enhanced damages.

soundwaves reflected off subsurface structures and use the reflected soundwaves to map the geology under the ocean. *WesternGeco II*, 791 F.3d at 1343. WesternGeco invented "lateral steering" technology that allows surveyors to control the positions of the streamers (and thus the sensors) and to turn the streamers actively, rather than simply pulling them behind the ship. *Id.* WesternGeco commercialized its inventions with the "Q-Marine," the first surveying system with lateral steering. *Id.*

In 2007 ION Geophysical Corporation (ION) began selling a competing survey system, the "DigiFIN," that infringed WesternGeco's patents for the Q-Marine. Petroleum Geo-Services, Inc. (PGS) is ION's contracting partner and customer. PGS specifically commissioned ION to design a "Next Generation Streamer Positioning System" to copy WesternGeco's capabilities and to compete with WesternGeco's

---

After the Supreme Court decided *Halo*, it granted certiorari in *WesternGeco II* and issued a GVR order remanding the case to this Court "for further consideration in light of *Halo*." 136 S.Ct. 2486. Recently, in *WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358 (Fed. Cir. 2016) ("*WesternGeco III*"), the Court vacated the judgment of the district court of no willful infringement by ION and remanded for further consideration of enhanced damages.

commercial embodiment Q-Marine. (Appx3650-3682).[4] In 2006 PGS and ION executed a "Launch Partner Agreement" to finalize and commercialize DigiFIN as a competitor to Q-Marine. (Appx3728-3732). ION then manufactured, and PGS used, the infringing system to break into the market WesternGeco's patented technology had created. (Appx6326-6343). PGS's arrangement with ION includes multiple indemnity agreements. (Appx4090). PGS concealed the vast majority of those agreements, producing only one—a Master Purchase Agreement between a PGS subsidiary and an ION subsidiary. The agreement included an indemnification clause obligating ION's subsidiary to indemnify PGS from any third-party claim (such as WesternGeco's) regarding breach of patent rights, and granted ION's subsidiary unilateral control of any action to remedy infringement. (Appx2069).

---

[4] Citations of (Appx___) reference by page numbers materials in the Appendix filed in the following consolidated appeals pending before this Court: *WesternGeco LLC v. Petroleum Geo-Services, Inc., ION Geophysical Corporation, ION International S.A.R.L.*, Nos. 2016-2099, -2100, -2101; and *WesternGeco LLC v. Petroleum Geo-Services, Inc.*, Nos. 2016-2332, -2333, -2334.

In 2009 WesternGeco sued ION for infringement. *WesternGeco II*, 791 F.3d at 1343; *see also* (Appx3733-3806). It is undisputed that ION knew of WesternGeco's patents before it was sued. A jury trial found ION to have infringed several of WesternGeco's patents. *WesternGeco II*, 791 F.3d at 1344. These findings were upheld on appeal to this Court, *id.* at 1343, and proceedings are ongoing in the district court—to determine whether and how much to enhance damages under 35 U.S.C. § 284. *See WesternGeco III*, 837 F.3d at 1364.

PGS actively participated in the ION litigation and was served with a subpoena. (Appx3808). Through its outside counsel, PGS appeared in the ION litigation and agreed to accept service of pleadings in that case, which included an amended complaint for patent infringement. (Appx3868). PGS also attended the trial at ION's invitation and raised comments and questions between their respective counsel. (Appx4072). PGS asserted a "common interest privilege" concerning communications with ION regarding "WG litigation" and "litigation interests" based on "Western[Geco]'s litigiousness on the subject of DigiFIN giv[ing] rise to a common legal interest regarding the patent infringement assertions." (Appx4141-4142; Appx4137-4140).

After the 2012 jury finding that ION willfully infringed several of WesternGeco's patents, (Appx1971-1978), PGS continued to meet with ION to discuss litigation evidence and arguments and the potential to collaterally attack the *ION* judgment. (Appx4083). Specifically, PGS asserted in the district court that "reversal or remand on substantive patent grounds [in the ION litigation] would curtail or extinguish Western[Geco]'s patent claims against ION, and by extension, Geo [*i.e.*, PGS]." (Appx4205, n.1). PGS later invoked its indemnification agreement with ION in 2012. (Appx4131).

WesternGeco also ultimately sued PGS separately for its related infringement using the same DigiFIN product in 2013. *See* Complaint, *WesternGeco L.L.C. v. Petroleum Geo-Services Inc.*, No. 4:13-cv-02725 (S.D. Tex. Sept. 16, 2013), ECF No. 1. PGS, in turn, invoked *res judicata* in the district court based on the ION litigation, alleging that its infringement and ION's infringement comprised a single claim. (Appx4205, n.1). That case remains stayed while the IPRs continue.

In 2014, PGS filed IPR petitions challenging the validity of the patents at issue in the ION litigation and the related litigation against PGS. *See, e.g.*, IPR2014-00687, IPR2014-00688, IPR2014-00689. ION

subsequently filed its own (otherwise untimely) IPR petitions and joined them with PGS's first-round IPRs on January 14, 2015. *See* IPR2015-00565, IPR2015-00566, IPR2015-00567.

When the petitions were filed, ION was undisputedly time-barred from filing its own petitions, as WesternGeco had sued ION five years earlier. Likewise, the statute would undisputedly bar *all* the IPR proceedings if ION were a real party in interest or privy of PGS. 35 U.S.C. § 315(b) (An IPR "may not be instituted if the petition requesting the proceeding is filed more than one year after the date on which the petitioner, *real party in interest*, or *privy* of the petitioner is served with a complaint alleging infringement of the patent." (emphases added)).

The PTAB, however, prevented WesternGeco from developing a full record and making the argument that ION was PGS's real party in interest or privy—and thus that both PGS and ION were barred from seeking *inter partes* review of the WesternGeco patents. Specifically, both before and after the PTAB's Institution determinations as to PGS's and ION's IPRs, WesternGeco repeatedly sought discovery regarding PGS's relationship with ION. But WesternGeco was denied any meaningful response by PGS and the PTAB.

For its part, PGS continually engaged in deliberate gamesmanship to evade producing evidence that it admitted exists and that is directly relevant to the Section 315(b) bar. For example, prior to Institution when WesternGeco served interrogatories requesting, *inter alia*, any indemnification agreements between PGS and ION, (Appx7043-7049), PGS admitted such agreements existed, (Appx4090), but failed to produce them. When WesternGeco followed up with additional interrogatories seeking similar information, PGS narrowed the scope of WesternGeco's interrogatories by unilaterally "redefining" the subpoena's definitions to exclude PGS's and ION's related operating companies. (Appx4081; Appx5416). WesternGeco brought this sleight of hand to the PTAB's attention when seeking leave to file a motion for additional discovery, but the PTAB nonetheless denied WesternGeco's requests. (Appx14109-14112).

After PGS's and ION's IPRs were instituted, PGS eventually produced a single Master Purchase agreement between its subsidiary and a subsidiary of ION. (Appx5383-5408). However, despite having admitted to the existence of multiple other agreements (Appx4090), which PGS also admitted "have provisions that relate to

indemnification," (Appx8547, 23:22-25), PGS refused to produce any of them. (Appx8546, 22:20-24). Again, despite PGS's plain gamesmanship, WesternGeco's request to even file a motion for additional discovery was denied. (Appx1312-1316; Appx8516-8517, 27:16-28:5; Appx8545, 21:21-24; Appx8551, 27:1-5). The PTAB went on to deny without comment WesternGeco's motion for rehearing on this point. (Appx1295-1311; Appx1313, n.3; Appx1557, n.4 (IPR2014-00687, Decision Denying Rehearing, Paper No. 98)).

Thus far, PGS and ION's gaming of the system has paid off. In its final decisions, the PTAB found several of WesternGeco's claims unpatentable on various grounds. (Appx1-360 (Final Written Decisions in IPR2014-00687, IPR2014-00688, IPR2014-00689, IPR2014-01475, IPR2014-01477, IPR2014-01478)). Those decisions are now on appeal before this Court. *See WesternGeco LLC v. Petroleum Geo-Services, Inc., ION Geophysical Corporation, ION International S.A.R.L.*, Nos. 2016-2099, -2100, -2101; and *WesternGeco LLC v. Petroleum Geo-Services, Inc.*, Nos. 2016-2332, -2333, -2334.

In sum, five years after WesternGeco initiated litigation on its Q-Marine patents against ION, and two years after a jury found ION

liable for infringement of WesternGeco's patents, ION's contracting partner and customer PGS initiated IPR proceedings challenging the validity of the already-litigated patents. With PGS as its stalking horse, ION itself later initiated IPR challenges that it joined with PGS's first-round challenges. After failing to prove invalidity to the district court at summary judgment, failing to prove invalidity to the jury at trial, failing to prove invalidity in post-trial motions, and waiving its right to appeal those failed defenses to this Court, ION was able to rely on PGS to bootstrap a collateral invalidity attack before the PTAB. The AIA was designed to prohibit, not encourage, exactly this type of duplicative, costly, and inefficient patent-dispute resolution. *See Cuozzo*, 136 S.Ct. at 2143-44 (describing the two goals of establishing the IPR process, including providing an *efficient alternative* to litigation). PGS and ION's gamesmanship of the IPR regime, like that confronted by Wi-Fi One in this litigation, frustrates rather than furthers the AIA's purpose of streamlining patent litigation and reducing costs.

Unfortunately, WesternGeco and Wi-Fi One's experiences are not unique. To the contrary, petitioners have begun to deploy novel end-

runs around the AIA's structural limitations, and PTAB panels have already accepted some of these attempts by crafting new legal theories and overlooking factual issues, all without this Court's oversight. For example, in *Synopsis, Inc. v. Mentor Graphics Corp.*, 814 F.3d 1309 (Fed. Cir. 2016), petitioner Synopsis faced the Section 315(b) time bar when, one day after filing its IPR petition, it acquired a company that had been sued more than a year earlier for infringing the patent in question. *Id.* at 1312-13. A panel of the PTAB endorsed Synopsis's theory that the acquired company was not the real party in interest or Synopsis's privy. The PTAB applied a formalistic analysis—unsupported by anything in the text of the AIA, which is governed by the timing of the institution by the PTAB, not the filing by the petitioner, *see* 35 U.S.C. § 315(b)— that "it is only relationships up until the time a petition is filed that matter." *Synopsis*, IPR2012-00042, 2014 WL 722009, at *7 (P.T.A.B. Feb. 19, 2014). This Court refused to review that analysis. *Synopsis*, 814 F.3d at 1314.

Another notable example of this trend is *Target Corp. v. Destination Maternity Corp.*, IPR2014-00508, 2015 WL 636415 (P.T.A.B. Feb. 12, 2015), a case in which the PTAB permitted an

existing petitioner to avoid the time bar by moving for "joinder" of a new petition-filed by *the same party*—raising new issues to petitioner's own previously filed IPR. *Compare* 35 U.S.C. § 315(c) (allowing Director to "join *as a party*" those who meet certain standards (emphasis added)), *with* Decision Granting Petitioner's Request for Rehearing at 13, *Target* (P.T.A.B. Feb. 12, 2015).

As shown in these examples, PTAB panels have repeatedly selected the statutory construction that expands the PTAB's "discretion to move forward . . . where a petitioner . . . may not bring a . . . petition because of a § 315(b) bar." Decision Granting Petitioner's Request for Rehearing at 13, *Target* (P.T.A.B. Feb. 12, 2015); *see also MCM Portfolio LLC v. Hewlett-Packard Co.*, 812 F.3d 1284, 1287-88 (Fed. Cir. 2015) (holding unreviewable the PTAB's determination that "MCM does not provide persuasive evidence that HP and Pandigital are privies for purposes of § 315(b)," Institution Decision at 7, *Hewlett-Packard Co. v. MCM Portfolio LLC*, IPR2013-00217, 2013 WL 8595889, at *7 (P.T.A.B. Sept. 10, 2013)).

Like WesternGeco and Wi-Fi One's experiences, these examples reflect two ways in which the unreviewability rule invites a swell of IPR

petitions pushing against statutory limitations. First, they demonstrate that certain statutory restrictions, particularly Section 315(b)'s time limits and provisions governing privies and real parties in interest, have already been loosened in the absence of judicial review. Second, they reflect how petitioners can successfully evade statutory limitations with a novel theory, so long as a single PTAB panel accepts it. That is particularly so because (as WesternGeco and Wi-Fi One have seen) the PTAB routinely denies even the most minor discovery requests that might allow an IPR defendant to demonstrate the existence of a privity relationship for purposes of the time bar. Essentially, patent challengers know that the PTAB is likely to miss or ignore a privity relationship, and under *Achates* no court will ever be permitted to do anything about it. This is precisely the problem Justice Kagan foretold in *Mach Mining*:

> Absent such review, [an agency's] compliance with the law would rest in [the agency's] hands alone. We need not doubt [an agency's] trustworthiness, or its fidelity to law, to shy away from that result. We need only know—and know that Congress knows—that legal lapses and violations occur, and especially so when they have no consequence. That is why [the Supreme Court] has so long applied a strong presumption favoring judicial review of administrative action.

135 S.Ct. at 1652-53.

In sum, recent history shows that patent challengers have been emboldened by the *Achates* unreviewability rule. Given the pattern of successful end-runs around the time bar, if *Achates* is left undisturbed patent challengers will continue to have every incentive to pursue duplicative IPR petitions, rather than use the IPR process as the *alternative* to litigation intended by Congress.

* * *

Proper interpretation of Section 314(d) to preclude judicial review of a PTAB's "reasonable likelihood" determination makes perfect sense, because judicial review of the PTAB's final decision regarding patent validity will encompass the preliminary decision on the challenger's likelihood of success. Indeed, *Cuozzo* repeatedly recognizes that the Section 314(d) determination is meant to be unreviewable because it is merely a preliminary determination. *E.g.*, *Cuozzo*, 136 S.Ct. at 2140 ("The Patent Office's decision to initiate inter partes review is 'preliminary,' not 'final.'"); *id.* ("preliminary decision to institute [IPR]"). But in expanding Section 314(d)'s judicial-review bar to include Section 315(b)'s timeliness bar, *Achates* insulates entirely from judicial review

the critical inquiry into whether the particular IPR petitioner has timely filed. This is not what Congress intended.

The Court should overrule *Achates* and reject its misreading of Congress's evident intent concerning Section 315(b). The judicially enforceable requirements of Section 315(b) provide reasonable certainty that patents that have been successfully asserted and validated in litigation will not be subjected to unending, serial, collateral attacks in the Patent Office by the defendant—or its privies, allies, and hired guns—bringing duplicative IPR petitions. Enforced in a uniform manner by this Court, Section 315(b) will help achieve Congress' intended balance, where IPR functions as an alternative pathway for invalidating meritless patents but not as an opportunity to game the system for defendants who have long since lost an infringement suit regarding a meritorious patent.

## CONCLUSION

The Court should overrule *Achates Reference Publishing, Incorporated v. Apple, Incorporated*, 803 F.3d 652 (Fed. Cir. 2015) and hold that judicial review is available for patent owners to challenge a

PTAB decision that an IPR petitioner satisfied the timeliness requirement of 35 U.S.C. § 315(b).

Dated: February 23, 2017

Respectfully submitted,

/s/ Sean D. Jordan
Sean D. Jordan
JACKSON WALKER L.L.P.
100 Congress Ave., Suite 1100
Austin, Texas 78701
[Tel.] (512) 236-2281
[Fax] (512) 391-2101
*sjordan@jw.com*

COUNSEL FOR AMICUS CURIAE

## PROOF OF SERVICE

The undersigned hereby certifies that on February 23, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

The undersigned further certifies that service of paper copies of the foregoing will be accomplished in accordance with the guidance provided in the Court's order on petition for rehearing dated January 4, 2017.

/s/ Sean D. Jordan
Sean D. Jordan

## CERTIFICATE OF COMPLIANCE

Counsel for *Amicus Curiae* WesternGeco LLC hereby certifies that:

1. The brief complies with the type-volume limitation of this Court because exclusive of the exempted portions it contains 5,271 words as counted by the word processing program used to prepare the brief; and

2. The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Office Word 2010 in a proportionately spaced typeface: Century, font size 14.

Dated: February 23, 2017

/s/ Sean D. Jordan
Sean D. Jordan